Jay J. Schuttert, Esq.
Nevada Bar No. 8656
David W. Gutke, Esq.
Nevada Bar No. 9820
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 900
Las Vegas, NV 89101
Telephone: (702) 805-0290
Facsimile: (702) 805-0291
Email: jschuttert@efstriallaw.com
Email: dgutke@efstriallaw.com

Andrew Weaver (*pro hac vice*)
POLSINELLI PC
1000 Louisiana Street, 53rd Floor
Houston, TX 77002
Telephone (713) 374-1600
Facsimile: (713) 374-1601
Email: aweaver@polsinelli.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNIVERSAL ENTERTAINMENT CORPORATION, a Japanese corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ARUZE GAMING AMERICA, INC., a Nevada corporation, KAZUO OKADA, an individual<br><br>Defendants. | **CASE NO.:  2:18-CV-585 (RFB) (GWF)**<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR LEAVE TO FILE THE FIRST AMENDED COMPLAINT** |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR LEAVE TO FILE THE FIRST AMENDED COMPLAINT**

**I.     INTRODUCTION**

Plaintiff Universal Entertainment Corporation ("UEC") opposes the Motion to Dismiss filed by Defendants Aruze Gaming America, Inc. ("AGA") and Kazuo Okada ("Okada") (collectively "Defendants") based on Rule 12(b)(6) of the Federal Rules of Civil Procedure.  UEC also respectfully requests leave to file its First Amended Complaint (attached hereto as Exhibit A and hereinafter

1

referred to as "Ex. A") pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Defendants' Motion to Dismiss ("Motion") should be denied.  Additionally, UEC should be granted leave to file its First Amended Complaint.

## II.   FACTUAL SUMMARY

On March 30, 2018, UEC filed suit against AGA and Okada raising claims of patent infringement, tortious interference, breach of fiduciary duty, fraudulent misrepresentation and unjust enrichment.  *See generally* Complaint, Docket No. 1 (hereinafter "Compl.").  The Complaint accuses each Defendant of different tortious acts.  Specifically, AGA (a company solely owned and controlled by Okada) is accused of patent infringement of UEC's `472, `473, `013 and `047 patents in Counts One through Four.  *See* Compl. ¶¶ 76-98.  AGA is accused of infringing these patents through AGA's unauthorized manufacture, sale and offer for sale, etc. of the Accused Products.  *Id.*  Further, AGA is accused of inducing and contributing to the infringement of these four UEC patents.  *Id.*  Okada himself is not accused of patent infringement.

In addition to AGA's patent infringement, UEC accuses Okada and AGA of several State law torts.  Okada is accused of Tortious Interference (Count Five), Breach of Fiduciary Duty (Count Six), Fraudulent Misrepresentation (Count Seven) and Unjust Enrichment (Count Eight).  *See* Compl. ¶¶ 99 – 125.  AGA is accused only of Tortious Interference (Count Five) and Unjust Enrichment (Count Eight).  *Id.* at ¶¶ 99 – 104 and ¶¶ 121 – 125.

On May 29, 2018, Defendants AGA and Okada moved for dismissal of certain claims pursuant to Rule 12(b)(6).  *See generally*, Motion, Docket No. 13.  Specifically, AGA moves for dismissal of the patent infringement counts (Counts One through Four) based on a supposed "oral license" granted by Okada essentially to himself (AGA).  Motion at 9-10.  Next, AGA moves for dismissal of the contributory infringement aspect of Counts One through Four because UEC supposedly failed to identify specific components sold by AGA.  *Id.* at 10-11.  AGA also moves, with respect to Counts One and Two for limitations of damages based on the doctrine of "intervening rights" because the `472 and `473 patents are reissue patents under 35 U.S.C. § 252.  *Id.* at 12-14. With respect to UEC's state law claims against Okada and AGA, the Defendants argue that certain claims are "preempted" by Federal Patent Law.  *Id.* at 15-20.  Further AGA argues that UEC's tortious interference claim fails to

2

1  identify third party agreements or opportunities that were usurped or interfered with.  *Id.* at 20-22.

2  Finally, Okada argues that UEC's fraudulent misrepresentation claim failed to particularly identify

3  Okada's misrepresentations sufficiently.  *Id.* at 23-24.

4  **III.   LEGAL STANDARD**

5        **A.   Dismissal Under Rule 12(b)(6)**

6        Rule 8(a)(2) of the Federal Rules of Civil procedure requires only "a short plain statement of

7  the claim showing that the pleader is entitled to relief" in order "to give the defendant fair notice of

8  what the…claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

9  544, 555 (2007).   A plaintiff must plead facts showing that a violation is plausible, not just possible.

10  *Ashcroft .v Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555) (emphasis added).   The

11  complaint must contain "factual content that allows the court to draw the reasonable inference that the

12  defendant is liable for the misconduct alleged."  *Id.*   However, when considering whether the complaint

13  is sufficient to state a claim pursuant to Rule 12(b)(6), the court will take all material allegations as

14  true and construe them in the light most favorable to the plaintiff.  *See Faulkner v. ADT Sec. Services,*

15  *Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013); *see also NL Indus., Inc., v. Kaplan*, 792 F.2d 896, 898 (9th

16  Cir. 1986).

17        **B.   Leave to Amend Under Rule 15(a)(2)**

18        Federal Rule of Civil Procedure 15(a)(2) provides that with leave of the Court, a party may

19  amend its pleading and that "the court should freely give leave when justice so requires." Fed. R. Civ.

20  P. 15(a)(2).   Courts consider five factors when assessing a motion for leave to amend: (1) bad faith; (2)

21  undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and, (5) whether the

22  plaintiff has previously amended the complaint. *See Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir.

23  2004).   In making this assessment, the court must remain guided by the underlying purpose of Rule 15,

24  which is to facilitate decision on the merits, rather than on the pleadings or technicalities.  *Id.*

25        Here, considerations of undue delay, undue prejudice and the existence of previous

26  amendments are easily resolved – none exist.   This case is in its infancy and no discovery or significant

27  activity has occurred to date beyond Defendants' Motion.   Accordingly, only the aspect of "futility"

28  needs to be addressed.   In this regard, "a proposed amendment is futile *only if no set of facts can be*

*proved* under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Sweaney v. Ada Cnty., Idaho,* 119 F.3d 1385, 1393 (9th Cir. 1997) (emphasis added). "Absent a showing of the aforementioned factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon*, 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original); *Spencer v. Kohl's Dept. Stores, Inc.*, 2015 WL 5766109 at *1 (D. Nev., September 29, 2015) ("In general, leave to amend under Rule 15 should be denied only where there is a 'showing of bad faith, undue delay, futility or undue prejudice to the opposing party.").

