Jay J. Schuttert, Esq.
Nevada Bar No. 8656
David W. Gutke, Esq.
Nevada Bar No. 9820
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 900
Las Vegas, NV 89101
Telephone (702) 805-0290
Facsimile (702) 805-0291
Email: jschuttert@efstriallaw.com
Email:  dgutke@efstriallaw.com

ANDREW WEAVER (PRO HAC VICE)
POLSINELLI PC
1000 Louisiana Street, 53rd Floor
Houston, TX 77002
Telephone:  (713) 374-1600
Facsimile:  (713) 374-1601
Email:  aweaver@polsinelli.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNIVERSAL ENTERTAINMENT CORPORATION, a Japanese corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ARUZE GAMING AMERICA, INC., a Nevada corporation, KAZUO OKADA, an individual<br><br>Defendants. | CASE NO.:  2:18-CV-0585 (RFB) (GWF)<br><br>**SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT

Universal Entertainment Corporation, a Japanese corporation, by and through its attorneys, for its Complaint against Aruze Gaming America, Inc., a Nevada corporation, and Kazuo Okada, an individual (collectively, "Defendants"), hereby alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Universal Entertainment Corporation ("UEC") is a corporation organized under the laws of Japan with its headquarters and principal place of business located in Tokyo, Japan. UEC is a publicly traded Japanese gaming and entertainment company that is traded on the Tokyo Stock Exchange JASDAQ (standard).

2.      Defendant Aruze Gaming America, Inc. ("AGA") is a Nevada corporation, with its principal place of business located at 955 Grier Dr. #A, Las Vegas, Nevada 89119.

3.      Defendant Kazuo Okada (hereinafter "Okada") is an individual that resides at the 16th Floor, Tower 2, The Lily, 129 Repulse Bay Road, Repulse Bay, Hong Kong, China but regularly transacts business in the State of Nevada.  Okada founded UEC and was an officer and director of UEC until June 2017.  Upon information and belief, Okada is the sole shareholder of AGA, as well as an officer and director of AGA.  Further, upon information and belief, Okada continuously and systematically transacts business in the State of Nevada by directing AGA employees in the State of Nevada in their activities involving the design, manufacture and/or sale of infringing game machines (as described below) and is personally licensed by the Nevada Gaming Commission.

4.      Upon information and belief, Okada also directed AGA employees in the State of Nevada in their activities that resulted in the infringement by AGA of UEC's patents as described herein.

5.      This action arises under the patent laws of the United States, Title 35 of the United States Code, 35 U.S.C. §§ 1 *et seq*.  Accordingly, this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2), as this action is between a corporate citizen of a foreign state and a corporate citizen of the State of Nevada and a resident of Hong Kong, China and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court further has supplemental jurisdiction under 28 U.S.C. § 1367 because it has original jurisdiction over the claims arising under the patent laws of the United States and the

other claims asserted herein are so related as to form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) or (3).  Venue is also proper in this District pursuant to 28 U.S.C. § 1400(b) because AGA is incorporated in Nevada, has its headquarters and established place of business in Nevada, has committed acts of infringement in Nevada, and is subject to both general and specific personal jurisdiction in Nevada.  Similarly, Okada who owns, directs and controls AGA (a Nevada corporation) and who holds a gaming license in Nevada is also subject to personal jurisdiction in Nevada.

## THE ASSERTED PATENTS

9.      UEC is a pioneer in the gaming industry and in particular UEC is a pioneer in the design of innovative and unique slot machine type games.

10.      UEC develops high-quality products and services for the gaming industry.  UEC is active in developing new and exciting gaming devices and describes its mission as providing sound entertainment that transcends the likes of age, gender and national borders for people all over the world.  UEC has been awarded over five-hundred patents worldwide (hereinafter "UEC's patent rights").

11.      In particular, UEC is the sole owner of certain patents namely, U.S. Reissue Patent No. 46,472 ("the `472 patent"), U.S. Reissue Patent No. 46,473 ("the `473 patent"), U.S. Patent No. 8,088,013 ("the `013 patent") and U.S. Patent No. 8,246,047 ("the `047 patent").  Collectively, the `472, `473, `013 and `047 patents will be referred to herein as the "Asserted Patents."  The Asserted Patents generally relate to slot machine type gaming devices and specific aspects of their construction and operation.  Each of the Asserted Patents has been duly and legally issued, is valid and enforceable and has been assigned to UEC.

### The `472 Patent:

12.      UEC owns all right, title and interest in U.S. Reissue Patent No. 46,472 (the `472 patent), entitled "Slot-Type Gaming Machine with Improved Cabinet."  The `472 patent duly and lawfully issued on July 11, 2017, with Koichiro Hashimoto as the named inventor.  The `472 patent

3

issued from Application No. 14/961,361, filed on December 7, 2015 and ultimately claims priority to Japanese Application No. 2007-160632, which was filed on June 18, 2007.  A true and correct copy of the `472 patent is attached hereto as **Exhibit A**.

13.     Generally, the `472 patent is directed to a gaming machine having a cabinet with a front opening, a hinged front door, and an input device.  An operation table projects forward from the door and has an asymmetrical front edge perimeter that establishes a recess side of the table disposed toward the side of the door including the hinge and a protrusion side of the table opposite the hinged side of the door.  As an illustrative example, one of AGA's infringing G-ENEX gaming machines is depicted immediately below.



*available at* https://aruzegaming.com/g-series/

**AGA's G-ENEX FAMILY OF GAMES**

1

***The `473 Patent*:**

2  14.  UEC owns all right, title and interest in U.S. Reissue Patent No. 46,473 (the `473

3 patent), entitled "Slot-Type Gaming Machine with Improved Cabinet."  The `473 patent duly and

4 lawfully issued on July 11, 2017, with Koichiro Hashimoto as the named inventor.  The `473 patent

5 issued from Application No. 14/962,087, filed on December 8, 2015 and ultimately claims priority to

6 Japanese Application 2007-160632, which was filed on June 18, 2007.  A true and correct copy of

7 the `473 patent is attached hereto as **Exhibit B**.

8  15.  Generally, the `473 patent is directed to a gaming machine having a cabinet with a

9 front opening covered by a hinged door.  An operation table projects forward from the door and has

10 an asymmetrical front edge perimeter that establishes a recess side of the table disposed toward the

11 side of the door including the hinge and a protrusion side of the table opposite the hinged side of the

12 door. As an illustrative example, an annotated version of AGA's infringing G-ENEX gaming

13 machine depicted above is shown immediately below.

14

15

16

17

18

19

20



21

22

23

24

25

26

27

28    **ANNOTATED PHOTOGRAPH OF AGA G-ENEX GAME**

*The `013 Patent:*

16.   UEC owns all right, title and interest in U.S. Patent No. 8,088,013 (the `013 patent), entitled "Gaming Machine."   The `013 patent duly and lawfully issued on January 3, 2012, with Takashi Abe, Hideaki Kishi, and Yuya Konno as the named inventors.   The `013 patent issued from Application No. 12/124,754, filed on May 21, 2008 and ultimately claims priority to Japanese Application No. 2007-169775, which was filed on June 27, 2007.   A true and correct copy of the `013 patent is attached hereto as **Exhibit C**.