## IV.    DISCUSSION

### A.    The Complaint Properly Pleads Patent Infringement by AGA

The originally filed Complaint accuses AGA of infringing UEC's `472, `473, `013 and `047 patents (Counts One through Four, respectively). *See* Compl. ¶¶ 76-98. Defendants seek dismissal of these Counts arguing that the Complaint itself alleges facts supporting the notion that Mr. Okada (a former Officer and former Chairman of the Board of Directors for UEC) granted a royalty-free, oral license to AGA -- a company that Mr. Okada wholly owns and controls. Motion at 10.

The incongruity of Defendants' argument prevents it from being seriously entertained. If the Court were to grant dismissal on the basis that Okada granted AGA (essentially a creature of Okada himself) a royalty-free license with no compensation to UEC, the patent owner, then Defendants would be tacitly conceding and admitting that Okada engaged in self-dealing in breach of his fiduciary duty to UEC (Count Six) on a massive scale. Further, the unjust profits obtained from this breach of fiduciary duty would constitute an admission to Okada's unjust enrichment at UEC's expense (Count Seven). However, putting these admissions aside, the Defendants' fantasy of an "oral" license agreement is unsupportable in view of the law and the express allegations of the Complaint.

There are at least three fatal flaws with Defendants' argument. First, Defendants simply pretend not to understand the differences between a person's management responsibilities as opposed to a person's possession of power to execute a contract on behalf of a company. Indeed, the question (as Defendants put it) is not whether *everyone* at UEC needed to approve a license; rather, the question is whether Okada had the authority to grant AGA an oral, consideration free license agreement without even memorializing this grant in writing.

Second, assuming for the sake of argument that Okada had the power to grant AGA an oral, consideration free license, *nowhere* in the Complaint—contrary to Defendants' argument—is it alleged that Okada actually granted AGA a license.  In fact, the Complaint repeatedly alleges that this did not occur.  While Defendants attempt obfuscation by asserting that "the Complaint alleges that AGA's actions with respect to the use of UEC's Asserted Patents were expressly authorized by Mr. Okada … and by Mr. Yaegashi, General Manager of UEC's Patent Department from 2002 to 2013," none of the cited paragraphs of the Complaint (¶¶ 3, 4, 50, 53-55, 61-64 and 70) support the Defendants' argument.

Finally, assuming that Okada had the authority to grant a license to AGA and assuming that Okada granted such a license to AGA, the question then becomes whether the supposed license meets the legal requirements of an enforceable contract.  Even a cursory examination of this question amply demonstrates that the legal requirements of an enforceable contract were not met.  Accordingly, the originally filed Complaint properly pled patent infringement and the First Amended Complaint is not futile.

### 1. Okada Lacked the Power to Engage in Self-Dealing Under Japan's Companies Act

Okada could not have unilaterally granted a patent license to his personally-owned company, AGA, because Japanese corporate law prohibits such self-dealing.  Under Japan's Companies Act (the law regulating how Japanese companies may operate), Mr. Okada did not have authority to approve a license of UEC's patent rights to his own, separate company, without first making a full disclosure of the relevant facts (e.g., that the license would be compensation-free) to the other directors and without first obtaining approval of the entire Board of Directors.  Article 356(1) of the Japan Companies Act provides:

> In the following cases, a director shall disclose the material facts on the relevant transactions at a shareholder's meeting and obtain approval of the shareholder's meeting:
> (i) If a director intends to carry out, for himself/herself or for a third party, any transactions in the line of business of a Stock Company;
> (ii) If the director intends to carry out any transactions with the Stock Company for himself/herself or for a third party; or
> (iii) If a Stock Company intends to guarantee debts of a director or otherwise to carry out any transactions with a person other than the director that results in a conflict of interests between the Stock Company and such director.

1  Japan Companies Act, Article 356(1).[1]  Where a company, like UEC, has a Board of Directors,

2  approval by "shareholder's meeting" is replaced with approval by the "board of directors." *Id.* at Article

3  365(1).

4  　　　　If such a license were granted, by Okada, each provision of Article 356(1) would be violated.

5  By purportedly granting a license to Mr. Okada's own company, AGA, to make and sell slot machine

6  games covered by UEC's patents, Mr. Okada would be "carry[ing] out, for himself/herself [Okada] or

7  for a third party [AGA], [a] transaction in the line of business of [UEC; namely the patented slot

8  machine games]." *See* Japan Companies Act, Article 356(1)(i).  Furthermore, the grant of a royalty

9  free patent license to AGA—a company unaffiliated with UEC and wholly owned and controlled by

10  Mr. Okada - - would be "carry[ing] out [a] transaction with [UEC; namely the purported patent license

11  agreement under UEC's patent rights] for himself/herself [Okada] or for a third party [AGA]." *See Id.*

12  at (ii).  Finally, even if Article 356(1)(ii) is not violated, a license to Mr. Okada's wholly-owned

13  company under UEC's patent rights, with no compensation to UEC, would result in a "conflict of

14  interest" with UEC under Japan Companies Act, Article 356(1)(iii).  *Id.* at (iii).

15  　　　　Okada would have been required to make a full disclosure of the material facts regarding the

16  purported royalty-free license to AGA to the UEC Board of Directors, which he did not.  *See* Compl.

17  ¶¶ 54-56, 64, 66, 67-68, 72.  Similarly, the UEC Board of Directors had to authorize the transaction,

18  which it did not (*see above*).  Accordingly, Defendants' "license" theory fails as a matter of law and

19  the originally filed Complaint was proper.

20  　　　　　　　　**2.   The Complaint Repeatedly Alleges that No Authorization Was Granted**

21  　　　　AGA additionally argues that the originally filed Complaint somehow alleges that AGA had

22  UEC's blessing to exploit UEC's valuable patents.  Motion at 8-9.  Defendants willfully misread the

23  allegations set forth in the Complaint.  Repeatedly, the Complaint expressly alleges that AGA had no

---

24  [1] This translation of Japan Companies Act, Article 356(1) is provided by the Japan Ministry of Justice and can

25  be accessed at this website:
http://www.japaneselawtranslation.go.jp/law/detail/?ft=1&re=2&dn=1&co=01&ia=03&x=64&y=18&ky=com

26  panies&page=19.  While the English translation is not the "Official Text" of the Japanese law, the Ministry of
Justice provides the translations "as reference materials to aid in the understanding of Japanese laws and

27  regulations."     Japanese     Law     Translation,     About     Law     Data,     accessible     at
http://www.japaneselawtranslation.go.jp/law/about_lawdata/?re=2.     *See also* Fed. R. Civ. P. 44.1 ("In

28  determining foreign law, the court may consider any relevant material or source, including testimony, whether
or not submitted by a party or admissible under the Federal Rules of Evidence.").

authority to practice the Asserted Patents. *See e.g.*, Compl. at ¶¶ 54, 55, 56, 66, 72, 77, 81, 85, 92, 110 and 113.   As just one example, the Complaint alleges that:

> This split in responsibility further facilitated Okada's ability to manufacture and sell gaming devices through AGA, gaming devices that used UEC's patent rights, including the Asserted Patents, ***without compensation to UEC or authorization from UEC*** by ensuring that those with potential knowledge and responsibility over UEC's foreign business reported to Okada, rather than others.