17.   Generally, the `013 patent is directed to a gaming machine that includes a first box having inner walls, a second box, a front member, a communicating portion, and an exhausting portion.   The front member has side walls, and covers components placed at a front portion of the second box. The front member defines a first space at the front portion.   The communicating portion provided at the front portion allows a second space inside the second box to communicate with the first space.   The exhausting portion provided in a side wall of the front member allows air sent from the second space to the first space to be discharged.   The front member is arranged such that a first distance is smaller than a second distance, where the first distance starts at a first inner wall to finish at a first side wall, and the second distance starts at a second inner wall to finish at a second side wall. As an illustrative example, an annotated version of drawings from the manual for AGA's infringing G-ENEX gaming machine depicted above is shown immediately below.



**ANNOTATED AND CROPPED AGA G-ENEX FIGURE 9-7, EXHIBIT E**



**ANNOTATED AND CROPPED AGA G-ENEX FIGURE 9-7, EXHIBIT E**



**ANNOTATED AND CROPPED AGA G-ENEX FIGURE 1-3, EXHIBIT E**

***The `047 Patent:***

18.     UEC owns all right, title and interest in U.S. Patent No. 8,246,047 (the `047 patent), entitled "Display for Game and Gaming Machine."  The `047 patent duly and lawfully issued on August 21, 2012, with Yasuyuki Sekine as the named inventor.  The `047 patent issued from Application No. 09/208,696 and ultimately claims priority to Japanese Application No. 9-340193 filed on December 10, 1997.  A true and correct copy of the `047 patent is attached hereto as **<u>Exhibit D.</u>**

19.     Generally, the `047 patent is directed to a display for a game having a plurality of reels, each having a plurality of sequentially arranged symbols that appear on each of the reels.  Each reel includes one symbol that appears serially, at least two times without any intervening symbol. When the reels are stopped, symbols can be viewed along at least two straight lines and at least one of those lines provides a winning state and all other lines do not produce a winning state.   An exemplary reel and symbol configuration is depicted immediately below utilizing AGA's CUBE-X game family machine, the FIRE AND THUNDER game machine.



**SCREEN SHOT FROM AGA's CUBE-X "FIRE AND THUNDER"
DEMOSTRATION VIDEO**

20.     Throughout the relevant time-period, UEC complied with the marking provisions of 35 U.S.C. § 287(a) with respect to each of the Asserted Patents.

## AGA'S ACCUSED PRODUCTS

### THE G-SERIES FAMILY OF GAMES:

21.     AGA offers for sale as one of its product families the "G-SERIES" family of games that are available in two sub-families the G-ENEX family of games (hereinafter "G-ENEX") and the G-COMFORT family of games (hereinafter "G-COMFORT").  AGA's family of G-ENEX and G-COMFORT games are described and offered for sale at AGA's website www.aruzegaming.com/g-series/.  A true and correct copy of the G-ENEX family Service Manual is attached hereto as **Exhibit E**.

### THE G-STATION FAMILY OF GAMES:

22.     AGA offers for sale as one of its product families the G-STATION family of games (hereinafter "G-STATION").  AGA's family of G-STATION games is described and offered for sale at, for example, AGA's website www.aruzegaming.com/g-station/.

### THE CUBE-X FAMILY OF GAMES (SOME EXAMPLES INCLUDE THOSE GAMES LISTED IMMEDIATELY BELOW):

23.     AGA offers for sale as one of its product families the "CUBE-X" family of games (hereinafter "CUBE-X").  AGA's family of CUBE-X games is described and offered for sale at, for example, AGA's website www.aruzegaming.com/cube-x-video/.

### THE "FIRE AND THUNDER" GAME:

24.     AGA offers for sale as one of its products the "FIRE AND THUNDER" slot machine game (hereinafter "FIRE AND THUNDER").  The FIRE AND THUNDER slot machine game is described and offered for sale at AGA's website www.aruzegaming.com/cube-x-innovator/fire-and-thunder/ and a video illustrating aspects of its operation can be found at this website.

### THE "AZTEC SOL" GAME:

25.     AGA offers for sale as one of its products the "AZTEC SOL" slot machine game (hereinafter "AZTEC SOL").  The AZTEC SOL slot machine game is described and offered for sale at AGA's website www.aruzegaming.com/innovator/aztec-sol/ and a video illustrating aspects of its operation can be found at this website.

*THE "KING OF DRAGONS" GAME:*

26.    AGA offers for sale as one of its products the "KING OF DRAGONS" slot machine game (hereinafter "KING OF DRAGONS").   The KING OF DRAGONS slot machine game is described and offered for sale at AGA's website at www.aruzegaming.com/innovator/king-of-dragons/ and a video illustrating aspects of its operation can be found at this website.

*THE "MIGHTY LION" GAME:*

27.    AGA offers for sale as one of its product the "MIGHTY LION" slot machine game (hereinafter "MIGHTY LION").   The MIGHTY LION slot machine game is described and offered for sale as AGA's website at www.aruzegaming.com/innovator/might-lion/ and a video illustrating aspects of its operation can be found at this website.

*THE "CHANGING 7'S" GAMES:*

28.    AGA offers for sale as one of its products the "CHANGING 7's HAPPY FORTUNE," "CHANGING 7's HAWAII" and "CHANGING 7's LUCKY STARS" slot machine games (collectively hereinafter "CHANGING 7's").   The CHANGING 7's slot machine games are respectively described and offered for sale at AGA's websites:

   www.aruzegaming.com/innovator/changing-7s-happy-fortune/

   www.aruzegaming.com/innovator/changing-7s-hawaii/ and

   www.aruzegaming.com/innovator/changing-7s-lucky-stars/, and each of the websites includes a video illustrating aspects of the game's operation.

*THE "NINJA WARRIOR" GAME:*

29.    AGA offers for sale as one of its products the "NINJA WARRIOR" slot machine game (hereinafter "NINJA WARRIOR").   The NINJA WARRIOR slot machine game is described and offered for sale at AGA's website www.aruzegaming.com/innovator/ninja-warrior/ and a video illustrating aspects of its operation can be found at this website.

*THE "DANCING DRAGON" GAME:*

30.    AGA offers for sale as one of its products the "DANCING DRAGON SPIRIT" slot machine game (hereinafter "DANCING DRAGON").   The DANCING DRAGON slot machine game    is    described    and    offered    for    sale    at    AGA's    website

www.aruzegaming.com/innovator/dangcing-dragon-spirit/ and a video illustrating aspects of its operation can be found at this website.

### THE "APEX GORILLA" GAME:

31.     AGA offers for sale as one of its products the "APEX GORILLA" slot machine game (hereinafter "APEX GORILLA").   The APEX GORILLA slot machine game is described and offered for sale at AGA's website www.aruzegaming.com/cube-x-innovator/apex-gorilla/ and a video illustrating aspects of its operation can be found at this website.

### THE "BURNING HOT JACKPOT" GAMES:

32.     AGA offers for sale as one of its products the "APEX TIGER – BURNING HOT JACKPOT," "AZTEC SOL – BURNING HOT JACKPOT," "HOWLING WOLF – BURNING HOT JACKPOT," and "THE GREAT INCA – BURNING HOT JACKPOT" slot machine games (hereinafter "BURNING HOT JACKPOT").   The BURNING HOT JACKPOT slot machine games are respectively described and offered for sale at AGA's websites:

www.aruzegaming.com/cube-x-innovator/bhj-apex-tiger/,

https://aruzegaming.com/cube-x-innovator/aztec-sol-bhjp/,

https://aruzegaming.com/cube-x-innovator/howling-wolf-bhjp/, and

https://aruzegaming.com/global-branches/cube-x-innovator-link-global/great-inca-bhj_mac/

and each of the websites includes a video illustrating aspects of the game's operation.