Compl. ¶ 55 (emphasis added).   Likewise, with respect to each of Counts One through Four, UEC specifically alleges that AGA practiced the Asserted Patents without authorization:

> AGA has infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the `472 patent (claim 1 *et seq.*) by manufacturing, providing, selling, offering to sell, importantly and/or distributing ***without authority,*** the infringing slot machines....

Compl. at ¶ 77; *see also id.* at ¶¶ 81, 85 and 92 (emphasis added).   Accordingly, AGA's "oral license" theory fails again and the original filed Complaint was proper.

### 3. Defendants' Supposed Oral, Consideration-Free License is Unenforceable

While it is true that certain licenses may be royalty free, even royalty-free licenses must be supported by consideration.   Nevada (as elsewhere) requires legally enforceable contracts to "be supported by consideration." *Jones v. SunTrust Mortg., Inc.*, 128 Nev. 188, 191 (2012).   The Complaint alleges repeatedly that no compensation (i.e., consideration) was provided to UEC for AGA's use of the Asserted Patents. Compl. at ¶¶ 54, 55, 56, 66, 72, 77, 81, 85, 92, 110 and 113. No consideration exists and none was argued by Defendants. Finally, Nevada contracts require an offer and an acceptance along with a meeting of the minds regarding the essential terms of a contract. *Certified Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371, 378 (2012) ("Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of minds and consideration").

Finally, Defendants appear to concede that no written license exists. *See* Motion at 10. U.S. Patents 8,088,013 and 8,246,047 issued over five years ago in 2012 (*see* Compl. Exhs. C, D), and patents RE46,472 and RE46,473 issued nearly a year ago, in July 2017. (*See* Compl. Exhs. A, B). As a result, the "oral" license Defendants argue was granted to AGA would have initiated in 2012 and extend until the patents expire.   The `047 patent expires in 2024; the `472 and `473 patents expire in

2029; the `013 patent expires in 2030. That alleged license is unenforceable under Nevada's Statute of Frauds, which voids these types of purported oral agreements:

> Agreements not in writing:  When void.  In the following cases every agreement is void, unless the agreement, or some note or memorandum thereof expressing the consideration, is in writing, and subscribed by the person charged therewith:
>     1.   Every agreement that, by its terms, is not to be performed within 1 year from the making thereof ....

NRS 111.220(1).

Because the purported "oral" license allegedly granted to Mr. Okada's company AGA extends until at least 2024 – six years from now – the alleged agreement is not capable of being performed within one year.  As a result, the alleged license would be void under Nevada's Statute of Frauds.  *See* NRS 111.220(1); *see also Sun Studs, Inc., v. Applied Theory Associates, Inc.*, 772 F.2d 1557, 1562-63 (Fed. Cir. 1985) (affirming trial court's summary judgment that Statute of Frauds voids purported oral patent license agreement:  "[T]he Supreme Court and the Ninth Circuit have applied the Statute of Frauds to oral agreements which grant a license under a patent whose remaining term is more than one year") (citing *Packet Co. v. Sickles*, 72 U.S. (5 Wall.) 580, 595 (1867)); *Schick Service, Inc. v. Jones*, 173 F.2d 969, 975-77 (9th Cir. 1949).  Accordingly, Defendants' "license" theory, under which AGA was granted an "oral" license under UEC's patents, fails under the Statute of Frauds, even if it were true.

For at least the foregoing reasons, the Court should deny Defendants' motion to dismiss Counts One through Four against AGA relating to patent infringement.

## B.   The Complaint Properly Pleads Contributory Infringement by AGA

Additionally, AGA argues that UEC failed to properly plead contributory infringement pursuant to 35 U.S.C. § 271(c).  Specifically, AGA argues that UEC failed to identify a "component" that has no "substantial non-infringing use."  Motion at 11.  AGA's argument lacks substance and should be denied, particularly in light of the proposed First Amended Complaint, which moots any argument AGA might have had.

Contributory infringement requires that "a component of a patented machine, ... be especially made ... for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use."  35 U.S.C. § 271(c).  Generally, to properly plead

8

contributory infringement "a plaintiff must, among other things, plead facts that allow an *inference* that the components sold or offered for sale have no substantial non-infringing uses." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (emphasis added).   Non-infringing uses are "substantial" when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant or experimental.  *See Vita-Max Corp. v. Basic Holdings, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009).

In the original Complaint, Plaintiff properly pleaded sufficient facts that allow an inference to be drawn that AGA has sold or offered for sale components of its slot machines having no substantial non-infringing use.  Specifically, the Complaint alleged that AGA's slot machines are dedicated gaming machines, with components having specific shapes making up the gaming machines and structures which can only be assembled together to form the infringing gaming machines.  *See* Compl. ¶¶ 77-79, 81-83, 85-90, 92-98.  As such, these dedicated, specific components cannot be characterized as "staple articles" or "commodities," a factual conclusion necessary underlying the supposition that they have no substantial non-infringing use.  Further, spare or replacement parts supporting unauthorized products fall squarely within contributory infringement.  *See Aro Mfg. Co. v. Convertible Top Co.*, 365 U.S. 336, 492-93 (1961).

First, the G-ENEX families of slot machines, specifically accused of infringing the `472 and `473 patents, include components that have no substantial non-infringing uses.  Such components include, *inter alia*, a cabinet with a front opening covered by a hinged front door as well as an operation table that projects forward from the door and has an asymmetrical front edge that establishes a recess side of the table disposed toward the side of the door including the hinge and a protrusion side of the table opposite the hinged side of the door. Compl. ¶¶ 77-79 and 81-83.  Such components (for example, a hinged front door, or an asymmetric front edge) making up the slot machines are specifically shaped to assemble and function specifically with one another and cannot be characterized as staple articles or commodities.  These components are made specifically for the dedicated gaming machines and have no substantial non-infringing use.