### THE "ROSE" GAMES:

33.     AGA offers for sale as one of its products the "ROSE ELEGANT PINK," "ROSE JOYFUL YELLOW" and "ROSE PASSION RED" family of slot machine games (hereinafter "ROSE").   The ROSE ELEGANT PINK slot machine game is described and offered for sale at AGA's website at www.aruzegaming.com/innovator/the-rose-elegant-pink/ and a video illustrating aspects of its operation can be found at this website.   The ROSE JOYFUL YELLOW slot machine game is described and offered for sale at AGA's website at www.aruzegaming.com/innovator/the-rose-joyful-yellow/.   The ROSE PASSION RED slot machine game is described and offered for sale at AGA's website at www.aruzegaming.com/innovator/rose-passion-red/.

### THE "HOWLING WOLF" GAME:

34.    AGA offers for sale as one of its product the "HOWLING WOLF" slot machine game (hereinafter "HOWLING WOLF").  The HOWLING WOLF slot machine game is described and offered for sale at AGA's website at www.aruzegaming.com/innovator/howling-wolf/ and a video illustrating aspects of its operation can be found at this website.

### THE "CRAZY STARS" GAME:

35.    AGA offers for sale as one of its products the "CRAZY STARS" slot machine game (hereinafter "CRAZY STARS").  The CRAZY STARS slot machine game is described and offered for sale at AGA's website www.aruzegaming.com/innovator-deluxe/crazy-stars/ and a video illustrating aspects of its operation can be found at this website.

### THE "HOT HEARTS" GAME:

36.    AGA offers for sale as one of its products the "HOT HEARTS" slot machine game (hereinafter "HOT HEARTS").  The HOT HEARTS slot machine game is described and offered for sale at AGA's website www.aruzegaming.com/innovator-deluxe/hot-hearts and a video illustrating aspects of its operation can be found at this website.

### THE "SAMURAI DRAGON" GAME:

37.    AGA offers for sale as one of its products the "SAMURAI DRAGON."  The SAMURAI DRAGON slot machine game is described and offered for sale at AGA's website at https://aruzegaming.com/cube-x-innovator/samurai-dragon/ and a video illustrating aspects of its operation can be found at this website.

### "THE GOLD LEGEND" GAME:

38.    AGA offers for sale as one of its products the "999.9 GOLD WHEEL – THE GOLD LEGEND" (hereinafter "THE GOLD LEGEND").  THE GOLD LEGEND slot machine game is described and offered for sale at AGA's website at https://aruzegaming.com/cube-x-ultimate/999-9-gold-wheel-gold-legend/ and a video illustrating aspects of its operation can be found at this website.

### THE "CRYSTAL" GAME:

39.    AGA offers for sale as one of its products the "CRYSTAL."  The CRYSTAL slot machine game is described and offered for sale at AGA's website at

1   https://aruzegaming.com/innovator-deluxe/crystal/ and a video illustrating aspects of its operation

2   can be found at this website.

3                    **THE "PLATINUM JACKPOT" GAME:**

4           40.     AGA offers for sale as one of its products the "PLATINUM JACKPOT."   The

5   PLATINUM JACKPOT slot machine game is described and offered for sale at AGA's website at

6   https://aruzegaming.com/innovator-deluxe/platinum-jackpot/ and a video illustrating aspects of its

7   operation can be found at this website.

8                         **"THE GOLD" GAME:**

9           41.     AGA offers for sale as one of its products "THE GOLD."  THE GOLD slot machine

10  game is described and offered for sale at AGA's website at  https://aruzegaming.com/innovator-

11  deluxe/the-gold/ and a video illustrating aspects of its operation can be found at this website.

12                   **THE "AZTEC SPIRIT" GAME:**

13          42.     AGA offers for sale as one of its products the "AZTEC SPIRIT."   The AZTEC

14  SPIRIT slot machine game is described and offered for sale at AGA's website at

15  https://aruzegaming.com/innovator/aztec-spirit/ and a video illustrating aspects of its operation can be

16  found at this website.

17                   **THE "BAMBOO PANDA" GAME:**

18          43.     AGA offers for sale as one of its products the "BAMBOO PANDA."  The BAMBOO

19  PANDA slot machine game is described and offered for sale at AGA's website at

20  https://aruzegaming.com/innovator/bamboo-panda/ and a video illustrating aspects of its operation

21  can be found at this website.

22                    **THE "PANDA SPIRIT" GAME:**

23          44.     AGA offers for sale as one of its products the "PANDA SPIRIT."  The PANDA

24  SPIRIT slot machine game is described and offered for sale at AGA's website at

25  https://aruzegaming.com/innovator/panda-spirit/ and a video illustrating aspects of its operation can

26  be found at this website.

27

28

### THE "RAPID SHOT" GAME:

45.     AGA offers for sale as one of its products the "RAPID SHOT SAPPHIRE," "RAPID SHOT RUBY," and "RAPID SHOT DIAMOND" slot machine games (collectively hereinafter "RAPID SHOT").  The RAPID SHOT slot machine games are described and offered for sale at AGA's website at https://aruzegaming.com/innovator/rapid-shot/ and a video illustrating aspects of its operation can be found at this website.

### "THE GREAT INCA" GAME:

46.     AGA offers for sale as one of its products "THE GREAT INCA."  THE GREAT INCA slot machine game is described and offered for sale at AGA's website at https://aruzegaming.com/innovator/the-great-inca/ and a video illustrating aspects of its operation can be found at this website.

### THE "WILD DANCE FIRE" GAME:

47.     AGA offers for sale as one of its products the "WILD DANCE FIRE."  The WILD DANCE FIRE slot machine game is described and offered for sale at AGA's website at https://aruzegaming.com/innovator/wild-dance-fire/ and a video illustrating aspects of its operation can be found at this website.

48.     Collectively, the CUBE-X, G-COMFORT, G-ENEX, G-STATION, FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE products of AGA constitute the "Accused Products" and infringe one or more claims of the Asserted Patents as set forth below.

## OKADA'S USURPATION OF CORPORATE OPPORTUNITIES

49.     UEC repeats and re-alleges all of the allegations of the preceding paragraphs ¶¶ 1- 48 as if fully set forth herein.

### *Changes in UEC's Organization and Management:*

50.     Okada was the founder of UEC and served as "Representative Director" from June 1972 to September 2004.  Under Japanese law, Representative Director is generally equivalent to Chief Executive Officer.  From January 2006 until June 2017, Okada was a Director and Chairman of the Board of Directors for UEC.

51.     UEC's corporate organization has changed over time.  Between June 2008 to June 2010, UEC was organized as a "company with committees" ("*iinkai secchi geisha*") which is a type of stock corporation managed by a Nominating Committee, Audit Committee, Compensation Committee and represented by a position called Representative Executive Officer under Japan's Companies Act.  The Representative Executive Officer during the period between approximately June 2008 to June 2010 was Mr. Hajime Tokuda (hereinafter "Tokuda").

52.     In June 2010, UEC changed from a "company with committees" to a "company with a board of company auditors."  In October 2010, Mr. Jun Fujimoto (hereinafter "Fujimoto") became the Representative Director and CEO of UEC.

53.     In approximately July 2010, UEC appointed Fujimoto to head UEC's domestic business (within Japan).  At the same time, Okada, who was the Chairman of the Board of Directors, was placed in charge of UEC's foreign business (including the United States).