Second, the G-ENEX, G-COMFORT, G-STATION, AND CUBE-X families of slot machines, which are accused of infringing the `013 patent, include components that have no substantial non-

infringing use.  Such components include, *inter alia*, a second box housed by a first box, the second box including a control board that includes a central processing unit.  Compl. ¶¶ 86-87.  The front member has side walls and covers components required for executing the game and define a first space, a plurality of cables extend from the second box to the first space.  *Id.* Additionally, these families of slot machines have an exhaust portion provided in a side wall of the front member, with the plurality of cables extending out of the first space via the exhaust portion.  *Id.*.  One or more of these components of the accused slot machines of these families have a structure and function specifically to assemble with one another and cannot be characterized as staple articles or commodities but are made specifically for the dedicated gaming machines and have no substantial non-infringing use.  *Id.*

Third, additional AGA slot machine games and game families alleged to infringe the `047 patent include components having no substantial non-infringing uses.  Such slot machine games and game families have a display including a plurality of independently rotatable reels, rotatable about a common axis and includes one symbol (e.g., stylized "Wild" symbol and 7 symbols) that appears serially at least two times without any intervening different symbol and each symbol appears on each of the real sheets.  Compl. ¶¶ 92-93.  Additionally, the Complaint recites facts showing that these have at least two straight lines (3 lines) when the reels are stopped, wherein the alignment on at least one of the lines of any specific combination of symbols show a winning state for the player and all other combinations of the symbols on the straight lines do not provide a winning state for the player.  *Id.* Again, these components, for example reels and displays, are made specifically for one another and cannot be characterized as staple articles or commodities but are made specifically for the dedicated gaming machines and have no substantial non-infringing use.  *Id. at* ¶¶ 86-87.

Because factual conflicts or disputes must be resolved in favor of UEC, the allegations of the Complaint as originally filed are more than sufficient to satisfy the requirements of contributory infringement.  In any event, the proposed First Amended Complaint provides additional detail regarding contributory infringement to further describe that the accused slot machines are sold as integrated units and/or as one or more separate components as replacement parts as part of service agreements.  *See* Ex. A, at ¶¶ 80, 85, 93 and 102.  Further, the Amended Complaint expressly recites the lack of any substantial non-infringing use for such components.  *Id.* To the extent that the Court

1    deems the original Complaint as insufficiently detailed in its pleading of contributory infringement,

2    the proposed First Amended Complaint addresses any such concern and is not futile.

3                    **C.    AGA Lacks Intervening Rights**

4            With respect to the `472 and `473 reissue patents (Counts One and Two), AGA makes a set of

5    confused and ultimately defective arguments with respect to "intervening rights."   Motion at 12-14.

6    Generally, "intervening rights" arise in two forms.   The first type of intervening rights, "absolute"

7    intervening rights, are statutory (35 U.S.C. § 252) and only limit *past* liability before the patent's

8    reissue date, but does not limit liability for post-reissuance infringement.   The second type of

9    intervening rights, "equitable" intervening rights, are judge-made and potentially look forward after

10   reissuance, but with limitations.   As set forth below, AGA's intervening rights arguments do not

11   warrant dismissal pursuant to Rule 12(b)(6) and the original Complaint was proper.

12                    **1.    Legal Requirements of Intervening Rights**

13           Absolute intervening rights protect against infringement of a claim that does not come out of

14   reissuance with substantially identical scope as an original claim.   If none of the claims coming out of

15   reissue have substantially identical scope to an original claim, there will be no damage for infringement

16   before the claims reissued.   That is, if the scope of a claim after reissue is not substantially identical to

17   the scope of an original claim of the patent prior to reissue, there is an absolute prohibition to a damage

18   award for infringing activity, pre-reissue.   However, if a claim is reissued that has a scope substantially

19   identical to an original claim, damages for infringement before and during reissue can be assessed.  *See*

20   35 U.S.C. § 252 ("but in so far as the claims of the original and reissued patents are substantially

21   identical, such surrender shall not affect any action then pending nor abate any cause of action then

22   existing.").

23           Equitable intervening rights are limited by principals of equity and require a fact-intensive

24   examination of multiple factors including: "(1) whether substantial preparation was made before the

25   reissue; (2) whether there are existing orders or contracts; (3) whether non-infringing goods can be

26   manufactured from the inventory used to manufacture the infringing product and the cost of

27   conversion; and, (4) whether the infringer has made profits sufficient to cover its investment."  *See*

28   *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 756 F.2d 1574, 1579-80 (Fed. Cir. 1985).

Moreover, because equitable intervening rights rely on a determination of equity, the Court may also consider the relative degree of good faith or bad faith exercised by the accused infringer. *Id.*

For the reasons set forth below, it appears that AGA is *only* arguing for absolute intervening rights and therefore the remainder of this argument addresses only the issue of absolute intervening rights. However, to the extent that AGA is attempting to argue for equitable intervening rights, because of the intensive factual determinations that would be required, and because AGA does not present any evidence to support such facts, and because the Complaint is replete with allegations of AGA's bad faith, it would be inappropriate to dismiss pursuant to Rule 12(b)(6).

### 2. Dismissal is Not Warranted Because of AGA's Continuing Infringement

Since absolute intervening rights only preclude liability for infringement *prior to* the issuance of a reissue patent claim, the existence of absolute intervening rights could only result in the dismissal of Counts One and Two if AGA had ceased its infringement prior to the issuance of the reissued `472 and `473 patents. Indeed, AGA implies that the Complaint does not allege post-issuance, continuing infringement. Motion at 14 (Counts One and Two "should be dismissed to the extent they accuse gaming machines that predate the 2017 reissue[s]."). However, the Complaint is not so limited. The Complaint clearly and repeatedly makes clear that AGA's infringement is continuing in nature:

> 77.    On information and belief, AGA has infringed and ***continues to infringe,*** ... one or more claims of the `472 patent (claim 1 *et seq.*) by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority, the infringing slot machines....
> \*\*\*\*
> 81.    On information and belief, AGA has infringed and ***continues to infringe,*** ... one or more claims of the `473 patent (claim 14 *et seq.*) by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority, the infringing slot machines ....

Compl. ¶¶ 77, 81. (Emphasis added). Indeed, UEC is aware of AGA releasing entirely new infringing games after the reissuance of the `472 and `473 patent.

### 3. AGA is accused of Infringing Multiple Independent Claims

AGA also attempts to argue that the Complaint only alleges that AGA infringes a limited set of claims. This is not a fair reading of the Complaint; regardless, the proposed First Amended Complaint makes explicit that more than one independent claim is infringed by AGA.

With respect to the `472 patent, Count One of the Complaint expressly alleges that AGA infringes "one or more claims of the `472 patent (claim 1 *et seq.*)." Compl. at ¶ 77.   Claim 1 is not the only independent claim of the `472 patent. Compl., Ex. A. The statement in the Complaint regarding the `472 patent was not intended to exclude the possibility of infringement of other claims.   The proposed First Amended Complaint expressly calls out AGA's infringement of at least claim 1 of `472 patent. *See* Ex. A, ¶ 77 ("AGA has infringed and continues to infringe, …, at least claim 1 of the `472 patent").