### *Changes in UEC's Patent Department:*

54.     Since at least as early as 2002, UEC has maintained a Patent Department whose official responsibilities included filing for patents, monitoring for patent infringement by third parties, and licensing.  Even when Tokuda, UEC's Representative Executive Officer (June 2008 to May 2010) had direct management authority over the Patent Department according to UEC's official rules, Okada used his vast influence and authority over UEC generally to direct and influence the Patent Department.  The decision in July 2010 of placing Fujimoto in charge of UEC's domestic operations (within Japan) and Okada in charge of UEC's foreign operations of UEC (including the United

15

States) (as discussed above in ¶ 53), also led to a division of UEC's Patent Department into domestic (within Japan) and foreign (including the United States) sections, with each section reporting to Fujimoto and Okada, respectively.  This split in responsibility further facilitated Okada's ability to manufacture and sell gaming devices through AGA, gaming devices that used UEC's patent rights, including the Asserted Patents, without compensation to UEC or authorization from UEC by ensuring that those with potential knowledge and responsibility over UEC's foreign business reported to Okada, rather than to others.

55.     Mr. Nobuo Yaegashi ("Yaegashi") was General Manager of UEC's Patent Department from March 2002 to March 2013.  Yaegashi reported to Okada and took direct instructions from Okada throughout this period of time even though (as alleged above) Yaegashi officially was to directly report to others within UEC.  For example, during the period of time of June 27th 2008 to June 25th 2010, Yaegashi should have directly reported to Tokuda (UEC's Representative Executive Officer and President), and after UEC implemented changes of titles and positions of officers, which was announced publicly on June 7, 2010 and June 25th, 2010, Yaegashi should have directly reported to Fujimoto (UEC's Representative Director and Vice Chairman, who later was elected Representative Director and President, CEO and CIO); yet, during these time periods Yaegashi instead took direction from Okada.  Okada's influence over Yaegashi facilitated Okada's ability to conceal the use of the Asserted Patents by AGA without compensation to or authorization by UEC, enriching Okada as AGA's only shareholder by controlling the possible flow of information to other managers and directors at UEC.

56.     In April 2011, Mr. Hiroyuki Kuwana ("Kuwana") was appointed to head the Patent Department's domestic section (within Japan), while Yaegashi remained the head of the foreign section (including the United States).  This arrangement further facilitated Okada's ability to conceal the use of UEC's patent rights without compensation to or authorization by UEC, enriching Okada as AGA's only shareholder, by ensuring that those with knowledge and responsibility would report directly to Okada.

/ / /

/ / /

16

***AGA's Shift to Okada's Sole Ownership and Control:***

57.     In 2005, AGA was formed for manufacturing gaming devices for sale outside of Japan and was entirely owned by UEC, operating as a consolidated subsidiary of UEC.

58.     In August 2008, Okada purchased shares of AGA from UEC and UEC issued additional AGA stock to Okada.  As a result, as of January 2009, while AGA was still operating as a subsidiary of UEC, UEC only held 49.95% of AGA's stock and the remaining 50.05% was held by Okada.  Upon information and belief, Okada presided over AGA and made all of its important business decisions.

59.     In December 2008, a decision was made to transfer the remaining stock of AGA owned by UEC to Okada.  This additional transfer process began in 2009 and was completed in March 2010, such that AGA ceased to operate as a UEC subsidiary in March 2010.

60.     After the decision to transfer entire ownership of AGA to Okada, both UEC and AGA employees began preparing for this change.

***Okada Uses AGA to Usurp UEC's Corporate Opportunities:***

61.     At no relevant time was AGA authorized to practice any of the Asserted Patents by any officer, director, manager or any other UEC employee having authority to do so. In fact, UEC made it clear that AGA would require a license from UEC to practice UEC's patent rights and to provide compensation to UEC.  However, as detailed herein, AGA did not enter into any license agreement with UEC and AGA never provided any compensation to UEC for the use of UEC's patent rights.

62.     As alleged above, Okada positioned himself to direct, control, and influence UEC's Patent Department through Yaegashi, the General Manager of UEC's Patent Department, who reported to Okada and took direction from Okada throughout the time period from 2008 to 2010. Further, upon information and belief, Okada initially instructed AGA employees and Yaegashi to license those UEC patent rights to AGA that were necessary for AGA to continue manufacturing gaming devices.

63.     Beginning in approximately March 2009, Yaegashi held discussions with AGA personnel to discuss specific conditions of a patent license agreement between UEC and AGA.

Importantly, given his position within UEC, Okada knew that AGA was being transferred to his complete ownership.  Moreover, Okada as Chairman of the Board of Directors of UEC wielded substantial influence and directly controlled the UEC Patent Department.

64.  Upon information and belief, Okada later instructed Yaegashi to cease all discussions relating to the execution of a license agreement between UEC and AGA.  Okada further, upon information and belief, instructed Yaegashi not to seek compensation from AGA for the use of any of UEC's patents, and further, instructed Yaegashi to not disclose these facts to any others at UEC – including Tokuda, who was the Representative Executive Officer of UEC from 2008 to 2010.  On information and belief, Yaegashi followed both of these directives from Okada.  Likewise, Okada himself did not inform any of the other Board of Directors for UEC of these facts.  Okada never disclosed to the UEC Board of Directors that he directed Yaegashi to cease discussion with AGA.  Similarly, Okada never obtained approval from the UEC Board of Directors to grant any type of royalty-free license to AGA.  As a director and officer of UEC, Okada owed a fiduciary duty to the company.  In contravention of his fiduciary duty, Okada failed to disclose AGA's unauthorized use of UEC's patent rights to UEC's Board of Directors

65.  Indeed, AGA has never executed any license agreement with UEC and AGA has never paid any monetary consideration to UEC for use of any of UEC's patent rights and, in particular, never paid any monetary consideration to UEC for the use of the Asserted Patents.

66.  When Kuwana was appointed to take charge of UEC's Patent Department's domestic section, Yaegashi briefed Kuwana on the domestic business operations of the UEC Patent Department.  Yaegashi failed to inform Kuwana of both the circumstances of AGA's unauthorized use of UEC's patent rights and that no UEC-AGA license existed.  When Yaegashi left UEC in 2013 and Kuwana was placed in charge of UEC's Patent Department's foreign section, Yaegashi again failed to inform Kuwana (or any other UEC employee) of AGA's unauthorized use of UEC's patent rights, AGA's unauthorized use of certain Asserted Patents in particular, or AGA's failure to enter into a license agreement with UEC.

/ / /

/ / /

18

*__UEC Establishes a Special Investigation Committee:__*

67.     In June 2017, UEC became aware of a possibility that Okada engaged in misconduct in relation to foreign business. In response to this misconduct, UEC established a Special Investigation Committee formed by outside experts to investigate Okada.

68.     On August 29, 2017, the Special Investigation Committee reported the result of the investigation to UEC.  This identified the fact that Okada had caused UEC damages worth at least JPY2.2 billion due to his misconduct through the foreign business done for his personal gain during 2013-2015.  In response to the work of the Special Investigation Committee, UEC personnel further reviewed Okada's activities and they discovered the fact that AGA was making unauthorized use of UEC patent rights, including the Asserted Patents, and that Okada had concealed these facts.

69.     Because of Okada's actual knowledge of the Asserted Patents, AGA also had actual knowledge of the Asserted Patents.

70.     Upon information and belief, Okada directed employees of AGA located in Nevada to develop and produce the Accused Products, which made use of the technology claimed in the Asserted Patents, without obtaining a license or permission from UEC, and thereby infringing the Asserted Patents.

71.     AGA provided no benefit or compensation to UEC for its exploitation of the Asserted Patents; AGA never entered into a license agreement with UEC.