Similarly, with respect to the `473 patent, Count Two of the Complaint expressly alleges that AGA infringes "*one or more claims* of the '473 patent…" Compl. ¶ 81 (emphasis added).   While UEC specifically points to claim 14 which newly issued on July 11, 2017, the issue date of the '473 patent, AGA's infringement is not limited merely to claim 14 and its dependent claims. In other words, the Complaint as drafted highlights claim 14, but does not exclude other independent claims and the claims that depend therefrom. To that end, UEC specifically asserts AGA's infringement of at least claims 1 and 14 of the `473 patent in the Amended Complaint. *See* Ex. A, ¶ 82 ("AGA has infringed and continues to infringe … at least claims 1 and 14 of the `473 patent").

### 4.   AGA Fails to Examine "Claim Scope"

Since AGA continues to infringe both the `472 and `473 patents and infringes multiple independent claims within the `472 and `473 patents, AGA's other argument in favor of absolute intervening rights can be addressed.   Specifically, AGA argues that it has the "statutory right to continue the use of, to offer to sell, and to sell to others to be used, offered or sale, the accused gaming machines that AGA made, purchased, offered to sell, or used within the United States, or imported into the United States, prior to the grant of these reissue patents [the `472 and '473 patents] on July 11, 2017, because none of the asserted claims in the reissue patents was in the original patent." Motion at 14.

However, simply being an "original" claim is not the test for absolute intervening rights. Instead, the test involves an examination of claim scope.   35 U.S.C. § 252.   If a claim's scope is "substantially identical" to the scope of an original claim, then no intervening rights attach. *Id.*   Here, AGA correctly points out that claim 1 of the `472 patent and claim 14 of the `473 patent received

1    amendments during the reissue process; however, AGA fails to sufficiently analyze the scope of the

2    original and amended claim to determine whether their scopes are "substantially identical." *See*

3    *generally*, Motion at 12-14.

4        AGA incorrectly argues that the addition of the term "operation table" to each of the

5    independent claims 1, 6, and 10 of the `472 patent to overcome an 35 U.S.C. § 112, second paragraph,

6    rejection during the reissue prosecution means that the claim has been substantively changed. *See*

7    Motion at 14, citing *Laitram Corp. v. NEC.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998). What AGA fails to

8    point out, however, is that the Federal Circuit in *Laitram Corp.* "arrive[s] at [their] conclusion, not

9    through any 'per se rule,' but in light of an overall examination of the written description, the

10   prosecution history and the language of the respective claims. *Id.* AGA simply wants the Court to apply

11   a per se rule and presume substantial scope changes to the claim without conducting the extensive

12   analysis that is required, contrary to *Laitram*.

13       With respect to the `472 patent, perhaps AGA could potentially – if it performed the necessary

14   analysis of the claim scope – show that all of the independent claims are not "substantially identical"

15   to the original claim scope.  However, for purposes of AGA's Motion, the fact remains that AGA

16   simply pointed out the existence of amendments and asks the Court to assume that the amendments

17   substantially changed the claims' scope.  For purposes of a motion to dismiss, this is insufficient.[2]

18       Moreover, with respect to the `473 patent, even a cursory review of the amended claim language

19   reveals the non-substantive and cosmetic character of the amendments.  In response to a rejection under

20   35 U.S.C. § 112, ¶ 2 for being unclear, UEC amended independent claims 1, 6, and 10 to recite "'which

21   <u>operation table</u> extends along the width direction of the front door,' **for clarity**" and dependent "'claims

22   3, 4, 7, 8, 11 and 12 "<u>which operation table</u> has substantially the same width as the front door,' to

23   obviate the rejection." Patent Owner Response in App. No. 14/962,087 dated December 19, 2016 at p.

24   13 (underlining showing additions).  While the words of the amended claims 1-13 that matured as the

25   `473 patent are not literally identical to the original claims, the scope of these claims did not change.

26   As such, no intervening rights under 35 U.S.C. § 252 have triggered. *See Slimfold Mfg. Co., Inc. v.*

27

28   _____

[2] In any event, even if the Court were inclined to credit AGA's argument, that would only impact UEC's ability to obtain pre-issuance damages and not impact UEC's ability to recover for AGA's continuing infringement.

14

*Kinkead Industries, Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987) (holding that amending a claim in reissue directed to a metal door, merely to provide antecedent basis for the "collar" element already recited in the claim, did not substantially amend the claim).

### 5. Intervening Rights Have Not Been Established by AGA and Would Not Result in Dismissal of Counts One or Two

In summary, AGA is simply mistaken that the original Complaint did not allege continuing, present infringement by AGA. As a result, Counts One and Two of the Complaint relating to the `472 and `473 patents cannot be dismissed – only the extent that UEC can recover pre-reissue damages can be questioned. Further, as addressed above, AGA does not sufficiently analyze claim scope, but simply assumes a claim scope change from the mere existence of an amendment. Finally, with respect to the `473 patent, the proposed First Amended Complaint specifically accuses AGA of infringing reissued independent claim 1 which clearly retains its original scope.

### D. UEC's State Law Claims are Not Preempted

Defendants argue that UEC's state law claims against Okada (Counts Five, Six and Eight) and against AGA (Count Five and Count Eight) are preempted by Federal Patent Law. Defendants do not argue that Count Seven based in fraudulent misrepresentation against Okada is preempted. Defendants argue that because "there is no patent infringement, those tort claims fail to state a claim for relief." Motion at 15. However, as detailed above, UEC's patent infringement claims against AGA are viable.

While Defendants are correct that "state law that conflicts with federal law is 'without effect,'" the Defendants neglect to address the heavy presumption that exists against the preemption of state law. *See Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1331-1332 (Fed. Cir. 1998), *overruled in part on other grounds by Midwest Industries, Inc. v. Karavan Trailers, Inc.*, F.3d 1365, 50 U.S.P.Q.2d 1672 (Fed. Cir. 1999); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("The historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.")

With this presumption against preemption in mind, Supreme Court precedent establishes three mechanisms of preemption -- "explicit," "field" and "conflict" preemption. *Hunter Douglas,* 153 F.3d

1    at 1332.  Patent Law does not provide for explicit preemption.  *Hunter Douglas,* 153 F.3d at 1332.

2    ("[F]ederal patent law plainly does not provide for explicit preemption.").

3        "Because pre-emption is an affirmative defense, a defendant seeking to set aside state law bears

4    the burden to prove impossibility." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 634-35 (2011) (citing *Crosby*

5    *v. National Foreign Trade Council*, 530 U.S. 363, 372-373 (2000)).  "To prevail on this defense, a

6    defendant must demonstrate that 'compliance with both federal and state [law] is a physical

7    impossibility.'" *Id.* (citing *Florida Lime & Avacado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143

8    (1963)).  "'The existence of a hypothetical or potential conflict is insufficient to warrant' pre-emption

9    of state law." *Id.*

10       "Field" preemption requires a finding that the "scheme of federal regulation [is] so pervasive

11   as to make reasonable the inference that Congress left no room for the States to supplement it." *Hunter*

12   *Douglas,* 153 F.3d at 1332 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  As

13   explained by the Federal Circuit in *Hunter Douglas*, Congress clearly did not intend to preempt unfair

14   competition style state torts:

15           [T]here is no reason to believe that the clear and manifest purpose of Congress was for
             federal patent law to occupy exclusively the field pertaining to state unfair competition
16           law.   Because of the lack of such congressional intent, in conjunction with the
             underlying presumption disfavoring preemption, there is no field preemption of state
17           unfair competition claims that rely on a substantial question of federal patent law.