72.     UEC did not learn of AGA's unauthorized use of UEC's patent rights, including the Asserted Patents, until UEC began investigating Okada's misconduct in 2017.

73.     The Asserted Patents have economic value to UEC and could have been licensed by UEC to AGA for substantial revenue and/or other consideration.

74.     Upon information and belief, Okada intentionally directed AGA employees located in Nevada to usurp corporate opportunities belonging to UEC that were afforded by the Asserted Patents, for the benefit of AGA and Okada himself.

75.     Okada failed to act in the best interest of UEC by allowing AGA's exploitation of the Asserted Patents through at least his failures to report such activity to UEC and not stopping AGA from engaging in willful infringement of the Asserted Patents, thereby causing damage to UEC.

## COUNT ONE

### (Infringement of the `472 patent – AGA)

76.     UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs ¶¶ 1 - 75.

77.     On information and belief, AGA has infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claim 1 of the `472 patent  by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority, the infringing slot machines, including without limitation the G-ENEX family of slot machine games. Exemplarily, and as illustrated immediately below, slot machines of the G-ENEX family have a cabinet with a front opening covered by a hinged door, as well as an input device, such as a game button, to input an operation related to the gaming machine.  An operation table projects forward from the door and has an asymmetrical front edge perimeter that establishes a recess side of the table disposed toward the side of the door including the hinge and a protrusion side of the table opposite the hinged side of the door.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



**ANNOTATED AND CROPPED PHOTOGRAPH OF REPRESENTATIVE
AGA G-ENEX GAME**

78.     As illustrated in **Exhibit E**, the G-ENEX family of slot machine games comprises a cabinet having a front opening.  **Exhibit E,** at pp. 1-1 and 1-3.  The G-ENEX machines also comprise a front door pivotably coupled to the cabinet via a hinge attached to a lateral side of the cabinet and at a front side thereof.  **Exhibit E,** at pp. 1-7, 2-4 and 9-5.  The G-ENEX machines further comprise an input device to input an operation related to the gaming machine.  **Exhibit E,** at pp. 1-1, 5-6, 9-15, and 9-16.  The G-ENEX machines further comprise a front door that includes an operation table that maintains a fixed position relative to the front door, and projects forward from the front door.  **Exhibit E,** at pp. 1-2, 2-2, 9-15 and 9-19.  The operation table extends along a width of the front door and includes an asymmetrically configured front edge perimeter to thereby form an operation table side having a recess and an operation table side having a protrusion.  **Exhibit E**, cover.  The operation table side having the recess is disposed toward the side of the front door including the hinge and the operation table side having the protrusion is disposed opposite the side of the front door including the hinge.  **Exhibit E**, cover.

79.     Moreover, on information and belief, AGA has induced, and is inducing, the infringement of the claims of the `472 patent (for example, claims 1, 6, 10, and 18).  On information and belief, the direct infringement induced by AGA includes at least the operation by gaming establishments, and their customers, of the G-ENEX family of slot machine games.  On information and belief, AGA has the specific intent to encourage or direct the end users to infringe the `472 patent by practicing all the limitations of at least one claim of the `472 patent.  AGA induces these users to operate the G-ENEX family of slot machine games knowing that these acts constitute infringement of the `472 patent and with specific intent to encourage those acts and encourage infringement.

80.     Further, on information and belief, AGA has contributed to, and is contributing to, the infringement of the claims of the `472 patent (for example, claims 1, 6, 10, and 18). On information and belief, the direct infringement contributed to by AGA includes at least the operation by gaming establishments, and their customers, of the G-ENEX family of slot machine games. On information and belief, AGA, with knowledge and without authorization, provides the G-ENEX family of slot machine games as a unit and/or as one or more components including replacement parts or to be assembled.  The G-ENEX family of slot machines are dedicated slot machine games, with one or

more components being specifically adapted, shaped, and/or fitted, including at least the components described in ¶¶ 77-78, for such slot machine games, which infringe claims of the `472 patent. These non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 77-78, constitute a material part of the claimed invention, with AGA knowing that at least the components described in ¶¶ 77-78 are made and/or especially adapted for use in an infringement of the patent.  Accordingly, the one or more non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 77-78, are not staple articles of commerce, commodities, or commonly available items and have no substantial non-infringing uses other than as a component of the infringing G-ENEX family of slot machine games, and AGA has provided these non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 77-78, with this knowledge.

## COUNT TWO

### (Infringement of the `473 patent – AGA)

81.     UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs, ¶¶ 1 - 80.

82.     On information and belief, AGA has infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claims 1 and 14 of the `473 patent  by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority, the infringing slot machines, including without limitation the G-ENEX family of slot machine games. Exemplarily, and as illustrated immediately below, slot machines of the G-ENEX family have a cabinet with a front opening covered by a hinged door.  An operation table projects forward from the door and has an asymmetrical front edge perimeter that establishes a recess side of the table disposed toward the side of the door including the hinge and a protrusion side of the table opposite the hinged side of the door.



**ANNOTATED AND CROPPED PHOTOGRAPH OF REPRESENTATIVE
AGA G-ENEX GAME**

83.     As illustrated in **Exhibit E**, the G-ENEX family of slot machine comprises a cabinet having a front opening.  **Exhibit E**, at pp. 1-1, 1-3.  The G-ENEX machines further comprise a front door pivotably coupled to the cabinet via a hinge disposed on a lateral side of the cabinet.  **Exhibit E**, at pp. 1-7, 2-4, and 9-5. The front door includes an operation table that maintains a fixed position relative to the front door and projects forward from the front door.  **Exhibit E**, at pp. 2-2, 9-15, 9-19. Further, in the G-ENEX machines, the operation table extends along a width of the front door and includes an asymmetrical front edge perimeter, which forms an operation table side corresponding to a recess and an operation table side corresponding to a projection.  **Exhibit E**, cover.  Further, the G-ENEX machines exhibit an operation table side corresponding to the recess which is substantially disposed on the side of the front door including the hinge and the operation table side corresponding to the projection that is substantially disposed on that side of the front door opposite the hinge. **Exhibit E**, cover.

84.     Moreover, on information and belief, AGA has induced, and is inducing, the infringement of the claims of the `473 patent (for example, claims 1, 6, 10, and 23).  On information and belief, the direct infringement induced by AGA includes at least the operation by gaming

24

establishments, and their customers, of the G-ENEX family of slot machine games.  On information

and belief, AGA has the specific intent to encourage or direct the end users to infringe the `473 patent

by practicing all the limitations of at least one claim of the `473 patent.  AGA induces these users to

operate the G-ENEX family of slot machine games knowing that these acts constitute infringement of

the `473 patent and with specific intent to encourage those acts and encourage infringement.

85.     Further, on information and belief, AGA has contributed to, and is contributing to, the

infringement of the claims of the `473 patent (for example, claims 1, 6, 10, and 23). On information

and belief, the direct infringement contributed to by AGA includes at least the operation by gaming

establishments, and their customers, of the G-ENEX family of slot machine games. On information

and belief, AGA, with knowledge and without authorization, provides the G-ENEX family of slot

machine games as a unit and/or as one or more components including replacement parts or to be

assembled.  The G-ENEX family of slot machines are dedicated slot machine games, with one or

more components being specifically adapted, shaped, and/or fitted, including at least the components

described in ¶¶ 82-83, for such slot machine games, which infringe claims of the `473 patent. These

non-interchangeable, discrete, specially designed and engineered components, including at least the

components described in ¶¶ 82-83, constitute a material part of the claimed invention, with AGA

knowing that at least the components described in ¶¶ 82-83 are made and/or especially adapted for

use in an infringement of the patent.  Accordingly, the one or more non-interchangeable, discrete,

specially designed and engineered components, including at least the components described in ¶¶ 82-

83, are not staple articles of commerce, commodities, or commonly available items and have no

substantial non-infringing uses other than as a component of the infringing G-ENEX family of slot

machine games, and AGA has provided these non-interchangeable, discrete, specially designed and

engineered components, including at least the components described in ¶¶ 82-83, with this

knowledge.