18   *Hunter Douglas,* 153 F.3d at 1333; *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S.

19   141, 166 (1989) ("Both the law of unfair competition and state trade secret law have coexisted

20   harmoniously with federal patent protection for almost 200 years, and Congress has given no indication

21   that their operation is inconsistent with the operation of federal patent laws.").  Indeed, with respect to

22   unfair competition-style claims, because of the "states' long-standing governance of [contractual and

23   marketplace] affairs," the presumption against preemption is reinforced. *Hunter Douglas,* 153 F.3d at

24   1334 (citing *Medtronic, Inc.*, 518 U.S. 485).  Moreover, the Supreme Court has repeatedly stated that

25   federal patent law issues housed in a state law cause of action are fully capable of being adjudicated

26   even if there is no accompanying federal claim. *See e.g. Hawthorn v. Lovorn*, 475 U.S. 255, 266 n. 18

27   (1982); *Pratt v. Paris Gaslight & Coke Co.*, 168 U.S. 255, 257-59 (1897).

28

1         Accordingly, all that remains for Defendants to argue is "conflict" preemption.  "For conflict

2 preemption, we consider whether the state law actions frustrate 'the accomplishment and execution of

3 the full purposes and objectives of Congress.' "  *Hunter Douglas,* 153 F.3d at 1335; *Hines v.*

4 *Davidowitz,* 312 U.S. 52, 67 (1941).  This means that if a tort action is based on "conduct that is

5 protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy….

6 Conversely, if the conduct is not so protected or governed, then the remedy is not preempted." *Hunter*

7 *Douglas,* 153 F.3d at 1335.  However, a state law is not preempted unless **"every fact situation that**

8 **would satisfy the state law is in conflict with federal law**."  *Hunter Douglas,* 153 F.3d at 1335

9 (emphasis added) (citing *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987)).

10         Simply put, Defendants have not shown that "every fact situation that would satisfy state law

11 is in conflict with federal law," as required by the "conflict" preemption analysis set forth by the

12 Supreme Court.  Further, many of the cases relied upon by Defendants are simply inapplicable as they

13 represent attempts by plaintiffs to become quasi-inventors or quasi-owners of patents using state law.

14 *See e.g., Tavory v. NTP*, 297 Fed.Appx. 976, 983 (Fed. Cir. 2008) ("Tavory cannot sidestep § 262 [joint

15 ownership] through a state law unjust enrichment claim").

16         Other cases relied upon by Defendants attempted to create quasi-patent rights that were contrary

17 to the Patent Act.  *See e.g., Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1380-1381

18 (2005) ("If Ultra-Precision's unjust enrichment claim were available, a would-be inventor need not

19 satisfy any of the rigorous standards of patentability to secure a perpetual patent-like royalty under

20 state law based on the use of an unpatented idea"); *Waver v. Ford Motor Co.*, 331 F.3d 851, 856-857

21 (holding Waver could not use state law unjust enrichment to create a quasi-patent right after placing

22 his idea in the public domain); *General Elec. Co. v. Wilkins*, 2011 WL 3163348, at *8 (E.D. California,

23 July 26, 2011) (holding that defendant's unjust enrichment claim to be preempted where defendant

24 alleged to be the true owner of patents since "Defendant's unjust enrichment claim makes no distinction

25 between the general licensing revenue Plaintiff has obtained from the `585 and `985 Patents and any

26 portion of such revenues attributable to 'false exclusivity.'").

27         Still other cases relied upon by the Defendants are inapplicable because the plaintiff attempted

28 to use state law to police patent-holder's enforcement of patent rights or conduct by patent applicants

before the USPTO. *See e.g.*, *CardioVention, Inc. v. Medtronic, Inc.*, 430 F.Supp.2d  933, 939 (D. Minn. 2006) ("CardioVention's claim, as plead, is an attempt to remedy conduct before the PTO, rather than marketplace misconduct."); *Core Wireless Licensing S.a.r.l. v. Apple Inc.*, 2015 WL 4775973, at * 4 (E.D. Tex. August 11, 2015) ("The Court fails to see how the relief requested, as pled here, would not result in a 'patent-like royalty for the making, using or selling of a product in the public domain.'"); *Neonatal Product Group, Inc. v. Shields*, 276 F.Supp.3d 1120, 1151 (D. Kansas 2017) (Counterclaim defendant arguing "it is inequitable to allow Neonatal to 'benefit from the [patent] by selling the machine disclosed in the patent and marking the machine with that number, while refusing to pay royalties to the patent owner."); *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1373 (holding that "a claim of infringement of a foreign patent does not constitute a claim of unfair competition within the meaning of [28 U.S.C. §] 1338(b) .").

### 1.   UEC's Breach of Fiduciary Duty Claim Against Okada is Not Preempted

Defendants argue that UEC's breach of fiduciary duty claim against Okada is preempted. Motion at 19-20. In essence, UEC accuses Okada of engaging in a form of self-dealing. Through other tortious and fraudulent means, Okada abused and manipulated his position at UEC to obscure and shield AGA – a company that Okada solely and completely owns, controls and profits from – against compensating UEC for AGA's unauthorized use of the Asserted Patents. *See* Compl. ¶¶ 105 – 111.

Defendants cite only the single case of *Del Madera Properties* in support of its' preemption argument. Motion at 20. However, this case grounded in Copyright law simply does not apply. *See Del Madera Properties v. Rhodes and Gardner, Inc.*, 820 F.2d 973 (9th Cir. 1987). First, Copyright law expressly sets forth a test to analyze whether a claim is preempted by Copyright law in 17 U.S.C. § 301 and accordingly it was this statutory framework that was analyzed in *Del Madera Properties*. *Id.* at 976 ("Section 301 of the Copyright Act establishes a two-part test for preemption."). No analogous provision exists in patent law. Further, as the Ninth Circuit explained, the unfair competition claim based on a breach of fiduciary duty was dismissed because no fiduciary duty existed, not because of preemption. *Id.* at 978 ("Defendants, however, were never in a fiduciary relationship with Del Madera. McCart may have been, but she is not a party to this action. Since the defendants were not

1    in a fiduciary relationship with Del Madera, they did not breach a fiduciary duty owed to Del

2    Madera."). Additionally, UEC submits that the preemption argument set forth by Defendants fails for

3    the reasons presented above.