/ / /

/ / /

/ / /

/ / /

**COUNT THREE**

**(Infringement of the `013 patent – AGA)**

86.     UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs, ¶¶ 1 - 85.

87.     On information and belief, AGA has infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the `013 patent (claim 1 et seq.) by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority, the infringing slot machines, including without limitation the G-ENEX, G-COMFORT, G-STATION and CUBE-X families of slot machine games.

88.     As illustrated in **Exhibit E** and exemplified immediately below, the G-ENEX family of slot machine comprises a cabinet with a first box having inner walls.  **Exhibit E,** at p. 9-7. Further, the G-ENEX machines have a second box housed by the first box.  **Exhibit E**, at pp. 9-7, 9-8.   This second box houses a control board that includes a central processing unit for controlling the game.  **Exhibit E**, at pp. 9-9, 9-10.  The front member has side walls and covers components required for executing the game.  The components are placed at a front portion of the second box when the front portion of the second box is closed.  **Exhibit E**, at pp. 9-9.  Further, the G-ENEX machines have a front member defining a first space at the front portion of the second box (**Exhibit E**, at 9-9) and a communicating portion provided at the front portion of the second box, the communicating portion allowing a second space inside the second box to communicate with the first space (**Exhibit E**, at 9-9).  A plurality of cables extend from the front portion of the second box to the first space and a bonding portion is provided for bonding the plurality of cables (**Exhibit E**, at 9-9, 9-10).  An exhausting portion is provided in a side wall of the front member, the exhausting portion allowing air sent from the second space inside the second box to the first space inside the second box to the first space to be discharged. Further, the front member is arranged to lie such that a first distance is smaller than a second distance, where the first distance starts at a first inner wall at an end portion of the first box and finishes at a first side wall at an end portion of the front member (**Exhibit E**, at 1-3). Further, the second distance starts at a second inner wall at the opposite end portion of the first box and finishes at a second side wall at the opposite end portion of the front member (**Exhibit E**, at 1-3).

The plurality of cables extend out of the first space via the exhausting portion and the bonding portion is arranged to lie closer to the exhausting portion, between the exhausting portion and the front portion of the second box from which the plurality of cables start to extend (**Exhibit E**, at 6-30).



**ANNOTATED AND CROPPED AGA G-ENEX FIGURE 9-7, EXHIBIT E**



**ANNOTATED AND CROPPED AGA G-ENEX FIGURE 1-3, EXHIBIT E**

**ANNOTATED AND CROPPED AGA G-ENEX FIGURE 6-2, EXHIBIT E**

89.     Additionally, the CUBE-X, G-COMFORT and G-STATION families of slot machine games comprises a cabinet with a first box having inner walls.  Further, the CUBE-X, G-COMFORT, and G-STATION machines have a second box housed by the first box.  The front member has side walls and cover components required for executing the game.  The components are placed at a front portion of the second box when the front member defining a first space at the front portion of the second box to communicate with the first space.  An exhausting portion is provided in a side wall of the front member, the exhausting portion allowing air sent from the second space inside the second box to the first space inside the second box to the first space to be discharged. Further, the front member is arranged to lie such that a first distance is smaller than a second distance, where the first distance starts at a first inner wall at an end portion of the first box and finishes at a first side wall at an end portion of the front member.  Further, the second distance starts at a second inner wall at the opposite end portion of the first box and finishes at a second side wall at the opposite end portion of the front member. The plurality of cables extend out of the first space via the exhausting portion and the bonding portion is arranged to lie closer to the exhausting portion, between the exhausting portion and the front portion of the second box from which the plurality of cables start to extend.

28

90.     Moreover, on information and belief, AGA has induced, and is inducing, the infringement of the claims of the `013 patent (for example, claim 1).  On information and belief, the direct infringement induced by AGA includes at least the operation by gaming establishments, and their customers, of the G-ENEX, G-COMFORT, G-STATION, and CUBE-X families of slot machine games. On information and belief, AGA has the specific intent to encourage or direct the end users to infringe the `013 patent by practicing all the limitations of at least one claim of the `013 patent.  AGA induces these users to operate the G-ENEX, G-COMFORT, G-STATION, and CUBE-X families of slot machine games knowing that these acts constitute infringement of the `013 patent and with specific intent to encourage those acts and encourage infringement.

91.     Further, on information and belief, AGA has contributed to, and is contributing to, the infringement of the claims of the `013 patent (for example, claim 1). On information and belief, the direct infringement contributed to by AGA includes at least the operation by gaming establishments, and their customers, of the G-ENEX, CUBE-X, G-COMFORT, and G-STATION families of slot machine games. On information and belief, AGA, with knowledge and without authorization, provides the G-ENEX, CUBE-X, G-COMFORT, and G-STATION families of slot machines games as a unit and/or as one or more components including replacement parts or to be assembled.  The G-ENEX, CUBE-X, G-COMFORT, and G-STATION families of slot machines games are dedicated slot machine games, with one or more components being specifically adapted, shaped, and/or fitted, including at least the components described in ¶¶ 88-89, for such slot machine games, which infringe claims of the `013 patent. These non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 88-89, constitute a material part of the claimed invention, with AGA knowing that at least the components described in ¶¶ 88-89 are made and/or especially adapted for use in an infringement of the patent. Accordingly, the one or more non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 88-89, are not staple articles of commerce, commodities, or commonly available items and have no substantial non-infringing uses other than as a component of the infringing G-ENEX, CUBE-X, G-COMFORT and G-STATION families of slot machines games,

29

and AGA has provided these non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 88-89, with this knowledge.

**COUNT FOUR**

**(Infringement of the `047 patent -- AGA)**

92.     UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs, ¶¶ 1 - 93.

93.     On information and belief, AGA has infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the `047 patent (claim 1 et seq.) by manufacturing, providing, selling, offering to sell, importing and/or distributing without authority, several infringing slot machines, including without limitation the FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE slot machine games.  As illustrated immediately below, utilizing the exemplary FIRE AND THUNDER slot machine of the CUBE-X family, a plurality of reels, each having a plurality of sequentially arranged symbols that appear on each of the reels are shown. Each reel includes one symbol that appears serially, at least two times without any intervening symbol, such as the depicted "Wild" symbol.  When the reels are stopped, symbols can be viewed along at least two straight (horizontal) lines and at least one of those lines provides a winning state and all other lines do not produce a winning state.



**SCREEN SHOT FROM AGA's "FIRE AND THUNDER"**
**DEMONSTRATION VIDEO**

94.     More specifically, and still as an example, upon information and belief, the FIRE AND THUNDER video slot machine game includes a display for a game that comprises a plurality of independently rotatable reels, rotatable about a common axis, as FIRE AND THUNDER is a 5-reel, 3-row stepper slot.  Further, the FIRE AND THUNDER games include a reel sheet attached to the periphery of each of the reels, where each reel sheet includes a plurality of symbols sequentially arranged for viewing by a player upon stopping of the rotation of the corresponding reel (bars, 7-symbols, Wild, etc.). Each of the reel sheets includes one symbol that appears serially at least two times without any intervening different symbol and each symbol of the plurality of symbols appears on each of the reel sheets. For example, the stylized "Wild" symbol and 7 symbols appear consecutively on each reel sheet without other intervening symbols.  Finally, the FIRE AND THUNDER games include a display window for viewing the symbols on the reels along each of the at least two straight lines (3 lines) when the reels are stopped, wherein the alignment on at least one of the lines of any specific combination of symbols show a winning state for the player and all other combinations of the symbols on the straight lines do not provide a winning state for the player.