### 2.    UEC's Unjust Enrichment Claim Against AGA is Not Pre-Empted

5        To demonstrate "conflict" preemption, Defendants must show that "every fact situation that

6    would satisfy the state law is in conflict with federal law." *Hunter Douglas,* 153 F.3d at 1335 (citing

7    *California Coastal Comm'n*, 480 U.S. at 580). Defendants do not conduct any analysis of the elements

8    of unjust enrichment and apply them the factual allegations of the Complaint. This simply fails to meet

9    the burden of demonstrating preemption, because as the Supreme Court stated in *Bonito Boats*, state

10   law torts have "coexisted harmoniously with federal patent protection for almost 200 years." *Bonito*

11   *Boats*, 489 U.S. at 166.

12       Defendants rely on several cases that do not apply here. These include the *Tavory, Ultra-*

13   *Precision* and *General Elec.* decisions (dealing with self-proclaimed co-owners or co-inventors), and

14   the *Core Wireless* and *Waner* decisions (dealing with quasi-patent theories where the product had been

15   in the public domain). None of these scenarios are analogous to the unjust enrichment claims pled in

16   the Complaint.

17       Similarly, Defendants' reliance on *Veto* is misplaced. While Defendants pull a pithy quote that

18   superficially resembles the situation here, this surface analysis is insufficient to establish preemption.

19   In contrast to *Veto*, the present Complaint does much more than simply copy and paste the allegations

20   of patent infringement under the heading "unjust enrichment." Rather, the Complaint sets forth in

21   detail Okada's numerous gyrations and misdeeds and how he personally and his company AGA

22   unjustly benefited. *See e.g,.* Compl. ¶¶ 49-75. These factual allegations are largely unnecessary to

23   plead patent infringement against AGA and indeed Okada is not himself accused of patent infringement

24   such that no preemption could exist with respect to the unjust enrichment of Okada.

25       Further, Defendants' arguments fail to analyze the elements of unjust enrichment and the

26   remedies available under unjust enrichment in Nevada. A defendant may be unjustly enriched by, for

27   example, inequitably accepting and retaining a benefit. *See e.g., Kennedy v. Carriage Cemetery*

28   *Services, Inc.*, 727 F.Supp.2d 925, 932 (D. Nev. 2010). This benefit need not be limited to monetary

proceeds deriving from patent infringement – which is limited to the making, using, sale, etc. of patented articles. *See* 35 U.S.C. §§ 271, 284. Further, unjust enrichment provides for different potential remedies as compared with patent infringement – such as *quantum meruit* and restitution. *See Leasepartners Corp. v. Robert L. Brooks Trust*, 113 Nev. 747, 755 (1973); *Morrow v. Barger*, 103 Nev. 247, 252 (1987). The point here is not to argue the merits of unjust enrichment, but rather to point out that the Defendants have failed to establish that "every fact situation that would satisfy the state law is in conflict with federal law." *Hunter Douglas,* 153 F.3d at 1335 (citing *California Coastal Comm'n* , 480 U.S. at 580).

### 3.   UEC's Tortious Interference Claim Against AGA is Not Pre-Empted

"[C]laims of tortious interference or unfair competition are not preempted by strict liability patent infringement claims because the tort claims require proof of knowledge or intent, or other elements that ensure that the claims are not inconsistent with, or duplicative method for the enforcement of patent rights." *Am. Traffic Sols., Inc. v. B&W Sensors, LLC*, 2014 WL 1272509, at *4 (E.D. Mo. 2014); *see also California Table Grape Com'n v. RB Sandrini, Inc*., 2007 WL 1847631, at *27 (E.D. Cal. 2007) (finding that state law claims for unfair competition and tortious interference are not preempted by direct infringement action because they require proof of different elements than infringement action). Similarly, Defendants' arguments regarding preemption of tortious interference claims also fail to establish that "every fact situation that would satisfy the state law is in conflict with federal law." *Hunter Douglas,* 153 F.3d at 1335. Again, the allegations against AGA and Okada go beyond merely AGA's patent infringement. Specifically, the Complaint alleges that AGA had knowledge of and interfered with UEC's relationships with potential customers of UEC and potential licensees of the Asserted Patents. *See* Compl. ¶¶ 100-101. The fact that this interference relates to AGA's unauthorized exploitation of the Asserted Patents does not make UEC's tortious interference claims carbon copies of its patent infringement claims against AGA. Just as one, non-limiting example, patent infringement generally reaches the manufacture, sale and use of unauthorized patented articles (35 U.S.C. § 271); however, tortious interference can reach *prospective* contracts and relationships that are not consummated and intentionally thwarted by the other party's conduct. This fact and the fact

1    that tortious interference requires an element of intent, whereas patent infringement can be a strict

2    liability offense is more than sufficient to show that the claims are different.

3            Once again, Defendant's authority is misplaced.   In *A.K Stamping Co., Inc. v. Instrument*

4    *Specialities Co., Inc.*, summary judgment was granted on a tortious interference claim because the

5    elements of the claim were not met, not based on preemption. 106 F. Supp. 2d 627, 649 (D.N.J. 2000).

6    In *CardioVention*, the tortious interference claim was held to be preempted because it was an attempted

7    to regulate conduct before the PTO, not marketplace misconduct. *CardioVention*, 430 F. Supp. at 939-

8    40. *Mars* did not even involve a tortious interference claim. *Mars*, 24 F.3d 1368 (Fed. Cir. 1994).

9            Finally, to the extent that the Defendants are arguing that tortious interference is preempted in

10   this case because AGA's exploitation of the Asserted Patents is "authorized" due to the "oral" license

11   purportedly granted to AGA by Okada, this argument fails for the reasons set forth above.

12                        **E.      The Complaint Properly Pleads Tortious Interference**

13           Defendants' Motion also alleges that UEC's claim for tortious interference with prospective

14   economic advantage should be dismissed as the Complaint does not identify any prospective contract

15   with which Defendants allegedly interfered, any third party with whom UEC purportedly had a

16   prospective contract, or any interference by the Defendants.   The Defendants' particular concern

17   appears to be in connection with the identification of a third party.   Motion at 21 ("UEC does not

18   identify any third party with which UEC had a prospective contract; instead, UEC identifies only

19   'contracts or relationships . . . with respect to licensing of Asserted Patents.").[3]

20           The Complaint as originally filed, does give the impression that the Defendants' interference

21   with UEC's "contracts or relationships with its customers and potential customers with respect to

22   licensing of the Asserted Patents" constitutes the entirety of UEC's allegations. Compl. ¶ 100.   The

23   proposed First Amended Complaint expressly accuses Okada of interfering with UEC's prospective

24   contractual relationship with AGA.   As between UEC and Okada, AGA is a third party.   While the