95.     In a similar fashion, the AZTEC SOL, KING OF DRAGONS, MIGHTY LION, BURNING HOT JACKPOT, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, THE GREAT INCA, and WILD DANCE FIRE slot machine games operate in substantially the same manner as the FIRE AND THUNDER slot machine game with respect to the limitations of claim 1, while utilizing different artwork in its symbols.  In AZTEC SOL, the symbol of the stylized Aztec coin serves as the "Wild" symbol in FIRE AND THUNDER and the 7 symbols serve the same purpose as the 7 symbols in FIRE AND THUNDER with respect to the language of the claims.  Likewise, in the KING OF DRAGONS slot machine game, the 7s and Bonus symbols serve the same functionality.  Additionally, in the MIGHTY LION slot machine game the Bonus and 7s symbols serve the same functionality.  Additionally, in the BURNING HOT JACKPOT slot machine games the Bonus and 7s symbols serve the same functionality.  Additionally, in the SAMURAI DRAGON slot machine

games the Bonus and 7s symbols serve the same functionality. Additionally, in THE GOLD LEGEND slot machine games the Bonus and 7s symbols serve the same functionality. Additionally, in the CRYSTAL slot machine games the Bonus and 7s symbols serve the same functionality. Additionally, in the PLATINUM JACKPOT slot machine games the Bonus and 7s symbols serve the same functionality. Additionally, in THE GOLD slot machine games the Bonus and 7s symbols serve the same functionality. Additionally, in the AZTEC SPIRIT slot machine games the Bonus and 7s symbols serve the same functionality. Additionally, in the PANDA SPIRIT slot machine games the Bonus and the 7s symbols serve the same functionality. Additionally, in the BAMBOO PANDA slot machine games the Wild and 7s symbols serve the same functionality. Additionally, in THE GREAT INCA slot machine games the Bonus and 7s symbols serve the same functionality. Additionally, in the WILD DANCE FIRE slot machine games the Bonus and 7s symbols serve the same functionality.

96.     In the games CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, ROSE and HOWLING WOLF, the 7 symbols appear serially on each reel and perform the same functionality as the 7 symbols in FIRE AND THUNDER in the game's operation.

97.     In the game CRAZY STARS, the stylized Wild symbol appears serially on each reel and performs the same functionality as the Wild symbol in FIRE AND THUNDER in the game's operation.  Likewise, in the HOT HEARTS game the Bonus symbol appears serially on each reel and performs the same functionality as the Wild symbol in the FIRE AND THUNDER in the game's operation.

98.     In the game RAPID SHOT, the Progressive symbol appears serially on each reel and performs the same functionality as the Wild symbol in FIRE AND THUNDER in the game's operation with respect to the language of the claims.

99.     Moreover, on information and belief, AGA has induced, and is inducing, the infringement of the claims of the `047 patent (for example, claim 1).  On information and belief, the direct infringement induced by AGA includes at least the operation by gaming establishments, and their customers, of the FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING

HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE slot machine games. On information and belief, AGA has the specific intent to encourage or direct the end users to infringe the `047 patent by practicing all the limitations of at least one claim of the `047 patent. AGA induces these users to operate the FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE slot machine games knowing that these acts constitute infringement of the `047 patent and with specific intent to encourage those acts and encourage infringement.

100.    Further, on information and belief, AGA has contributed to, and is contributing to, the infringement of the claims of the `047 patent (for example, claim 1). On information and belief, the direct infringement contributed to by AGA includes at least the operation by gaming establishments, and their customers, of the FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE slot machine games. On information and belief, AGA, with knowledge and without authorization, provides slot machines of the FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE slot machine games as a unit and/or as one or more components

including replacement parts or to be assembled.  The FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE slot machines are dedicated slot machine games, with one or more components being specifically adapted, shaped, and/or fitted, including at least the components described in ¶¶ 93-98, for such slot machine games, which infringe claims of the `047 patent. These non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 93-98, constitute a material part of the claimed invention, with AGA knowing that at least the components described in ¶¶ 93-98 are made and/or especially adapted for use in an infringement of the patent.  Accordingly, the one or more non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 93-98, are not staple articles of commerce, commodities, or commonly available items and have no substantial non-infringing uses other than as a component of the infringing FIRE AND THUNDER, AZTEC SOL, KING OF DRAGONS, MIGHTY LION, CHANGING 7's, NINJA WARRIOR, DANCING DRAGON, APEX GORILLA, BURNING HOT JACKPOT, ROSE, HOWLING WOLF, CRAZY STARS, HOT HEARTS, SAMURAI DRAGON, THE GOLD LEGEND, CRYSTAL, PLATINUM JACKPOT, THE GOLD, AZTEC SPIRIT, BAMBOO PANDA, PANDA SPIRIT, RAPID SHOT, THE GREAT INCA, and WILD DANCE FIRE slot machine games, and AGA has provided these non-interchangeable, discrete, specially designed and engineered components, including at least the components described in ¶¶ 93-98, with this knowledge.

## COUNT FIVE

### (Tortious Interference with Prospective Economic Advantage – All Defendants)

101.   UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs, ¶¶ 1 - 100.

102.   Defendants had knowledge of UEC's contracts or relationships with its customers and potential customers with respect to licensing of the Asserted Patents.  With respect to Defendant

Okada, Okada had knowledge of the potential license agreements between UEC and AGA.  With respect to Defendant AGA, AGA had knowledge of potential agreement between UEC and other game manufacturers, such as without limitation International Game Technology, Inc., who is part of a patent cross-licensing agreement that related to at least some of UEC's Patent Rights, including the Asserted Patents.

103.    Despite having knowledge of UEC's prospective relationships, Defendants intentionally interfered with UEC's prospective relationships by at least exploiting the Asserted Patents without permission or justification.

104.    On information and belief, Defendants also took affirmative action to dissuade third parties from entering into agreements with UEC and Defendants thereby acted deliberately, overtly, dishonestly and in conscious disregard of the significant harm to UEC.  Defendants' motives were so improper and their conduct so oppressive, outrageous and intolerable that punitive damages are warranted.

105.    UEC has been damaged by Defendants' tortious actions in an amount to be proven at trial.

106.    UEC did not discover that Defendants had interfered with UEC's prospective economic advantages until UEC personnel investigated the actions of Okada as described in ¶¶ 67 - 68.

## COUNT SIX

### (Breach of Fiduciary Duty of Loyalty – Okada)

107.    UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs, ¶¶ 1 - 106.

108.    As an officer and director of UEC, Okada owed a fiduciary duty of loyalty to UEC.

109.    Okada intentionally breached his fiduciary duty to UEC by allowing and/or directing AGA to infringe patents owned by UEC.  Additionally, Okada concealed the infringing actions of AGA.  By failing to act to protect the valuable intellectual property rights of UEC, Okada served his personal interests, thereby misappropriating UEC's corporate opportunities on behalf of himself and AGA, as Okada was the sole shareholder of AGA, and therefore personally benefited.