25   

26   [3] Defendants do not appear to substantively challenge any of the other elements of tortious interference: (1) the
     existence of a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the
27   defendant of that prospective relationship; (3) an intent to harm the plaintiff by preventing or interfering with
     the prospective contractual relationship; (4) the absence of privilege or justification by the defendant; and (5)
28   actual harm to the plaintiff as a result of the defendant's conduct. *See Leavitt v. Leisure Sports, Inc.*, 734 P.2d
     1221, 1225 (Nev. 1987).

original Complaint made this clear in paragraphs 61 through 66, which detail Okada's undermining and ultimate termination of license negotiations between UEC and AGA, the First Amended Complaint more clearly describes this conduct in the body of Count Five. *See* Ex. A, ¶ 104.  Likewise, in connection with AGA, the proposed First Amended Complaint expressly accuses AGA of interfering with UEC's prospective relationship with other manufacturers of slot machine games such as International Game Technology, Inc., Aristocrat Leisure Ltd., and Scientific Games Corp., who are part of a patent cross-licensing arrangement and that AGA interfered with UEC's attempt to join this arrangement. *See* Ex. A, ¶ 104.

## F. The Complaint Pleads Fraudulent Misrepresentation With Particularity

While Okada feigns an inability to discern the nature this claim against him (Motion at 24), even a superficial examination of the Complaint demonstrates the reflexive nature of Okada's arguments.  Under Nevada law, fraudulent misrepresentation requires: (1) a false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation.  *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).  The complaint must include "averments to the time, the place, the identity of the parties involved, and the nature of the fraud."  *Rocker v. KPMG LLP*, 148 P.3d 703, 708 (Nev. 2006), *abrogated on other grounds by Buzz Stew, LLC v. City of N. Las Vegas, 124 Nev. 224, 228 n. 6, 181 P.3d 670, 672 n.6 (*2008).  However, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."  Nev. R. Civ. P. 9(b).  All of these elements are set forth in the Complaint with more than sufficient particularity.

In summary, the Complaint alleges that Okada positioned himself to act as the gatekeeper for the dissemination of critical patent-related information to the Board of Directors and Officers of UEC. *See e.g.*, Compl. at ¶ 61 ("Okada positioned himself to direct, control or influence UEC's Patent Department through Yaegashi, the General Manager of UEC's Patent Department, who reported to Okada and took direction from Okada throughout this period of time."); *see also* Compl. at ¶ 54. As such, Okada was in the sole position to inform UEC that patent licensing negotiations with AGA had ceased and in fact, were cancelled. *See e.g.*, Compl. at ¶ 116 ("Because Yaegashi reported to Okada,

only Okada could make these facts known to the other Board of Directors and officers of UEC."). Yet, despite knowing that patent licensing negotiations with AGA had ceased and that AGA would not be entering into a license, Okada failed to inform UEC's Board of Directors of such facts. *See e.g.*, Compl. at ¶ 114 ("[B]eginning in 2009 . . . Okada failed to disclose the fact that the negotiations had been cancelled and instructed Yaegashi to conceal these circumstances as well."); *see also* Compl. at ¶¶ 64 and 68.

Further, the Complaint alleges that Okada made false representations and intentional omissions of facts, including Okada's failure to inform UEC that patent licensing negotiations with AGA had ceased and that AGA would not be entering into a license. *See e.g.*, Compl. at ¶ 114 ("[B]eginning in 2009 . . . Okada failed to disclose the fact that the negotiations had been cancelled and instructed Yaegashi to conceal these circumstances as well."). Okada was aware that the negotiations were a sham and were designed to lull other directors and officers of UEC into believing that UEC would receive value for UEC's patent rights. *See e.g.*, Compl. at ¶ 116. In addition, Okada, as an officer and director of UEC, owed a fiduciary duty to UEC, and as such, was bound in good faith to disclose information to UEC. Compl. at ¶ 106; *see also Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 110 (Nev. 1998) (A duty to disclose may arise when a fiduciary relationship exists between the parties or "where the parties enjoy a 'special relationship,' that is, where a party reasonably imparts special confidence in the defendant and the defendant would reasonably know of this confidence."). Importantly, where a party is bound in good faith to disclose information, the suppression or omission of a material fact is "equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist." *Nelson v. Heer*, 163 P.3d 420, 426 (Nev. 2007) (holding that the false representation element of intentional misrepresentation is indistinguishable from the false representation element of fraudulent misrepresentation).

Finally, the Complaint alleges that UEC has been damaged by Okada's fraudulent misrepresentations in an amount to be proven at trial. Compl. at ¶ 118. As such, the Complaint includes averments to the time (*e.g.*, beginning in 2009), the place (*e.g.*, Japan and/or Nevada), the identity of the parties involved (*e.g.*, UEC and Okada), and the nature of the fraud (*e.g.*, omission of the material

fact that patent licensing negotiations with AGA had ceased, having been cancelled by Okada for the benefit of AGA with no value to UEC). *See Rocker*, 148 P.3d at 708 (Nev. 2006).

In a footnote, Okada further argues that allegations based "upon information and belief" are insufficient to support a fraud claim. Motion at 24, n. 3. The case law cited by Okada, however, makes clear that such allegations are only insufficient if they fail to include "a statement of facts on which the belief is founded." *Shroyer v. New Cingular Wireless Servs.*, 606 F.3d 658, 661 (9th Cir. 2010), *amended and superceded by Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035 (9th Cir. 2010). As recited above, the Complaint alleges a definitive time frame, beginning after 2009, and explains in detail what UEC believes constitutes the fraudulent misrepresentation -- failing to inform the Board of Directors for UEC of failed patent licensing negotiations with AGA, and concealing the circumstances of AGA's unauthorized practice of the Asserted Patents. *See e.g.*, Compl. at ¶¶ 114-116. Thus, the fraudulent misrepresentation claim has been pled with particularity sufficient to allow Okada to prepare an answer.

## IV.   CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss should be denied. Additionally, UEC's Motion for Leave to File Its First Amended Complaint should be granted.

RESPECTFULLY SUBMITTED this 3rd day of July, 2018.

By: _____
Jay J. Schuttert, Esq.
Nevada Bar No. 8656
David W. Gutke, Esq.
Nevada Bar No. 9820
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 900
Las Vegas, NV 89102
Telephone: (702) 805-0290
Facsimile: (702) 805-0291

Andrew Weaver (pro hac vice)
Polsinelli PC
1000 Louisiana Street, 53rd Floor
Houston, TX 77002
Telephone: (713) 374-1600
Facsimile: (713) 374-1601
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was electronically served on counsel of record this 3rd day of July, 2018, using the Court's CM/ECF System.

_____<i>/s/ Faith B. Radford</i>_____<br>An Employee of Evans Fears & Schuttert LLP