110.    Okada acted deliberately, overtly, dishonestly and in conscious disregard of the significant harm to UEC.  Okada's motives were so improper and his conduct so oppressive, outrageous and intolerable that punitive damages are warranted.

111.    UEC has been damaged by Okada's breach of fiduciary duty in an amount to be proven at trial.

112.    Further, Okada is not entitled to the benefit of the "Business Judgment Rule" for at least the reason that UEC obtained no benefit whatsoever from AGA's unauthorized practice of the Asserted Patents.  Indeed, as alleged herein Okada did not "act in good faith and on an informed basis."  Rather, Okada engaged in naked self-dealing by profiting from AGA's knowing and willful infringement of UEC's valuable Asserted Patents.

113.    UEC did not discover Okada's breach of his fiduciary duty to UEC until UEC personnel investigated the actions of Okada as described in ¶¶ 67 - 68.

### COUNT SEVEN

### (Fraudulent Misrepresentation – Okada)

114.    UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs, ¶¶ 1 - 113.

115.    Among other things, Okada made a series of affirmative misrepresentations and intentional omissions of material facts.  These material facts related to AGA's unauthorized practice of the Asserted Patents and the failure of AGA to negotiate any license agreement that would provide value to UEC for AGA's use of the Asserted Patents.

116.    Okada instructed Yaegashi to engage in what amounted to sham negotiations between UEC and AGA beginning in 2009, just prior to the transfer of AGA to Okada's sole ownership.  Upon information and belief, after AGA became solely owned by Okada, Okada instructed Yaegashi to cease such negotiations.  Further, Okada failed to disclose the fact that the negotiations had been cancelled and instructed Yaegashi to conceal these circumstances as well.  In July 2010, Okada took formal control of UEC's foreign (including US) business and UEC's patent department was divided along domestic (Japan) and foreign (including US) lines as well.  This ensured that Yaegashi would

report to Okada and facilitated Okada's scheme to conceal the circumstances of AGA's unauthorized practice of the Asserted Patents.

117.    Okada's affirmative misrepresentations and intentional omissions of material facts were made with the full knowledge that they were false, deceptive and material.   These misrepresentations and omissions had the purpose of personally enriching Okada through the profits of his wholly-owned AGA and as a result, UEC was harmed.

118.    Further, Okada's misrepresentations and omissions were carefully calculated to induce UEC's reliance.  The initial sham negotiations ordered by Okada and conducted by Yaegashi were designed to lull other directors and officers of UEC into believing that UEC would receive value for UEC's patent rights once AGA was wholly owned by Okada.  Okada continued to induce UEC into reliance by cancelling the negotiations only after the sale of AGA was complete, and by further positioning himself within UEC to control foreign (including US) business and ensuring that Yaegashi reported directly to Okada, thereby preventing others at UEC from knowing of the facts surrounding AGA's improper use of the Asserted Patents.  Given the division of responsibility within UEC, no one other than Okada and Yaegashi would know that license negotiations were no longer ongoing and that the negotiations were in fact cancelled, and that AGA would ultimately not be entering into a license agreement with UEC.  Because Yaegashi reported to Okada, only Okada could make these facts known to the other Board of Directors and officers of UEC.

119.    Additionally, Okada's direction of Yaegashi to negotiate a patent license between AGA and UEC is an admission that the UEC patent rights, including the Asserted Patents, were valuable and that UEC should be compensated for their use by AGA.

120.    UEC has been damaged by Okada's fraudulent misrepresentations in an amount to be proven at trial.

121.    Further, as alleged above, Okada is not entitled to the benefit of the "Business Judgment Rule" for at least the reason that UEC obtained no benefit whatsoever from AGA's unauthorized practice of the Asserted Patents.  Indeed, as alleged herein, Okada did not "act in good faith and on an informed basis." Rather, Okada engaged in naked self-dealing by profiting from AGA's knowing and willful infringement of UEC's valuable Asserted Patents.

122.    UEC did not discover that Okada had made fraudulent misrepresentations to UEC until UEC personnel investigated the actions of Okada as described in ¶¶ 67 - 68.

### COUNT EIGHT

### (Unjust Enrichment – All Defendants)

123.    UEC repeats and re-alleges, as if fully set forth herein, the allegations contained in all the preceding paragraphs, ¶¶ 1 - 122.

124.    By engaging in the conduct alleged in this Complaint, Defendants have improperly received monies or other benefits and compensation that unjustly enriched them at UEC's expense.

125.    There is no legal justification for Defendants' unjust enrichment at UEC's expense.

126.    UEC has been damaged by Defendants' actions to unjustly enrich themselves in an amount to be proven at trial.

127.    It would be inequitable to allow Defendants' to retain the benefits receive at the expense of UEC.

128.    UEC did not discover that Defendants had unjustly enriched themselves to UEC's detriment until UEC personnel investigated the actions of Okada as described in ¶¶ 67 - 68.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Hold that AGA has directly infringed and indirectly infringed (through inducement and contributory infringement) claims of the Asserted Patents, literally and/or under the doctrine of equivalents pursuant to 35 U.S.C. § 271;

B.    Preliminarily and permanently enjoin AGA as well as its respective agents, servants, officers, directors, employees and all persons acting in concert with them, directly or indirectly, from infringing, inducing others to infringe, or contributing to the infringement of the Asserted Patents pursuant to 35 U.S.C. § 283;

C.    Order AGA to account for and pay to UEC the damages to which UEC is entitled as a consequence of AGA's infringement of the Asserted Patents and to which is available under 35 U.S.C. § 284;

D. Find that AGA's infringement is willful and accordingly award UEC enhanced damages in accordance with 35 U.S.C. § 284;

E. Declare this case exceptional pursuant to 35 U.S.C. § 285 and award UEC its reasonable attorneys' fees and costs in this action;

F. Award to Plaintiff its' actual, consequential, and incidental damages sustained in an amount to be proven at trial caused by AGA and/or Okada;

G. Award to Plaintiff exemplary and/or punitive damages pursuant to N.R.S. § 42.005 based on AGA's and Okada's malice towards UEC and/or conscious disregard for UEC's rights.

H. Award to Plaintiff restitution or disgorgement of Defendant AGA's and/or Okada's unjust profits.

I. Award to Plaintiff its' costs, expenses, disbursements, and attorneys' fees incurred herein;

J. Award to Plaintiff pre-judgment and post-judgment interest on the foregoing amounts at the maximum rate recoverable by law; and

K. Award to Plaintiff such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of all issues triable by a jury.

RESPECTFULLY SUBMITTED this 23rd day of August, 2018.

By:  */s/ Jay J. Schuttert* _____
Jay J. Schuttert, Esq.
Nevada Bar No. 8656
David W. Gutke, Esq.
Nevada Bar No. 9820
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Avenue, Suite 900
Las Vegas, NV 89102
Telephone (702) 805-0290
Facsimile (702) 805-0291
Email: jschuttert@eftriallaw.com
Email: dgutke@efstriallaw.com

Andrew Weaver (pro hac vice)
Polsinelli PC
1000 Louisiana Street, 53rd Floor
Houston, TX 77002
Telephone:  (713) 374-1600
Facsimile:  (713) 374-1601
Email:  aweaver@polsinelli.com

ATTORNEYS FOR PLAINTIFF
UNIVERSAL ENTERTAINMENT
CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically served on counsel of record this 23rd day of August, 2018, using the Court's CM/ECF System.


_____/s/ Faith B. Radford_____
An Employee of Evans Fears & Schuttert LLP