1  J. Stephen Peek, Esq. (1758)
   Bryce K. Kunimoto, Esq. (7781)
2  Robert J. Cassity, Esq. (9779)
   HOLLAND & HART LLP
3  9555 Hillwood Drive, 2nd Floor
   Las Vegas, Nevada 89134
4  Tel: (702) 669-4600
   speek@hollandhart.com
5  bkunimoto@hollandhart.com
   bcassity@hollandhart.com
6
   *Attorneys for Defendants Aruze Gaming*
7  *America and Kazuo Okada*

8  Jeffrey S. Love, Esq. (*pro hac vice*)
   Kristin L. Cleveland, Esq. (*pro hac vice*)
9  KLARQUIST SPARKMAN, LLP
   One World Trade Center
10 121 S.W. Salmon Street Suite 1600
   Portland, Oregon 97204
11 jeffrey.love@klarquist.com
   kristin.cleveland@klarquist.com
12
   *Attorneys for Defendant Aruze Gaming*
13 *America, Inc*

14

15

16 UNIVERSAL ENTERTAINMENT
   CORPORATION, a Japanese corporation
17
   Plaintiff,
18
   v.
19
   ARUZE GAMING AMERICA, INC., a Nevada
20 corporation, KAZUO OKADA, an individual

21 Defendants.

   ARUZE GAMING AMERICA, INC., a Nevada
22 corporation, KAZUO OKADA, an individual

23
   Counterclaimants,
24
   v.
25
   UNIVERSAL        ENTERTAINMENT
26 CORPORATION,  a  Japanese  corporation,
   ARUZE USA, a Nevada corporation, and JUN
27 FUJIMOTO, an individual,

28 Counter Defendants.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

CASE NO.:  2:18-00585-RFB-GWF

**ARUZE GAMING AMERICA, INC.
AND KAZUO OKADA'S ANSWER TO
UNIVERSAL ENTERTAINMENT
CORPORATION'S SECOND
AMENDED COMPLAINT,
COUNTERCLAIMS AGAINST
UNIVERSAL ENTERTAINMENT
CORPORATION, ARUZE USA,
INC., AND JUN FUJIMOTO**

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

Page 1

**HOLLAND & HART** LLP
9555 Hilldrive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

## DEFENDANTS' ANSWER TO SECOND AMENDED COMPLAINT

Defendants Aruze Gaming America, Inc. ("AGA") and Kazuo Okada ("Mr. Okada") (collectively, "Defendants"), by and through their attorneys of record, hereby answer and respond to Universal Entertainment Corporation's ("UEC")[1] Second Amended Complaint, filed in the United States District Court for the District of Nevada on August 23, 2018, as follows:

## GENERAL DENIAL

Unless specifically admitted below, Defendants deny each and every allegation made in the Second Amended Complaint.

## PARTIES, JURISDICTION, AND VENUE

1.      As to paragraph 1, Defendants admit these allegations.

2.      As to paragraph 2, Defendants admit these allegations.

3.      As to paragraph 3, Defendants admit that Mr. Okada is an individual who resides at 16th Floor, Tower Two, The Lily, 129 Repulse Bay Road, Repulse Bay, Hong Kong, China. Mr. Okada admits that he is the owner of an entity that engages in business in the State of Nevada.  Mr. Okada admits that he was the founder of the entity which is now UEC, and was an officer and director of UEC until, through unlawful conduct, he was wrongfully removed as a director in May 2017.   Mr. Okada admits that he is licensed by the Nevada Gaming Commission.    Mr. Okada denies the remaining allegations in this paragraph.   AGA lacks knowledge or information sufficient to form a belief as to the truth of the allegations directed to Mr. Okada that are not expressly admitted, and therefore denies the same.  Defendants deny any remaining allegations in this paragraph,   and specifically deny infringement of any valid claim of any asserted patent.

4.      As to paragraph 4, Defendants deny these allegations.

5.      As to paragraph 5, Defendants admit that Plaintiff purports to bring a cause of action for patent infringement against AGA.  Defendants admit, for the purposes of this action

---

[1] For the sake of simplicity, throughout the Answer and Counterclaim, Defendants use "AGA" and "UEC" to refer to those companies irrespective of their formal legal entity names, which have changed throughout the companies' history.

only, that this Court has subject matter jurisdiction over the claims asserted in Plaintiff's Second Amended Complaint.   Defendants deny the remaining allegations in this paragraph, and specifically deny infringement of any valid claim of any asserted patent.

6.     As to paragraph 6, Defendants admit, for the purposes of this action only, that this Court has subject matter jurisdiction over the claims asserted in Plaintiff's Second Amended Complaint.

7.     As to paragraph 7, Defendants admit, for purposes of this action only, that this Court has supplemental jurisdiction over the claims asserted in Plaintiff's Second Amended Complaint.

8.     As to paragraph 8, AGA admits that it is subject to jurisdiction in Nevada.  AGA denies the remaining allegations in this paragraph.  Mr. Okada admits that he owns AGA and that he holds a gaming license in Nevada. Mr. Okada denies the remaining allegations in this paragraph and specifically denies that the Court has personal jurisdiction over him for the allegations in Plaintiff's Second Amended Complaint.

## THE ASSERTED PATENTS

9.     As to paragraph 9, Defendants admit that UEC, under the leadership of Mr. Okada, was a pioneer in pachislot and pachinko machines. Defendants deny the remaining allegations in this paragraph.

10.     As to paragraph 10, Defendants admit that UEC, under the leadership of Mr. Okada, developed high-quality, new and exciting pachislot and pachinko gaming devices. Defendants admit that it appears that UEC has been listed as an assignee on over five hundred patents, worldwide. Defendants deny the remaining allegations in this paragraph.

11.     As to paragraph 11, Defendants admit that the Asserted Patents relate to the construction or operation of slot machines. Defendants deny the remaining allegations in this paragraph.

///

///

**HOLLAND & HART LLP**
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

**The '472 Patent:**

12.     As to paragraph 12, AGA admits that Exhibit A, on its face, appears to be a copy of the '472 patent, entitled "Slot-Type Gaming Machine with Improved Cabinet," which lists Koichiro Hashimoto as an inventor, states it issued July 11, 2017 from Application No. 14/961,361, filed on December 7, 2015, and purports to claim priority to Japanese Application No. 2007-160632, filed on June 18, 2007.  AGA denies all remaining allegations in this paragraph, and specifically denies that UEC owns all right, title and interest in the '472 patent. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

13.     As to paragraph 13, AGA admits that the image in this paragraph appears to depict one of AGA's products. The description set forth in this paragraph uses terms that are used by some of the claims of the Asserted Patents, which are subject to claim construction by the Court; accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. AGA denies that the pictured device, or any other AGA game machine, infringes any valid claim of the '472 patent.   Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**The '473 Patent:**

14.     As to paragraph 14, AGA admits that Exhibit B, on its face, appears to be a copy of the '473 patent, entitled "Slot-Type Gaming Machine with Improved Cabinet," which lists Koichiro Hashimoto as an inventor, states it issued July 11, 2017 from Application No. 14/962,087, filed on December 8, 2015, and purports to claim priority to Japanese Application No. 2007-160632, filed on June 18, 2007. AGA denies all remaining allegations in this paragraph, and specifically denies that UEC owns all right, title and interest in the '473 patent. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

15.     As to paragraph 15, AGA admits that the image in this paragraph appears to depict one of AGA's products, supplemented by annotations made by Plaintiff. The description set forth

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

in this paragraph uses terms that are used by some of the claims of the Asserted Patents, which are subject to claim construction by the Court; accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. AGA denies that the pictured device, or any other AGA game machine, infringes any valid claim of the '473 patent.   Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

<div align="center">

**The '013 Patent:**

</div>

16.     As to paragraph 16, AGA admits that Exhibit C, on its face, appears to be a copy of the '013 patent, entitled "Gaming Machine," which lists Takashi Abe, Hideaki Kishi, and Yuya Konno as inventors, states it issued January 3, 2012 from Application No. 12/124,754, filed on May 21, 2008, and purports to claim priority to Japanese Application No. 2007-169775, filed on June 27, 2007. AGA denies all remaining allegations in this paragraph, and specifically denies that UEC owns all right, title and interest in the '013 patent. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

17.     As to paragraph 17, AGA admits that the images in this paragraph appear to depict drawings excerpted from an Service Manual for "G-ENEX Video Slot" Gaming Machine as distributed in Australia,  supplemented by annotations made by Plaintiff. The description set forth in this paragraph uses terms that are used by some of the claims of the Asserted Patents, which are subject to claim construction by the Court; accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. AGA denies that the pictured device, or any other AGA game machine, infringes any valid claim of the '013 patent.   Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

<div align="center">

**The '047 Patent:**

</div>

18.     As to paragraph 18, AGA admits that Exhibit D, on its face, appears to be a copy of the '047 patent, entitled "Display for Game and Gaming Machine," which lists Yasuyuki Sekine as an inventor, states it issued August 21, 2012 from Application No. 09/208,696, and

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 • Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

purports to claim priority to Japanese Application No. 9-340193, filed on June 10, 1997. AGA denies all remaining allegations in this paragraph, and specifically denies that UEC owns all right, title and interest in the '047 patent. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

19.     As to paragraph 19, AGA admits that the image in this paragraph appears to be a screen shot from an AGA video. The description set forth in this paragraph uses terms that are used by some of the claims of the Asserted Patents, which are subject to claim construction by the Court; accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. AGA denies that FIRE AND THUNDER, or any other AGA game machine infringes any valid claim of the '047 patent.   Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

20.     As to paragraph 20, AGA denies these allegations.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### AGA'S ACCUSED PRODUCTS

#### "THE G-SERIES FAMILY OF GAMES:"

21.     As to paragraph 21, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a listing of G-Series games, which games are available for installation in G-ENEX and G-Comfort cabinets. AGA admits that Exhibit E appears to be a Service Manual for "G-ENEX Video Slot" Gaming Machine as distributed in Australia.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

#### "THE G-STATION FAMILY OF GAMES:"

22.     As to paragraph 22, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a listing of G-Station games.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for

sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### "THE CUBE-X FAMILY OF GAMES"
### (SOME EXAMPLES INCLUDE THOSE GAMES LISTED IMMEDIATELY BELOW):

23.     As to paragraph 23, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a listing of Cube-X games.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Fire And Thunder" Game:

24.     As to paragraph 24, AGA admits that it offers the "Fire and Thunder" slot machine game.  AGA denies that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Fire and Thunder" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Aztec Sol" Game:

25.     As to paragraph 25, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Aztec Sol" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "King Of Dragons" Game:

26.     As to paragraph 26, AGA admits that it offers the "King of Dragons" slot machine game. AGA denies that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "King of Dragons" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Mighty Lion" Game:

27.     As to paragraph 27, AGA admits that, at the time of this Answer, AGA's web site contains a description and video of the "Mighty Lion" slot machine game, available at https://aruzegaming.com/innovator/mighty-lion/.  AGA denies that the link in this paragraph is accurately transcribed. AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.   Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Changing 7's" Games:

28.     As to paragraph 28, AGA admits that, at the time of this Answer, the links set forth in this paragraph point to descriptions and videos of the "Changing 7's" slot machine games.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Ninja Warrior" Game:

29.     As to paragraph 29, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Ninja Warrior" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Dancing Dragon" Game:

30.     As to paragraph 30, AGA admits that it offers the "Dancing Dragon" slot machine game.  AGA denies that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Dancing Dragon" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**The "Apex Gorilla" Game:**

31.     As to paragraph 31, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Apex Gorilla" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**The "Burning Hot Jackpot" Games:**

32.     As to paragraph 32, AGA admits that, at the time of this Answer, the links set forth in this paragraph point to descriptions and videos of the "Burning Hot Jackpot" slot machine games.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**The "Rose" Games:**

33.     As to paragraph 33, AGA admits that, at the time of this Answer, the links set forth in this paragraph point to descriptions and videos of the "Rose" slot machine games.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**The "Howling Wolf" Game:**

34.     As to paragraph 34, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Howling Wolf" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

///

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

### The "Crazy Stars" Game:

35.     As to paragraph 35, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Crazy Stars" slot machine game. AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Hot Hearts" Game:

36.     As to paragraph 36, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Hot Hearts" slot machine game. AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Samurai Dragon" Game:

37.     As to paragraph 37, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Samurai Dragon" slot machine game. AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### "The Gold Legend" Game:

38.     As to paragraph 38, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Gold Legend" slot machine game. AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale. Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### The "Crystal" Game:

39.     As to paragraph 39, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Crystal" slot machine game.

AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

<div align="center"><strong>The "Platinum Jackpot" Game:</strong></div>

40.    As to paragraph 40, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Platinum Jackpot" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

<div align="center"><strong>"The Gold" Game:</strong></div>

41.    As to paragraph 41, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "The Gold" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

<div align="center"><strong>The "Aztec Spirit" Game:</strong></div>

42.    As to paragraph 42, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Aztec Spirit" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

<div align="center"><strong>The "Bamboo Panda" Game:</strong></div>

43.    As to paragraph 43, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Bamboo Panda" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

**The "Panda Spirit" Game:**

44.     As to paragraph 44, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Panda Spirit" slot machine game. AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**The "Rapid Shot" Game:**

45.     As to paragraph 45, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Rapid Shot" slot machine game. AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**"The Great Inca" Game:**

46.     As to paragraph 46, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "The Great Inca" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

**The "Wild Dance Fire" Game:**

47.     As to paragraph 47, AGA admits that, at the time of this Answer, the link set forth in this paragraph points to a description and video of the "Wild Dance Fire" slot machine game.  AGA denies all remaining allegations in this paragraph, and specifically denies that listing a product on a website constitutes an offer for sale.  Mr. Okada lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

48.     As to paragraph 48, Defendants deny these allegations.

///

///

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

**OKADA'S ALLEGED USURPATION OF CORPORATE OPPORTUNITIES**

49.     As to paragraph 49, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

**Changes in UEC's Organization and Management:**

50.     As to paragraph 50, Defendants admit that Mr. Okada was the founder of UEC and, from at least January 2006 until June 2017, was a Director and Chairman of the Board of UEC.   Mr. Okada admits that he was wrongfully removed as Director and Chairman of the Board in June 2017.   Defendants admit that Mr. Okada has served as Representative Director of UEC.  As to the specific dates alleged of Mr. Okada's tenure, Defendants lack knowledge or information sufficient to form a belief as to the truth of this allegation.   The allegation that "Under Japanese law, Representative Director is generally equivalent to Chief Executive Officer" calls for a legal conclusion.   Defendants deny all remaining allegations in this paragraph.

51.     As to paragraph 51, Defendants admit that UEC's corporate organization changed over time and that during a certain period, UEC operated as a "company with committees."  Defendants admit that Mr. Hajime Tokuda previously served as Representative Executive Officer of UEC.   As to the dates of Mr. Tokuda's tenure, Defendants lack knowledge or information sufficient to form a belief as to the truth of this allegation.

52.     As to paragraph 52, Defendants admit that "In June 2010, UEC changed from a 'company with committees' to a 'company with a board of company auditors.'" Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and therefore deny the same.

53.     As to paragraph 53, Defendants admit these allegations.

**Changes in UEC's Patent Department:**

54.     As to paragraph 54, Defendants admit that, since at least as early as 2002, UEC maintained a Patent Department whose official responsibilities included filing for patents, monitoring for patent infringement by third parties, and licensing.  Defendants deny that Mr.

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

Okada improperly influenced the Patent Department.  Defendants deny that "This split in responsibility further facilitated Okada's ability to manufacture and sell gaming devices through AGA, gaming devices that used UEC's patent rights, including the Asserted Patents, without compensation to UEC or authorization from UEC by ensuring that those with potential knowledge and responsibility over UEC's foreign business reported to Okada, rather than to others." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

55.    As to paragraph 55, Defendants deny that "Okada's influence over Yaegashi facilitated Okada's ability to conceal the use of the Asserted Patents by AGA without compensation to or authorization by UEC, enriching Okada as AGA's only shareholder by controlling the possible flow of information to other managers and directors at UEC." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

56.    As to paragraph 56, Defendants deny that "This arrangement further facilitated Okada's ability to conceal the use of UEC's patent rights without compensation to or authorization by UEC, enriching Okada as AGA's only shareholder, by ensuring that those with knowledge and responsibility would report directly to Okada." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

### AGA's Shift to Okada's Sole Ownership and Control

57.    As to paragraph 57, Defendants admit that in 2005, AGA manufactured gaming devices for sale outside Japan.  Defendants deny the remaining allegations of this paragraph.

58.    As to paragraph 58, Defendants admit that "In August 2008, Okada purchased shares of AGA. "  Defendants admit that, as of January 2009, UEC held 49.95% of AGA's stock and Mr. Okada held 50.05% of AGA's stock and AGA continued to operate as an affiliate of UEC.  Defendants admit that Mr. Okada was an officer and director of AGA as of at least 2010.  Defendants  lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the same.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

59.     As to paragraph 59, Defendants admit that "In December 2008, a decision was made to transfer the remaining stock of AGA" to Mr. Okada, and that "This additional transfer process began in 2009" and the transfer was completed in or about March 2009, with some issues related to the transfer completed in 2010. AGA denies that it ceased being a UEC subsidiary in March 2010 and asserts that from the date UEC no longer owned more than 50% of AGA's stock, AGA was not a subsidiary of UEC.

60.     As to paragraph 60, this allegation is vague and unclear.   Defendants lack information or knowledge sufficient to form a belief as to the truth of this allegation, and therefore deny the same.

**Allegations that Okada Uses AGA to Usurp UEC's Corporate Opportunities:**

61.     As to paragraph 61, AGA denies the allegations. Mr. Okada lacks knowledge or information sufficient to perform a belief about the truth of the allegations in this paragraph.

62.     As to paragraph 62, Defendants admit that Mr. Okada was, at various times, in the position of Director and officer of UEC and, as such, properly directed and controlled many aspects of UEC's business, including issues relating to foreign patent rights. Defendants admit that UEC, as AGA's patent department, licensed UEC patent rights for AGA, that were necessary or useful for AGA to manufacture gaming devices, to AGA. Defendants deny the remaining allegations of this paragraph.

63.     As to paragraph 63, Defendants admit that, as of March 2009, Okada knew that AGA was being transferred to his complete ownership.  Defendants admit that, at the time, Mr. Okada was Chairman of the UEC Board of Directors and, as such, properly directed and controlled many aspects of UEC's business, including issues relating to foreign patent rights. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

64.     As to paragraph 64, Defendants admit that UEC granted to AGA a royalty-free license to UEC's patents.  As to the allegation that Mr. Okada owed UEC a fiduciary duty, this

allegation calls for a legal conclusion.   Defendants deny the remaining allegations in this paragraph.

65.     As to paragraph 65, Defendants deny these allegations.

66.     As to paragraph 66, Defendants deny that AGA had "unauthorized use of UEC's patent rights, AGA's unauthorized use of certain Asserted Patents in particular, or AGAs' failure to enter into a license agreement with UEC."  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and therefore deny the same.

**UEC Establishes a Special Investigation Committee:**

67.     As to paragraph 67, Defendants deny these allegations.

68.     As to paragraph 68, Defendants deny these allegations.

69.     As to paragraph 69, Defendants deny these allegations.

70.     As to paragraph 70, Defendants admit that UEC authorized and licensed AGA to use technology described and claimed in its patents, including the Asserted Patents, and that UEC's authorization was acknowledged by Mr. Okada and/or other UEC officers on multiple occasions.  Defendants deny the remaining allegations.

71.     As to paragraph 71, Defendants deny these allegations.

72.     As to paragraph 72, Defendants deny these allegations.

73.     As to paragraph 73, Defendants deny these allegations.

74.     As to paragraph 74, Defendants deny these allegations.

75.     As to paragraph 75, Defendants deny these allegations.

**COUNT ONE**
**(Alleged Infringement of the `472 patent – AGA)**

76.     As to paragraph 76, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

77.     As to paragraph 77, AGA admits that the image in this paragraph appears to depict one of AGA's products, supplemented by annotations made by Plaintiff.  AGA denies that its G-ENEX cabinets infringe any claim of the `472 patent.   The description set forth in

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

this paragraph uses terms that are used by some of the claims of the `472 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.  Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count One is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

78.    As to paragraph 78, AGA admits that Exhibit E is a Service Manual for "G-ENEX Video Slot" Gaming Machine as distributed in Australia.  AGA denies that its G-ENEX cabinets infringe any claim of the `472 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `472 patent,  which are subject to claim construction by the Court and have a patent contextual meaning. Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count One is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

79.    As to paragraph 79, AGA denies these allegations. Count One is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

80.    As to paragraph 80, AGA denies these allegations. Count One is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

**COUNT TWO**
**(Alleged Infringement of the `473 patent – AGA)**

81.    As to paragraph 81, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

82.    As to paragraph 82,   AGA admits that the image in this paragraph appears to depict one of AGA's products, supplemented by annotations made by Plaintiff.  AGA denies that its G-ENEX cabinets infringe any claim of the `473 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `473 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.   Accordingly,

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Two is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

83.     As to paragraph 83,   AGA admits that Exhibit E is a Service Manual for "G-ENEX Video Slot" Gaming Machine as distributed in Australia.  AGA denies that its G-ENEX cabinets infringe any claim of the `473 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `473 patent,   which are subject to claim construction by the Court and have a patent contextual meaning. Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Two is   not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

84.     As to paragraph 84, AGA denies these allegations.  Count Two is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

85.     As to paragraph 85, AGA denies these allegations. Count Two is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

### COUNT THREE
### (<u>Alleged Infringement of the `013 patent – AGA</u>)

86.     As to paragraph 84, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

87.     As to paragraph 87, AGA denies these allegations.  Count Three is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

88.     As to paragraph 88,   AGA admits that Exhibit E is a Service Manual for "G-ENEX Video Slot" Gaming Machine as distributed in Australia.   AGA admits that the images in this paragraph appear to depict drawings included in a Service Manual for "G-ENEX Video Slot" Gaming Machine as distributed in Australia, supplemented by annotations made by

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

Plaintiff.  AGA denies that its G-ENEX cabinets infringe any claim of the `013 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `013 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.  Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Three is  not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

89.   As to paragraph 89,   AGA admits that it has CUBE-X, G-COMFORT and G-STATION cabinets.  AGA denies that its CUBE-X, G-COMFORT and G-STATION cabinets infringe any claim of the `013 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `013 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.  Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Three is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

90.   As to paragraph 90, AGA denies these allegations. Count Three is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

91.   As to paragraph 91, AGA denies these allegations. Count Three is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

**COUNT FOUR**
**(Alleged Infringement of the `047 patent – AGA)**

92.   As to paragraph 92, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

93.   As to paragraph 93,   AGA admits that the image in this paragraph appears to be a screen shot from AGA's "Fire and Thunder" slot machine which has a CUBE-X cabinet, and the screen shot depicts a "wild" symbol, among others.  AGA denies that any of the listed slot

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

machines infringe any claim of the `047 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `047 patent,   which are subject to claim construction by the Court and have a patent contextual meaning. Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

94.     As to paragraph 96,   AGA admits that AGA's "Fire and Thunder" slot machine has 5 reels and a 3-row stepper slot, and displays a "wild" symbol, among others.  AGA denies that any of the listed slot machines infringe any claim of the `047 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `047 patent,   which are subject to claim construction by the Court and have a patent contextual meaning. Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

95.     As to paragraph 95,   AGA admits that AGA's slot machine listed in this paragraph have 5 reels and a 3-row stepper slot.  AGA admits that Aztec Sol has an Aztec coin symbol; that Panda Spirit has wild and 7 symbols; and that the remaining slot machines listed in this paragraph have bonus and 7 symbols.  AGA denies that any of the listed slot machines infringe any claim of the `047 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `047 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.  Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

96.     As to paragraph 96, AGA admits that the slot machines listed in this paragraph have 7 symbols.  AGA denies that any of the listed slot machines infringe any claim of the `047 patent.   The description set forth in this paragraph uses terms that are used by some of the

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

claims of the `047 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.  Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

97.     As to paragraph 97, AGA admits that the slot machines listed in this paragraph have wild symbols.  AGA denies that any of the listed slot machines infringe any claim of the `047 patent.   The description set forth in this paragraph uses terms that are used by some of the claims of the `047 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.  Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

98.     As to paragraph 98,   AGA admits that the Rapid Shot slot machine has wild symbols.  AGA denies that any of the listed slot machines infringe any claim of the `047 patent. The description set forth in this paragraph uses terms that are used by some of the claims of the `047 patent,   which are subject to claim construction by the Court and have a patent contextual meaning.  Accordingly, AGA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

99.     As to paragraph 99, AGA denies these allegations. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

100.     As to paragraph 100, AGA denies these allegations. Count Four is not directed at Mr. Okada, therefore Mr. Okada has no obligation to respond to the allegations of this paragraph.

///

///

**COUNT FIVE**
(<u>Alleged Tortious Interference with Prospective Economic Advantage – All Defendants</u>)

101.    As to paragraph 101, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

102.    As to paragraph 102,   Defendants deny these allegations.

103.    As to  paragraph 103, Defendants deny these allegations.

104.    As to  paragraph 104, Defendants deny these allegations.

105.    As to  paragraph 105, Defendants deny these allegations.

106.    As to  paragraph 106, Defendants deny these allegations.

**COUNT SIX**
(<u>Alleged Breach of Fiduciary Duty of Loyalty - Okada</u>)

107.    As to  paragraph 107, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

108.    As to  paragraph 108, Mr. Okada admits that, at various time, he was an officer and director of UEC but denies the remaining allegations on the grounds it calls for a legal conclusion. Count Six is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

109.    As to  paragraph 109, Mr. Okada denies these allegations.  Count Six is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

110.    As to  paragraph 110, Mr. Okada denies these allegations. Count Six is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

111.    As to  paragraph 111, Mr. Okada denies these allegations. Count Six is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

112.    As to paragraph 112,   the allegation that Mr. Okada is not entitled to the benefit of the Business Judgment Rule calls for a legal conclusion.  Mr. Okada denies the remaining allegations of this paragraph. Count Six is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

113.   As to paragraph 113, Mr. Okada denies these allegations. Count Six is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

**COUNT SEVEN**
**(<u>Alleged Fraudulent Misrepresentation - Okada</u>)**

114.   As to paragraph 114, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

115.   As to paragraph 115, Mr. Okada denies these allegations. Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

116.   As to paragraph 116, Mr. Okada admits that Mr. Okada was properly in formal control of UEC's foreign business, including issues relating to UEC's foreign patent rights. Mr. Okada denies the remaining allegations in this paragraph. Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

117.   As to paragraph 117, Mr. Okada denies these allegations. Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

118.   As to paragraph 118, Mr. Okada denies these allegations. Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

119.   As to paragraph 119, Mr. Okada denies these allegations. Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

120.   As to paragraph 120, Mr. Okada denies these allegations. Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

121.   As to paragraph 121,  the allegation that Mr. Okada is not entitled to the benefit of the Business Judgment Rule calls for a legal conclusion.  Mr. Okada denies the remaining allegations of this paragraph.   Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

122.   As to paragraph 122, Mr. Okada denies these allegations. Count Seven is not directed at AGA, therefore AGA has no obligation to respond to this paragraph.

///

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

## COUNT EIGHT
### (Alleged Unjust Enrichment – All Defendants)

123.     As to paragraph 123, Defendants repeat and reallege each and every answer contained in the above paragraphs as though fully set forth herein.

124.     As to paragraph 124, Defendants deny these allegations.

125.     As to paragraph 125, Defendants deny these allegations.

126.     As to paragraph 126, Defendants deny these allegations.

127.     As to paragraph 127, Defendants deny these allegations.

128.     As to paragraph 128, Defendants deny these allegations.

## AFFIRMATIVE AND OTHER DEFENSES

Further answering the Second Amended Complaint and as additional defenses thereto, Defendants state the following affirmative and other defenses, without admitting any allegation not otherwise admitted and without assuming any burden of proving any fact that is otherwise Plaintiff's burden to prove. Defendants reserve the right to amend their answer or to augment these defenses based on further investigation and discovery.

### First Defense: Lack of Standing

1.     UEC lacks authority to file and maintain this suit, because Mr. Okada is the rightful controlling owner of Okada Holdings Limited, the controlling shareholder of UEC.  Mr. Okada was wrongfully removed from his positions of control over UEC by a coup d'état orchestrated by Mr. Fujimoto, Tomohiro Okada, and others.     Specifically, Mr. Fujimoto, Tomohiro, and others wrongfully purportedly ousted Mr. Okada from control over Okada Holdings Limited and in turn from his position as Chairman of the Board of UEC by fraudulent and illegal means, as described in paragraphs 70 through 127 of the Counterclaim.  But for these fraudulent and illegal acts, Mr. Okada's control of Okada Holdings Limited and his position of control within UEC would not be in dispute and Mr. Okada would not have authorized the wrongful filing of UEC's spurious complaint.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

2.      To the extent that Plaintiff is not the owner of the Asserted Patents, it has not established that it has standing to bring these alleged causes of action for patent infringement.

**Second Defense: Non-Infringement**

3.      AGA does not infringe and has not infringed any valid and enforceable claim of the Asserted Patents, nor does AGA contribute to the infringement of, or actively induce others to infringe any valid and enforceable asserted claims of the Asserted Patents, either directly, indirectly, literally, or under the doctrine of equivalents.

**Third Defense: License, Covenant Not To Sue, Exhaustion**

4.      To the extent that any of Plaintiff's allegations of infringement are premised on the alleged use, sale, or offer for sale of methods, systems, apparatus, features, and/or products that are licensed under the Asserted Patents, such allegations are barred pursuant to license and/or exhaustion.

5.      Plaintiff granted AGA license and/or authorization to practice the Asserted Patents and/or to manufacture, have made, offer to sell, sell and import the Accused Products.  To the extent the Asserted Patents' named inventors were AGA employees, or otherwise working for the benefit of AGA and/or using AGA's facilities or personnel, when they made the claimed inventions, AGA is licensed under, or the owner of, those Asserted Patents under applicable Japanese and/or U.S. law, including Japanese Patent Act Article 35, Nevada Revised Statute 600.500, and/or common law and equitable principles.

**Fourth Defense: Invalidity**

6.      The asserted claims of the Asserted Patents are invalid for failing to comply with the provisions of the Patent Laws, Title 35 U.S.C., including without limitations 35 U.S.C. §§ 101, 102, 103, and/or 112 *et seq*., and/or for double patenting.

**Fifth Defense: Equitable Defenses**

7.      Plaintiff's claims in Counts Five, Six, Seven and Eight are barred, in whole or in part, by the doctrines of equitable estoppel, laches, prosecution laches, disclaimer, waiver, uncleans hands, and/or other equitable defenses.

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

**Sixth Defense: Statute of Limitation**

8.     Plaintiff's claims are barred pursuant to the respective statutes of limitation.

**Seventh Defense: Failure to Mitigate Damages**

9.     Plaintiff's claims may be barred, in whole or in part, by its failure to mitigate damages.

**Eighth Defense: Damages Limited**

10.     Some or all of Plaintiff's claims are barred, in whole or in part, or otherwise limited pursuant to 35 U.S.C. §§ 286-288.

**Ninth Defense: Failure to State a Claim**

11.     Plaintiff fails to state a claim on which relief can be granted.

**Tenth Defense: Unavailability Of Relief (Enhanced Damages)**

12.     Plaintiff has failed to plead and meet the requirements for enhanced damages.

**Eleventh Defense: 35 U.S.C. Sec. 288**

13.     Plaintiff's prayer for costs is barred under 35 U.S.C. § 288 on account of the invalidity of at least one or more claims of the Asserted Patents.

**Twelfth Defense: Intervening Rights**

14.     Counts One and Two, and all Counts to the extent they are based on the reissue patents alleged in Counts One and Two, are barred by statutory and equitable intervening rights as to past and future conduct pursuant to 35 U.S.C. § 252.

**Thirteenth Defense: Preemption**

15.     Patent Law, 35 U.S.C. section 101 et seq., preempts Counts Five, Six and Eight.

**Fourteenth Defense: Failure to Identify Contractual Relationships**

16.     Plaintiff has failed to satisfactorily identify any pre-existing or prospective contractual relationships with which Defendants allegedly interfered.

**Fifteenth Defense: Failure to Plead Fraud With Particularity**

17.     Plaintiff has failed to plead fraud with particularity.

///

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

### Sixteenth Defense: Laches

18.    Plaintiff's claims are barred under the doctrine of laches.

### Seventeenth Defense: Unclean Hands

19.    Plaintiff's claims are barred under the doctrine of unclean hands.

### Eighteenth Defense: Excused/Justification

20.    The conduct challenged in Plaintiff's Second Amended Complaint was and is excused and/or justified under the circumstances.

### Nineteenth Defense: No Damages

21.    Plaintiff has not suffered any actual damages or cognizable harm.

### Twentieth Defense: No Proximate Causation

22.    If Plaintiff suffered any loss, injury, damage, or detriment, the same was directly and proximately caused by the conduct, acts, omissions, activities, carelessness, recklessness, negligence, unreasonableness, and/or intentional misconduct or intervening acts of Plaintiff or others.

### Twenty-First Defense: Promissory Estoppel

23.    Plaintiff's claims are barred by the doctrine of promissory estoppel.

### Twenty-Second Defense: Waiver

24.    Plaintiff's claimed are barred under the doctrine of waiver.

### Twenty-Third Defense: Reverse Doctrine of Equivalents

25.    No relief is available to Plaintiff because, among other things, use of the accused technology is substantially different in principle from the purported inventions described in the '013 and '047 Patents, and Plaintiff cannot sustain its burden of proving otherwise, under the reverse doctrine of equivalents.

### Twenty-Fourth Affirmative Defense: Reservation Of Additional Defenses.

26.    Defendants reserve all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and the Patent Laws of the United States, and any other defenses, at law or in

equity, that may now exist or in the future be available based on discovery and further factual investigation in this case.

## DEFENDANTS' COUNTERCLAIMS

Counterclaimants Aruze Gaming America, Inc. ("AGA") and Kazuo Okada ("Mr. Okada") (collectively, "Counterclaimants"), by and through their counsel of record, for their Counterclaim against Universal Entertainment Corporation ("UEC"), Aruze USA, Inc. ("Aruze USA"), and Jun Fujimoto ("Mr. Fujimoto"), hereby allege and complain as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Counterclaimant AGA is a Nevada corporation with its principal place of business located at 955 Grier Drive, Suite A, Las Vegas, Nevada 89119.

2.      Counterclaimant Mr. Okada is an individual residing in the Hong Kong Special Administrative Region of the People's Republic of China.  Mr. Okada singlehandedly founded UEC and served as an officer and director of UEC until he was wrongfully ousted in June 2017.

3.      Counterdefendant UEC is a corporation organized under the laws of Japan with its headquarters and principal place of business located in Tokyo, Japan.

4.      Counterdefendant Mr. Fujimoto is an individual residing in Tokyo, Japan.  Mr. Fujimoto has been the President of UEC since June 2011 and has availed himself of the benefits and protections of the state of Nevada by filing an application for licensure pending before the Nevada Gaming Commission and by directing his wrongful actions against AGA and Okada into Nevada.  In March 2017 Mr. Fujimoto set into motion his plan to wrongfully oust Mr. Okada from his position as an officer and director of UEC.

5.      Counterdefendant Aruze USA is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 2831 St. Rose Parkway, Suite 334, Henderson, Nevada 89052, and is a wholly owned subsidiary of UEC.  Aruze USA's primary asset was its ownership of stock in Wynn Resorts Limited.

6.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a), because this Court has original jurisdiction over UEC's Second Amended Complaint, and the claims raised

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

herein are related to the original jurisdiction such that they form part of the same case or controversy.

7.      Additionally, this Court has subject matter jurisdiction over the Counterclaims against UEC and Mr. Fujimoto pursuant to 28 U.S.C. § 1332(a)(2), as those claims arise between a Nevada corporate citizen and a Hong Kong citizen, on the one hand, and a Japanese corporate citizen and a Japanese citizen, respectively, on the other.  The amount in controversy with respect to such Counterclaims exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (2), or (3), because Counterclaimant Aruze USA is a corporate resident of Nevada and subject to personal jurisdiction, and a substantial harm resulting from the events and omissions has been felt by Counterclaimant AGA in Nevada.

## GENERAL ALLEGATIONS

### A.  Mr. Okada's Formation of UEC and UEC's Evolution

9.      Mr. Okada is an entrepreneur, engineer, and pioneer in the gaming industry. Given his interest in mechanics, as a young man he studied at an engineering vocational school. He thereafter earned a living repairing jukeboxes and cathode-ray tube televisions brought into Japan from the United States.

10.     In 1969, Mr. Okada founded Universal Lease Co. Ltd ("Universal Lease"), which manufactured coin-operated arcade games for children and/or leased jukeboxes.  Mr. Okada owned 100% of the shares of Universal Lease.

11.     After a trip to Las Vegas that same year, Mr. Okada decided to enter the slot machine manufacturing business.

12.     In 1971, Universal Lease changed its name to Universal Co. Ltd, and in 1975, Universal Co. Ltd. changed its name to Universal Sales Co., Ltd ("Universal Sales").  Mr. Okada continued to own 100% of the shares of Universal Sales.

13.     In April 1998, Universal Sales changed its name to Aruze Corporation and registered its shares for the first time on what is known today as the Tokyo Stock Exchange

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

JASDAQ (Japanese Association of Securities Dealers Automated Quotation).  Mr. Okada served as Director and Chairman of the Aruze Corporation board of directors.

14.     In 1983, AGA was incorporated in Nevada under the name Universal Distributing of Nevada, Inc. ("UDN").  UDN was formed to manufacture and sell gaming devices outside of Japan, including in the United States.  In 2005, Mr. Okada, who owned all of the stock of UDN, sold his UDN stock to UEC.  From 2005 until August 2008, UDN was a wholly owned subsidiary of UEC.

15.     In 2005, UDN changed its name to Aruze Gaming America, Inc.

16.     In August 2008, Mr. Okada purchased shares of AGA from Aruze Corporation (which later became UEC), and Aruze Corporation issued additional AGA stock to Mr. Okada, resulting in Mr. Okada holding a 49.95% ownership interest in AGA.  Aruze Corporation owned the remaining 50.05% interest at that time.

17.     In December 2008, Mr. Okada commenced the process to purchase from Aruze Corporation the remaining 50.05% shares in AGA, which transfer was completed in March 2009.  Mr. Okada then owned 100% of the stock in AGA, and AGA ceased operating as a UEC subsidiary.

18.     On November 1, 2009, Aruze Corporation changed its name to Universal Entertainment Corporation, the name under which the company operates at the present time.

19.     In June 2010, UEC changed its corporate governance structure from a "company with committees," a type of stock corporation organized by a series of committees including a Nominating Committee, Audit Committee, and Compensation Committee, and represented by a Representative Executive Officer, to a "company with board of auditors."

**B.   The Okada Family's Ownership of UEC and Formation of Okada Holdings Limited**

20.     In 1960, Mr. Okada married his first wife and proceeded to have two children with her: a son, Tomohiro Okada ("Tomohiro") in 1967, and a daughter, Hiromi Okada ("Hiromi"), in 1969.

21.     In March 1991, Mr. Okada gifted Tomohiro approximately 9% of the shares in Universal Sales in light of his upcoming graduation from university.  At that time, Mr. Okada had aspirations that his son would succeed him in running the company someday.  At the same time, Mr. Okada gifted approximately 9% of the shares in Universal Sales to Hiromi.  Mr. Okada did not envisage that Hiromi would take an active role in the company but gave her the shares to provide her financial security.

22.     Mr. Okada's "transfer" of shares to his children was in name only for the purpose of obtaining favorable tax consequences and in anticipation of the true transfer to his children. Tomohiro and Hiromi would need to become Hong Kong residents to benefit from the waiver of the transfer/gift tax and have not yet taken this step.  Nor have his children paid the appropriate gift/transfer tax, which would be owed if they claim the shares had truly been transferred.

23.     At the time he nominally gifted the shares to his children, Mr. Okada considered Universal Sales to be his creation, which required his active input to grow and remain successful.  Mr. Okada had no intention to allow Tomohiro and Hiromi to control or vote the shares, but rather, intended to remain in control of 100% of the shares himself.  Accordingly, prior to the transfers, he told both Tomohiro and Hiromi that the shares would be given to them on certain additional terms and conditions, including: (a) Mr. Okada would retain full control of the shares, including but not limited to the exercise of voting rights attached to them; (b) Tomohiro and Hiromi would not take any steps that would cause Mr. Okada to lose control of the shares; and (c) Mr. Okada would continue to serve as director until such time as he decided otherwise.

24.     The terms and conditions of the share transfer were not reduced to writing due to two important aspects of Japanese culture.  First, Japanese children of Tomohiro and Hiromi's generation are expected to, and do, follow the instructions and wishes of their father. Second, Japanese culture places great emphasis on trust and the familial relationship, meaning

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

that it is regarded as unnecessary to record agreements and understandings between family members, even for very important matters.

25.     Both Tomohiro and Hiromi orally agreed to the terms and conditions on which the share transfers were premised.  Mr. Okada would not have transferred his children the shares if they had not agreed to his terms and conditions that are set forth in paragraph 23.

26.     Following the share transfers, Mr. Okada, Tomohiro, and Hiromi all acted in accordance with the terms and conditions set forth above; Mr. Okada continued to exercise full control over 100% of the shares.

27.     In 1993 or 1994, as a result of a company merger, Mr. Okada allocated additional shares to Tomohiro.  These shares were transferred on the same terms and conditions as were agreed to in March 1991.  Tomohiro again agreed to the conditions, and Mr. Okada continued to exercise full control over the shares.

28.     In April 1991, at the age of 23, Tomohiro joined UEC as an employee.  In or about August 1995, Tomohiro became a director of UEC.  Between June 1995 and June 2002, Tomohiro had roles in various aspects of business.  All roles in the business were assigned by Mr. Okada.  Mr. Okada assigned Tomohiro to the roles of:  Director of Corporate Planning; Director of Research and Development; Director of the Administration Department; and Director of Investor Relations.

29.     Tomohiro did not perform well at UEC and his employment was terminated in June 2002.

30.     In March 2008, Mr. Okada gave Tomohiro a second chance to involve himself in the management of UEC.  Mr. Okada arranged for Tomohiro to become the director of a UEC subsidiary, Aruze USA.  At the same time, Tomohiro was also appointed a director of UEC.

31.     Tomohiro was again unsuccessful in his duties as director.  In 2015, Tomohiro was removed as director of UEC and Aruze USA.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

32.     Mr. Okada and Tomohiro have had little contact with each other since about 2010.  Mr. Okada and Tomohiro generally only met at formal family ceremonies and gatherings.

33.     In 1997, Mr. Okada's first wife passed away due to illness.  Thereafter, Hiromi became very close with her older brother Tomohiro.  Mr. Okada often spent long hours at the office to manage his business, and thus Tomohiro became Hiromi's closest family member.  Due to this close relationship, Hiromi had complete trust in Tomohiro to look out for the family's interest.

34.     In 1999, Mr. Okada married his second wife, Ms. Takako Okada ("Takako").

35.     By September 2010, Mr. Okada, Tomohiro, Hiromi, and Takako collectively owned 67.9% of the publicly traded shares of UEC.

36.     In September 2010, Mr. Okada incorporated Okada Holdings Limited ("Okada Holdings"), a Hong Kong company, to serve as a holding company for all UEC shares held under the names of Mr. Okada's family members.  Mr. Okada informed Hiromi that all the shares in UEC owned by the Okada family would be held by Okada Holdings.  Hiromi did not object to this arrangement.  The ownership structure of Okada Holdings at the time of its formation was as follows:

| Shareholder | Number of Shares | % Ownership |
|---|---|---|
| Mr. Okada | 4,342,147,372 | 46.3% |
| Tomohiro | 4,071,306,841 | 43.4% |
| Hiromi | 916,127,910 | 9.78% |
| Takako | 33,386,126 | 0.36% |

This ownership structure was set up on the same terms and conditions that Tomohiro and Hiromi originally agreed to in March 1991.  Mr. Okada continued to exercise control over all UEC shares owned by Okada Holdings.

37.     For over forty-seven years, from the time of the company's inception until June 2017, with limited exception, Mr. Okada had majority shareholder control over UEC through his control of his and his family's shares, and his position as Okada Holdings' sole director, was

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

involved in the management of UEC, and served as one of the UEC Directors and served as the Chairman. Accordingly, Mr. Okada's name is often associated with UEC. Indeed, one of UEC's latest business projects is a casino resort in the Philippines, "Okada Manila," which bears Mr. Okada's name.

### C. Mr. Okada's Oversight of and Responsibility for UEC's Foreign Patents

38.     In 2002, UEC, then operating as Aruze Corporation, created a patent department to manage its intellectual property rights. Mr. Nobuo Yaegashi was appointed as the General Manager for the patent department.

39.     On March 31, 2009, shortly after the AGA share transfer, AGA and Aruze Corporation executed a contract titled "Agreement to Transfer the Right to Receive Patents" ("First IP Agreement"). A true and accurate copy of the First IP Agreement in Japanese, along with an English translation, is attached hereto as **Exhibit 1**. Under the First IP Agreement, AGA transferred one-half of the right to receive patents to Aruze Corporation. Aruze Corporation was responsible for the costs incurred for filing patent applications, was required to file patent applications as joint applications by Aruze Corporation and AGA and was also responsible for maintaining the joint patent rights. AGA was obligated to cooperate with patent applications, report obstructions to patent rights, and not cause loss of novelties or disclose inventions to third parties without prior approval by Aruze Corporation.

40.     Both UEC and AGA operated under the understanding that AGA shared in the patent rights obtained by UEC.

41.     In June 2010, UEC appointed Mr. Fujimoto to head UEC's domestic (Japanese) business. Mr. Fujimoto was therefore responsible for UEC's domestic patents. At the same time, Mr. Okada was placed in charge of UEC's foreign business and was therefore responsible for UEC's foreign patents.

### D. UEC's Asserted Patents

42.     On May 21, 2008, Aruze Corporation filed U.S. Patent Application No. 12/124,754, and on January 3, 2012, U.S. Patent 8,088,013 (the "'013 Patent") was issued.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 • Fax: (702) 669-4650

43.     On December 10, 1998, Aruze Corporation filed U.S. Patent Application No. 09/208,696, and on August 21, 2012, U.S. Patent No. 8,246,047 (the "'047 Patent") was issued.

44.     On December 7, 2015, UEC filed U.S. Patent Application No. 14/961,361, and on July 11, 2017, U.S. Reissue Patent No. 46,472 (the "'472 Patent") was issued.

45.     On December 8, 2015, UEC filed U.S. Patent Application No. 14/962,087, and on July 11, 2017, U.S. Reissue Patent No. 46,473 (the "'473 Patent") was issued.

### E.   UEC, Aruze USA, and Mr. Okada Become Embroiled in the Wynn Litigation

46.     Mr. Okada met Steve Wynn, at one time a prominent figure in the Las Vegas gaming industry, when AGA was selling electronic gaming machines in Nevada.  The two men shared a mutual respect due to their respective status in the gaming industry.

47.     In June 2000, Mr. Wynn was ousted from Mirage Resorts, Inc., the casino conglomerate that he had developed, following Mirage Resorts, Inc.'s hostile takeover by MGM Grand Inc.

48.     Humiliated by his public ouster, Mr. Wynn was anxious to re-enter the casino business and rebuild his reputation and standing in Las Vegas.  He purchased the old Desert Inn casino and had plans to build a new casino on the site, to be called "Wynn."

49.     Beginning in October 2000, Mr. Wynn used a Nevada limited liability company called Valvino Lamore, LLC ("Valvino") as the holding entity for his new casino project.

50.     Mr. Wynn lacked the capital to fund the development of the casino and undertook an extensive search for investors.  Having been forced out of Mirage Resorts, Inc., he was shunned by other sources of capital.  Mr. Wynn eventually called on Mr. Okada as a source of investment funds to get Mr. Wynn back on his feet, and the Wynn casino up and running.

51.     After in-person discussions between Mr. Wynn and Mr. Okada, Aruze USA made a contribution of $260 million in cash to Valvino in exchange for approximately 50% of the membership interests in Valvino effective October 3, 2000.  This contribution was the seed capital that allowed for the development of what is now Wynn Resorts, Limited ("WRL").

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

52.     In April 2002, Aruze USA made two additional contributions totaling $120 million to Valvino.

53.     From October 2002 to February 2012, Mr. Okada served as a director of WRL. From October 2002 through October 2011, Mr. Okada also served as Vice Chairman of WRL.

54.     After an initial public offering which closed in October 2002, Aruze USA became a 24.5% shareholder of WRL.  As of February 2012, Aruze USA was a 19.66% shareholder of WRL.

55.     In February 2012, WRL ousted Mr. Okada from his position as director of WRL and redeemed the Aruze USA stock at a 30% discount.  At the same time, WRL sued Mr. Okada, UEC, and Aruze USA in Nevada District Court for declaratory judgment that WRL's actions were proper, breach of fiduciary duty, and aiding and abetting the same.  WRL's allegations against Mr. Okada for breach of fiduciary duty were based on actions taken in Mr. Okada's capacity as a director and officer of UEC and Aruze USA.  Specifically, WRL brought suit against Mr. Okada, UEC, and Aruze USA based on allegations of improper conduct pertaining to the development of UEC's casino resort in Manila, Philippines, including the alleged bribery of Filipino gaming officials by UEC's board of directors (the "Wynn Litigation").

56.     Because the claims against Mr. Okada in the Wynn Litigation stemmed from his role as a director of UEC and Aruze USA, both UEC and Aruze USA had a duty to indemnify Mr. Okada from all legal expenses and costs pursuant to Nevada statutory law and the Articles of Incorporation and/or Bylaws of each company.

57.     For example, the Aruze USA Articles of Incorporation provide, in relevant part:

> Each person who is or was a director of the corporation (including the heirs, executors, administrators or estate of such person) **shall be indemnified by the corporation** as of right to the full extent permitted by Chapter 78 of the Nevada Revised Statutes against any liability, cost or expense asserted against such director and incurred by such director by reason of the fact that such person is or was a director.  The expenses of directors, past or present, incurred in defending a civil or criminal action, suit, or proceeding **must be paid by the corporation as incurred and in advance of the final disposition of the action, suit or proceeding** upon receipt of an undertaking by or on behalf of the director to repay the amount if it is ultimately determined by a court of competent jurisdiction that

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

he is not entitled to be indemnified by the corporation.

(Emphasis added).

58.    Similarly, the Aruze USA Bylaws provide, in relevant part:

Each person who is or was a director or officer of the corporation (including the heirs, executors, administrators, or estate of such person) **shall be indemnified by the corporation** as of right against any liability, cost, or expense incurred by such director or officer by reason of the fact that such person is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, except to the extent that such indemnification is prohibited by Chapter 78 of the Nevada Revised Statutes. The expenses of directors or officers, past or present, incurred in defending a civil or criminal action, suit, or proceeding **must be paid by the corporation as incurred and in advance of the final disposition of the action, suit or proceeding** upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by the corporation.

(Emphasis added).

59.    Finally, the UEC Articles of Incorporation provide, in relevant part:

The Company may, pursuant to Paragraph 1, Article 426 of the Companies Act, exempt the Directors (including former Directors) from their liabilities provided in Paragraph 1, Article 423 of the Companies Act, to the extent permitted by laws and regulations, based upon a resolution adopted by the Board of Directors.

60.    In or about April 2014, while Mr. Okada was a director of both UEC and Aruze USA, he retained the law firm of Holland & Hart to represent UEC, Aruze USA, and Mr. Okada personally (the "Aruze Parties") in the Wynn Litigation.  Holland & Hart replaced the Aruze Parties' previous counsel.

61.    During the course of Holland & Hart's representation of the Aruze Parties, Holland & Hart regularly remitted invoices for attorneys' fees and costs to UEC.  Such invoices were routinely paid by UEC.

62.    Holland & Hart represented the Aruze Parties until July 21, 2017, after Mr. Okada was removed from his position as a director of UEC.  At that point, Holland & Hart, with the consent of UEC and Aruze USA, proceeded to represent Mr. Okada only.  UEC and Aruze USA were represented by other counsel.

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

63.     In recognition of, and in accordance with, their duty to indemnify Mr. Okada as a former director, UEC and Aruze USA continued to routinely pay Holland & Hart's attorneys' fees invoices for legal services rendered to Mr. Okada personally following Holland & Hart's withdrawal from representation of UEC and Aruze USA.

64.     A trial date in the Wynn Litigation was set for April 16, 2018.  Mr. Okada was prepared to go to trial and vehemently opposed settlement of claims throughout the Wynn Litigation, both while a director of UEC and Aruze USA and after his ouster.

65.     In December 2017, with the impending trial in the Wynn Litigation less than six months away, Mr. Okada retained the law firm of Bartlit Beck Herman Palenchar & Scott, LLP ("Bartlit Beck") to serve as co-lead counsel along with Holland & Hart.

66.     The terms of Mr. Okada's engagement of Bartlit Beck included, *inter alia*, a flat monthly fee and a success bonus. A dispute is currently pending in Clark County District Court with respect to the validity of the success bonus.

67.     In March 2018, after significant trial preparation by Holland & Hart and Bartlit Beck, and with trial just over one month away, UEC, Aruze USA, and WRL engaged in surreptitious settlement discussions without the knowledge of Mr. Okada.  Ultimately, WRL agreed to settle all claims asserted against UEC and Aruze USA for approximately $2.63 billion. Mr. Okada was not apprised of the settlement until after it had been consummated.  Although Mr. Okada was not a party to the settlement, subsequently, WRL voluntarily dismissed, with prejudice, all claims against Mr. Okada.

68.     UEC and Aruze USA's settlement of claims for $2.63 billion came at a significant discount in favor of WRL and to the detriment of UEC and Aruze USA.  Based on a February 16, 2018 press release issued by UEC, UEC's own expert opined that UEC was "entitled to approximately $4.5 billion in damages for the invalid redemption as of October 31, 2017."  Accordingly, UEC and Aruze USA settled the Wynn Litigation for approximately $1.87 billion less than it was entitled.  The day the settlement was announced, UEC's stock price dropped 16%, while WRL's stock price rose 6.4%.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

69.     Had Mr. Okada been a director of UEC and Aruze USA in March 2018, he would not have voted to approve the settlement, and, as representative of the majority shareholder in UEC, Okada Holdings, would have in fact prevented the settlement from occurring.

### F.  Mr. Fujimoto Orchestrates a Scheme to Wrest Control of UEC from Mr. Okada

70.     In May and June 2017, Mr. Okada's son Tomohiro and his former trusted colleague Mr. Fujimoto executed a coup d'état to strip Mr. Okada of control of two of the companies he founded – Okada Holdings and UEC.  These conspiratorial efforts were done fraudulently and unlawfully and therefore have no legal effect.  As a result, Mr. Okada remains the rightful controlling owner of both Okada Holdings and UEC, despite claims and actions to the contrary.

71.     For as long as Mr. Fujimoto had been involved in UEC's management, he and Mr. Okada would often times have disagreements over the direction of the company.  As time went on, Mr. Okada's continued control over the company he singlehandedly founded and led to great success posed a threat to Mr. Fujimoto's personal career aspirations.  Specifically, in or about 2012, Mr. Fujimoto began putting a plan in place to take over UEC and discredit Mr. Okada by framing him as a criminal so that Fujimoto could take control of the company and prevent Mr. Okada from taking back control.

72.     Additionally, in or about May 2017, Mr. Okada objected to two major changes in a proposed UEC resolution – an increase in UEC director compensation from 1 billion yen (approximately 9 million USD) per year to 2 billion yen per year (approximately 18 million USD) and an extension in director terms from one year to two years.

73.     Further, as the Wynn Litigation progressed into 2017 and closer to trial, Mr. Fujimoto and Mr. Okada differed strongly in their preferred disposition of the case.  Mr. Fujimoto preferred to settle the case, and he preferred as expeditious of a settlement as possible. A settlement in the billions of dollars would greatly advance UEC's bottom line, and lead to larger performance bonuses for UEC's directors, including Mr. Fujimoto.  Were the Wynn Litigation to proceed to trial starting in April 2018, any such performance bonus would be at

1   best delayed, and at worst, nonexistent.  Mr. Fujimoto knew that Mr. Okada opposed any such

2   settlement and wished to go to trial.

3         74.     Consequently, in 2017, Mr. Fujimoto, along with several directors of UEC and

4   a key member of Mr. Okada's family, executed Fujimoto's long held plan to oust Mr. Okada

5   from his own company and seize control over the company and the upcoming decisions with

6   respect to director compensation, term length, and settlement of the Wynn Litigation.  Mr.

7   Fujimoto took a two-pronged approach to ensure complete control over UEC – first, divest Mr.

8   Okada of his controlling status in Okada Holdings, UEC's majority shareholder, and second,

9   remove Mr. Okada as a director of UEC under false pretenses.

10   **1.  Mr. Fujimoto conspires with Tomohiro to divest Mr. Okada of control**

11   **over Okada Holdings**

12         75.     Since about 2015, Hiromi was suffering from significant anxiety and stress due

13   to a fear that she was being stalked.  She reported the stalking incidents to the Japanese police

14   and confided in her brother Tomohiro about her stress and anxiety.

15         76.     In an attempt to take advantage of Hiromi's weakened emotional state,

16   Tomohiro, in furtherance of Fujimoto's plan to oust Mr. Okada from UEC, orchestrated a

17   scheme to wrest control of Hiromi's 9.78% minority share of Okada Holdings, which, combined

18   with his 43.4% stake, would give Tomohiro control over Okada Holdings.  Tomohiro's plan

19   was heavily influenced by Mr. Fujimoto, who needed Mr. Okada to lose control of Okada

20   Holdings in order to accomplish Mr. Fujimoto's larger objective of seizing control of UEC.

21   Additional facts necessary for particularized pleading are within the Counterdefendants'

22   knowledge.  At this time, Counterclaimants Mr. Okada and AGA are unable to plead with

23   greater specificity because the Counterdefendants possess the required information.  *Rocker v.*

24   *KPMG LLP*, 122 Nev. 1185, 148 P.3d 703 (2006) overruled on other grounds in *Buzz Stew,*

25   *LLC v. City of N. Las Vegas*, 124 Nev. 224, 181 P.3d 670 (2008).

26

27

28

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

77.     Tomohiro first suggested that Hiromi travel overseas for vacation to avoid the stalker and enjoy some relaxation.  Hiromi, trusting her brother's advice, complied.  Tomohiro paid for Hiromi to take back-to-back trips to Hawaii and Thailand.

78.     Though Hiromi's Hawaii trip was intended to be a relaxing vacation, her anxiety was exacerbated because she believed her stalker had followed her to Hawaii.  Hiromi became even more fearful after she believed she found several wire-tapping devices in her hotel room.

79.     Following her trip to Hawaii, Hiromi was scheduled to spend one night in Tokyo before departing for Thailand.  Tomohiro telephoned Hiromi while she was in Hawaii and asked to see her immediately upon her arrival in Tokyo.  Hiromi again complied with her brother's wishes.

80.     On or about May 2, 2017, Tomohiro requested that Hiromi sign signature pages of various documents, drafted in English, a language in which Hiromi is not fluent.  Tomohiro provided Hiromi no opportunity to read through the documents and provided no explanation as to the purpose of the documents or the effect of Hiromi's signature.  Hiromi trusted her brother and complied with his request.  Hiromi did not and could not have imagined that the papers she was instructed to sign would be in any way harmful to her, to Mr. Okada, or to the Okada family in general.

81.     On or about May 11, 2017, Tomohiro met Hiromi at her house and requested that she sign additional papers.  Hiromi, again trusting her brother, complied with his request.  She signed the papers Tomohiro presented to her without any opportunity to review them or learn of their significance.  These documents were drafted in English, a language foreign to Hiromi.  During the meeting, Tomohiro appeared rushed and left once the papers were signed, approximately ten minutes after his arrival.

82.     On May 21, 2017, Tomohiro sent a text message to Hiromi and requested that she meet him at Tokyo station two days later, on May 23, 2017, because he had made an appointment at a notary's office.  Hiromi complied.  On the way to the notary's office on May

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

23, Tomohiro stated to Hiromi that unless she signed the documents, UEC could come to an end.  Hiromi was shocked and in disbelief by this revelation.

83.     Upon arriving at the notary's office, Hiromi was greeted by two people who introduced themselves as Tomohiro's lawyers.  Tomohiro's lawyers presented documents for both Hiromi and Tomohiro to sign.  Hiromi was asked to sign the documents quickly because the notary allegedly had another appointment he needed to attend.  Tomohiro's lawyers did not provide Hiromi with an opportunity to read through the papers, provided no explanation of their purpose or effect, and Hiromi was not represented by separate counsel at the signing. Nonetheless, trusting her brother and believing that he had the best interest of her and her father at heart, especially based on his earlier agreement that Mr. Okada would remain in control of UEC, Hiromi signed the documents in a process that took approximately ten minutes.

84.     The documents that Tomohiro deceived Hiromi into signing on or about May 2, 2017, May 11, 2017, and May 23, 2017, were both against Hiromi's interest and contrary to Tomohiro and Hiromi's earlier oral agreement with Mr. Okada that Mr. Okada would continue to control 100% of the shares of Okada Holdings.  Had Hiromi been aware of the content and nature of the documents, she would not have signed them.

85.     The document Hiromi was induced to sign, titled "Share Management and Disposal Trust Agreement" and dated March 2, 2017, purports to have the effect of, *inter alia*, (i) granting Tomohiro a thirty-year irrevocable right to solely control and vote Hiromi's shares in Okada Holdings; (ii) granting Tomohiro the right to exercise Hiromi's voting rights at his sole discretion and with Hiromi having no right to give Tomohiro instructions on how to vote her shares; and (iii) barring Hiromi from transferring, pledging, or disposing of her beneficial interest in her shares without the prior written consent of Tomohiro.

86.     The document Hiromi was induced to sign, the Notice of Appointment dated May 12, 2017, purportedly authorized the appointment of two persons unknown to Hiromi, Mr. Takada and Mr. Ishida, to the board of directors of Okada Holdings.  Following the execution of the Notice of Appointment, Mr. Takada and Mr. Ishida signed a Notice of Removal of

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

Director, dated May 12, 2017, which removed Mr. Okada as a director of Okada Holdings. The Notice of Removal of Director was subsequently mailed to Mr. Okada.

87. On May 12, 2017, Mr. Takada and Mr. Ishida signed a written resolution purporting to remove Mr. Okada as a director of Okada Holdings and filed with the Hong Kong Company Registry a Notice of Change of Company Secretary and Director relating to Okada Holdings. This filing provided notice that Mr. Okada had been removed as a director of Okada Holdings, and that both Mr. Ishida and Mr. Takada replaced Mr. Okada as directors as Okada Holdings.

88. Once Mr. Okada was purportedly removed as a director of Okada Holdings, he effectively lost control of both Okada Holdings and UEC (and its affiliates) by virtue of the fact that the Okada family's collective 67.9% controlling interest in UEC was held and controlled by Okada Holdings, now under the ostensible control of Mr. Takada and Mr. Ishida.

89. On May 23, 2017, Tomohiro induced Hiromi to sign another version of the Share Management and Disposal Trust Agreement (the March 2, 2017 and May 23, 2017 versions are collectively referred to hereafter as "Trust Agreements"). The document signed on May 23, 2017 was similar to the document dated March 2, 2017, but this time was notarized. The Trust Agreements signed by Hiromi provided that Hiromi would transfer her shares of Okada Holdings into the trust created by the Trust Agreements via an Instrument of Transfer to be executed on the same date as the respective Trust Agreements. However, the Instrument of Transfer was not executed contemporaneously with the Trust Agreements.

90. On August 9, 2017, prior to execution of the Instrument of Transfer and while Hiromi retained legal title to her shares of Okada Holdings, Hiromi executed a Power of Attorney in favor of Mr. Okada, authorizing him to exercise Hiromi's rights as a registered shareholder of Okada Holdings.

91. On August 11, 2017, pursuant to Hiromi's Power of Attorney, Mr. Okada issued two notices. First, Mr. Okada issued a notice appointing himself as Director of Okada Holdings.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

Second, Mr. Okada issued a notice removing Mr. Takada and Mr. Ishida as Okada Holdings' directors.

92.     On August 14, 2017, Hiromi allegedly signed the Instrument of Transfer, which purported to transfer her shares to Tomohiro (individually, not as Trustee), for no consideration whatsoever.  Hiromi has no recollection of signing this document.

**2.   Hiromi learns of the fraudulent Share Transfer Agreement and fights, with Mr. Okada, to invalidate its terms**

93.     On or about August 22, 2017, Hiromi learned that she purportedly transferred her shares in Okada Holdings to Tomohiro without her knowledge.

94.     Hiromi was utterly shocked when she learned of the situation and immediately went to Hong Kong to meet with Li & Partners, a corporate law firm, to sign documents to rescind whatever documents she might have signed which purportedly transferred her shares to Tomohiro.  In addition, on September 7, 2017, Hiromi signed a statutory declaration attesting to facts surrounding the purported share transfer.  Therein, Hiromi disclaimed the document she previously signed affirming Tomohiro's affirmation, denied authorizing the transfer of her shares in Okada Holdings to Tomohiro, and implicated Tomohiro in a scheme to defraud her, claiming that Tomohiro had been a victim of brainwashing.

95.     On September 8, 2017, Mr. Okada held an Extraordinary General Meeting of Okada Holdings, attended by himself and Hiromi, at which it was resolved that the purported removal of Mr. Okada as director of Okada Holdings on May 12, 2017 was declared invalid, that any notice, resolution or other documents approving or confirming Mr. Okada's removal were rescinded and revoked, and that Mr. Okada was appointed a director of Okada Holdings effective August 11, 2017.

96.     On October 4, 2017, Mr. Okada wrote letters to the Philippine Amusement and Gaming Corporation (PAGCOR) and the United States Security and Exchange Commission (SEC), informing the latter that he had officially regained majority ownership and control of Okada Holdings, which owned 67.9% of UEC.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

97.     Despite Mr. Okada's efforts to regain control over Okada Holdings, UEC refuses to recognize his authority.

98.     Hiromi has since filed a lawsuit in Hong Kong against Tomohiro and Okada Holdings and has alleged, *inter alia*, that Tomohiro engaged in fraud by having her sign documents that purportedly allowed Tomohiro to irrevocably control her shares in Okada Holdings and have Mr. Okada removed as a director of Okada Holdings.  That lawsuit remains pending in Hong Kong.

### 3.     Mr. Fujimoto commences a plot to deem Mr. Okada unsuitable as a director of UEC

99.     Although Mr. Takada and Mr. Ishida's ostensible newly-gained control over Okada Holdings meant that they could have prevented Mr. Okada from being on the proposed UEC slate of directors, Mr. Fujimoto knew that Mr. Okada would vigorously challenge Tomohiro's illegal seizure of control of Okada Holdings.  Accordingly, UEC, under the direction of Mr. Fujimoto, engaged in further efforts to deem Mr. Okada unsuitable as a director of a publicly- traded company to ensure that he had no further influence or control over UEC's affairs.  These efforts involved perpetuating a false narrative about Mr. Okada and generating suspicion about fraudulent acts in which he allegedly engaged.

100.     Specifically, on May 23, 2017, UEC held an extraordinary Board of Directors meeting, during which Mr. Nobuyoshi Ichikura, a full-time UEC corporate auditor, gave a report regarding suspected fraudulent acts that occurred in March 2015.  Mr. Ichikura alleged that Mr. Okada was involved in a 2 billion yen loan made by Tiger Resorts Asia ("Tiger Resorts"), a UEC subsidiary, to a third party, which loan violated UEC's internal approval process.  This improper loan was allegedly processed by Mr. Okada and Mr. Yoshinao Negishi, Director and General Manager of UEC's Administrative Division ("Mr. Negishi").  Mr. Okada has denied and continues to deny these false allegations.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

101. Notwithstanding Mr. Ichikura's UEC Auditor Report, UEC acknowledged that if it were concluded that there was an unauthorized outflow of funds, there would be no financial loss to the company.

102. As a result of these allegations, UEC, led by Mr. Fujimoto, suspended Mr. Okada and Mr. Negishi from exercising any authority and relieved them of all of their responsibility.

103. As the head of UEC's domestic Japanese business, Mr. Fujimoto exerted complete control over the UEC Corporate Audit Department, where Mr. Ichikura was employed.

104. On May 31, 2017, UEC issued a press release titled "Proposed Change of Board Members," in which UEC announced that pursuant to a Board of Directors meeting held earlier that day, two individuals – Mr. Kenji Asano and Mr. Masayoshi Miyanaga – were being proposed as new directors for approval at the upcoming UEC Meeting of Shareholders on June 29, 2017. Additionally, five other directors were slated for reappointment: Mr. Fujimoto, Mr. Hajime Tokuda, Ms. Takako Okada, Mr. Seisui Kamigaki, and Mr. Sadao Otani. For the first time in the company's history, Mr. Okada was not identified on the slate of proposed UEC directors.

105. The May 31, 2017 press release stated that UEC shall be operated under "the continuous leadership of Mr. Jun Fujimoto as its Representative Director and President." It further stated that Okada Holdings, which owned 67.9% of the voting rights of UEC, had stated its intention to approve the proposed slate of directors at the June 29, 2017 Meeting of Shareholders.

106. With Mr. Okada effectively silenced with respect to UEC's corporate governance pending his formal removal as a director, UEC announced that its directors had passed a resolution at the May 31, 2017 Board meeting to submit a proposal to UEC shareholders to increase the remuneration of UEC directors from 1 billion yen to 2 billion yen per year (out of which the amount of remuneration for outside directors would be no more than 200 million yen per year), which did not include the salary portion paid to directors who also

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

served as UEC employees.  Moreover, the directors proposed that director terms be extended from one year to two years.  Although Mr. Okada expressed his opposition to both measures, the resolution nonetheless passed.

**4.    Mr. Fujimoto and Tomohiro ensure that Hiromi will not foil their plot**

107.    On June 1, 2017, Mr. Fujimoto e-mailed Tomohiro and expressed concern about Mr. Okada filing legal documents in Hong Kong within the next two to three weeks to regain control of Okada Holdings.  Mr. Fujimoto had apparently learned that Mr. Okada was confident that his legal filings would show that Hiromi's signature was not her true intention and that he could persuade Hiromi to acknowledge the same.

108.    Mr. Fujimoto therefore told Tomohiro that Hiromi needed to disappear for one month to prevent Mr. Okada from securing her cooperation.

109.    On June 1, 2017, Tomohiro sent an electronic message to Hiromi with the subject line, translated into English, "Although I think you don't like this," and cut and pasted an e-mail from Mr. Fujimoto.  The e-mail states, "(The Chairman) will prepare the paper in Hong Kong tomorrow in English which mentions the shares transfer paper and the signature as a joint-signer is not your sister's true intention and from after tomorrow, let her sign again.  It's necessary to be on the run for one month." Additional facts necessary for particularized pleading are within the Counterdefendants' knowledge.  At this time, Counterclaimants Mr. Okada and AGA are unable to plead with greater specificity because the Counterdefendants possess the required information.  *Rocker v. KPMG LLP*, 122 Nev. 1185, 148 P.3d 703 (2006) overruled on other grounds in *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 181 P.3d 670 (2008).

110.    Tomohiro represented to Hiromi that Mr. Okada would soon be arrested and that she must avoid further contact with Mr. Okada.

111.    Because Hiromi was close with Tomohiro and trusted him fully, she followed his instructions and refrained from further communications with Mr. Okada.

///

///

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

**5.   UEC establishes a sham Special Investigation Committee to further investigate Mr. Okada's alleged wrongdoing**

112.    On June 8, 2017, UEC announced that it had established an independent Special Investigation Committee ("SIC") consisting of three supposedly independent external experts – Mr. Michio Masaki, Mr. Sotaro Matsuo, and Mr. Miya Fukayama.

113.    In reality, the SIC lacked any form of independence.  First, Mr. Fujimoto hand selected the three members of the SIC.  Second, Mr. Masaki, Mr. Matsuo, and Mr. Fukayama had all previously assisted UEC's internal audit team in its investigation, which was overseen by Mr. Fujimoto. Third, Mr. Fujimoto spearheaded the SIC and generally exerted influence over the SIC process.  Fourth, Mr. Masaki, Mr. Matsuo, and Mr.  Fukuyama are all members of the same firm.

114.    Finally, on July 14, 2017, Mr. Fujimoto was personally involved in leading a group of seven people, including the three SIC members, in interrogating an AGA employee, former Okada Manila employee, and TRA board member.  This interrogation was conducted in such a way as to place as much blame as possible on Mr. Okada.  In the interrogation, Mr. Fujimoto stated that he wanted to eliminate Mr. Okada completely and threatened to bring claims against AGA and the AGA employee personally unless he agreed to say negative things about Mr. Okada.

**6.   Tomohiro deceives Hiromi into signing additional documents**

115.    In early June 2017, Hiromi received a text message from a Hong Kong lawyer stating that Mr. Okada had commenced legal action against her.  Hiromi was shocked to learn this information.

116.    In mid- to late June 2017, Tomohiro asked Hiromi to accompany him to a Notary Public's office to formally acknowledge the lawsuit that Mr. Okada had initiated against her. Upon her arrival at the Notary Public's office, Hiromi was met by Tomohiro's Japanese lawyer who informed her that she was a defendant in a lawsuit and her signature was required to

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

acknowledge the claim.  In reliance on these representations, Hiromi signed the document presented to her.

117.    Hiromi subsequently learned that the document she had signed was not an acknowledgement of service of a lawsuit filed by Mr. Okada, but rather was an acknowledgement confirming the veracity of a 327-page affirmation by Tomohiro, which she had never seen.  Tomohiro's affirmation, which purported to speak on behalf of Hiromi, asserted that Tomohiro and Hiromi had never agreed with Mr. Okada that Mr. Okada would remain in control of all shares of UEC owned by the Okada family, that it was not customary in Japanese culture for children to obey their father's wishes, and that Tomohiro and Hiromi had acted together to remove Mr. Okada from control of Okada Holdings due to acts of misfeasance on his part.  The nature of the document signed by Hiromi was completely contrary to the explanation that had been provided to her.

**7.    UEC's shareholders' vote results in company changes and Mr. Okada's formal ouster from UEC**

118.    On June 29, 2017, UEC held its General Meeting of Shareholders, at which UEC's shareholders voted on the proposed slate of directors, the director compensation increase, and the director term increase.

119.    For the first time since Mr. Okada founded UEC in 1969, he was prevented from voting his interest in UEC, as Tomohiro, through his appointed directors of Okada Holdings, Mr. Takada and Mr. Ishida, purportedly controlled Okada Holdings' 67.9% interest in UEC.

120.    Had Mr. Okada been in control of Okada Holdings' shares as of the date of the Meeting of Shareholders, he would have voted to disapprove of the director slate, the director compensation increase, and the director term increase.  Instead, the shareholders voted to approve all three measures.

121.    After the June 29, 2017 shareholder vote, Mr. Okada's involvement with UEC formally ceased.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 • Fax: (702) 669-4650

**8. UEC's SIC Report is issued as belated support for Mr. Okada's removal as a UEC director**

122. On August 30, 2017, UEC issued a press release titled "Notice on Results of Investigation by Special Investigation Committee and Future Actions," which attached a copy of the SIC's report (the "SIC Report"). The SIC Report concluded that "[a]s a result of the investigation of the Special Investigation Committee, it has become clear that Mr. Okada led and conducted the fraudulent acts . . . ."

123. The alleged fraudulent acts referenced by the SIC Report involved, first, a HKD 135 million (USD 17 million) loan from Tiger Resorts to a third party in October 2014, which loan was used largely to repay an earlier loan by Okada Holdings, which loan was for the benefit of Okada Manila. The SIC Report alleges that Mr. Okada sought to invest in junkets (business operators that solicit and bring in wealthy customers to the casino) by going through the borrower that received the allegedly improper loan from Tiger Resorts. What the SIC Report omitted is that at this time, UEC's subsidiary, Tiger Resort Leisure and Entertainment, Inc. ("TRLEI"), was in the process of constructing Okada Manila, its large-scale casino resort in the Philippines, the success of which was largely dependent on junkets. In any event, Mr. Okada denies these allegations in the SIC Report.

124. Second, the SIC Report contends Mr. Okada engaged in nefarious and improper conduct when he asked that a HKD 16 million payment (approximately USD 2 million) be made to a highly-experienced consultant in the hospitality industry who was engaged to provide, and did provide, services related to the operation of Okada Manila. Despite these allegations, the SIC Report provided no evidence that Mr. Okada personally benefitted from this payment or that the monies were used for any improper purpose. Mr. Okada denies these allegations in the SIC Report.

125. Third, the SIC Report concluded that Mr. Okada approved an improper HKD 16 million (approximately USD 2 million) payment by Tiger Resorts to an unknown payee for "payment handling fees for the art work." The SIC Report assumes that Mr. Okada, who is an

avid art collector, purchased artwork for personal use, but does not address whether it investigated if the artwork was purchased for the Okada Museum of Art or Tiger Resorts' Manila Casino, both of which are operated by UEC.  Mr. Okada denies any allegation that he improperly purchased artwork for personal use.  Rather, the payment went to purchase artwork for Okada Manila, and the artwork purchased had, upon information and belief, been delivered to Okada Manila prior to the writing of the SIC Report.

126.    Finally, the SIC Report concluded that, in 2014, Mr. Okada pledged as collateral assets of UE Korea, a subsidiary of UEC, to acquire land in South Korea.  Although the SIC Report characterizes this act as improper, it acknowledges that Mr. Okada did not conceal his intentions and in fact disclosed the proposed transaction to UEC on February 21, 2014. Although one UEC employee objected to the proposed transaction, Mr. Okada proceeded with the loan, but shortly thereafter cancelled the loan and the pledging of collateral by UEC.  The acquisition of the land in Korea was for the benefit of UEC and UEC Korea with an anticipated development of a hotel casino by UEC Korea in Incheon, Korea.

127.    These paper-thin allegations and unsubstantiated conclusions of the SIC Report were stitched together at the direction of Mr. Fujimoto in an effort to provide retroactive support for Mr. Ichikura's Audit Report finding Mr. Okada unsuitable as a UEC director, to provide independent support to prevent Mr. Okada from reinstating himself as a director of UEC in the future, and to prevent discovery of illegal acts by Mr. Fujimoto.  Specifically, Mr. Fujimoto knew that Mr. Okada would fight to regain control of Okada Holdings, and that there was a likelihood of success of such an outcome.  Accordingly, Mr. Fujimoto orchestrated these allegations against Mr. Okada, which, if believed to be true, would prevent Mr. Okada from serving as a UEC director due to, *inter alia*, suitability issues associated with UEC's gaming license for its new casino resort in the Philippines.  Thus, the public release of such allegations virtually ensured that Mr. Okada could not resume control of UEC, even if he regained control of Okada Holdings.  Additional facts necessary for particularized pleading are within the Counterdefendants' knowledge.  At this time, Counterclaimants Mr. Okada and AGA are

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

1   unable to plead with greater specificity because the Counterdefendants possess the required

2   information.  *Rocker v. KPMG LLP*, 122 Nev. 1185, 148 P.3d 703 (2006), overruled on other

3   grounds in *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 181 P.3d 670 (2008).

4   ### G.  With Mr. Okada out of the Picture, UEC Settles the Wynn Litigation at a

5   ### Substantial Discount, to the Personal Benefit of Mr. Fujimoto and the Other

6   ### Directors

7   128.    Once Mr. Okada was ousted from control of UEC's largest shareholder, Okada

8   Holdings, and removed as a director of UEC, Mr. Fujimoto finally had the ability to pursue

9   settlement of the Wynn Litigation – a course of action to which Mr. Okada would have never

10  agreed, especially based on the low settlement amount.

11  129.    With trial set to begin on April 16, 2018, and scheduled for six months, it was

12  imperative to Mr. Fujimoto that settlement discussions move quickly.

13  130.    Notably, UEC directors, including Mr. Fujimoto, were compensated under a

14  performance-based standard, meaning that after reappointment of a director at the June Meeting

15  of Shareholders, the amount of compensation to be paid to a director is determined based on

16  UEC's performance in the previous business year.  To Mr. Fujimoto, this meant that if he could

17  settle the Wynn Litigation in 2018, rather than risk going to trial, UEC would receive an influx

18  of cash, strengthening the company's performance for the year, increasing Mr. Fujimoto's, and

19  the other UEC directors' performance-based compensation, and paying debt to Deutsche Bank

20  at the urging of a UEC senior executive who was a former Deutsche Bank executive.

21  131.    On March 6, 2017, UEC, Aruze USA, and WRL ultimately settled all claims

22  between and among them for a $2.63 billion payment from WRL to UEC.  The settlement was

23  entered without the knowledge or consent of Mr. Okada, despite the fact that Mr. Okada was a

24  co-defendant in the Wynn Litigation and WRL's claims in the Wynn Litigation stemmed largely

25  from allegations involving actions of Mr. Okada in his capacity as an officer and director of

26  UEC and Aruze USA.

27

28

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

### H.  UEC Files a Meritless Criminal Complaint in the Philippines Against Mr. Okada, which Is Summarily Dismissed

132.    In or about early 2018, TRLEI, the UEC subsidiary that operates the Okada Manila resort in the Philippines, under the direction of Mr. Fujimoto, filed a criminal complaint against Mr. Okada in the courts of the Philippines for two counts of "estafa," or fraud.  The criminal complaint generally alleged that during Mr. Okada's stint as CEO of TRLEI, he illegally disbursed company funds worth more than $3 million for his consultancy fees and salaries during his one-month tenure.  The complaint alleged that the TRLEI board of directors did not authorize or approve the payment.  The complaint's second count stemmed from Mr. Okada's decision to award a $7 million supply contract for the installation of LED fixtures in Okada Manila to his own company, Aruze Philippines Manufacturing, Inc.

133.    In response to the filing of the criminal complaint, Philippine authorities ordered border guards at the country's airports and seaports to be on the lookout for Mr. Okada and monitoring his activity.

134.    Not long after the filing of the criminal complaint, Philippine prosecutors dismissed the complaint and ruled that the "facts in the case are insufficient to engender a well-founded belief that a crime of Estafa (fraud) has been committed."  The dismissal resolution further found that the nature of the case was civil, not criminal.

135.    Following the dismissal of the complaint against Mr. Okada, in or about June 2018, UEC, through its subsidiary TRLEI, asked the Philippines Department of Justice to start a new investigation into the estafa complaint against Mr. Okada.  The original filing of the criminal complaint, the resulting monitor order, and the unfounded renewed request to investigate alleged criminal activity damaged Mr. Okada's reputation and business dealings and was another component of the ongoing scheme by UEC and Mr. Fujimoto to bring down Mr. Okada.

///
///

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

### I.   UEC Issues Press Releases Containing False Statements to Interfere with AGA's Business

136.   Following Mr. Fujimoto, UEC, and Aruze USA's successful ouster of Mr. Okada from the companies, they continued to pursue any means necessary to interfere with the business interests of Mr. Okada and AGA, causing damage to them and their respective reputations by issuing numerous false and misleading press releases.

137.   On September 22, 2017, UEC published a press release titled "Action Taken Against Infringement of Company-Held Patent Rights by Aruze Gaming America, Inc." (the "September 2017 Press Release").  The September 2017 Press Release contained several false and defamatory statements.  First, UEC stated that AGA "has continued to violate an agreement that it has executed with the Company to pay it patent licensing fees for Company-held patents."  Second, UEC stated that it "has verified that AGA has continued to use Company-held patents without permission."  The September 2017 Press Release listed Mr. Fujimoto under "Name of Representative" as the UEC representative responsible for approval of the press release.

138.   On April 2, 2018, UEC published a press release titled "Notice of Filing of Lawsuit in United States." (the "April 2018 Press Release").  Therein, UEC falsely stated that "it became clear that AGA had illegally used patents on gaming machines belonging to the Company to conduct sales of gaming machines in the United States, and that Kazuo Okada, a former Director of the Company, had illegal involvement in those activities."  The April 2018 Press Release listed Mr. Fujimoto under "Name of Representative" as the UEC representative responsible for approval of the press release.

139.   On May 14, 2018, UEC published a press release titled "Notice of Decision to File Lawsuits to Aruze Gaming America, Inc. Group." (the "May 2018 Press Release").  Therein, UEC falsely stated that "AGA Group companies had illegally used patents on gaming machines belonging to the Company to conduct the sales of gaming machines in each country indicated below, the Company therefore has decided to file criminal complaints and civil lawsuits based on violations of patent rights and other rights against AGA Group companies

and Kazuo Okada."   The May 2018 Press Release listed Mr. Fujimoto under "Name of Representative" as the UEC representative responsible for approval of the press release.

140.     The defamatory statements in the September 2017 Press Release, the April 2018 Press Release, and the May 2018 Press Release (collectively, the "Defamatory Statements") have caused damage to Mr. Okada and AGA's current and prospective business relationships and to their respective reputations.

### J.   A Second Criminal Investigation Is Initiated Against Mr. Okada in Hong Kong

141.     In or about early August 2018, the Hong Kong Independent Commission Against Corruption ("ICAC") received a complaint regarding alleged corruption on the part of Mr. Okada.

142.     While the ICAC has not released who made the complaint against Mr. Okada, Mr. Okada has reasonable grounds to believe that UEC was involved.

143.     On August 6, 2018, UEC issued a public press release stating that Mr. Okada had been "arrested by the ICAC in relation to various corruption related offenses," and that UEC would "render [its] full support and assistance to ICAC and other law enforcement authorities should the same be required." ("August 2018 Press Release").

144.     Many news sources that reported on Mr. Okada's arrest by the ICAC cited directly to UEC's August 2018 Press Release as their source of information.

145.     UEC's involvement in the ICAC corruption complaint, its cooperation with the ICAC, and its public reporting of the arrest are yet another instance of UEC and Mr. Fujimoto's plot to destroy Mr. Okada, his business reputation, and his livelihood and have caused Mr. Okada damage.

///

///

///

///

///

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

**FIRST CLAIM FOR RELIEF**

**(Breach of Duty to Indemnify under NRS 78.7502:**

**Mr. Okada's Claims Against UEC and Aruze USA)**

146.     Mr. Okada repeats and realleges each and every allegation contained in the preceding paragraphs of this Counterclaim, incorporating them by reference, and further alleges as follows:

147.     NRS 78.7502(1) provides, in relevant part, that "[a] corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, except an action by or in the right of the corporation, by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, . . ., against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding if the person: (a) Is not liable pursuant to NRS 78.138; or (b) Acted in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the corporation . . . ."

148.     NRS 78.7502(3) provides, "To the extent that a director, officer, employee or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections 1 and 2, or in defense of any claim, issue or matter therein, the corporation **shall indemnify** him or her against expenses, including attorneys' fees, actually and reasonably incurred by him or her in connection with the defense."  (Emphasis added).

149.     In February 2012, Mr. Okada was sued by WRL in the Wynn Litigation by reason of the fact that he was an officer and director of UEC and Aruze USA.

150.     Mr. Okada was forced to retain legal counsel to defend him against the allegations in the Wynn Litigation and incurred attorneys' fees and other costs.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 • Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

151.   The allegations against Mr. Okada in the Wynn Litigation were ultimately resolved by WRL's voluntary dismissal of all claims against Mr. Okada prior to trial.  As such, Mr. Okada was not liable to UEC, Aruze USA, or its stockholders pursuant to NRS 78.138.

152.   Because the claims against him were voluntarily dismissed by WRL, Mr. Okada was successful in his defense of the Wynn Litigation and is entitled to mandatory indemnification by UEC and Aruze USA of all expenses incurred by him in connection with his defense.  *See* NRS 78.7502(3).

153.   UEC and Aruze USA have refused to indemnify Mr. Okada for the full amount of attorneys' fees and expenses incurred by Mr. Okada in his defense of the Wynn Litigation and are therefore in violation of NRS 78.7502.

154.   UEC and Aruze USA's unjustified violation of NRS 78.7502 has damaged Mr. Okada in an amount in excess of $75,000.00.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief under NRS 78.7502:

### Mr. Okada's Claims Against UEC and Aruze USA)

155.   Mr. Okada repeats and realleges each and every allegation contained in the preceding paragraphs of this Counterclaim, incorporating them by reference, and further alleges as follows:

156.   A dispute has arisen between Mr. Okada on one hand and UEC and Aruze USA on the other, over whether, pursuant to NRS 78.7502, UEC and Aruze USA are required to indemnify Mr. Okada for expenses incurred in his defense of the claims asserted against him in the Wynn Litigation.

157.   Said dispute is an actual dispute and is capable of judicial resolution, but after numerous attempts, cannot be resolved by the Parties without intervention of this Court.

158.   Declaratory relief is necessary to declare whether UEC and Aruze USA are required to indemnify Mr. Okada for expenses actually and reasonably incurred in his defense of the claims asserted against him in the Wynn Litigation.

159.     Mr. Okada therefore seeks a declaration that UEC and Aruze USA are required to indemnify him for expenses incurred in his defense of the claims asserted against him in the Wynn Litigation. The expenses incurred total an amount in excess of $75,000.00

### THIRD CLAIM FOR RELIEF

### (Breach of Indemnity: Mr. Okada's Claim Against Aruze USA)

160.     Mr. Okada repeats and realleges each and every allegation contained in the preceding paragraphs of this Counterclaim, incorporating them by reference, and further alleges as follows:

161.     Pursuant to Section V.3 and Section V.4 of the Aruze USA Articles of Incorporation and Section VII.6 of the Aruze USA Bylaws, Aruze USA has a duty to indemnify Mr. Okada against any liability, cost, or expense incurred by Mr. Okada by virtue of his defense of the Wynn Litigation.

162.     Aruze USA has breached this duty to indemnify by failing to indemnify Mr. Okada for attorneys' fees and costs incurred in his defense of the Wynn Litigation.

163.     As a direct, foreseeable, and proximate result of Aruze USA's breach, Mr. Okada has suffered damages in an amount in excess of $75,000.00.

### FOURTH CLAIM FOR RELIEF

### (Breach of Indemnity: Mr. Okada's Claim Against UEC)

164.     Mr. Okada repeats and realleges each and every allegation contained in the preceding paragraphs of this Counterclaim, incorporating them by reference, and further alleges as follows:

165.     Pursuant to Article 27 of the UEC Articles of Incorporation, UEC has a duty to indemnify Mr. Okada against any liability, cost, or expense incurred by Mr. Okada by virtue of his defense of the Wynn Litigation.

166.     UEC has breached this duty to indemnify by failing to indemnify Mr. Okada for attorneys' fees and costs incurred in his defense of the Wynn Litigation.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

167.    As a direct, foreseeable, and proximate result of UEC's breach, Mr. Okada has suffered damages in an amount in excess of $75,000.00.

## FIFTH CLAIM FOR RELIEF

### (Equitable Estoppel: Mr. Okada's Claims Against UEC and Aruze USA)

168.    Mr. Okada repeats and realleges each and every allegation contained in the preceding paragraphs of this Counterclaim, incorporating them by reference, and further alleges as follows:

169.    At all relevant times, UEC and Aruze USA were apprised of the fact that Mr. Okada had been sued in the Wynn Litigation in connection with his role as an officer and director of UEC and Aruze USA.  UEC and Aruze USA were also aware of the fact that their governing corporate documents and Nevada law required them to indemnify Mr. Okada under the circumstances.

170.    From the inception of the Wynn Litigation, UEC and Aruze USA have consistently paid Mr. Okada's attorneys' fees and costs incurred in defending against the claims in the Wynn Litigation.  These payments were made with the intent that Mr. Okada rely on UEC and Aruze USA's continued payment of Mr. Okada's attorneys' fees and costs.

171.    In engaging Bartlit Beck as co-lead trial counsel and contracting for payment of the success fee upon successful conclusion of the Wynn Litigation, Mr. Okada justifiably relied upon UEC and Aruze USA's prior payment of the full extent of his attorneys' fees and costs incurred in the Wyn Litigation.

172.    Mr. Okada was unaware that UEC and Aruze USA did not intend to continue to pay the full extent of his attorneys' fees and costs, specifically, the success fee owed to Bartlit Beck at the successful conclusion of the Wynn Litigation.

173.    UEC and Aruze USA are estopped from denying payment of the Bartlit Beck success fee based on their prior conduct and Mr. Okada's justifiable reliance, to his detriment, on such prior conduct.

///

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

## SIXTH CLAIM FOR RELIEF

### (Defamation: Mr. Okada and AGA's Claims Against UEC and Mr. Fujimoto)

174.   Counterclaimants repeat and reallege each and every allegation contained in the preceding paragraphs of this Counterclaim, incorporating them by reference, and further allege as follows:

175.   On September 22, 2017, April 2, 2018, and May 14, 2018, UEC separately issued the Defamatory Statements which contained false and defamatory statements concerning Mr. Okada and AGA, as described verbatim above.

176.   The September 2017 Press Release, the April 2018 Press Release, and the May 2018 Press Release all listed Mr. Fujimoto under "Name of Representative," and thus, Mr. Fujimoto was responsible for and signed off on each respective press release.

177.   UEC and Mr. Fujimoto caused to be published, without privilege, each of the defamatory press releases.  The press releases remain available to the public on UEC's website: http://www.universal-777.com/en/ir/release/.

178.   In early 2018, UEC, under the direction of Mr. Fujimoto, caused to be filed a criminal complaint in the Philippines which contained false and defamatory statements regarding Mr. Okada, as described above.

179.   Upon information and belief, in August 2018, UEC, under the direction of Mr. Fujimoto, caused a criminal complaint to be made to the Hong Kong ICAC which contained false and defamatory statements regarding Mr. Okada, as described above.

180.   UEC and Mr. Fujimoto's publication of the Defamatory Statements, the defamatory statements in the Philippines criminal complaint, and the defamatory statements in the Hong Kong ICAC complaint was intentional and done in bad faith with malice with the intent to cause Mr. Okada and AGA harm.

181.   As a direct, foreseeable, and proximate result of UEC and Mr. Fujimoto's intentional publication of the Defamatory Statements, Counterclaimants have suffered damages in an amount in excess of $75,000.00.

**SEVENTH CLAIM FOR RELIEF**

**(Intentional Interference with Contractual Relations:**

**Mr. Okada and AGA's Claims Against UEC and Mr. Fujimoto)**

182.   Counterclaimants repeat and reallege each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further allege as follows:

183.   At all relevant times, AGA and Mr. Okada, as principal of AGA, had valid and existing contracts with a number of gaming machine customers in the United States.

184.   UEC and Mr. Fujimoto knew of the existence of AGA's customer contracts.

185.   UEC and Mr. Fujimoto intentionally took action to disrupt AGA's then-current contractual relationships by, among other things, asserting publicly, through press releases and other statements, that AGA was unlawfully practicing UEC patents and that AGA and Mr. Okada were engaged in other misconduct, and by filing sham lawsuits alleging the same.

186.   At all relevant times, Mr. Okada had valid and existing contracts with his children, Tomohiro and Hiromi, related to Mr. Okada's exercise of control over Universal Sales/UEC and Okada Holdings shares that he had nominally transferred to his children.

187.   Mr. Fujimoto and UEC knew of the existence of Mr. Okada's contracts with his children.

188.   Mr. Fujimoto individually and UEC, through the actions of Mr. Fujimoto, an officer of UEC, intentionally took action to disrupt Mr. Okada's contractual relationship with his children by, among other things, conspiring to deceive Hiromi into purportedly signing away her rights to shares of UEC stock, depriving Mr. Okada of his rightful control of Okada Holdings, and removing Mr. Okada from his position as director of Okada Holdings and officer and director of UEC.

189.   As a direct, foreseeable, and proximate cause of UEC and Mr. Fujimoto's actions, AGA's contractual relations with one or more customers and Mr. Okada's contractual

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 • Fax: (702) 669-4650

relations with his children were disrupted, and AGA and Mr. Okada suffered damages in an amount in excess of $75,000.00.

<div align="center">

**EIGHTH CLAIM FOR RELIEF**

**(Intentional Interference with Prospective Economic Advantage:**

**Mr. Okada and AGA's Claims Against UEC and Mr. Fujimoto)**

</div>

190.   Counterclaimants repeat and reallege each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further allege as follows:

191.   At all relevant times AGA and Mr. Okada, as principal and owner of AGA, had prospective contractual relationships with third parties, including gaming regulators, customers, potential customers, and potential investors.

192.   UEC and Mr. Fujimoto knew of the existence of these prospective contractual relationships.

193.   UEC and Mr. Fujimoto sought to intentionally harm AGA and Mr. Okada, without privilege or justification, in the following ways:

a.   intentionally publishing false and defamatory statements, including the Defamatory Statements alleged above, statements made to Philippines and Hong Kong officials in connection with criminal complaints against Mr. Okada, statements disparaging AGA, its management, owners and business practices, statements disparaging and denying AGA's patent rights and other intellectual property rights, including its right to sublicense certain patents, and statements denying AGA's rights to manufacture, import and sell its gaming machines;

b.   interfering with AGA's ability to maintain its Nevada gaming license by accusing AGA and persons associated with AGA of wrongdoing, publicizing such accusations, and filing sham lawsuits alleging such wrongdoing;

c.   sending a letter to a company with whom AGA has a cross-license, IGT, disparaging and falsely mis-stating AGA's rights to license certain patents; and

d.   other ways to be proven at trial.

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

194.   As a direct, foreseeable, and proximate cause of UEC and Mr. Fujimoto's actions, AGA's prospective contractual relations with one or more potential customers or investors, and AGA's potential approvals by and relationships with one or more regulators, were disrupted and AGA and Mr. Okada suffered damages in an amount in excess of $75,000.00.

## NINTH CLAIM FOR RELIEF

### (Civil Conspiracy: Mr. Okada's Claim Against Mr. Fujimoto)

195.   Mr. Okada repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

196.   Mr. Fujimoto, in connection with Tomohiro and third parties undertook the following concerted action with the intent to accomplish the unlawful objective of ousting Mr. Okada from his position as controlling shareholder and sole director of Okada Holdings and his position as director of UEC:

a.      fraudulently inducing Hiromi to sign away control and voting rights to her shares of Okada Holdings to Tomohiro, such that Tomohiro could remove Mr. Okada from his position as director of Okada Holdings, appoint two new directors to Okada Holdings, and exercise control over Okada Holdings' shares in UEC;

b.      fraudulently inducing Hiromi to disappear for one month in June 2017 to prevent Mr. Okada from obtaining her acknowledgement in a court filing to regain control of Okada Holdings;

c.      removing Mr. Okada as a UEC director to have UEC shareholders approve an increase to director compensation, including Mr. Fujimoto's own compensation as well as an increase to Mr. Fujimoto's director term;

d.      removing Mr. Okada as a UEC director to allow UEC to settle with WRL in the Wynn Litigation at a substantial discount to increase director compensation, including Mr. Fujimoto's own compensation; and

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

e. other ways to be proven at trial.

197. The purpose for which Mr. Fujimoto undertook the above concerted action was to harm Mr. Okada and to enrich himself personally by entrenching himself more deeply into UEC's affairs and increasing his personal director compensation.

198. Mr. Fujimoto's actions, and those of his co-conspirators, were unlawful and invalid, and Mr. Okada remains the rightful controlling owner of Okada Holdings and UEC.

199. As a direct, foreseeable, and proximate cause of Mr. Fujimoto's conspiratorial actions, Mr. Okada suffered damages in an amount in excess of $75,000.00.

## TENTH CLAIM FOR RELIEF

### (Breach of Patent License Agreement: AGA's Claim Against UEC)

200. AGA repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

201. Prior to 2005, Mr. Okada owned all AGA stock. In 2005, he sold it to UEC. In 2008 and 2009, UEC sold all AGA stock back to Mr. Okada, completing the sale on or about March 31, 2009.

202. While AGA was a subsidiary of UEC, from 2005 to August 2008, and while UEC continued to own AGA stock through March 31, 2009, AGA held a worldwide license (excluding Japan) to UEC's patents and other intellectual property, and the right to make, sell and license gaming product worldwide (excluding Japan) based upon UEC's patents and other intellectual property. AGA's license included, but was not limited to, the right to make, have made, import, offer for sale, and sell all gaming machines and games played thereon that it developed, was developing or having developed, manufactured or sold from 2005 through March 31, 2009 ("AGA's Gaming Machines"), and to develop, manufacture and sell new gaming machines and games played thereon based on, modifying, replacing or supplementing AGA's Gaming Machines. The license included, but was not limited to, all game software, gaming systems, and gaming equipment used in or with AGA's Gaming Machines. AGA's

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

Gaming Machines included the G-ENEX cabinet accused by UEC in this case and identified in part by the 2007 G-ENEX service manual referenced in UEC's Second Amended Complaint as Exhibit E.

203.   AGA retained its license after March 31, 2009, to patents and other intellectual property owned by UEC on or before that date, and intellectual property obtained by UEC after that date related to it, such as patents issued after 2009 that claim priority to patent applications filed before 2009, and to make, import, offer for sale, and sell AGA's Gaming Machines and games played thereon, and to develop, manufacture and sell new gaming machines and games played thereon based on, modifying, replacing or supplementing AGA's Gaming Machines.

204.   The "Asserted Patents" in this case are U.S. Reissue Patent No. 46,472 ("the `472 patent"); U.S. Reissue Patent No. 46,473 ("the `473 patent"); U.S. Patent No. 8,088,013 ("the `013 patent"); and U.S. Patent No. 8,246,047 ("the `047 patent").

205.   All four Asserted Patents issued after 2009, and claim priority to patent applications filed before 2009.

206.   AGA is licensed to the four Asserted Patents.

207.   Specifically, the four Asserted Patents are reissues of, or otherwise related to, patent applications filed by UEC before 2009, in that they claim priority to those earlier applications. The `472 and `473 patents issued on July 11, 2017, and claim priority to Japanese Application No. 2007-160632 filed on June 18, 2007.  The `013 patent issued on January 3, 2012, and claims priority to Japanese Application No. 2007-169775 filed on June 27, 2007. The `047 patent issued on August 21, 2012, and claims priority to Japanese Application No. 9-340193 filed on December 10, 1997.

208.   AGA's intellectual property license includes a license to patents issued after 2009 that claim priority to applications filed before 2009, including but not limited to continuations, continuations-in-part, divisionals, reissues, reexaminations, and foreign counterparts.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

209.   UEC granted AGA a perpetual, worldwide (excluding Japan) license to all UEC patentable inventions, issued patents and patent applications, including all parents, provisionals, continuations, continuations-in-part, divisionals, reissues, reexaminations, and foreign counterparts, whether related to such patents and applications directly or through one or more intervening US or foreign applications.   The license includes any right to apply for the registration of such rights, and all renewals and extensions.   It includes the right to grant licenses or sub-licenses.

210.   UEC retained ownership of the licensed patents, and the obligation to incur all expenses required to establish and maintain them.

211.   AGA's license was confirmed orally by UEC.

212.   AGA's license was confirmed in writings by UEC, including emails from UEC's Yoshiyuki Shoji to AGA's executive vice president and general counsel in September through December 2010.

213.   The continuation of AGA's license after March 2009 was confirmed by a contract between AGA and UEC dated on or about February 28, 2010, in which the parties agreed that AGA retains assets necessary for it to maintain and continue to develop, manufacture and sell gaming machines to customers in countries outside of Japan.

214.   The continuation of AGA's license after March 2009 was confirmed by the sales contracts between UEC and Mr. Okada and related documents, in which UEC sells AGA to Mr. Okada as a going concern for the purpose of allowing AGA to continue and to expand its prior business activities, including developing, manufacturing, and selling gaming machines to customers in countries outside of Japan.   For example, UEC established the value of the AGA stock that UEC sold to Mr. Okada by having AGA evaluated as a going concern.   AGA was an intended beneficiary of the agreements to sell AGA as a going concern.

215.   AGA's license has been confirmed by the conduct of UEC and AGA.   Both companies acted in accordance with it from at least 2005 until 2017.   For example, UEC knew about, and never objected to, AGA's gaming machine business, based on UEC's patents, at any

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

time prior to 2017.  In or about 2007, UEC reviewed and approved for manufacture and sale by AGA the G-ENEX gaming machine cabinet that it accuses in its Second Amended Complaint. For another example, in the second half of 2009, UEC sold most or substantially all of its remaining inventory of gaming machine components to an entity owned by Mr. Okada and affiliated with AGA, AGA Philippines Inc.

216.   UEC's press releases and UEC corporate reports describe UEC's transfer of its casino gaming machine business to AGA (and AGA affiliates), starting when AGA was a UEC subsidiary, and continuing after UEC sold AGA to Mr. Okada.  Many of these press releases and corporate reports are still available on UEC's website today.

217.   For example, a UEC press release dated March 15, 2007, included in **Exhibit 2** and currently available at http://www.universal-777.com/en/news/pdf/2007/20070315_e.pdf, states:  "On April 1, 2007, [UEC's] overseas casino gaming machine business is scheduled to be transferred to Aruze Gaming America, Inc."  It provides reasons for the transfer: "[UEC] concluded that transferring its R&D and sales departments for that business to AGA and working towards strengthening its presence in the world's largest market [i.e., the U.S. market] would be the most appropriate course of action.  Additionally, transferring this business to AGA ensures that no duty to refrain from competition is present between AGA and [UEC]."  It notes that the transfer includes "88" "employees" of the "Gaming R&D Department," and describes the "nature of operations" for those employees as "Development of gaming machines for overseas casinos."  On information and belief, in or about April 2007 UEC did transfer employees in its gaming R&D department to AGA, in effect even if formal transfers occurred later, and AGA employed and/or directed them to develop gaming machines for overseas casinos for AGA's benefit.  The transferred employees included some who were named inventors on one or more Asserted Patents, and on the patent application(s) filed in June 2007 to which they claim priority.

218.   A UEC press report dated August 21, 2008, currently available on UEC's website, UEC announced its decision to sell back a majority of AGA shares to Mr. Okada, and

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

stated: "While [UEC] has engaged in the manufacturing of gaming machines for overseas markets … since January 2005, the business has continued to generate low profit due to high costs …. In order to develop the overseas gaming machines business on a full scale, [UEC] … will transfer 171 AGA shares … to Mr. Kazuo Okada."

219. For another example, a UEC press release dated April 1, 2009, currently available at http://www.universal-777.com/en/news/pdf/2009/20090401_e.pdf and included in **Exhibit 3**, states in part that: "In the global economic slump … reduction of deficit burden is vital for the Company. … The transfer of AGA shares by [UEC] will allow AGA to operate its management … under the leadership of Mr. Kazuo Okada. This share transfer also reduced the financial and managerial burdens for [UEC]. [UEC] will concentrate on its Pachislot/Pachinko business, the main business of [UEC]…." It describes the nature of AGA's business as of December 2008 as, "Development, manufacturing and sales of gaming machines for overseas casinos." Other exemplary press releases available on UEC's web site, describing UEC's motive in transferring its gaming machine business to AGA, are dated April 14 and August 7, 2009.

220. UEC's 2007 Annual Report, currently available on UEC's website at http://www.universal-777.com/en/ir/library/pdf/financial/annual_20080229.pdf and attached hereto as **Exhibit 4**, states on page 2 that: "In our overseas casino gaming machine business, by the end of 2007, the R&D and other departments under this business will be transferred to and concentrated in Aruze Gaming America, Inc." Exhibit 4 states on page 19: "Following resolutions of the Meeting of the Board of Directors held on March 15, 2007, the Company transferred its overseas casino machine gaming business to Aruze Gaming America, Inc. ("AGA"), a wholly-owned US subsidiary of the Company, on April 1, 2007."

221. UEC's 2008 Annual Report, currently available on UEC's website at http://www.universal-777.com/en/ir/library/pdf/financial/annual_20081119.pdf, a true copy of which is attached hereto as **Exhibit 5**, states on page 3: "In regards to the overseas casino gaming machine business, business development efforts will be chiefly conducted through

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

Aruze Gaming America, Inc." This similar statement is at page 24: "Recognizing the necessity of establishing an R&D and sales framework capable of accommodating the growing US market in order to successfully expand its casino machine business, the Company concluded that transferring its R&D and Sales departments for that business to Aruze Gaming America and working towards strengthening its presence in the world's largest market would be the most appropriate course of action."

222.    UEC's 2009 Financial Review, currently available on UEC's website at http://www.universal-777.com/en/ir/library/pdf/financial/financial_20091207.pdf, states at page 3 that: "From this fiscal year, it is planned that Gaming Machine Business will be eliminated from our consolidated financials since the business has been transferred."

223.    UEC's 2016 Financial Information, currently available on UEC's website at http://www.universal-777.com/en/ir/library/pdf/financial/financial_2016_e.pdf, states in its history summary on page 5 that in April 2007, UEC "Transferred gaming machine business for overseas casinos to Aruze Gaming America, Inc."

224.    UEC has acknowledged in writing that it has benefited from AGA's development, manufacture and sale of gaming machines since March 31, 2009.  For example, UEC issued an "Information Memorandum" for its offering of $400,000,000 in "corporate notes," which it expected to be delivered on or about October 14, 2016.  That Memorandum is currently available to the public on the Internet, for example at http://infopub.sgx.com/FileOpen/Universal%20Entertainment%20Corporation%20-%20Information%20Memorandum%20(05.10.16).ashx?App=Prospectus&FileID=30158. The Memorandum refers to UEC's strong relationship with AGA as a reason for investors to purchase the notes.  The Memorandum refers to AGA as a UEC major individual shareholder "because 100% of [AGA's] voting rights are held by Kazuo Okada, Director of [UEC]" (page F-43), states that gaming machines have been ordered from AGA for UEC subsidiary Tiger Resorts' major casino in Manila (p. 81-82), and touts the benefits to UEC's subsidiary and its

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

casino of their relationship with AGA and AGA's gaming machine business (at page 72, referring to UEC as "Company"):

> Tiger Resorts expects to benefit from the strong synergies that exist among itself, the Company and Aruze Gaming America, Inc. ("Aruze Gaming"). Okada Manila's casino is expected to feature the latest technology from Aruze Gaming, including player tracking and yield management systems, which will assist Tiger Resort in marketing specific offerings to targeted customers based on their preferences, and multicurrency foreign exchange machines. Tiger Resort also expects to benefit from the strong support of the Company and Aruze Gaming, each of which has large dedicated development teams that are willing and able to assist Tiger Resort to make sure it stays at the cutting edge of gaming technology. Both the Company and Aruze Gaming have a long track record of developing next generation gaming applications and other leading technology platforms. Tiger Resort believes that access to this technology will provide Tiger Resort with cutting edge analytical, predictive and engagement capabilities that will enable Tiger Resort to implement dynamic and innovative technological solutions, while offering an enhanced customer experience to its gaming patrons.

225.   AGA's license is an oral license, and an implied license, and a license confirmed by emails and other writings exchanged between UEC and AGA.  It is a license by operation of law under Article 35 of the Japanese Patent Act, Nevada Revised Statute 600.500, and/or common law and equitable principles.

226.   In 2017, Mr. Fujimoto conspired with others to usurp Mr. Okada's rightful control over UEC.  Mr. Fujimoto thereafter abused his position at UEC to attack and harm Mr. Okada in many respects, including by attacking and harming AGA, because it is a U.S. company owned by Mr. Okada.  Mr. Fujimoto's unlawful tactics include causing UEC to breach its license agreement with AGA.

227.   UEC breached its patent license agreement with AGA by suing AGA on the Asserted Patents, and by publicly denying AGA's license, for example, in press releases, correspondence, website statements, and lawsuits.

228.   UEC's breach has harmed, and will continue to harm, AGA in an amount in excess of $75,000.00.  It has caused AGA to incur litigation expenses, damaged AGA's

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

reputation, and interfered with AGA's existing and prospective business relations.  To the extent AGA is the owner of one or more of the Asserted Patents under N.R.S. 600.500 or common law and equitable principles, the Court should declare AGA's ownership and order UEC to assign the patents to AGA.

<div align="center">

**ELEVENTH CLAIM FOR RELIEF**

**(Breach of Trademark License Agreement: AGA's Claim Against UEC)**

</div>

229.   AGA repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

230.   UEC's intellectual property license to AGA includes a trademark license.  UEC granted AGA a perpetual, worldwide (excluding Japan) license to all UEC trademarks and service marks, including registered marks, foreign marks, and applications for marks throughout the world (but excluding Japan), and including any right to apply for the registration of such rights.

231.   UEC retained the obligation to incur all expenses required to establish and maintain the trademarks.

232.   UEC further agreed to incur all expenses required to register and maintain those trademarks used by AGA after March 31, 2009, and UEC agreed to maintain those registrations for AGA's benefit and use.

233.   AGA's license has been confirmed by the conduct of UEC and AGA.  Both companies acted in accordance with it from at least 2005 until 2017.  During that time, UEC routinely registered trademarks used by AGA, based on AGA's use, and paid for the costs of registering and maintaining them, for the benefit and use of AGA.

234.   AGA's license is an oral license, and an implied license, and a license confirmed by emails and other writings exchanged between UEC and AGA and by documents filed by UEC in certain national trademark offices, including the U.S. trademark office.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

235.   In 2017, Mr. Fujimoto conspired with others to usurp Mr. Okada's rightful control over UEC.  Mr. Fujimoto thereafter abused his position at UEC to attack and harm Mr. Okada in many respects, including by attacking and harming AGA, because it is a U.S. company owned by Mr. Okada.  Mr. Fujimoto's unlawful tactics include causing UEC to breach its trademark agreements with AGA.

236.   UEC breached its trademark agreements with AGA by refusing to acknowledge and denying its obligation to maintain trademarks used by AGA for AGA's benefit, abandoning registrations of and applications to register trademarks used by AGA, refusing to register related marks used by AGA, and refusing AGA's request that it assign to AGA those trademarks that are based on AGA's use and were registered for AGA's benefit.

237.   UEC's breach has harmed, and will continue to harm, AGA in an amount in excess of $75,000.00.  The U.S. trademark office has rejected some AGA applications to register trademarks related to trademarks registered in UEC's name but based on AGA's use.  AGA is at risk of losing many valuable trademark registrations which were obtained for AGA's benefit and based on AGA's use.

## TWELFTH CLAIM FOR RELIEF

### (Sham Patent Litigation: AGA's Claim Against UEC and Mr. Fujimoto)

238.   AGA repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

239.   When UEC filed its lawsuit against AGA alleging infringement of the Asserted Patents (the "Lawsuit"), UEC and Mr. Fujimoto knew that UEC had authorized AGA's use of the Asserted Patents and had specifically authorized AGA's manufacture and sale of AGA Gaming Machines such as G-ENEX gaming machines.  Mr. Fujimoto caused UEC to file the Lawsuit against AGA, and to accuse of infringement certain AGA Gaming Machines, including AGA's G-ENEX gaming machines and games played thereon, and gaming machines and games based on, modifying, replacing or supplementing AGA's Gaming Machines.

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

240.    When UEC filed its lawsuit, UEC and Mr. Fujimoto knew that UEC had granted AGA a license to its patents that included the Asserted Patents.  UEC and Mr. Fujimoto knew that UEC had granted AGA a license to manufacture and sell AGA Gaming Machines, including AGA's G-ENEX gaming machines and games played thereon.

241.    UEC filed the suit anyway, and Mr. Fujimoto caused UEC to file it, for the purpose of wrongfully harming Mr. Okada and his U.S. company, AGA.

242.    The misconduct of UEC and Mr. Fujimoto in filing the Lawsuit is part of their broader conspiracy to harm Mr. Okada and AGA.

243.    The goals of their conspiracy include having Mr. Fujimoto and other co-conspirators seize control of UEC, usurp Mr. Okada's control over UEC, damage Mr. Okada's reputation, personal and family relationships, finances, and businesses, damage AGA reputation, finances, and business, interfere with AGA's contracts and prospective contracts, seize AGA's money and intellectual property assets, including renouncing the licenses alleged herein, seize AGA's goodwill and customer relations, and cripple Mr. Okada's and AGA's efforts to defend themselves, their reputations, and their assets.

244.    Acts in furtherance of their conspiracy include filing the Lawsuit despite knowing it was baseless, sham litigation.  They also include defrauding Mr. Okada's daughter by purportedly taking control over her shares in the holding company that owns the majority of UEC's stock; seizing control of UEC from Mr. Okada; issuing trumped up charges and findings against Mr. Okada; breaching UEC's longstanding intellectual property license agreements with AGA; making fraudulent demands for AGA's assets and claims to AGA's intellectual property; and defaming AGA and Mr. Okada through press releases and otherwise.

245.    In furtherance of this conspiracy, upon information and belief, Mr. Fujimoto has caused UEC to develop plans to enter the U.S. slot machine market in competition with AGA, and using UEC's sham patent litigation and denials of AGA's licenses to attempt to force AGA out of business, cause others not to do business with AGA, and monopolize the market for slot machines covered by the Asserted Patents and other UEC patents.

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

246. AGA has been damaged, and will continue to be damaged, by UEC's sham litigation in an amount in excess of $75,000.00. It has incurred expenses in defending the sham litigation. Its business has been placed in jeopardy.

## THIRTEENTH CLAIM FOR RELIEF

### (Breach of Equitable Trust as to Trademarks: AGA's Claim against UEC)

247. AGA repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

248. UEC holds in equitable trust, for the benefit of AGA, registrations of trademarks used by AGA, where AGA's use was submitted to trademark offices as a basis for obtaining the registrations.

249. As trustee, UEC's obligations include incurring all expenses needed to establish and maintain the registrations and assisting AGA in registering related trademarks.

250. UEC has breached its obligations as trustee, damaging AGA.

251. The circumstances of UEC's acquisition of these trademark registrations based on AGA's use are inequitable as against AGA.

252. The trademark registrations should be awarded and assigned to AGA under a constructive trust, which is necessary to prevent a failure of justice.

253. Damages should be awarded to compensate AGA for the costs of maintaining the trademark registrations, in an amount in excess of $75,000.00.

## FOURTEENTH CLAIM FOR RELIEF

### (False Representation in Violation of the Lanham Act, 15 U.S.C. § 1125(a): AGA's Claim Against UEC)

254. Counterclaimant AGA repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

///

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

255.   On September 22, 2017, April 2, 2018, and May 14, 2018, UEC separately issued the statements, described verbatim above as Defamatory Statements, which contained false and defamatory statements concerning Mr. Okada and AGA.  These statement were made and used by UEC, and each were false and misleading descriptions of fact (collectively, "Misrepresentations").

256.   UEC's Misrepresentations have been used in interstate and international commerce. They have been distributed over the Internet and in international correspondence (and, on information and belief, in international telephonic communications) with business associates, customers and potential customers in the United States and abroad.

257.   On information and belief, UEC's Misrepresentations have been made in furtherance of its plan to enter the U.S. slot machine market, as a competitor to AGA, and therefore in the commercial promotion of its own products.

258.   UEC acted in bad faith, intentionally taking action to disrupt AGA's business by, among other things, asserting publicly, through press releases and other statements, that AGA was unlawfully practicing UEC patents and that AGA and Mr. Okada were engaged in other misconduct, and by filing sham lawsuits alleging the same.

259.   UEC's Misrepresentations are material misrepresentations of AGA's products, wrongfully insinuating and stating that AGA does not have authority to sell its products.  Such material misrepresentations impact customers, potential customers and business associates willingness to do business with AGA.

260.   AGA has been and will be injured by UEC's Misrepresentations.

261.   UEC's Misrepresentations have violated the federal Lanham Act, 15 U.S.C. § 1125(a).

262.   AGA is informed and believes, and on that basis alleges, that it has lost or is likely to lose profits from business due to the Misrepresentations and that the Misrepresentations have diminished AGA's reputation and goodwill. In addition, AGA has been damaged in the amount reasonably required for corrective activities to offset the false beliefs created by UEC's

Misrepresentations, including the bringing of this claim. AGA is entitled to an award of all damages under 15 U.S.C. § 1117(a)(2).

263.   UEC's Misrepresentations have caused and are causing irreparable injury to AGA. AGA is informed and believes, and on that basis alleges, that the Misrepresentations will result in further irreparable injury if Defendants are not enjoined to cease, desist from, retract, and correct the Misrepresentations. AGA is entitled to such an injunction under 15 U.S.C. § 1116(a).

264.   This is an exceptional case, and AGA should recover its attorneys' fees and litigation expenses under 15 U.S.C. § 1117(a).

## FIFTEENTH CLAIM FOR RELIEF

### (Declaratory Judgment as to Patent Rights: AGA's Claim Against UEC)

265.   AGA repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

266.   AGA contends it is licensed to the Asserted Patents and to all UEC patents issued and that will issue outside of Japan that claim priority to any patent application filed before March 31, 2009, or that are based on any invention discovered prior to March 31, 2009 (the "Licensed Patents").   AGA contends that its license is exclusive,  giving AGA the right to prohibit UEC from practicing the Licensed Patents outside of Japan, and the sole right to license others to the Licensed Patents.   AGA contends that its license included (but was not limited to) the right to make, have made, import, offer for sale, and sell all gaming machines and games played thereon that it developed, was developing or having developed, manufactured or sold from 2005 through March 31, 2009 ("AGA's Gaming Machines"), and the right to develop, manufacture and sell new gaming machines and games played thereon based on, modifying, replacing or supplementing AGA's Gaming Machines.  The license included, but was not limited to, all game software, gaming systems, and gaming equipment used in or with AGA's Gaming Machines.  AGA's Gaming Machines included the G-ENEX cabinet accused by UEC

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

in this case and identified in part by the 2007 G-ENEX service manual referenced in UEC's Second Amended Complaint as Exhibit E.

267.   Despite previously admitting AGA's license,   UEC has recently denied  that AGA has a license to the Licensed Patents and to AGA's Gaming Machines, including G-ENEX gaming machines,   both in writings and in its actions, including by initiating this suit and by taking steps to sell, or create a subsidiary to sell,  in the United States and other countries outside of Japan gaming machines likely to practice some of the Licensed Patents.

268.   The value of the license in dispute is in excess of $75,000.00.

269.   Pursuant to 28 U.S.C. sections 2201 and 2202, AGA seeks a judgement declaring that it is licensed to the Licensed Patents, including the Asserted Patents, and to AGA's Gaming Machines, including G-ENEX gaming machines,   and declaring the terms of the license, including that AGA's license is exclusive,   that UEC has no right to practice the patents outside of Japan, and that UEC is obligated to pay all fees necessary to maintain the patents.

### SIXTEENTH CLAIM FOR RELIEF

**(Declaratory Judgment as to Trademark Rights:  AGA's Claim Against UEC)**

270.   AGA repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

271.   AGA contends it is licensed to, and the equitable and beneficial owner of, trademarks that UEC registered in the United States trademark office and other countries based on AGA's use of the marks (the "Licensed Trademarks").   AGA contends that its license and rights to use the marks are exclusive, giving AGA the right to prohibit UEC from using them. AGA contends that UEC is obligated to maintain the registrations for AGA's benefit, or alternatively, to assign the registrations to AGA and pay to the AGA an amount sufficient to cover the cost of maintaining the registrations.

**HOLLAND & HART** LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

272. UEC has recently refused to acknowledge AGA's rights in the Licensed Trademarks, and UEC's duties to maintain them, and refused AGA's request that it assign the trademark registrations at issue to AGA.

273. Recently, the U.S. trademark office has rejected AGA applications to register certain trademarks, on the ground that they are too similar to the Licensed Trademarks. A declaration of AGA's rights in the Licensed Trademarks would help AGA register similar marks.

274. The value of the trademark registrations in dispute is in excess of $75,000.00.

275. Pursuant to 28 U.S.C. sections 2201 and 2202, AGA seeks a judgement declaring that it is licensed to the Licensed Trademarks, that AGA is the beneficial and equitable owner of those registrations, and declaring the terms of the license, including that AGA's license is exclusive, and that UEC is obligated to maintain the registrations for AGA's benefit or, alternatively, to assign the registrations and marks to AGA and pay it an amount sufficient to maintain them.

### SEVENTEENTH CLAIM FOR RELIEF

### (Breach of Contract: Mr. Okada's Claim Against UEC)

276. Counterclaimant Mr. Okada repeats and realleges each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further alleges as follows:

277. UEC sold AGA's stock to Mr. Okada on the mutual understanding that AGA was being purchased as a going concern, to continue to engage in and expand upon its gaming machine business.

278. UEC had the AGA stock it sold to Mr. Okada evaluated, for purposes of determining a fair sales price, on the understanding that AGA was being sold as a going concern.

279. One of the assets AGA retained in the sale to Mr. Okada was AGA's rights to use UEC's patents, trademarks, and other intellectual property related to AGA's gaming machine business outside of Japan, and the right to make, have made, import, offer for sale, and

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

sell all gaming machines and games played thereon that AGA developed, was developing or having developed, manufactured or sold from 2005 through March 31, 2009 ("AGA's Gaming Machines"), and to develop, manufacture and sell new gaming machines and games played thereon based on, modifying, replacing or supplementing AGA's Gaming Machines.

280.   UEC has breached its sales agreements with Mr. Okada by asserting its patents against AGA and interfering with AGA's rights to practice the UEC patents and trademarks related to AGA's gaming machine business and AGA's rights to sell AGA Gaming Machines, such as G-ENEX gaming machines.

281.   UEC has breached its obligations of good faith and fair dealing in its sales agreements with Mr. Okada by asserting its patent claims and other claims against Mr. Okada and AGA in bad faith.

282.   As a direct, foreseeable, and proximate result of UEC's breach of contract with Mr. Okada, Mr. Okada has suffered damages in an amount in excess of $75,000.00.

## EIGHTEENTH CLAIM FOR RELIEF

### (Abuse of Process: AGA and Mr. Okada's Claim Against UEC)

283.   Counterclaimants AGA and Mr. Okada repeat and reallege each and every allegation contained in the preceding paragraphs of these Counterclaims, incorporating them by reference, and further allege as follows:

284.   UEC initiated this lawsuit not for the purpose of resolving a legal dispute, but rather for the ulterior purposes of destroying Mr. Okada's personal and business reputation and preventing Mr. Okada from regaining control of Okada Holdings or UEC.

285.   Subsequent to the filing of this lawsuit, UEC has taken willful action not proper in the regular conduct of legal proceedings.  These actions include, but are not limited to, UEC's issuance of defamatory press releases regarding allegations made in the lawsuit, UEC's affiliate TRLEI's requesting the Philippines Department of Justice to start a new investigation into the previously-dismissed estafa complaint against Mr. Okada, UEC's involvement and cooperation in the ICAC's arrest and investigation into corruption allegations against Mr. Okada, and UEC's

issuance of the August 2018 Press Release publicly exploiting the fact that Mr. Okada had been arrested in Hong Kong.

286.    As a direct, foreseeable, and proximate result of UEC's actions, Mr. Okada has suffered damages in an amount in excess of $75,000.00.

287.    Counterclaimants have been forced to retain the services of counsel to address the conduct complained of herein and are therefore entitled to all of their attorneys' fees and costs associated with bringing this action.

**PRAYER**

WHEREFORE, Defendants and Counterclaimants Aruze Gaming America, Inc. and Kazuo Okada pray for Judgment on Universal Entertainment Corporation's Second Amended Complaint as follows:

1.    UEC take nothing by virtue of the Second Amended Complaint on file herein, and that the same be dismissed with prejudice;

2.    For special damages in the form of attorneys' fees;

3.    For an award of reasonable attorneys' fees and costs of suit incurred in this action;

4.    For an award to AGA of its attorneys' fees and expenses under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117(a);

5.    For an order declaring that UEC and Aruze USA owe Mr. Okada indemnification for all expenses, including attorneys' fees and costs incurred in the Wynn Litigation;

6.    For an order awarding Mr. Okada and AGA its damages, including compensatory and exemplary damages, in an amount to be proven at trial;

7.    For an order declaring that AGA has not infringed, contributed to the infringement of, and/or induced the infringement of any asserted claim of the Asserted Patents;

8.    For an order declaring that the accused products do not infringe, contribute to the infringement of, and/or induce the infringement of any asserted claim of the Asserted

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

Patents;

9.      For an order declaring that the claims of the Asserted Patents are invalid;

10.     For an order establishing a constructive trust for all UEC Claimed Slot Machine Patents and Trademark Rights in favor of AGA; and

11.     For an order declaring breach of contract and that AGA is entitled to the right to use the Asserted Patents;

12.     On the Tenth Claim for Relief, for Breach of Patent License Agreement, for an award of damages, and, to the extent AGA owns one or more of the Asserted Patents under N.R.S. 600.500 or common law and equitable principles, for a declaration of AGA's ownership and order requiring UEC to assign any such patent(s) to AGA;

13.     On the Eleventh Claim for Relief, for Breach of Trademark License Agreement, for an award of damages and an order requiring UEC to assign the trademarks at issue to AGA;

14.     On the Twelfth Claim for Relief, for Sham Patent Litigation, an award of treble damages, prejudgment interest, costs and attorneys' fees pursuant to 15 U.S.C.S. § 15;

15.     On the Thirteenth Claim for Relief, for breach of an equitable trust as to trademarks, for an award of damages and an order requiring UEC to assign the trademarks at issue to AGA;

16.     On the Fourteenth Claim for Relief, for False Representation in Violation of the Lanham Act, damages under 15 U.S.C. § 1117(a)(2), an injunction under 15 U.S.C. § 1116(a) prohibiting similar misconduct, and an award of attorneys' fees and litigation expenses under 15 U.S.C. § 1117(a);

17.     On the Fifteenth Claim for Relief, for a Declaratory Judgment as to Patent Rights, a judgment declaring that AGA is licensed to the Licensed Patents, including the Asserted Patents, and to AGA's Gaming Machine, including the G-ENEX gaming machines, and declaring the terms of the license, including that AGA's license is exclusive, that UEC has no right to practice the patents outside of Japan, and that UEC is obligated to pay all fees necessary to maintain the patents;

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

18.     On the Sixteenth Claim for Relief, for a Declaratory Judgment as to Trademark Rights, a judgment declaring that AGA is licensed to the Licensed Trademarks, that AGA is the beneficial and equitable owner of those registrations, and declaring the terms of the license, including that AGA's license is exclusive, and that UEC is obligated to maintain the applications and registrations for AGA's benefit or, alternatively, to assign them and the marks to AGA and pay AGA an amount sufficient to prosecute and maintain them;

19.     On the Seventeenth Claim for Relief, for Breach of Contract, for an award of damages, costs and attorneys' fees; and

20.     On the Eighteenth Claim for Relief, for Abuse of Process, for an award of damages, costs, and attorneys' fees.

21.     For such other and further relief as the Court may deem just and proper.

DATED this 20th day of September 2018.

By  /s/ J. Stephen Peek
J. Stephen Peek, Esq. (1758)
Bryce K. Kunimoto, Esq. (7781)
Robert J. Cassity, Esq. (9779)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nevada 89134

*Attorneys for Defendants Aruze Gaming America and Kazuo Okada*

Jeffrey S. Love, Esq. (*pro hac vice*)
Kristin L. Cleveland, Esq. (*pro hac vice*)
KLARQUIST SPARKMAN, LLP
One World Trade Center
121 S.W. Salmon Street, Ste 1600
Portland, Oregon 97204

*Attorneys for Defendant Aruze Gaming America, Inc*

HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ◆ Fax: (702) 669-4650

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of September 2018, a true and correct copy of the foregoing **ARUZE GAMING AMERICA, INC. AND KAZUO OKADA'S ANSWER TO UNIVERSAL ENTERTAINMENT CORPORATION'S SECOND AMENDED COMPLAINT, COUNTERCLAIMS AGAINST UNIVERSAL ENTERTAINMENT CORPORATION, ARUZE USA, INC., AND JUN FUJIMOTO** was served by the following method(s):

☒  Electronic:  by submitting electronically for filing and/or service with the United States District Court, District of Nevada's e-filing system and served on counsel electronically in accordance with the E-service list to the following email addresses:

Jay J. Schuttert, Esq.
David W. Gutke, Esq.
EVANS FEARS & SCHUTTERT LLP
2300 West Sahara Ave Ste 900
Las Vegas, NV 89101

Andrew Z. Weaver, Esq.
POLSINELLI PC
1000 Louisiana Street, 53rd Floor
Houston, TX 77002

*Attorneys for Plaintiff*

      /s/ Valerie Larsen
An Employee of Holland & Hart, LLP

**HOLLAND & HART LLP**
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

# INDEX OF EXHIBITS

| Tab | Description | Page No. |
|-----|-------------|----------|
| 1 | Agreement to Transfer the Right to Receive Patents | 1 – 8 |
| 2 | UEC press release dated March 15, 2007 | 9 – 18 |
| 3 | UEC press release dated April 1, 2009 | 19 – 21 |
| 4 | UEC's 2007 Annual Report | 22 – 46 |
| 5 | UEC's 2008 Annual Report | 47 – 83 |

**HOLLAND & HART LLP**
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: (702) 222-2500 ♦ Fax: (702) 669-4650

# EXHIBIT 1

## Agreement to Transfer the Right to Receive Patents

# EXHIBIT 1

産業財産権を受ける権利の譲渡に関する契約書

アルゼ株式会社（以下「甲」という）とアルゼゲーミングアメリカインク（以下「乙」という）とは、乙の保有する特許、実用新案、意匠及び商標（以下、総称して「産業財産権」という）を受ける権利を乙が甲に譲渡することに関し、次のとおり契約を締結する。

第1条（産業財産権を受ける権利の譲渡）
1．乙は、本契約締結の日以降に保有することとなった産業財産権を受ける権利（以下「本権利」という）について、その1／2を甲に譲渡するものとする。
2．甲乙は、相手方の事前の書面による同意がなければ各自の持分を処分することはできない。

第2条（対価及び費用）
1．甲は、前条による本権利の譲渡の対価として、本権利に基づいて行う出願（以下「出願」という）に要する費用、産業財産権の成立、維持に要する費用の一切を負担する。
2．甲と乙は、第三者に対する実施許諾契約又は譲渡契約を締結するのに要する費用、および第三者の産業財産権の侵害を停止し、又は損害賠償金、補償金若しくは和解金等を取得するのに要する訴訟および交渉等に要する費用の負担については協議のうえ取り決めるものとする。

第3条（実施および実施料）
1．本権利に基づき取得した産業財産権の実施は乙のみが行うものとし、乙が実施した場合には、乙は甲に対して実施料を支払うものとする。
2．前項における実施料は、乙の事業展開・収益等を参酌して決定するものとし、その金額は別途協議のうえ定めることとする。

第4条（出願）
出願の是非、出願内容、出願国及び権利維持期間については、甲乙協議のうえ決定するものとする。

第5条（甲の義務）

１．第１条の規定により譲渡され、本権利を有することとなった発明等について、甲は、甲と乙の共同出願として直ちに出願を行うものとする。ただし、当該発明等のうち新規性等の権利化への要件が認められない場合、甲は出願を行わない。

２．前項において行った出願に基づく産業財産権の成立および維持に係る一切の手続きは、甲が行うものとする。

第６条（乙の義務）

１．乙は、前条の規定に基づいて行われる甲の出願について、明細書作成の協力および技術説明等を行うものとする。

２．乙は、本権利に関して、新規性喪失の事実、同一または密接に関連する先行技術の存在等産業財産権の成立に障碍となる事由を知ったときは、速やかに甲に報告するものとする。

３．乙は、本権利について、新規性を喪失させ、密接に関連する技術的事項について出願日前に発表する等産業財産権の成立に障碍となる行為をしてはならない。

４．乙は、本権利に係る発明等が出願公開されるまで、当該発明等を第三者に開示してはならない。ただし、甲の事前の承諾を得た場合は、この限りではない。

第７条（収益）

甲と乙は、本権利または産業財産権を第三者に実施させることにより得た収入、第三者に譲渡することにより得た収入、第三者が支払った損害賠償金、補償金、その他、本権利または本件特許権に係わる対価として受けた収入については、甲と乙の持分に応じて分配するものとする。

第８条（特記事項）

第５条第１項に基づいて甲と乙の共同出願とすべき事案のうち、甲又は乙単独名義でなされた出願については、当該出願が権利化された時点において、相手方に対して１／２を譲渡する等、甲及び乙の共有名義となるよう手続きを実施するものとする。

第８条（契約期間）

本契約の期間は、契約締結の日から３年間とする。

第９条（準拠法）

本契約の有効性および履行については、日本法に準拠し、日本法に従って解釈されるものとする。

第１０条（解除）

甲または乙が本契約の条項に違反したとき、または破産等経済的信用が著しく毀損した場合、相手方は何らの通知催告を要せず、直ちに本契約を解除することができる。

第１１条（協議解決）
本契約の各事項に関する紛争若しくは疑義または本契約に定めのない事項については、甲乙協議の上解決する。

第１２条（合意管轄）
甲および乙は、本契約に関して紛争が生じた場合には、甲の住所地を管轄する裁判所を第一審の専属的合意管轄裁判所とすることに合意する。

第１３条（日本文の優先）
本契約は、日本文及び英文で締結するものとし、日本文の契約を正本とすることに甲乙合意する。

本契約の締結を証するため、本契約書２通を作成し、甲、乙が各１通を保管する。

平成２１年　３月　３１日

東京都江東区有明三丁目１番地２５
（甲）アルゼ株式会社
　　　代表執行役　徳田　一 

アメリカ合衆国ネバダ州ラスベガス市グリエー通り７４５番
（乙）アルゼゲーミングアメリカインク
　　　日本における代表者　岡田　和生

Agreement Relating to the Transfer of the Right to Receive Industrial Property Rights

Aruze Corporation (hereinafter referred to as "Party A" and Aruze Gaming America, Inc. (hereinafter referred to as "Party B" hereby enter into the following agreement with regard to the transfer from Party B to Party A of the rights to receive patents, utility models, designs, and trademarks (hereinafter collectively referred to as "industrial property rights") held by Party B.

Article 1 (Transfer of the right to receive industrial property rights)
1.  Party B shall transfer half of its rights (hereinafter referred to as "Rights") to receive industrial property rights that it gains on or after the date this agreement is executed to Party A.
2.  Neither Party A nor Party B may dispose of its own share without the prior written consent of the other party.

Article 2 (Consideration and expenses)
1.  Party A, as consideration for the transfer of Rights according to the preceding Article, shall bear all expenses necessary for applications (hereinafter referred to as "Applications") based on the Rights as well as expenses required for the establishment and maintenance of industrial property rights.
2.  Party A and Party B shall establish, based on mutual consultation, which party shall bear expenses required for executing patent licensing agreements or transfer agreements with third parties, as well as expenses required for litigation, negotiations, etc. required in order to stop infringement of industrial property rights by third parties and to obtain compensation for damages, compensation, settlement payments, etc.

Article 3 (Licenses and licensing fees)
1.  Only Party B may exercise industrial property rights obtained based on the Rights, and if Party B does exercise [an industrial property right], Party B shall pay Party A a licensing fee.
2.  The licensing fee in the preceding paragraph shall be determined with reference to Party B's business expansion, profits, etc. and the amount thereof shall be decided on based on separate mutual consultation.

Article 4 (Applications)
The decision of whether or not to file Applications, the content of Applications, the country of Applications, and the duration of rights shall be determined based on consultation between Party A and Party B.

Article 5 (Obligations of Party A)

1.  Party A shall immediately file as joint applications by Party A and Party B, Applications for inventions, etc. transferred based on the provisions of Article 1 for which it has gained Rights. However, if there are no requirements such as novelty, etc. necessitating acquisition of rights for one of said inventions, etc., Party A shall not file an Application.

2.  Party A shall carry out all procedures relating to the establishment and maintenance of industrial property rights based on Applications filed according to the preceding paragraph.

Article 6 (Party B's obligations)

1.  Party B shall provide cooperation in the preparation of specifications, technical descriptions, etc. for Applications filed by Party A based on the provisions of the preceding Article.

2.  If Party B becomes aware of any reason that may hinder the establishment of industrial property rights, such as facts causing loss of novelty, the existence of identical or closely related prior art, etc., it shall promptly report this to Party A.

3.  Party B may not engage in any action with regard to the Rights that may hinder establishment of industrial property rights, such as actions causing loss of novelty, publication of closely related technical matters prior to the filing date of an Application, etc.

4.  Party B may not disclose the inventions, etc. in question to any third party until the publication of Applications for inventions, etc. associated with the Rights. However, this restriction shall not apply if the prior permission of Party A is obtained.

Article 7 (Profit)

Income received through licensing of the Rights or industrial property rights to a third party, income received from transfer to a third party, and income received as compensation related to compensation for damages, compensation, etc. paid by a third party in relation to the Rights or patent rights related to this matter shall be distributed proportionally based on the shares held by Party A and Party B.

Article 8 (Special items)

For any application filed under the name of Party A or Party B alone in a case where a joint application by Party A and Party B is to be filed based on Article 5 paragraph 1, once a right is established for the application in question, procedures shall be carried out to share ownership jointly between Party A and Party B, including transferring half to the other party, etc.

Article 8 [sic] (Duration of agreement)

The duration of this agreement shall be three years from the date the agreement is executed.

Article 9 (Governing law)

The validity and fulfillment of this agreement shall be governed by Japanese law and shall be interpreted in accordance with Japanese law.

Article 10 (Cancellation)

If Party A or Party B violates the terms of this agreement or its economic credit is significantly harmed through bankruptcy, etc., it may immediately cancel this agreement without providing any prior notification to the other party.

Article 11 (Consultation and resolution)
Disputes and questions related to matters in this agreement and matters not provided for in this agreement shall be resolved through consultation between Party A and Party B.

Article 12 (Agreed jurisdiction)
If a dispute arises regarding this agreement, Party A and Party B agree that the court holding jurisdiction over Party A's address shall be the first and exclusive agreed court of jurisdiction.

Article 13 (Precedence of Japanese version)
This agreement shall be executed in Japanese and English, and Party A and Party B agree that the Japanese version shall be considered the original.

In witness whereof, this agreement shall be prepared in duplicate, with Party A and Party B each retaining one copy.

March 31, 2009

(Party A)   Aruze Corporation
3-1-25 Ariake, Kōtō-ku, Tōkyō-to
Hajime Tokuda, Representative Executive Officer
[seal: Aruze Corporation / Seal of the Representative Executive Officer]

(Party B)   Aruze Gaming America, Inc.
745 Grier Drive, Las Vegas, NV 89119 USA
Kazuo Okada, Representative in Japan
[seal: Aruze Gaming America, Inc. / Seal of the Director]

[seal: Aruze Corporation / Seal of the Representative Executive Officer]

[seal: Aruze Gaming America, Inc. / Seal of the Director]

# EXHIBIT 2

UEC press release dated
March 15, 2007

# EXHIBIT 2



March 15, 2007

Company Name: ARUZE CORP.
Name and Title of Representative: Kunihiko Yogo
Representative Director and CEO
(JASDAQ Code: 6425)
Contact: Yoshito Hori
Member of the Board of Directors
TEL: +81-3-5530-3055 (switchboard)

# Business Realignment of ARUZE GROUP

As of last year, ARUZE CORP. ("ARUZE" below) has been examining a realignment of its business in order to accommodate its transition to an operating holding company. In its Board of Directors Meeting held today, the Company decided on the following two courses of action: I. The transfer of ARUZE's overseas casino gaming machine business and II. the separation of its mobile website operation business. Details of this decision follow below. Furthermore, included at the end of this document is information on ARUZE's future policy regarding its transition to an operating holding company.

## I. Transfer of Overseas Casino Gaming Machine Business

On April 1, 2007, ARUZE's overseas casino gaming machine business is scheduled to be transferred to Aruze Gaming America, Inc. ("AGA" below), a 100%-owned American subsidiary of the Company.

### 1. Reason for Transfer

ARUZE aims to expand the scope of its operations around the three primary businesses that comprise the Company's current focus, these being its: (1) Japanese Pachislot/Pachinko business, (2) overseas casino gaming machine business and (3) joint casino hotel operation business through Wynn Resorts, Limited. Recognizing the necessity of establishing an R&D and sales framework capable of accommodating the growing US market (and facilitating the Company's entry in the Indian casino market*) in order to successfully expand its casino machine business, ARUZE concluded that transferring its R&D and sales departments for that business to AGA and working towards strengthening its presence in the world's largest market would be the most appropriate course of action. Additionally, transferring this business to AGA ensures that no duty to refrain from competition is present between AGA and ARUZE.

(*Indian casinos: Casinos operated by Native American tribes in the United States. Said casinos have been benefiting from rapid growth in the last several years.)

1

## 2. Nature of Transfer

### (1) Nature of Operations of Department to Be Transferred

|  | No. of Employees | Nature of Operations |
|---|---|---|
| International Sales Department | 10 | Sales of gaming machines to overseas casinos |
| Gaming R&D Department | 88 | Development of gaming machines for overseas casinos |
| Total | 98 |  |

### (2) Business Results of International Sales Department for Fiscal Year Ending March 31, 2006

|  | International Sales Dept. (a) | ARUZE CORP. Business Performance for Fiscal Year Ending March 31, 2007 | Ratio (a/b) |
|---|---|---|---|
| Net Sales | ¥1,539 million | ¥29,165 million | 5.3% |
| Gross Profit | ¥501 million | ¥13,643 million | 3.7% |
| Operating Profit | -¥1,491 million | -¥5,613 million | -% |
| *Ordinary Profit | - | -¥5,805 million | -% |

(No net sales are recorded for the Gaming R&D Department due to the nature of its activities.)

*Ordinary profit is omitted here due to non-operating profit/loss not being allocated on a departmental basis.

### (3) Items and Amounts Pertaining to Assets to Be Transferred (As of March 15, 2007)   (Units: Million ¥)

| Assets | | | Liabilities |
|---|---|---|---|
| Department | Item | Book Value |  |
| International Sales Department | Tangible Fixed Assets | 0.2 | N/A |
| Gaming R&D Department | Tangible Fixed Assets | 23.6 |  |
| Total | | 23.8 | — |

### (4) Transfer Price and Method of Settlement

ARUZE intends to add a valuation amount determined by an independent third-party assessor (tax accounting corporation) to the ¥23.8 million representing the book value of assets.

## 3. Summary of Transfer Recipient Company

| | |
|---|---|
| (1) Company Name | Aruze Gaming America, Inc. |
| (2) Primary Business | Sale and manufacture of gaming machines for overseas casinos |
| (3) Date Established | February 7, 1983 |
| (4) Location of Headquarters | 745 Grier Drive, Las Vegas, Nevada 89119 USA |
| (5) Representative | Kunihiko Yogo |
| | (ARUZE CORP. Representative Director and CEO) |
| (6) Capital | US$190,000.00 |

2

| (7) No. of Employees | 7 |
| (8) Major Shareholder Structure and Holding Percentage | ARUZE CORP.   100% |
| (9) Relationship with ARUZE | Capital relationship: AGA is a wholly-owned subsidiary of ARUZE. |
| | Personnel relationship: One ARUZE Director is concurrently serving as Director of AGA. |
| | Business relationship: The purchase and sale of components for overseas casino gaming machines. |

### 4. Schedule

| Date of Board of Directors Meeting finalizing transfer agreement | March 15, 2007 |
|---|---|
| Date of finalization of transfer agreement | March 31, 2007 (tent.) |
| Date of transfer | April 1, 2007 (tent.) |

### 5. Description of Accounting Procedures

The valuation amount established by the third-party assessor may result in transfer gains for ARUZE. Any amounts corresponding to these gains are scheduled to be posted by the transfer recipient company in the form of goodwill. This goodwill would be amortized in accordance with US accounting standards.

## II. Separation of Mobile Website Operation Business

ARUZE will separate its mobile phone website operation business as of April 2, 2007.

### 1. Purpose of Separation

Currently, ARUZE's Research and Development Division conducts the planning, development and operation of pay mobile websites, including "ARUZE Kingdom," "Super Real Mahjong" and "Shoryu Shogi." In order to boost the specialization and improve the competitiveness of this business to address intensified competition, as well as streamline the business of ARUZE, the Company has decided to separate this mobile website operation business and render it independent.

### 2. Key Points Pertaining to Separation

(1) Separation Schedule

| Date of Board of Directors Meeting approving separation plan | March 15, 2007 |
|---|---|
| Date of separation | April 2, 2007 (tent.) |
| Registration of establishment of newly-established company (effective date of separation) | April 2, 2007 (tent.) |

This separation is defined as a "new establishment separation through a simplified company separation" as stipulated in Article 805 of the Commercial Code of Japan. As such, ARUZE is not planning an approved resolution of the matter at the General Meeting of Shareholders.

(2) Method of Separation

①Method of Separation

ARUZE CORP. will represent the split company and ARUZE MEDIA NET INC. ("ARUZE MEDIA NET" below) will represent the newly-established company created through a new establishment separation.

②Reason for Adopting this Method of Separation

In order to boost the specialization of its mobile website operations business and further strengthen that competitiveness of that business in the process, ARUZE concluded that operating said business in the form of a 100%-owned subsidiary would be the most appropriate course of action. The Company therefore elected to employ the aforementioned method of separation, which establishes the business as a wholly-owned subsidiary.

(3) Share Allocation

The newly-established company will issue 2,000 shares of common stock upon the separation, with all of these shares to be allocated to ARUZE.

(4) Handling of Share Warrants and Bonds with Share Warrants Attached

The split company has issued share warrants; however, upon the separation, the newly-established company will not issue share warrants for the newly-established company in place of share warrants for the split company.

Additionally, the split company has not issued bonds with share warrants attached.

(5) Summary of Accounting Methods

As this separation is defined as a new establishment separation resulting in a subsidiary, accounting will be conducted based on the book value succession method.

(6) Rights and Obligations to Be Succeeded by Newly-Established Company

In accordance with the aforementioned new establishment separation plan, on the appointed day of the separation, the newly-established company will succeed the assets, liabilities and any and all incidental rights and obligations incidental to the business from the split company.

Additionally, ARUZE will make a concomitant assumption of debt to be succeeded by the newly-established company from ARUZE.

The valuation of assets and liabilities shall be based on the balance sheet dated on the final day of September 2006 and finalized after adjusting for differences in each as valued on the appointed day of separation.

(7) Expectations Regarding Debt Fulfillment

ARUZE has determined that there are no problems inherent with the certainty of debt fulfillment to be assumed by the Company and the newly-established company upon the

separation.

### 3. Description of Companies Involved in Separation (As of March 15, 2007)

| | Split Company (ARUZE) | Newly-Established Company |
|---|---|---|
| (1) Company Name | ARUZE CORP. | ARUZE MEDIA NET INC. |
| (2) Primary Business | Development, manufacturing, sales, leasing and import/export of amusement machines | Planning, development and sales of contents for mobile websites |
| (3) Date of Establishment | June 26, 1973 | April 2, 2007 (tent.) |
| (4) Location of Headquarters | 3-1-25 Ariake, Koto-ku, Tokyo | Same as left |
| (5) Representative | Kunihiko Yogo | Norihisa Kiriu |
| (6) Capital | ¥3,447 million (*1) | ¥50 million |
| (7) Outstanding No. of Shares | 80,195,000 shares (*1) | 2,000 shares |
| (8) Net Assets | ¥113,959 million (*1) | ¥100 million (tent.) |
| (9) Total Assets | ¥166,540 million (*1) | ¥121 million (tent.) |
| (10) Closing Day of Business Year | March 31 | March 31 |
| (11) No. of Employees | 901 (*1) | 4 (tent.) |
| (12) Primary Customers | Pachinko parlors across Japan | NTT DoCoMo, Inc.<br>KDDI CORPORATION<br>KYOCERA COMMUNICATION<br> SYSTEMS Co., Ltd.<br>SOFTBANK MOBILE Corp. |
| (13) Major Shareholders and<br>Holding Ratio<br>(As of Sept. 30, 2006) | Kazuo Okada    40.61%<br>Tomohiro Okada 29.51%<br>Hiromi Okada    6.64% | ARUZE CORP.   100.00% |
| (14) Primary Banks | The Bank of Tokyo-Mitsubishi UFJ, Ltd.,<br>Sumitomo Mitsui Banking Corporation,<br> etc. | (Undetermined) |
| (15) Relationship between Involved<br>Companies | Capital relationship: The newly-established company will be a wholly-owned subsidiary of ARUZE.<br>Personnel relationship: Directors from the split company will be dispatched to the newly-established company.<br>Business relationship: The newly-established company will consign development work pertaining to mobile contents to the separated company. | |

(16) Business Results for Last Three Fiscal Years

(Units: Million ¥)

| ①Split Company (ARUZE) | Non-Consolidated | | | Consolidated | | |
|---|---|---|---|---|---|---|
| Fiscal Year Ending | March 31,<br>2004 | March 31,<br>2005 | March 31,<br>2006 | March 31,<br>2004 | March 31,<br>2005 | March 31,<br>2006 |
| Net Sales | 79,491 | 49,526 | 29,165 | 101,077 | 72,458 | 48,506 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Operating Profit | 8,189 | 3,354 | -5,613 | 10,065 | 5,467 | -5,310 |
| Ordinary Profit | 9,738 | 3,313 | -5,805 | 8,399 | 2,083 | -8,578 |
| Net Profit | 1,723 | -7,019 | -13,891 | 156 | 1,022 | -12,713 |
| Net Profit Per Share (¥) | 21.56 | -87.85 | -173.86 | 1.96 | 12.79 | -159.11 |
| Dividends Per Share (¥) | 30 | 30 | 20 | - | - | - |
| Net Assets Per Share (¥) | 1,805.30 | 1,687.43 | 1,483.81 | 1,480.45 | 1,468.75 | 1,351.89 |

(*1) As of September 30, 2006.

## 4. Nature of Business Department to Be Separated

(1) Description of Operations of Mobile Website Operation Business Department

   Planning and sales of contents for mobile websites, operation of mobile websites, etc.

(2) Business Results of Mobile Website Operation Department for Fiscal Year

   Ending March 31, 2006

| | Mobile Website Operation Business (a) | ARUZE CORP. Business Performance for Fiscal Year Ending March 31, 2007 | Ratio (a/b) |
|---|---|---|---|
| Net Sales | ¥1,009 million | ¥29,165 million | 3.5% |
| Gross Profit | ¥761 million | ¥13,643 million | 5.6% |
| Operating Profit | - | -¥5,613 million | -% |
| *Ordinary Profit | - | -¥5,805 million | -% |

*Operating profit and ordinary profit are omitted here due to selling, general and administrative

   expenses and non-operating profit/loss not being allocated to this business.

(3) Items and Amounts Pertaining to Assets to Be Succeeded (As of April 2, 2007)    (Units: Million ¥)

| Assets | | Liabilities | |
|---|---|---|---|
| Item | Book Value | Item | Book Value |
| Cash | 34 | Accrued Payable/ Accrued Expenses | 21 |
| Accounts Receivable | 86 | - | - |
| Tangible Fixed Assets | 1 | - | - |
| Total Assets | 121 | Total Liabilities | 21 |

## 5. Status of ARUZE Following Separation

| (1) | Company Name | ARUZE CORP. (no change) |
|---|---|---|
| (2) | Primary Business | Development, manufacturing sales, leasing and import/export of amusement machines (no change) |
| (3) | Location of Headquarters | 3-1-25 Ariake, Koto-ku, Tokyo (no change) |
| (4) | Representative | Kunihiko Yogo (no change) |
| (5) | Capital | ¥3,447 million (no change) |
| (6) | Total Assets | Minute change in total assets due to separation. |
| (7) | Closing Day of Business Year | March 31 |
| (8) | Effect on Business Performance | The separation will not bear an effect ARUZE'S consolidated business results due to the newly-established company being a wholly-owned subsidiary. |

## III. Outlook on Business Performance Following Transfer

### Outlook on Business Performance (Non-Consolidated/Consolidated)

| | Fiscal Year Ending March 31, 2007 (Non-Consolidated) | Fiscal Year Ending March 31, 2007 (Consolidated) |
|---|---|---|
| Net Sales | ¥34,000 million | ¥37,800 million |
| Ordinary Profit | -¥1,500 million | -¥5,500 million |
| Net Profit | -¥3,700 million | ¥10,100 million |
| Annual Dividends Per Share | ¥50.00 | - |

*Note: The above will bear no effect on ARUZE's business results for the current fiscal year.

Additionally, the realignment of ARUZE's business as announced in this press release will not have an effect on consolidated results.

Business performance expectations for the fiscal year ending March 31, 2008 will be reported once they have been finalized.

**<Future Policy Regarding Transition to Operating Holding Company>**

**1. Revision of Pachislot/Pachinko Business**

At the time of ARUZE's announcement made on August 24, 2006 entitled "Revision of Transition Method to Operative Holding Company Framework," the Company had intended to separate its sales department by April 1, 2007. This scheduled date has been changed to October 1, 2007. The reason for this six-month extension is the belief that having the sales and manufacturing departments remain directly integrated rather than become separate companies will allow for more flexibility in dealing with currently-occurring changes in the market. This is especially crucial given the peak in replacement demand for Type 5 Pachislot machines expected to occur in the 1st Half of the fiscal year ending March 31, 2008.

With regards to the R&D departments for Pachislot and Pachinko, at the time of the aforementioned announcement on August 24, 2006, these two departments were scheduled to belong to the operating holding company. However, given that the market is anticipated to expect

elevated levels of playability in order to balance out the lower volatility of Type 5 Pachislot machines relative to their Type 4 counterparts, increasingly high levels of R&D capability are expected to be called upon in the future. With this in mind, ARUZE concluded that it is essential to increase the autonomy and specialization of its Pachislot and Pachinko R&D departments. Consequently, as of October 1, 2007, both departments will be separated from ARUZE and rendered as independent companies.

**2. Transition to Operating Holding Company**

ARUZE intends to make the transition to an operative holding company as of October 1, 2007. Following this transition, the ARUZE GROUP's domestic and overseas businesses will be separated, with clear delineation within the GROUP of which companies conduct Japanese Pachislot/Pachinko-related operations and which companies conduct operations pertaining to overseas casino gaming machines. The holding company itself is expected to focus specifically on areas that include "core R&D and patent management," "investment management," "group finance," "property management" and "systems management."

Specific plans regarding the transition will be executed pending approval by the Board of Directors and by shareholders at the Annual General Meeting of Shareholders scheduled for June 2007.

-Attachment: "Relationship Between ARUZE GROUP Companies"



Relationship Between ARUZE GROUP Companies

# EXHIBIT 3

UEC press release dated
April 1, 2009

# EXHIBIT 3



April 1, 2009

Company Name: ARUZE CORP.
Name and Title of Representative: Hajime Tokuda
Representative Executive Officer and President
(JASDAQ Code: 6425)
Contact: Naotaka Yamakita
Executive Officer,
Senior General Manager, Administration Division
TEL: 81-3-5530-3055 (switchboard)

## Announcement Regarding Transfer of Subsidiary Shares

ARUZE CORP. (hereinafter referred to as the "Company") hereby announces that a resolution to transfer the shares of Aruze Gaming America, Inc. (hereinafter, referred to as "AGA"), a consolidated subsidiary of the Company, to Mr. Kazuo Okada, the Chairman of the Board of Directors of the Company, has passed at the Extraordinary Board of Directors Meeting held on March 31, 2009. The transfer price will be ultimately determined based on the settlement of account of AGA as of the end of December 2008 with consideration for the real estate evaluation and the exchange fluctuations.

### 1. Reasons for share transfer

The Company group has regarded its casino gaming machine business as one of its three core businesses and has engaged in the sales of casino gaming machines centering on AGA.

In the global economic slump caused by the financial crisis, however, all the competitors engaged in casino gaming machines implemented price reductions of 25% to 40% and the competitive environment remains severe.

Considering such situation, reduction of deficit burden is vital for the Company.    Also, operational performance with higher mobility is necessary for the casino gaming machine business.    The transfer of AGA shares by the Company will allow AGA to operate its management based on the principle of self-supporting accounting with its own responsibility, under the leadership of Mr. Kazuo Okada.

This share transfer also reduces the financial and managerial burdens for the Company.    The Company will concentrate on its Pachislot/Pachinko business, the main business of the Company, to establish Aruze brand in the Pachislot/Pachinko market and to recover the market share, and conduct necessary operations for such purposes.

### 2. Transferee of the shares

(1) Name                                    Kazuo Okada
(2) Relationship with the Company           Chairman of the Board of Directors of the Company

### 3. Number of the shares to be transferred, transfer price and conditions before/after the transfer

(1)  Number of owning shares before the transfer:      1,079 shares
                                                       (Holding ratio: 49.95%)
                                                       (Number of voting rights: 1,079)


(2)  Number of shares to be transferred:               1,079 shares

1

| | |
|---|---|
| | (Transfer price: *see note) |
| | (Number of voting rights: 1,079) |
| (3)  Number of owning shares after the transfer: | 0 shares |
| | (Holding ratio: 0%) |
| | (Number of voting rights: 0%) |

*Note: The transfer price will be determined based on the settlement of account of AGA as of the end of December 2008 with consideration for the real estate evaluation and the exchange fluctuations.

## 4. Schedule

March 31, 2009   Resolution at the Board of Directors Meeting
March 31, 2009   Transfer of the shares

## 5. Future Outlook

Since AGA sets its period of settlement of account on December, the business result of AGA until the end of December 2008 will be the subject of the consolidation of the Company and will be reflected on the consolidated business results of the Company for the period ending March 2009.   Afterwards, the Company will follow the directions by the audit firm and disclose such information as necessary.

The impact of the said share transfer on the business performance forecast of the Company will be minimal.

### <Reference>

Company Profile of Aruze Gaming America, Inc. (as of the end of December 2008)

| (1) Trade name | Aruze Gaming America, Inc. |
|---|---|
| (2) Representative | Kazuo Okada |
| (3) Location of headquarters | Las Vegas, Nevada, U.S.A. |
| (4) Date of establishment | February 1983 |
| (5) Nature of business | Development, manufacturing and sales of gaming machines for overseas casinos |
| (6) Fiscal year end | December 31 |
| (7) Number of employees | 209 |
| (8) Main office | Las Vegas, Nevada, U.S.A. |
| (9) Capital | US$20,525,309 |
| (10) Number of outstanding shares | 2,160 shares |
| (11) Shareholder composition | Aruze Corp.: 49.95% Mr. Kazuo Okada: 50.05% |

(12) Performance trend in recent business years

| | FY ended on December 2007 | FY ended on December 2006 |
|---|---|---|
| Net sales | ¥586,566,000 | ¥6,906,000 |
| Gross profit | ¥294,514,000 | (¥11,060,000) |
| Operating income | (¥157,248,000) | (¥112,082,000) |
| Ordinary income | (¥166,114,000) | (¥98,472,000) |
| Income during the period | (¥226,651,000) | (¥72,971,000) |
| Total assets | ¥3,554,822,000 | ¥1,556,783,000 |
| Net assets | ¥1,070,801,000 | ¥1,352,970,000 |
| Dividend per share | - | - |

Exhibit Page No. 21

# EXHIBIT 4

## UEC's 2007 Annual Report

# EXHIBIT 4



**ANNUAL REPORT 2007**

# Forging a Global Strategy
# Grounded in Three Pillars of Business



**Kunihiko Yogo**

Representative Director and President

Allow me to extend my hearty greetings to you all. ARUZE CORP. concluded its 34th term (the fiscal year between April 1, 2006 and March 31, 2007) at the end of March 2007. In this Annual Report, we hope to provide you with a summary of our business performance for the 34th term as well as inform you of our prospects for the 35th term.

Firstly, I must mention that our settlement of accounts for the term ending March 2007 yielded unfavorable business results for that term, with consolidated operating losses of ¥3,205 million and consolidated ordinary losses of ¥6,764 million. However, due to the contribution of Wynn Resorts, Limited, an equity affiliate of ARUZE, net profit exceeding initial expectations was posted for the term in the amount of ¥9,169 million. Dividends of ¥50 will be paid for that fiscal year.

In our industry, the year 2007 will undoubtedly represent a turning point. This will be the year that the Type 4 machines that sustained the market will all be removed.

The appearance of "AT" and "stock" machines during the Type 4 era served to sharply accelerate the expansion of the Pachislot market with their high levels of volatility. In the midst of this situation, the machines that we released in 2002 found success among numerous players and Pachinko parlors alike. However, due to their high volatility, these machines had to be taken off the market in accordance with an administrative directive. Subsequently, certain machines by other manufacturers that had already been released on the market managed to escape newly-enacted changes in bylaws targeting machine specifications, and were not forcibly taken off the market due to their small installation base at the time. Additionally, certain machines released afterwards also fell outside the removal window, and this lead to the creation of a market in which the presence of these remaining machines was uncontested. Although we proceeded with the development of new products to counteract these machines, testing standards for Pachislot would become increasingly strict over the passage of time, which inhibited us from releasing machines outfitted with competitive features.

At the same time, we had just begun to revise our R&D framework, and were working towards strengthening our organization. This would generate some temporary confusion and administrative errors. However, we now possess the R&D capability necessary to maintain an advantageous position within the market.

The guidelines for regulations surrounding Type 5 were released in March 2004, with these put into effect in July of the same year. The time required for machine testing under these new regulations was greater than anticipated, leading to a blank that lasted until September 2005 during which we had not obtained any machine approvals. This led to multiple misreads in subsequent predictions that in turn resulted in downwards revisions of our business performance.

Afterwards, beginning in Fall 2005, we set in place a policy that focused our development and sales efforts on Type 5 machines. However, the gap in volatility between these machines and their Type 4 predecessors was significant, and the market's reception to these Type 5 machines was more lukewarm than previously conceived. Having predicted that the transition of the market from Type 4 to Type 5 would incite players accustomed to the high volatility present hitherto to leave parlors, in an attempt to reign in new user bases, we at ARUZE have been emphasizing the newer aspect of "playability" as a means to counteract the significant gap in volatility between Type 4 and Type 5. In order to help this aspect permeate the market, we introduced the industry's first rental system in January 2006. Under our standard rental plan, which consists of the leasing of 40 machines for a 24-month period, we are confident that our customers will be able to greatly reduce business costs relative to the older system of machine replacement revolving around the purchase of new machines.

Starting in April 2006, in addition to our 40-unit rental plan, we established a diverse series of new rental arrangements that emphasize the needs of the customer. Under the belief that expanding new user bases through the placement of Type 5 machines that precede the Type 4 removal deadline in Fall 2007 will both link to the business stability of parlors and contribute to the development of the industry as a whole, we have been proposing to parlors specific means of how to increase the number of successful establishments through the installation of Type 5 machines. However, despite the removal of Type 4.5 machines, which had represented an overwhelming share of the market up to that point, being conducted in part due to expired approval periods, the market would continue to emphasize revenues generated by high volatility, and would not be produced in increasing the Type 5 installed base. With the market opting to focus on immediate gross profits and continuing to depend on Type 4.7 machines as a result, the issue of weathering the transition to Type 5 was pushed to the side. This incited a vicious circle in which the number of players on the market, which had already been in a state of decline, dropped even further.

## Contents

01   Message from the President

03   Overview of Operations and Results

05   Consolidated Balance Sheets

07   Consolidated Statements of Operations

08   Consolidated Statements of Change in Net Assets

09   Consolidated Statements of Cash Flows

10   Notes to Consolidated Financial Statements

20   Company Profile

**Message from the President**

At the close of 2006, we introduced new Type 5 models that represented a tremendous evolution over the Type 5 models that had already been released up to that point. With these having been well received by the market, we established a prediction that the placement of Type 5 machines on the market was on the verge of accelerating. However, the testing standards for Type 5 would undergo yet another partial change; furthermore, after entering the new year, there would be a rush of applications to the designated testing facilities for new models by competing manufacturers, the processing of which came to be based not on order or number but on a lottery (lot-drawing) system. This was also a contributor in putting our business performance forecasts up to March 2007 off track.

Regarding our prospects for the 35th term, please first allow me to explain our three primary businesses, which break down into 1) domestic Pachislot and Pachinko business, 2) overseas casino gaming machine business and 3) casino hotel operation business.

## (1) Domestic Pachislot and Pachinko Business

Following an anticipated peak in replacement demand between June and September 2007, the market will finally make its official entry into the Type 5 era. ARUZE intends to maximize the opportunities presented by this situation to make a comeback. To this end, we will ensure that we are fully prepared to achieve our goal of 200,000 units of Pachislot sold over the fiscal year.

### <Three Types of Platforms Offered>

Altering the content and basis behind the applications we previously submitted for our earlier Type 5 titles, ARUZE will support the market by offering three different cabinets: DX, X and our latest cabinet, "7R."

1. DX Cabinet (For enjoying a fusion of reels and LCD visuals)
   -This standard model will support the current market and the players who make up that market, both of which have embraced LCD-based Pachislot as the mainstream.
2. X Cabinet (For enjoying LCD visuals with reels serving as command buttons)
   -This machine will attract new players with its intense LCD graphics that meet the standards of the videogame generation.
3. 7R Cabinet (For enjoying the reel control and winning combinations of the previous era)
   -This machine will help bring back former players who enjoyed Pachislot centered on reel control.

ARUZE GROUP has four brands each conducting development efforts for Pachislot machines. The differentiated use between each cabinet is where the strength of this arrangement lies. We believe it to be our mission to develop machines that target a broad range of different players and to release a wide variety of titles on the market. This is accomplished through the unique concepts individually held by the R&D teams under each ARUZE brand.

An example of one of our key releases is "Ao-Don," the official successor to the ARUZE hit "Hanabi" that charmed countless players upon its release in 1998. The over-40,000 orders received for "Ao-Don" before it was even placed in parlors is a sure indication that the Type 5 market has fully come into its own. Following the installation of "Ao-Don," parlors have been enjoying a level of operation reminiscent of an earlier era characterized by prosperous levels of business activity. We can now safely anticipate that the market is finally becoming primed to accept Type 5 machines in full force.

### <A New Type of Amusement Machine: "Slot Pachinko">

Given the significant changes in the Pachislot market, ARUZE is looking to capitalize on two new user bases, "players that are dissatisfied with Pachislot" and "players who feel that something is missing with Pachislot." As a means of addressing such users, we will bring to the market "Slot Pachinko," a new brand of amusement machine based on a completely novel concept.

Along with our new Type 5 machines, "Slot Pachinko" will support parlors by helping to keep players from leaving the Pachislot scene and capturing a new player base as the first machine of its kind in the industry.

### <Rebuilding of Sales Framework>

By the beginning of the 35th term, we have conducted thorough in-house training efforts for approximately 300 sales employees. These efforts have served to clarify the role and responsibility of sales personnel and strengthen organization in the sales department. Within this newly-reborn organization, each member of our sales staff is responsible for between 30 and 40 parlors,

and will increasingly conduct proposal-based sales initiatives tailored to meet each parlor's individual needs.

## (2) Overseas Casino Gaming Machine Business

In our overseas casino gaming machine business, by the end of 2007, the R&D and other departments under this business will be transferred to and concentrated in Aruze Gaming America, Inc., a 100%-owned subsidiary of ARUZE. With this, we intend to begin full-fledged efforts to expand this business.

Currently, casinos are experiencing significant growth on a worldwide basis. In the North America, the world's largest market, the emerging Native American casino market operated by Native American tribes within each US state is expanding rapidly alongside traditional casinos in Las Vegas and other areas. Additionally, as indicated by Macau, the Asian market is also predicted to grow at a tremendous rate. In order to meet the needs of this growth of the casino market on a worldwide scale, we at ARUZE will apply our elaborate contents planning and development ability that reflects Asian sensibilities and repertoire of technology honed through Pachislot development towards the release of new products for the world casino market. This will facilitate our full-fledged reentry into the key North American market, allow us to strengthen our bases in Australia and South Africa and pave the way for greater business development in the rapidly-growing market of Macau.

## (3) Casino Hotel Operation Business

As the only corporation in Japan to hold a license to operate a casino, ARUZE has succeeded in entering the domain of casino hotel operation as a joint venture partner of Wynn Resorts, Limited. In the 1st Quarter of 2007, "Wynn Las Vegas" posted operating profit in the amount of $59 million, an average room rate of $310 (compared to $293 for the same Quarter last year) and an occupancy rate of 96.2% (compared to 95.5% for the same Quarter last year), an exceptional performance all around. Additionally, "Wynn Macau," which opened in September 2006, had an excellent 1st Quarter with operating profit of $41 million, an average room rate of $245 and an occupancy rate of 84.8%. This gave Wynn Resorts $635.3 million in net revenues and $182 million in operating profit for the same Quarter (relative to $277.2 million in net revenues and $9.7 million in operating profit for the same Quarter last year). During 2006, since the 2nd Quarter, the quarter-to-quarter increase in net revenues for Wynn Resorts has been 116% for the 2nd to 3rd Quarter, 177% for the 3rd to 4th Quarter and 113% for the 4th Quarter to the 1st Quarter of 2007. Even with this fantastic performance, gradual moves are already being made to elevate Wynn Resorts to the next stage of the company's growth. In Las Vegas, the approximately 80,000-m² piece of land adjacent to Wynn Las Vegas" is scheduled in early 2009 to host the opening of "Encore at Wynn Las Vegas," a new casino resort currently under construction. In Macau, an expansion to "Wynn Macau" involving the construction of a 40-floor tower encompassing 400 suites, as well as other large-scale expansion projects, are underway. This "Wynn Diamond Suites" will be subsequently followed by a new hotel construction project on approximately 210,000-m² of land located on the Cotai Strip, the area of reclaimed land that straddles the two islands of Macau. Additionally, due to $900 million in proceeds from a casino concession sublicense in Macau, Wynn Macau has in effect recovered all investment made by the company toward development projects in the region thus far.

With this situation, the stock of Wynn Resorts has also been trading at a higher price than its competition. Furthermore, announcements that the company has plans for an early redemption of convertible debentures and an equity repurchase program with a scheduled budget of $1.2 billion is expected to contribute to the company's development even further.

While our domestic Pachislot and Pachinko business is experiencing a temporary bout of tumult due to changes in pertinent regulations, we at ARUZE believe that both Pachislot and Pachinko will continue to evolve as attractive pastimes that can be leisurely enjoyed, and we will continue to strive for the number one position in this sector. We also perceive the global growth of the casino market as a once-in-a-lifetime opportunity, and intend to gradually reorient our focus to the overseas market as we work towards establishing a global strategy in the future. Lastly, in introducing attractive new products to the market, we will maintain a clear and consistent vision, not limiting ourselves to common or fixed ways of thinking.

We are truly grateful for and hope to continue to benefit from your patronage. Thank you very much.

**Overview of Operations and Results**

## Analysis of Business Performance

### ①Net Sales

In ARUZE's primary business of Pachislot and Pachinko, net sales increased by 23.0% over the previous fiscal year to ¥30,808 million. Although eleven Type 5 Pachislot titles were released through aggressive sales efforts, sales results were sluggish due to the penetration of Type 5 Pachislot machines in the market not occurring at the brisker rate that the ARUZE had expected. Additionally, ARUZE did not conduct sales of Pachinko machines during the period. Net sales for the real estate business and gaming machine business fell below those under the previous fiscal year. Combined, the total amount of net sales fell 26.6% from the previous fiscal year to ¥35,580 million.

### ②Cost of Sales

The drop in net sales resulted in the total cost of sales decreasing 42.9% from the previous fiscal year to ¥17,743 million, leading to a cost of sales ratio of 49.9% for the year. As Adores, Inc. made the transition to an equity method affiliate at the end of March 2006, ARUZE's business segment entitled "Amusement Facility Operation Business" was eliminated, with this accompanied by an improvement in the cost of sales ratio of approximately 14%.

### ③Selling, General and Administrative Expenses

The total amount of selling, general and administrative expenses decreased by 7.4% relative to the previous fiscal year to ¥21,043 million. Among said expenses, R&D expenses decreased 8.6% from the previous fiscal year to ¥5,917 million.

### ④Non-Operating Income/Loss

ARUZE posted non-operating losses of ¥3,558 million, a deterioration of ¥290 million from the previous fiscal year. This was primarily due to investment losses under the equity method of ¥2,932 million, which stemmed from Wynn Resorts, Limited opening its casino resorts "Wynn Las Vegas" in April 2005 and "Wynn Macau" in September 2006. Related pre-opening costs have not yet been recovered.

### ⑤Net Income/Loss

Extraordinary income for the consolidated fiscal year in question was ¥22,965 million, an increase of ¥20,044 million over the previous fiscal year. This is primarily attributable to profit in the amount of ¥20,616 million posted in accordance with the sale of a concession sublicense conducted by Wynn Resorts, Limited, an equity method affiliate of ARUZE.

Extraordinary losses decreased by ¥970 million from the previous fiscal year to ¥4,809 million. This was primarily due to the posting of ¥2,140 million in appraisal losses on inventories, as well as ¥1,412 million for a provision of an allowance for litigation losses.

Collectively, the above resulted in ARUZE booking a net income of ¥9,169 million, net income per share of ¥114.76 and a net worth profit ratio of 8.2% for the consolidated fiscal year in question.

## Overview of Finance

### ①Assets

The amount of total assets at the end of the consolidated fiscal year in question was ¥171,681 million, representing an increase of ¥3,690 million over the previous consolidated fiscal year. For current assets, securities increased by ¥17,636 million, accounts receivable nontrade increased by ¥6,046 million and inventories increased by ¥2,081 million. Simultaneously, cash and deposits decreased by ¥16,398

million, notes receivable and accounts receivable trade decreased by ¥6,225 million and deferred tax assets decreased by ¥1,470 million. Total current assets increased by ¥2,813 million relative to the previous consolidated fiscal year to ¥86,043 million. Under fixed assets, long-term accounts receivable nontrade, which represented the receivable amount for Pachislot software, increased by ¥2,995 million as a result of the commencement of sales under ARUZE's rental system. While investment securities increased by ¥2,320 million, land decreased by ¥1,528 million, buildings and structures decreased by ¥769 million, rental assets decreased by ¥441 million and machinery and delivery equipment decreased by ¥297 million. In total, fixed assets increased by ¥953 million relative to the previous consolidated fiscal year to ¥85,612 million.

### ②Liabilities

Relative to the previous consolidated fiscal year, advance receipts increased by ¥2,680 million, deferred revenue increased by ¥2,071 million and the allowance for litigation losses increased by ¥1,412 million. Simultaneously, interest-bearing liabilities (the total amount of short-term borrowings, long-term borrowings and bonds) decreased by ¥13,430 million. As a result, total liabilities declined year-to-year by ¥4,596 million to ¥55,067 million.

### ③Net Assets

The amount of net assets at the end of the consolidated fiscal year in question was ¥116,614 million, the result of an increase of ¥7,561 million in earned surplus. The shareholders' equity ratio increased by 3.6 points to 67.9% compared to the previous fiscal year, and net assets per share increased by ¥106.00 to ¥1,457.89.

## Cash Flow

As of the end of the consolidated fiscal year in question, cash and cash equivalents totaled ¥39,149 million. The conditions of cash flows and primary factors contributing to fluctuations in cash flows during the year follow below.

### ①Cash Flow from Operating Activities

Cash flow from operating activities totaled ¥808 million in income (against ¥3,655 million in expenditure for the last fiscal year). This was mainly due to a ¥6,225 million-decrease in accounts receivable and a ¥4,751 million-increase in advance receipts, notwithstanding  expenditures in the form of a ¥6,047 million-increase in accounts receivable nontrade and a ¥2,995 million-increase in long-term accounts receivable nontrade.

### ②Cash Flow from Investing Activities

Cash flow from investing activities totaled ¥15,534 million in income (against ¥7,734 million in expenditure for the last fiscal year). This was mainly due to income generated from the sale of tangible fixed assets in the amount of ¥7,757 million and the repayment of investment securities resulting in income of ¥17,145 million, notwithstanding ¥8,592 million in expenditure stemming from the acquisition of tangible fixed assets.

### ③Cash Flow from Financing Activities

Cash flow from financing activities totaled ¥15,033 million in expenditure (against ¥5,937 million in expenditure for the last fiscal year). This was mainly due to ¥10,632 million in expenditure cause by a decrease in short- and long-term loans payable, ¥1,598 million in expenditure through dividends paid and ¥2,800 million in expenditure as a result of the redemption of corporate bonds.

## Capital Investment

Capital investment for the consolidated fiscal year amounted to ¥8,624 million. This is primarily accounted for by the acquisition of rental assets pertaining to the Pachislot and Pachinko business and tools, furniture and fixtures.

## Research and Development Activities

The fundamental policy of ARUZE GROUP is to exercise creativity and foresight in the ongoing creation of attractive and novel products. As a global entertainment company that provides high-quality entertainment for all people irrespective of generation, ARUZE's basic management policy is to do its part in forming "a society that holds dreams" through the creation of "enjoyment."

Centered on its businesses of Pachislot, Pachinko and gaming machines, the R&D efforts of ARUZE GROUP primarily consist of the development of Pachislot and Pachinko machines, console games for home use, amusement machines for commercial use and gaming machines.

Never allowing itself to be content with conventional technology, ARUZE has continually taken up the challenge of new technology, exploiting the latest technology available and developed novel and innovative products. In order to help realize the new dreams of its customers, ARUZE will

continue to reinforce its image of "ARUZE: The Technology Company" while simultaneously cultivating an image of "ARUZE: The Innovative Technology and Patent Company."

The R&D staff of ARUZE GROUP currently numbers 597, representing 50.0% of our workforce. For the fiscal year in question, total R&D expenses amounted to ¥5,917 million. ARUZE strives to incorporate increasingly sophisticated, efficient and low-cost design processes in its creation of audio and video for Pachislot, Pachinko and other commercial machines as well as for console games. Simultaneously, ARUZE promotes a "3R" (Reuse, Recycling and Reduction) policy in said development efforts.

Recognizing the arrival of next-generation IT technology, ARUZE strives to develop advanced technology that incorporates artificial intelligence (AI) algorithms into IT computer systems, establish a LAN-based network of AI management system terminals, institute human biometric authentication and automate various organizational process management systems. ARUZE GROUP is also making strides in building conversation-based AI and IT computer systems equipped with voice communication engines.

## Depreciation and Amortization Expenses

Depreciation and amortization expenses decreased 6.8% to ¥4,797 million.

















**Consolidated Balance Sheets**

March 31, 2007 and 2006

|  | March 31, | | |
|---|---|---|---|
|  | *2007* | *2006* | *2007* |
|  | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) |
| **Assets** | | | |
| **Current assets:** | | | |
| Cash and bank deposits (Note 10) | ¥ 21,041 | ¥ 37,439 | $ 178,180 |
| Trade notes and accounts receivable (Note 17) | 5,352 | 11,578 | 45,328 |
| Less:  Allowance for doubtful accounts | (36) | (71) | (311) |
| Securities (Note 10) | 18,108 | – | 153,342 |
| Inventories | 25,459 | 23,377 | 215,592 |
| Deferred tax assets (Note 4) | 1,449 | 2,919 | 12,273 |
| Refundable income taxes | – | 70 | – |
| Prepaid expenses and other current assets (Note 17) | 14,669 | 7,916 | 124,220 |
| Total current assets | 86,043 | 83,230 | 728,627 |
| **Property, plant and equipment, at cost:** | | | |
| Land (Note 3) | 13,522 | 15,050 | 114,507 |
| Buildings and structures (Note 3) | 10,342 | 10,827 | 87,578 |
| Machinery and equipment | 21,556 | 19,005 | 182,541 |
| Less:  Accumulated depreciation | (18,341) | (15,057) | (155,320) |
| Property, plant and equipment, net | 27,078 | 29,826 | 229,306 |
| **Investments and other assets:** | | | |
| Investment securities (Note 11) | 51,725 | 49,876 | 438,014 |
| Long-term loans receivable | 668 | 443 | 5,658 |
| Goodwill | 386 | 489 | 3,273 |
| Deferred tax assets (Note 4) | – | 81 | – |
| Other assets (Note 17) | 9,542 | 7,651 | 80,805 |
| Less:  Allowance for doubtful accounts | (3,788) | (3,710) | (32,084) |
| Total investments and other assets | 58,533 | 54,831 | 495,667 |
| **Deferred charges:** | | | |
| Bond issuance expenses | 21 | 97 | 178 |
| New stock issuance expenses | 4 | 4 | 36 |
| **Total assets** | ¥ 171,681 | ¥ 167,990 | $ 1,453,818 |

(See Notes to Consolidated Financial Statements.)

05

|  | March 31, | | |
|  | 2007 | 2006 | 2007 |
|  | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) |
| Liabilities and shareholders' equity | | | |
| Current liabilities: | | | |
| Short-term borrowings (Note 3) | ¥ 9,845 | ¥ 16,850 | $ 83,375 |
| Current portion of long-term debt (Note 3) | 10,188 | 4,309 | 86,273 |
| Notes and accounts payable: | | | |
| Trade | 7,523 | 7,936 | 63,710 |
| Other | 2,045 | 1,162 | 17,321 |
| Advances received | 5,035 | 2,355 | 42,643 |
| Deferred revenues | 5,939 | 3,868 | 50,295 |
| Accrued income taxes | 692 | 78 | 5,863 |
| Other current liabilities | 3,268 | 1,025 | 27,674 |
| Total current liabilities | 44,538 | 37,586 | 377,157 |
| Long-term liabilities: | | | |
| Long-term debt (Note 3) | 7,305 | 19,610 | 61,862 |
| Deferred tax liabilities | 156 | – | 1,327 |
| Other long-term liabilities | 3,066 | 2,467 | 25,967 |
| Total long-term liabilities | 10,528 | 22,077 | 89,157 |
| Total liabilities | 55,067 | 59,664 | 466,314 |
| Net assets | | | |
| Shareholders' equity (Note 7): | | | |
| Common stock: | | | |
| Authorized – 324,820,000 shares | | | |
| Issued – 80,195,000 shares | 3,446 | 3,446 | 29,188 |
| Capital surplus | 7,503 | 7,503 | 63,538 |
| Retained earnings | 104,337 | 96,775 | 883,538 |
| Treasury stock at cost: 289,415 shares in 2007 and | | | |
| 291,876 shares in 2006 | (1,821) | (1,837) | (15,427) |
| Total shareholders' equity | 113,465 | 109,857 | 960,834 |
| Valuation and translation adjustments: | | | |
| Unrealized holding gain on securities | 32 | 42 | 273 |
| Translation adjustments | 2,996 | 2,090 | 25,372 |
| Total valuation and translation adjustments | 3,028 | 2,132 | 25,641 |
| Subscription rights to shares | 12 | – | 104 |
| Minority interests | 108 | 306 | 915 |
| Total net assets | 116,614 | 112,923 | 987,501 |
| Total liabilities and net assets | ¥ 171,681 | ¥ 167,990 | $ 1,453,818 |

(See Notes to Consolidated Financial Statements.)

**Consolidated Statements of Operations**

Years ended March 31, 2007, 2006 and 2005

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | *2007* | *2006* | *2005* | *2007* |
| | | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) |
| Net sales | ¥ 35,580 | ¥ 48,506 | ¥ 72,458 | $ 301,302 |
| Cost of sales | 17,743 | 31,099 | 44,902 | 150,253 |
| Gross profit | 17,837 | 17,406 | 27,556 | 151,049 |
| Selling, general and administrative expenses (Note 17) | 21,043 | 22,717 | 22,088 | 178,197 |
| Operating (loss) income | (3,205) | (5,310) | 5,467 | (27,148) |
| Other income (expenses) (Note 17): | | | | |
| Interest and dividend income | 179 | 95 | 92 | 1,524 |
| Gain on changes in equity interest in affiliates | – | – | 15,810 | – |
| Gain on sales of investment securities | – | 2,274 | – | – |
| Interest expense | (477) | (650) | (756) | (4,039) |
| Gain (loss) on equity method investments | 17,683 | (2,699) | (6,041) | 149,744 |
| Provision for allowance for doubtful accounts | – | – | (640) | |
| Loss on impairment of fixed assets (Notes 1(p) and 14) | (64) | (1,818) | – | (548) |
| Loss on write-downs of inventories | (2,140) | (3,143) | (7,473) | (18,123) |
| Loss on disposal of inventories | – | – | (5,738) | – |
| Loss on sales and retirement of property, plant and equipment | (211) | (366) | (1,243) | (1,793) |
| Other, net (Note 12) | (372) | 182 | (2,027) | (3,152) |
| Total other income (expenses), net | 14,597 | (6,126) | (8,018) | 123,611 |
| Income (loss) before income taxes and minority interests | 11,391 | (11,436) | (2,551) | 96,463 |
| Income taxes (Note 4): | | | | |
| Current | 705 | 168 | 41 | 5,971 |
| Deferred | 1,761 | 1,734 | (2,881) | 14,916 |
| | 2,466 | 1,902 | (2,839) | 20,887 |
| Minority interests | (244) | (625) | (733) | (2,072) |
| Net (loss) income | ¥ 9,169 | ¥ (12,713) | ¥ 1,022 | $ 77,648 |

(See Notes to Consolidated Financial Statements.)

**Consolidated Statements of Change in Net Assets**

Years ended March 31, 2007, 2006 and 2005

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | *2006* | *2005* | **2007** |
| | | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) |
| **Common stock** | | | | |
| Balance at beginning and end of year (80,195,000 shares) | ¥ **3,446** | ¥ 3,446 | ¥ 3,446 | $ **29,188** |
| **Capital surplus** | | | | |
| Balance at beginning and end of year | ¥ **7,503** | ¥ 7,503 | ¥ 7,503 | $ **63,538** |
| **Retained earnings** | | | | |
| Balance at beginning of year | ¥ **96,775** | ¥ 111,823 | ¥ 111,426 | $ **819,502** |
| Adjustments to retained earnings: | | | | |
| Disposal of treasury shares | **(9)** | – | – | **(79)** |
| Adjustments for inclusion/exclusion of subsidiaries in/from consolidation | **–** | 62 | – | **–** |
| Increase resulting from change in equity interest in an affiliate | **–** | – | 1,745 | **–** |
| Adjustment to retained earnings arising from merger of consolidated subsidiaries | **–** | – | 27 | **–** |
| As adjusted | **96,765** | 111,885 | 113,198 | **819,423** |
| Net (loss) income | **9,169** | (12,713) | 1,022 | **77,648** |
| Cash dividends paid | **(1,598)** | (2,397) | (2,397) | **(13,532)** |
| Balance at end of year | ¥ **104,337** | ¥ 96,775 | ¥ 111,823 | $ **883,538** |
| **Treasury stock at cost: 289,415 shares in 2007 and 291,876 shares in 2006** | | | | |
| Balance at beginning of year | ¥ **(1,837)** | ¥ (1,836) | ¥ (1,835) | $ **(15,559)** |
| Net changes during the year | **15** | (1) | (1) | **132** |
| Balance at end of year | ¥ **(1,821)** | ¥ (1,837) | ¥ (1,836) | $ **(15,427)** |
| **Unrealized holding gain on securities** | | | | |
| Balance at beginning of year | ¥ **42** | ¥ 22 | ¥ 23 | $ **358** |
| Net changes during the year | **(10)** | 20 | (1) | **(85)** |
| Balance at end of year | ¥ **32** | ¥ 42 | ¥ 22 | $ **273** |
| **Translation adjustments** | | | | |
| Balance at beginning of year | ¥ **2,090** | ¥ (3,600) | ¥ (2,270) | $ **17,699** |
| Net changes during the year | **906** | 5,690 | (1,330) | **7,672** |
| Balance at end of year | ¥ **2,996** | ¥ 2,090 | ¥ (3,600) | $ **25,372** |
| **Subscription rights to shares** | | | | |
| Balance at beginning of year | ¥ **–** | ¥ – | ¥ – | $ **–** |
| Net changes during the year | **12** | – | – | **104** |
| Balance at end of year | ¥ **12** | ¥ – | ¥ – | $ **104** |
| **Minority interests** | | | | |
| Balance at beginning of year | ¥ **306** | ¥ 4,851 | ¥ – | $ **2,591** |
| Net changes during the year | **(197)** | (4,545) | – | **(1,676)** |
| Balance at end of year | ¥ **108** | ¥ 306 | ¥ – | $ **915** |

(See Notes to Consolidated Financial Statements.)

**Consolidated Statements of Cash Flows**

Years ended March 31, 2007, 2006 and 2005

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | *2007* | *2006* | *2005* | **2007** |
| | | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) |
| **Cash flows from operating activities** | | | | |
| (Loss) income before income taxes and minority interests | ¥ **11,391** | ¥ (11,436) | ¥ (2,551) | $ **96,463** |
| Depreciation and amortization of: | | | | |
| Property, plant and equipment | **4,797** | 5,149 | 6,367 | **40,621** |
| Loss on impairment of fixed assets | **64** | 1,818 | – | **548** |
| Goodwill | **126** | 319 | 742 | **1,075** |
| Provision for allowance for doubtful accounts | **43** | 1,478 | 1,029 | **371** |
| Interest expense | **477** | 650 | 756 | **4,039** |
| Interest and dividend income | **(182)** | – | – | **(1,545)** |
| Equity in losses of affiliates | **(17,683)** | 2,699 | 6,041 | **(149,744)** |
| Gain on changes in equity interest in affiliates | **–** | – | (15,829) | **–** |
| Loss on disposal of property, plant and equipment | **23** | 187 | 130 | **194** |
| Gain on sales of investment securities | **–** | (2,274) | – | **–** |
| Changes in operating assets and liabilities: | | | | |
| Trade notes and accounts receivable | **6,225** | (4,377) | 11,387 | **52,716** |
| Inventories | **(2,641)** | 1,502 | (5,691) | **(22,368)** |
| Prepaid expenses and other current assets | **(5,977)** | (4,021) | 5,625 | **(50,616)** |
| Notes and accounts payable | **(412)** | (1,258) | (2,793) | **(3,492)** |
| Advances received | **4,751** | 6,859 | – | **40,236** |
| Other current liabilities | **3,045** | (175) | 210 | **25,786** |
| Other noncurrent assets | **(2,257)** | (923) | (541) | **(19,117)** |
| Other noncurrent liabilities | **(55)** | 723 | (100) | **(473)** |
| Other | **(719)** | 243 | 1,739 | **(6,092)** |
| Subtotal | **1,198** | (2,835) | 6,524 | **10,148** |
| Interest and dividends received | **231** | 112 | 94 | **1,958** |
| Interest paid | **(418)** | (653) | (771) | **(3,547)** |
| Income taxes (paid) refunded | **(19)** | (278) | 8,071 | **(163)** |
| Compensation paid | **–** | – | – | **–** |
| Net cash (used in) provided by operating activities | **808** | (3,655) | 13,919 | **(6,849)** |
| **Cash flows from investing activities** | | | | |
| Purchases of investment securities | **–** | (12) | (27) | **–** |
| Proceeds from sales of investment securities | **17,145** | 0 | 8 | **145,187** |
| Purchases of property, plant and equipment | **(8,739)** | (8,890) | (3,993) | **(74,007)** |
| Proceeds from sales of property, plant and equipment | **7,757** | 519 | 4,570 | **65,694** |
| Net (increase) decrease in long-term loans receivable | **–** | (128) | 129 | **–** |
| Decrease (increase) in purchases of shares of subsidiaries | **(423)** | 240 | (1,664) | **(3,585)** |
| Other | **(205)** | 535 | (1,333) | **(1,740)** |
| Net cash used in investing activities | **15,534** | (7,734) | (2,310) | **131,548** |
| **Cash flows from financing activities** | | | | |
| Net (decrease) increase in short-term borrowings | **(7,004)** | (6,986) | (8,580) | **(59,316)** |
| Proceeds from issuance of long-term debt | **–** | 1,800 | 16,842 | **–** |
| Repayment of long-term debt | **(3,627)** | (3,139) | (6,259) | **(30,718)** |
| Proceeds from issuance of bonds | **–** | 6,895 | 11,330 | **–** |
| Payments for redemption of bonds | **(2,800)** | (2,100) | (60) | **(23,710)** |
| Purchases of treasury stock | **(0)** | (0) | (1) | **(0)** |
| Cash dividends paid | **(1,598)** | (2,397) | (2,397) | **(13,532)** |
| Other | **(3)** | (8) | (145) | **(31)** |
| Net cash (used in) provided by financing activities | **(15,033)** | (5,937) | 10,728 | **(127,309)** |
| Effect of exchange rate changes on cash and cash equivalents | **400** | 4 | 14 | **3,395** |
| Net (decrease) increase in cash and cash equivalents | **1,710** | (17,322) | 22,352 | **14,484** |
| Cash and cash equivalents at beginning of year | **37,439** | 55,080 | 32,566 | **317,038** |
| Decrease arising from exclusion of subsidiaries from consolidation | **–** | – | – | **–** |
| Effect of merger of subsidiaries on cash and cash equivalents | **–** | (318) | 161 | **–** |
| Cash and cash equivalents at end of year (Note 10) | ¥ **39,149** | ¥ 37,439 | ¥ 55,080 | $ **331,523** |

(See Notes to Consolidated Financial Statements.)

# 1. Summary of Significant Accounting Policies

## (a) Basis of preparation

The accompanying consolidated financial statements of ARUZE CORP. (the "Company") and consolidated subsidiaries (collectively, the "Group") are compiled from the consolidated financial statements prepared by the Company as required by the Securities and Exchange Law of Japan and have been prepared on the basis of accounting principles generally accepted in Japan, which are different in certain respects as to the application and disclosure requirements of International Financial Reporting Standards.

For the purposes of this document, certain reclassifications have been made in order to present the accompanying consolidated financial statements in a format which is familiar to readers outside Japan. In addition, certain amounts in the prior years' financial statements have been reclassified to conform to the current year's presentation.

As permitted, amounts of less than one million yen have been omitted. As a result, the totals shown in the accompanying consolidated financial statements (both in yen and in U.S. dollars) do not necessarily agree with the sum of the individual amounts.

## (b) Basis of consolidation

The accompanying consolidated financial statements include the accounts of the Company and 13 major subsidiaries in 2007 (13 in 2006 and 16 in 2005) over which substantial control is exerted either through majority ownership of voting stock and/or by other means. All significant intercompany balances and transactions have been eliminated from consolidation.

Aruze USA, Inc., Aruze Gaming America, Inc., Aruze Gaming Africa (Pty) Ltd. and Aruze Gaming Australia Pty Ltd. are consolidated on the basis of fiscal periods ended December 31, a balance sheet date that differs from that of the Company; however, the necessary adjustments have been made if the effect of the difference is material.

Investments in unconsolidated subsidiaries are stated at cost because their impact on the consolidated financial statements was not material.

Investments in affiliates (companies over which the Company has the ability to exercise significant influence) are stated at cost plus equity in their undistributed earnings or losses. Consolidated net (loss) income includes the Company's equity in the current net income or loss of such companies after the elimination of unrealized intercompany profits.

All assets and liabilities of the consolidated subsidiaries have been revalued on acquisition and the excess of cost over the underlying net assets at their respective dates of acquisition is being amortized over a period of five years on a straight-line basis.

## (c) Foreign currency translation

**Translation of foreign currencies**
All monetary assets and liabilities denominated in foreign currencies are translated into yen at the rates of exchange in effect at the balance sheet date. Gain or loss on translation resulting from the settlement of these items at such rates as of the balance sheet date is credited or charged currently to operations.

**Translation of accounts of overseas consolidated subsidiaries**
The accounts of the overseas consolidated subsidiaries, except for the components of shareholders' equity, are translated into yen at the rates of exchange in effect at the balance sheet dates of these subsidiaries. The components of shareholders' equity are translated at their historical exchange rates. The differences arising from translation are presented as translation adjustments in consolidated shareholders' equity and minority interests.

## (d) Cash equivalents

All highly liquid investments, generally with a maturity of three months or less when purchased, which are readily convertible into known amounts of cash and are so near maturity that they represent only an insignificant risk of any change in their value as a result of changes in interest rates, are considered cash equivalents.

Under the accounting standard for statements of cash flows, the definitions of "Cash and cash equivalents" in the consolidated statements of cash flows and of "Cash and bank deposits" in the consolidated balance sheets differ with respect to certain components. A reconciliation between the cash definitions above is presented in Note 10.

## (e) Securities

Available-for-sale ("other") securities with quoted market value are carried at market value, with unrealized gain, net of taxes, reported as a separate component of shareholders' equity, and with unrealized loss charged to income. The cost of securities sold is determined by the moving average method. Other securities whose market value is not available are stated at cost by the moving average method.

## (f) Inventories

**Merchandise, products and raw materials**
Merchandise, products, and raw materials are principally stated at cost determined by the average method.

**Work in process**
Work in process is principally stated at cost determined by the average method.

**Supplies**
Supplies are stated at cost determined by the last purchase price method.

## (g) Depreciation and amortization

**Depreciation**
1) Depreciation of property, plant and equipment of the Company and its domestic consolidated subsidiaries is calculated by the declining-balance method at the rates prescribed in the Corporation Tax Law of Japan. However, buildings (excluding structures attached to the buildings) acquired on or subsequent to April 1, 1998 by the Company and its domestic consolidated subsidiaries are depreciated by the straight-line method over the periods stipulated in the Corporation Tax Law.

Properties for the rental business are depreciated by the straight-line method. Depreciation for properties including Pachislot machines leased to customers is calculated by the straight-line method over the periods specified in the respective lease contracts.

Effective the year ended March 31, 2006, the Company has changed its method of depreciation of prepaid card vending machines leased to customers from the declining-balance method to the straight-line method. This change had no material impact on net loss for the year then ended.

Regarding assets obtained on or before March 31, 2007, following the amendments to the Corporate Tax Law in Japan, the Company and its domestic consolidated subsidiaries amortize the difference between the amount corresponding to 5% of the asset's acquisition price and its memorandum value evenly over 5 years, and post the amortization in the item of Depreciation. Such amortization commences from the following consolidated fiscal year of the year in which the asset's depreciation reaches the amount corresponding to 5% of the asset's acquisition price in accordance with the depreciation method provided in the former Corporate Tax Law. The said change has

a slight impact on the Company's profit and loss and segment information.

2) Depreciation of property, plant and equipment of the overseas consolidated subsidiaries is calculated by the straight-line method over the estimated useful lives of the respective assets.

**Amortization**

Software intended to be marketed for sale is amortized at the higher of either the amounts calculated based on the estimated salable units or the amounts allocated equally over the remaining useful lives of the assets (3 years). Costs for the development of software intended for internal use are amortized by the straight-line method over an estimated useful life of 5 years. Other software is amortized at the rates prescribed in the Corporation Tax Law.

*(h) Deferred charges*

New stock issuance expenses and bond issuance expenses are amortized uniformly over 3 years

*(i) Allowance for doubtful accounts*

The allowance for doubtful accounts is provided at an amount sufficient to cover possible losses on the collection of receivables and has been determined based on the Group's historical experience with write-offs plus an estimated amount for probable doubtful accounts based on a review of the collectibility of individual receivables.

At overseas consolidated subsidiaries, doubtful accounts, primarily individually designated receivables, are provided for at estimated amounts.

*(j) Accrued employees' bonuses*

The Company and its domestic consolidated subsidiaries provide an accrual for the current fiscal year's portion of the anticipated total amount of future bonus payments.

*(k) Leases*

Non-cancelable leases are accounted for as operating leases regardless of whether such leases are classified as operating or finance leases, except that leases which stipulate the transfer of ownership of the leased assets to the lessees are accounted for as finance leases.

*(l) Income taxes*

Deferred income taxes are recognized by the asset and liability method under which deferred tax assets and liabilities are determined based on the differences between financial reporting and the tax bases of the assets and liabilities, and are measured using the enacted tax rates and laws which will be in effect when the differences are expected to reverse.

*(m) Research and development costs*

Research and development costs are charged to income when incurred.

*(n) Derivatives*

Open derivatives positions are stated at fair value.

Gain or loss on derivatives designated as hedging instruments is deferred until the loss or gain on the underlying hedged item is recognized. The related interest differential paid or received under interest-rate swaps is recognized in interest expense over the terms of the swap agreements if certain conditions are met.

*(o) Appropriation of retained earnings*

Under the Commercial Code, the appropriation of retained earnings with respect to a given financial period is made by resolution of the shareholders at a general meeting held subsequent to the close of such financial period. The accounts for that period do not, therefore, reflect such appropriations. See Note 18.

*(p) Change in method of accounting*

A new Japanese accounting standard for the impairment of fixed assets entitled "Opinion Concerning the Establishment of an Accounting Standard for the Impairment of Fixed Assets" (Business Accounting Council, August 9, 2002) and a guideline entitled "Guideline on Implementation of the Accounting Standard for the Impairment of Fixed Assets" (Accounting Standards Board of Japan Guideline No. 6, October 31, 2003) were issued for financial years commencing on or subsequent to April 1, 2005.

The new standard requires that tangible and intangible fixed assets be carried at cost less depreciation, and be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The Group is required to recognize an impairment loss in their statement of operations if certain indicators of asset impairment exist and if the book value of the fixed assets exceeds the undiscounted sum of their future cash flows.

Effective April 1, 2005, the Group has adopted this standard for the impairment of fixed assets.

See Note 15 for the related effect on the segment information.

## 2. Japanese Yen and U.S. Dollar Amounts

The U.S. dollar amounts presented in the accompanying consolidated financial statements represent the arithmetic results of translating Japanese yen into U.S. dollars at ¥118.09 = U.S.$1.00, the approximate exchange rate prevailing on March 31, 2007. The inclusion of U.S. dollar amounts is solely for the convenience of the reader and is not intended to imply that Japanese yen have been or could be converted, realized or settled in U.S. dollars at that or any other rate.

11

## 3. Short-Term Borrowings and Long-Term Debt

Short-term borrowings substantially represent short-term borrowings from banks at an average interest rate of 1.0% per annum at March 31, 2007 and 0.9% at 2006.

Long-term debt at March 31, 2007 and 2006 consisted of the following:

| | 2007 | 2006 | 2007 |
|---|---|---|---|
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Japanese yen bonds, due from 2009 to 2014, at rates ranging from 0.66% to 1.57% | ¥ 8,450 | ¥ 11,250 | $ 71,555 |
| Loans from banks, due through 2010, at an average interest rate of 1.4% | 9,043 | 12,669 | 76,580 |
| Less: Current portion | (10,188) | (4,309) | (86,273) |
| | ¥ 7,305 | ¥ 19,610 | $ 61,862 |

The assets pledged as collateral for long-term debt at March 31, 2007 are summarized as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Buildings and structures | ¥ 465 | $ 3,937 |
| Land | 1,563 | 13,235 |
| | ¥ 2,028 | $ 17,173 |

The related debt for which the above assets were pledged as collateral at March 31, 2007 is summarized as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Current portion of long-term debt | ¥ 6,492 | $ 54,975 |
| Long-term debt | – | – |
| | ¥ 6,492 | $ 54,975 |

The aggregate annual maturities of long-term debt subsequent to March 31, 2007 are summarized as follows:

| Year ending March 31, | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| 2008 | ¥ 10,188 | $ 86,273 |
| 2009 | 3,172 | 26,860 |
| 2010 | 2,083 | 17,639 |
| 2011 | 4,500 | 38,106 |
| 2012 and thereafter | 1,000 | 8,468 |
| | ¥ 20,943 | $ 177,347 |

## 4. Income Taxes

The major components of deferred tax assets and liabilities at March 31, 2007 and 2006 are summarized as follows:

| | 2007 | 2006 | 2007 |
|---|---|---|---|
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Deferred tax assets – current: | | | |
| Inventories | ¥ 3,132 | ¥ 3,167 | $ 26,526 |
| Accrued employees' bonuses | 98 | 86 | 837 |
| Operating loss carryforwards | 2,506 | 2,735 | 21,222 |
| Timing difference of sales recognition | 2,519 | – | 21,335 |
| Excess of metal molds depreciation | – | 107 | – |
| Other | 1,296 | 31 | 10,979 |
| Gross deferred tax assets – current | 9,553 | 6,128 | 80,902 |
| Valuation allowance | (8,092) | (3,195) | (68,531) |
| Total deferred tax assets – current | 1,460 | 2,932 | 12,371 |
| Deferred tax liabilities – current: | | | |
| Other | (11) | (12) | (97) |
| Total deferred tax liabilities – current | (11) | (12) | (97) |
| Net deferred tax assets – current | ¥ 1,449 | ¥ 2,919 | $ 12,273 |
| Deferred tax assets – noncurrent: | | | |
| Allowance for doubtful accounts | ¥ 1,072 | ¥ 1,130 | $ 9,082 |
| Loss on devaluation of real estate | 50 | 52 | 430 |
| Unrealized gain on properties leased to customers | – | 19 | – |
| Research and development costs | 329 | 430 | 2,790 |
| Loss on investments | 284 | 228 | 2,408 |
| Loss on impairment of fixed assets | 503 | 476 | 4,262 |
| Operating loss carryforwards | 2,081 | 2,559 | 17,630 |
| Excess of metal molds depreciation | 101 | – | 858 |
| Other | 143 | 119 | 1,224 |
| Gross deferred tax assets – non-current | 4,568 | 5,018 | 38,688 |
| Valuation allowance | (4,446) | (4,690) | (37,651) |
| Total deferred tax assets – non-current | 122 | 328 | 1,036 |
| Deferred tax liabilities – non-current: | | | |
| Additional enterprise tax | (135) | (135) | (1,143) |
| Other | (143) | (111) | (1,210) |
| Total deferred tax liabilities – non-current | (279) | (246) | (2,362) |
| Net deferred tax liabilities – non-current | ¥ (156) | ¥ 81 | $ 1,321 |

A reconciliation between the statutory tax rates and the effective tax rates as a percentage of loss or income before income taxes for the years ended March 31, 2007, 2006 and 2005 is summarized as follows:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Statutory tax rates | 40.7% | 40.7% | 40.7% |
| Reconciliation: | | | |
| Additional taxes assessed on undistributed earnings | – | – | – |
| Valuation allowance | 45.7 | (46.1) | (68.4) |
| Equity in losses of affiliates | (63.2) | (9.6) | 156.6 |
| Amortization of goodwill | 0.4 | (1.1) | (11.8) |
| Other | (2.0) | (0.5) | (5.8) |
| Effective tax rates | 21.6% | (16.6)% | 111.3% |

## 5. Research and Development Costs

Research and development costs charged to income for the years ended March 31, 2007, 2006 and 2005 were as follows:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| 2007 | 2006 | 2005 | 2007 |
| (Millions of yen) | | | (Thousands of U.S. dollars) |
| ¥ 5,917 | ¥ 6,477 | ¥ 5,868 | $ 50,107 |

## 6. Leases

### (a) As lessee

The following *pro forma* amounts represent the acquisition costs, accumulated depreciation and net book value of the leased assets as of March 31, 2007 and 2006, which would have been reflected in the consolidated balance sheets if lease accounting had been applied to finance leases currently accounted for as operating leases:

| | Year ended March 31, | | |
| | 2007 | 2006 | 2007 |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
|---|---|---|---|
| Fixed assets: | | | |
| Acquisition costs | ¥ 872 | ¥ 15 | $ 7,383 |
| Accumulated depreciation | (145) | (10) | (1,235) |
| Net book value | 726 | 4 | 6,148 |
| Intangible fixed assets: | | | |
| Acquisition costs | 2 | 3 | 25 |
| Accumulated depreciation | (2) | (2) | (22) |
| Net book value | 0 | 1 | 0 |
| Total: | | | |
| Acquisition costs | 875 | 18 | 7,409 |
| Accumulated depreciation | (148) | (13) | (1,258) |
| Net book value | ¥ 726 | ¥ 5 | $ 6,151 |

Lease payments relating to finance leases accounted for as operating leases in the accompanying consolidated financial statements amounted to ¥93 million ($787 thousand), ¥245 million and ¥38 million for the years ended March 31, 2007, 2006 and 2005, respectively.

Depreciation of the leased assets computed by the straight-line method over the respective lease terms and the interest portion included in these lease payments are summarized as follows:

| | Year ended March 31, | | | |
| | 2007 | 2006 | 2005 | 2007 |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
|---|---|---|---|---|
| Depreciation | ¥ 82 | ¥ 237 | ¥ 36 | $ 701 |
| Interest expense | ¥ 17 | ¥ 10 | ¥ 2 | $ 146 |

Future minimum lease payments (including the interest portion thereon) subsequent to March 31, 2007 for non-cancelable operating leases and finance leases accounted for as operating leases are summarized as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Due within one year or less | ¥ 4,373 (4,096) | $ 37,031 (34,685) |
| Due subsequent to one year | 2,290 (1,687) | 19,391 (14,285) |
| Total | ¥ 6,664 (5,783) | $ 56,431 (48,971) |

Note: The amounts in parentheses in the above table represent future minimum lease payments to be made by sublessees.

Future minimum lease payments under sell-and-lease-back contracts for which invalidation of the sales agreement is being processed are as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Due within one year or less | ¥ 135 | $ 1,143 |
| Due subsequent to one year | 376 | 3,184 |
| Total | ¥ 512 | $ 4,327 |

### (b) As lessor

Information relating to finance leases of the Group at March 31, 2007 and 2006 is summarized as follows:

| | March 31, | | |
| | 2007 | 2006 | 2007 |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
|---|---|---|---|
| Leased properties: | | | |
| Acquisition cost | ¥ 4,867 | ¥ 3,381 | $ 41,216 |
| Accumulated depreciation | (2,027) | (155) | (17,169) |
| Net book value | ¥ 2,839 | ¥ 3,226 | $ 24,046 |

Lease revenues relating to finance leases accounted for as operating leases amounted to ¥2,338 million ($19,798 thousand) for the year ended March 31, 2007.

Depreciation of the leased properties computed by the straight-line method and interest income included in lease revenues for the year ended March 31, 2007 amounted to ¥1,862 million ($15,767 thousand) and ¥656 million ($5,555 thousand), respectively.

Interest income is computed as the difference between future lease revenues from lessees and estimated acquisition costs. Interest income is allocated to each fiscal period based on the interest method.

Future lease revenues (including the interest portion thereon) subsequent to March 31, 2007 for non-cancelable operating leases and finance leases accounted for as operating leases are summarized as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Due within one year or less | ¥ 6,414 (4,096) | $ 54,320 (34,691) |
| Due subsequent to one year | 2,421 (1,687) | 20,507 (14,287) |
| Total | ¥ 8,836 (5,783) | $ 74,827 (48,978) |

Note: The amounts in parentheses in the above table represent future minimum lease payments to be made by sublessees.

## 7. Shareholders' Equity

In accordance with the Companies Act of Japan, the Group has provided a legal reserve as an appropriation of retained earnings. The Code provides that an amount equal to at least 10% of the amounts to be disbursed as distributions of earnings be appropriated to the legal reserve until the sum of the legal reserve and additional paid-in capital equals 25% of the common stock account.

## 8. Stock Option Plans

**Stock option plan approved at a shareholders' meeting held on June 27, 2002**

On June 27, 2002, the shareholders approved a stock option plan for directors, statutory auditors and certain employees of the Company and wholly-owned subsidiaries to purchase warrants for the purchase of shares of the Company's common stock at advantageous prices.

The exercise price of each stock option was ¥302,000.

The stock options outlined above were/are exercisable during the period from June 27, 2004 through June 26, 2007.

**Stock option plan approved at a shareholders' meeting held on June 26, 2003**

On June 26, 2003, the shareholders approved a stock option plan for directors, statutory auditors and employees of the Company and subsidiaries to purchase warrants for the purchase of shares of the Company's common stock at advantageous prices.

Exhibit Page No. 36

The exercise price of each stock option is determined, subject to adjustment, at the higher of the average closing price of the Company's common stock announced by the Japan Securities Business Association in the month prior to the date of the granting of the options multiplied by a factor of 1.05, or the closing price of the Company's common stock on the date of the granting of the options.

The stock options outlined above were/are exercisable during the period from June 27, 2005 through June 26, 2008.

**Stock option plan approved at a shareholders' meeting held on June 29, 2004**

On June 29, 2004, the shareholders approved a stock option plan for employees of the Company and directors and employees of wholly-owned subsidiaries to purchase warrants on shares of the Company's common stock at advantageous prices.

The exercise price of each stock option is ¥243,400.

The stock options outlined above are exercisable during the period from July 1, 2006 through June 30, 2009.

**Stock option plan approved at a shareholders' meeting held on June 29, 2006**

On June 29, 2006, the shareholders approved a stock option plan for directors, officers, certain advisors and certain employees of the Company and subsidiaries to purchase warrants on shares of the Company's common stock at advantageous prices.

The exercise price of each stock option is determined, subject to adjustment, at the higher of the average closing market price of the Company's common stock traded on the JASDAQ Securities Exchange for the 6-month period ended the day prior to the grant date of the options multiplied by a factor of 1.05, or the closing market price of the shares of the Company's common stock on the grant date of the options.

The stock options outlined above are exercisable during a period to be determined by the Board of Directors of the Company within a period of 4 years commencing from the grant date of the options.

## 9. Amounts per Share

The following tables present net (loss) income per share for the years ended March 31, 2007, 2006 and 2005 and net assets per share at March 31, 2007 and 2006:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | 2006 | 2005 | **2007** |
| | | (Yen) | | (U.S. dollars) |
| Net (loss) income: | | | | |
| Basic | ¥ 114.76 | ¥(159.11) | ¥12.79 | $ 0.97 |
| Diluted (*1) | 114.75 | – | – | 0.97 |

| | March 31, | | |
|---|---|---|---|
| | **2007** | 2006 | **2007** |
| | | (Yen) | (U.S. dollars) |
| Net assets | ¥ 1,457.89 | ¥ 1,351.89 | $ 12.35 |

(*1)  Diluted net income per share has not been presented since the full dilution of common stock equivalents would have had no dilutive effect on net (loss) income per share for the years ended March 31, 2007, 2006 and 2005.

## 10. Supplementary Cash Flow Information

The following table represents a reconciliation of cash and cash equivalents as of and for the years ended March 31, 2007 and 2006:

| | Year ended March 31, | | |
|---|---|---|---|
| | **2007** | 2006 | **2007** |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Cash and bank deposits | ¥ 21,041 | ¥ 37,439 | $ 178,180 |
| Securities | ¥ 18,108 | – | $ 153,342 |
| Time deposits with a maturity of more than three months | – | (0) | – |
| Cash and cash equivalents | ¥ 39,149 | ¥ 37,439 | $ 331,522 |

## 11. Investment Securities

The components of unrealized gain or loss on marketable securities classified as other securities at March 31, 2007 and 2006 are summarized as follows:

| | March 31, 2007 | | |
|---|---|---|---|
| | Acquisition costs | Carrying value | Unrealized gain (loss) |
| | (Millions of yen) | | |
| Other securities whose carrying value recorded in the balance sheet exceeds their acquisition costs: | | | |
| Equity securities | ¥ 12 | ¥ 65 | ¥ 52 |
| Other securities whose carrying value recorded in the balance sheet does not exceed their acquisition costs: | | | |
| Other | – | – | – |
| Total | ¥ 12 | ¥ 65 | ¥ 52 |

| | March 31, 2007 | | |
|---|---|---|---|
| | Acquisition costs | Carrying value | Unrealized gain (loss) |
| | (Thousands of U.S. dollars) | | |
| Other securities whose carrying value recorded in the balance sheet exceeds their acquisition costs: | | | |
| Equity securities | $ 101 | $ 550 | $ 440 |
| Other securities whose carrying value recorded in the balance sheet does not exceed their acquisition costs: | | | |
| Other | – | – | – |
| Total | $ 101 | $ 550 | $ 440 |

| | March 31, 2006 | | |
|---|---|---|---|
| | Acquisition costs | Carrying value | Unrealized gain (loss) |
| | (Millions of yen) | | |
| Other securities whose carrying value recorded in the balance sheet exceeds their acquisition costs: | | | |
| Equity securities | ¥ 12 | ¥ 80 | ¥ 68 |
| Other securities whose carrying value recorded in the balance sheet does not exceed their acquisition costs: | | | |
| Other | 471 | 471 | – |
| Total | ¥ 484 | ¥ 552 | ¥ 68 |

## 12. Other Income (Expenses)

The components of "Other, net" in "Other income (expenses)" for the years ended March 31, 2007, 2006 and 2005 were as follows:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Rent received | ¥ 7 | ¥ 116 | ¥ 124 | $ 59 |
| Additional tax refunds | - | - | 159 | - |
| Gain on reappraisal of swaps | - | 145 | 219 | - |
| Gain on sale of fixed assets | 760 | 58 | 766 | 6,440 |
| Gain on prior-term adjustments | - | - | - | - |
| Recovery of bad debt | - | - | - | - |
| Other | (1,139) | (138) | (3,300) | (9,652) |
| Total | ¥ (372) | ¥ 182 | ¥ (2,027) | $ (3,152) |

## 13. Derivatives

Certain consolidated subsidiaries enter into transactions involving derivative financial instruments in order to manage the risk arising from adverse fluctuation in foreign currency exchange rates and interest rates. In accordance with the accounting standard for financial instruments, derivatives are carried at fair value with any changes in unrealized gain or loss credited or charged to operations, except for hedging instruments that meet the criteria for deferral hedge accounting.

The Company and its domestic subsidiaries have developed hedging policies to control various aspects of their derivatives transactions including authorization levels and limits on the volume of transactions. Based on these policies, the Company and its domestic subsidiaries hedge against the risk arising from fluctuation in foreign currency exchange rates and interest rates. They have, however, omitted an assessment of the effectiveness of these hedges because they determined that there was substantially no risk on the underlying assets and liabilities hedged by foreign forward exchange

contracts and interest-rate swap contracts as any negative effect arising from such hedging would be completely offset by the positive effect of the corresponding fluctuation in the respective foreign currency exchange rates or interest rates.

Summarized below are the notional amounts and the estimated fair value of the open derivatives positions at March 31, 2005:

| | March 31, 2005 | | |
|---|---|---|---|
| | Notional amounts | Fair value | Losses realized |
| | (Millions of yen) | | |
| Interest-rate swaps: | | | |
| Receive/floating and pay/fixed | ¥ 8,000 | ¥ (145) | ¥ (145) |
| Total | ¥ 8,000 | ¥ (145) | ¥ (145) |

## 14. Loss on Impairment of Fixed Assets

The following table presents the components of "Loss on impairment of fixed assets" reflected in the consolidated statement of operations for the year ended March 31, 2007:

| Impaired asset | Category | Location | Impaired loss | |
|---|---|---|---|---|
| | | | (Millions of yen) | (Thousands of U.S. dollars) |
| Idle assets and other | Machinery and equipment | Yotsukaido City, and other | ¥ 64 | $ 548 |
| Total | | | ¥ 64 | $ 548 |

(Principal circumstances leading to recognition of impairment loss)
The impairment loss on idle assets and other referred to above relates to assets which are not expected to be utilized in future operations and whose real estate market value has declined significantly. This loss, recorded in other expenses, amounted to ¥64 million ($548 thousand) and the carrying value of the related assets was written down to their respective recoverable amounts.

(Grouping of assets)
Assets are classified into groups by business segment. Shops and real estate for rental business, and idle assets which are not expected to be utilized in the future and related assets are further grouped at each individual asset.

(Determination of recoverable amounts)
- Idle assets and other, and assets in the game machines business:
  The recoverable amounts of these assets are determined based on their net realizable value. Real estate is measured based on appraisals conducted by real estate appraisers. Other assets are measured based on their residual value under the tax regulations.

- Shops and real estate in the rental business:
  The recoverable amounts of these assets are measured principally by their value in use and their estimated future cash flows at a discount rate of 3.5%.

15

## 15. Segment Information

The business segments of the Group for the years ended March 31, 2007, 2006 and 2005 are outlined as follows:

**Business segments**

Year ended March 31, 2007
(Millions of yen)

| | Pachislot/ Pachinko | Real estate | Amusement facilities management | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **I. Sales and operating income (loss)** | | | | | | | | |
| Sales to external customers | ¥ 30,808 | ¥ 1,022 | ¥ – | ¥ 2,553 | ¥ 1,196 | ¥ 35,580 | ¥ – | ¥ 35,580 |
| Intra-segment sales | – | 53 | – | 66 | 1,810 | 1,930 | (1,930) | – |
| Total sales | 30,808 | 1,075 | – | 2,620 | 3,006 | 37,511 | (1,930) | 35,580 |
| Operating expenses | 25,137 | 456 | – | 3,936 | 2,403 | 31,934 | 6,852 | 38,786 |
| Operating income (loss) | ¥ 5,670 | ¥ 618 | ¥ – | ¥ (1,316) | ¥ 603 | ¥ 5,576 | ¥ (8,782) | ¥ (3,205) |
| **II. Total assets, depreciation, loss on impairment of fixed assets and capital expenditures** | | | | | | | | |
| Total assets | ¥ 55,059 | ¥ 8,844 | ¥ – | ¥ 5,725 | ¥ 984 | ¥ 70,613 | ¥ 101,068 | ¥ 171,681 |
| Depreciation | 4,175 | 129 | | 190 | 36 | 4,531 | 265 | 4,797 |
| Loss on impairment of fixed assets | 54 | – | | 10 | – | 64 | | 64 |
| Capital expenditures | 8,360 | – | | 85 | 7 | 8,453 | 170 | 8,624 |

**Business segments**

Year ended March 31, 2007
(Thousands of U.S. dollars)

| | Pachislot/ Pachinko | Real estate | Amusement facilities management | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **I. Sales and operating income (loss)** | | | | | | | | |
| Sales to external customers | $ 260,885 | $ 8,654 | $ – | $ 21,619 | $ 10,127 | $ 301,295 | $ – | $ 301,295 |
| Intra-segment sales | – | 448 | – | 558 | 15,327 | 16,343 | (16,343) | – |
| Total sales | 260,885 | 9,103 | – | 22,186 | 25,455 | 317,647 | (16,343) | 301,295 |
| Operating expenses | 212,863 | 3,861 | – | 33,330 | 20,348 | 270,420 | 58,023 | 328,444 |
| Operating income (loss) | $ 48,014 | $ 5,233 | $ – | $ (11,144) | $ (5,106) | $ 47,218 | $ (74,367) | $ (27,140) |
| **II. Total assets, depreciation, loss on impairment of fixed assets and capital expenditures** | | | | | | | | |
| Total assets | $ 466,246 | $ 74,892 | $ – | $ 48,479 | $ 8,332 | $ 597,959 | $ 855,855 | $ 1,453,814 |
| Depreciation | 35,354 | 1,092 | | 1,608 | 304 | 38,369 | 2,244 | 40,621 |
| Loss on impairment of fixed assets | 457 | – | | 84 | – | 541 | | 541 |
| Capital expenditures | 70,793 | – | | 719 | 59 | 71,580 | 1,439 | 73,029 |

Notes:

a) Basis of segmentation

(1) The Group's businesses are divided into five segments based on the internal classification of their products, merchandise and sales markets.

(2) Adores, Inc, which was mainly classified under the Amusement facilities management business, was changed to an affiliated company on the equity method at the end of March 2006 fiscal year. Due to this change, the "Amusement facilities management business" was not the object for disclosure.

(3) The major products, merchandise and services in each business segment are summarized as follows:

| Pachislot/Pachinko | Pachislot, Pachinko, related parts and peripheral equipment |
|---|---|
| Real estate | Leasing of real estate |
| Game machines | Game machines and the related software for business or family use |
| Other | Planning, design and construction of Pachinko parlors |

b) Operating expenses in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥8,290 million ($70,200 thousand) which consisted of expenses incurred in the administrative department of ARUZE CORP.

c) Total assets in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥109,770 million ($929,545 thousand) which consisted primarily of surplus funds (cash and marketable securities) of ARUZE CORP., investments in overseas affiliates at the pre-operating stage, and property and equipment controlled by the administrative departments of these companies.

d) Amortization of, and additions to, long-term prepaid expenses are included under depreciation and capital expenditures.

## Business segments

**Year ended March 31, 2006**

(Millions of yen)

| | Pachislot/ Pachinko | Real estate | Amusement facilities management | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **I. Sales and operating income (loss):** | | | | | | | | |
| Sales to external customers | ¥ 25,038 | ¥ 2,049 | ¥ 16,011 | ¥ 3,999 | ¥ 1,407 | ¥ 48,506 | ¥ – | ¥ 48,506 |
| Intra-segment sales | – | 53 | 18 | 1,269 | 711 | 2,052 | (2,052) | – |
| Total sales | 25,038 | 2,102 | 16,030 | 5,268 | 2,118 | 50,559 | (2,052) | 48,506 |
| Operating expenses | 22,204 | 1,468 | 14,103 | 7,824 | 2,445 | 48,046 | 5,770 | 53,816 |
| Operating income (loss) | ¥ 2,834 | ¥ 634 | ¥ 1,927 | ¥ (2,556) | ¥ (327) | ¥ 2,513 | ¥ (7,823) | ¥ (5,310) |
| **II. Total assets, depreciation, loss on impairment of fixed assets and capital expenditures** | | | | | | | | |
| Total assets | ¥ 57,739 | ¥ 10,718 | ¥ – | ¥ 4,537 | ¥ 20,978 | ¥ 93,974 | ¥ 74,016 | ¥ 167,990 |
| Depreciation | 2,098 | 161 | 2,408 | 94 | 64 | 4,826 | 322 | 5,149 |
| Loss on impairment of fixed assets | 368 | 136 | 294 | 342 | – | 1,142 | 676 | 1,818 |
| Capital expenditures | 6,449 | 0 | 2,259 | 43 | 17 | 8,770 | 179 | 8,950 |

Notes:

a) Basis of segmentation

(1) The Group's businesses are divided into five segments based on the internal classification of their products, merchandise and sales markets.

(2) The major products, merchandise and services in each business segment are summarized as follows:

| Pachislot/Pachinko | Pachislot, Pachinko, related parts and peripheral equipment |
|---|---|
| Real estate | Leasing of real estate |
| Amusement facilities management | Management of amusement facilities |
| Game machines | Game machines and the related software for business or family use |
| Other | Planning, design and construction of Pachinko parlors |

b) Operating expenses in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥7,849 million which consisted of expenses incurred in the administrative department of ARUZE CORP.

c) Total assets in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥86,833 million which consisted primarily of surplus funds (cash and marketable securities) of ARUZE CORP., investments in overseas affiliates at the pre-operating stage, and property and equipment controlled by the administrative departments of these companies.

d) Amortization of, and additions to, long-term prepaid expenses are included under depreciation and capital expenditures.

## Business segments

**Year ended March 31, 2005**

(Millions of yen)

| | Pachislot/ Pachinko | Real estate | Amusement facilities management | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **I. Sales and operating income (loss):** | | | | | | | | |
| Sales to external customers | ¥ 47,318 | ¥ 1,353 | ¥ 16,177 | ¥ 4,672 | ¥ 2,935 | ¥ 72,458 | ¥ – | ¥ 72,458 |
| Intra-segment sales | 214 | 152 | 27 | 183 | 668 | 1,246 | (1,246) | – |
| Total sales | 47,532 | 1,505 | 16,205 | 4,856 | 3,604 | 73,704 | (1,246) | 72,458 |
| Operating expenses | 35,885 | 759 | 14,266 | 6,106 | 3,861 | 60,879 | 6,111 | 66,990 |
| Operating income (loss) | ¥ 11,647 | ¥ 746 | ¥ 1,939 | ¥ (1,250) | ¥ (257) | ¥ 12,825 | ¥ (7,357) | ¥ 5,467 |
| **II. Total assets, depreciation and capital expenditures** | | | | | | | | |
| Total assets | ¥ 44,101 | ¥ 13,039 | ¥ 16,078 | ¥ 7,337 | ¥ 21,035 | ¥ 101,593 | ¥ 91,738 | ¥ 193,332 |
| Depreciation | 2,777 | 203 | 2,555 | 326 | 133 | 5,996 | 370 | 6,367 |
| Capital expenditures | 872 | – | 2,917 | 137 | 384 | 4,312 | 293 | 4,605 |

Notes:

a) Operating expenses in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥7,350 million which consisted of expenses incurred in the administrative departments of ARUZE CORP. and Adores, Inc.

b) Total assets in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥105,274 million which consisted primarily of surplus funds (cash and marketable securities) of ARUZE CORP. and Adores, Inc., investments in overseas affiliates at the pre-operating stage, and property and equipment controlled by the administrative departments of these companies.

c) Amortization of, and additions to, long-term prepaid expenses are included under depreciation and capital expenditures.

**Geographical segments**

As permitted, disclosure of geographical segments for the years ended March 31, 2007, 2006 and 2005 has been omitted because the Japan segment constituted more than 90% of total consolidated sales and total assets.

**Overseas sales**

As permitted, disclosure of overseas sales for the years ended March 31, 2007, 2006 and 2005 has been omitted because sales in Japan constituted more than 90% of total consolidated sales.

17

## 16. Contingent Liabilities and Litigations

a) Corporation tax and additional taxes of ¥1,289 million ($10,915 thousand) were levied against the Company for the year ended March 31, 1998 during a previous tax examination. The Company lodged an objection to this tax assessment with the Tokyo National Tax Claim Court (the "Claim Court"). As a result, the Claim Court issued a ruling on January 29, 2004 that decreased the additional taxable income of ¥2,949 million ($24,972 thousand) determined by the original tax assessment by ¥16 million ($135 thousand) to ¥2,932 million ($24,828 thousand). The Company lodged an objection to the Claim Court's judgment with the Tokyo District Court on April 27, 2004 to seek a reversal of the decision of the Claim Court. On February 23, 2007, the Tokyo District Court ruled almost entirely in favor of the Company, and issued a revocation of the tax levies. The tax authorities were dissatisfied with the decision and filed an appeal on March 9, 2007.

b) A lawsuit was filed against the Company by KM Enterprise K.K. ("KM"), which is 100%-owned by Mr. Manabe, a former director of the Company, with the Tokyo District Court on October 31, 2002 claiming damages of $30 million (¥3,542 million). This lawsuit alleges that the Company was not able to obtain permission from the U.S. Gaming Board for the transfer of shares of common stock of Sigma Game, Inc. held by KM, although the Company and KM had agreed to this transfer. On January 17, 2006, the Court ruled fully in favor of KM. The Company filed a notice of appeal against this judgment on January 18, 2006.

With regard to this case, Adores, Inc. filed a lawsuit against Mr. Manabe for the repayment of a loan in the amount of ¥2,074 million ($17,562 thousand) made to Mr. Manabe that was guaranteed by the Company. The Court subsequently ruled in favor of Adores, Inc. As of March 30, 2006, the loan was transferred from Adores, Inc. to the Company, making the Company the creditor, and the related loan guarantee was cancelled at the time of this transfer. In addition, the Company has become a party to this lawsuit and assumed the rights and obligations as plaintiff from Adores, Inc.

After assuming claims on ¥2,074 million ($17,562 thousand) out of the total amount of damage claims from KM on July 27, 2006, Mr. Manabe participated in said litigation to seek a setoff against the loan assigned to the Company from Adores, Inc on August 7, 2006. On October 31, 2006, the Tokyo High Court handed down a decision to award the claims of KM on the remaining amount of damages of ¥11,800,880 (¥1,393 million) owed by KM following the setoff. The Company filed a petition for the acceptance of an appeal to the Supreme Court on November 13, 2006, claiming that the decision was unreasonable because examination was insufficient and the reason for the judgment was defective (The Company submitted a Reason of a Petition for Acceptance to the Supreme Court on January 23, 2007.). In accordance with a declaration of a provisional execution of the ruling, in December 2006, KM acquired ¥1,412 million ($11,956 thousand) by compulsory execution against ¥3,200 million ($27,097 thousand) deposited by the Company as a guarantee to suspend the execution of the decision by the Lower Court. On March 2, 2007, the Company filed a petition for the revocation of the deposit of the remaining amount, ¥1,788 million ($15,140 thousand). This is still being processed.

In accordance with said judgment, ¥1,412 million ($11,956 thousand) was posted as an allowance for litigation losses for the fiscal year in question.

c) Mr. Eikichi Kawasaki, the owner of SNK Corp. (which is currently in the process of liquidation), a former subsidiary of the Company, filed a lawsuit against the Company with the Osaka District Court on October 17, 2002. The plaintiff petitioned for cancellation of his obligation for a loan of ¥1 billion ($8,468 thousand) that the Company had made to SNK Corp. and which Mr. Eikichi Kawasaki had co-signed as guarantor. The Court found no reason to cancel Mr. Kawasaki's obligation as guarantor of this loan and dismissed Mr. Kawasaki's petition in a judgment issued on October 13, 2005, as well as the Company's claim that to fulfill his obligation as a joint guarantor. On October 31, 2005, the Company filed a notice of appeal with the Court seeking the execution of this guarantee obligation. For accounting purposes, the legal ruling, which is still pending, will have no impact on the Company's financial position because this ¥1 billion ($8,468 thousand) was fully written off in previous years. Mr. Kawasaki filed a second lawsuit against the Company with the Osaka District Court on October 28, 2002 seeking compensation of ¥6,791 million ($57,506 thousand) relating to the bankruptcy of SNK Corp. which he claimed was caused when the Company discontinued providing operating funds to SNK Corp. On October 13, 2005, the Court dismissed Mr. Kawasaki's claim. Mr. Kawasaki subsequently filed a notice of appeal with the Osaka High Court as an objection to this ruling; however, he withdrew the appeal after a settlement was reached on September 26, 2006.

d) SNK Playmore Corp., which has claimed the right to take over all copyrights from SNK Corp., a company currently in the process of liquidation, filed five lawsuits against the Company with the Osaka District

Court during the period from February 26, 2002 to October 28, 2002 seeking compensation totaling ¥9,632 million ($81,564 thousand). SNK Playmore Corp. claimed piracy with respect to the Company's planning, development, production and marketing of Pachislot machines and game-related software. The Osaka District Court issued a preliminary judgment in this case on January 15, 2004, ruling that the Company had used these copyrights without permission. A final judgment was issued on December 27, 2004 requiring the Company to pay ¥41 million ($347 thousand) as compensation for damages caused by piracy, whereas the original claim had been for ¥9,632 million ($81,564 thousand). However, the Company filed a notice of appeal with the Osaka High Court on the same date. SNK Playmore Corp. also filed a notice of appeal with the Osaka High Court claiming ¥9,591 million ($81,217 thousand), the portion for which they had not been compensated in the above judgment; however, they withdrew the appeal after a settlement was reached on January 31, 2007.

e) On February 6, 2004, the Company filed a petition with the Tokyo District Court seeking a provisional order to suspend production and sales of Pachislot machines manufactured by SNK Playmore Corp. on the grounds that they had infringed the Company's patents. On August 26, 2004, SNK Playmore Corp. and SNK Neogeo Corp. filed a lawsuit against the Company with the Osaka District Court seeking damages of ¥3,349 million ($28,359 thousand) claiming that the Company's action in posting a copy of this petition on its Internet home page was a form of malfeasance. On October 31, 2005, the Court dismissed the claim of SNK Playmore Corp. and SNK Neogeo Corp. and ruled in favor of the Company. SNK Playmore Corp., which merged with SNK Neogeo and took over its position as plaintiff to this lawsuit, filed a notice of appeal on November 11, 2005 objecting to the above ruling; however, they withdrew the appeal in accordance with the settlement reached on January 31, 2007 as described in d).

f) Forty-three customers who had purchased "Gold X" Pachislot machines from the Company in June 2003 filed five lawsuits against the Company with the Tokyo District Court during the period from August 2004 to May 2005. The plaintiffs initially claimed compensation totaling ¥279 million ($2,362 thousand) for earnings lost as a result of the temporary closure of their Pachinko parlors because of a suspected defect in their Gold X machines. Twenty-one of these customers have subsequently withdrawn from their lawsuits, leaving a total of 22 Pachinko parlor operators (in four lawsuits) still participating in their lawsuits as of March 31, 2007. The claims for damages have, accordingly, been reduced to ¥210 million ($1,778 thousand). Among 2 of the 4 said lawsuits, in one lawsuit, the Court handed down a decision on March 15, 2007 ordering the Company to pay approximately ¥700,000 ($5.9 thousand) against the plaintiff's claim for approximately ¥1.47 million yen ($12 thousand) in damages. As the plaintiff has appealed the case, the Company is currently conducting an incidental appeal. In another lawsuit, the Court handed down a decision on April 17, 2007 ordering the Company to pay approximately ¥4.80 million ($40 thousand) against the plaintiff's claim for ¥5.11 million ($43 thousand) in damages. The Company was dissatisfied with the ruling in this case and is conducting an appeal.

g) On May 26, 2006, the Japan Electric Amusement Machine Patent Association filed a complaint against the Company in the Tokyo District Court to seek the payment of ¥3,435 million yen ($29,087 thousand) as fees for a patent sublicense used from 1998 to 2005, asserting that it had claim to said fees in accordance with a patent license agreement based on the patent pool method. The Company is responding with the argument that the reasons for the claims under the complaint have no basis.

h) Contingent liabilities as of March 31, 2008 and 2007 were as follows:

| | Year ended March 31, | | |
|---|---|---|---|
| | **2007** | 2006 | **2007** |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Note receivable discounted | ¥     48 | ¥ 1,048 | $     406 |
| Note receivable endorsed | ¥ 8,785 | ¥ 1,603 | $ 74,392 |
| Account receivable | ¥ 1,616 | ¥ 1,005 | $ 13,684 |

## 17. Related Party Transactions

The Company has entered into significant related party transactions with certain companies controlled by the Chairman of the Board of Directors of the Company and his relatives, and with the directors of the Company. These transactions were conducted on an arm's-length basis.

Transactions between the Company and companies controlled by the Chairman of the Board of Directors of the Company and his relatives for the years ended March 31, 2007, 2006 and 2005 are summarized as follows:

Transactions with Aruze Gaming America, Inc.:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | 2006 | 2005 | **2007** |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Other income | ¥ – | ¥ – | ¥ 10 | $ – |
| Sundry expenses | ¥ – | ¥ – | ¥ – | $ – |

Aruze Gaming America, Inc. which was an affiliate of the Company prior to January 24, 2005 became a wholly-owned consolidated subsidiary following the purchase of its shares of common stock by the Company. Consequently, the above table presents transactions with this company only up to January 24, 2005.

Transactions with Borderless Inc., which is 100% owned by the Chairman of the Board of Directors of the Company:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | 2006 | 2005 | **2007** |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Travel expenses | ¥ – | ¥ – | ¥ 32 | $ – |

For the year ended March 31, 2006, the disclosure of related party transactions with Borderless Inc. has been omitted because of their immateriality.

Transactions between the Company and its directors for the years ended March 31, 2007, 2006 and 2005 are summarized as follows:

Transactions with Kazuo Okada:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | 2006 | 2005 | **2007** |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Purchases of marketable securities | ¥ – | ¥ – | ¥ 1,765 | $ – |

Transactions with Transorbit Corporation, which is 70% owned by the Chairman of the Board of Directors of the Company:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | 2006 | 2005 | **2007** |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Business trip expenses | ¥ 73 | ¥ 56 | ¥ – | $ 618 |

| | March 31, | | |
|---|---|---|---|
| | **2007** | 2006 | **2007** |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Accrued liabilities | ¥ 6 | ¥ 4 | $ 50 |

Transactions between the Company and its unconsolidated subsidiaries and affiliates for the years ended March 31, 2007, 2006 and 2005 are summarized as follows:

Transactions with Maps Corporation, an unconsolidated subsidiary of the Company:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | 2006 | 2005 | **2007** |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Interest income | ¥ – | ¥ – | ¥ – | $ – |
| Loss on debt waiver | ¥ – | ¥ 71 | ¥ – | $ – |

The loss on debt waiver referred to above resulted from the liquidation of Maps Corporation.

Transactions with Shochiku Aruze Communications Corporation, an unconsolidated subsidiary of the Company:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | 2006 | 2005 | **2007** |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Distribution of residual assets received | ¥ – | ¥ 5 | ¥ – | $ – |

The residual assets referred to above were distributed to the Company following the liquidation of Shochiku Aruze Communications Corporation.

Transactions with Adores Inc., an affiliate of the Company:

| | March 31, | | |
|---|---|---|---|
| | **2007** | 2006 | **2007** |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Trade accounts receivable | ¥ – | ¥ 1,048 | $ – |
| Other receivables | ¥ – | ¥ 1,603 | $ – |
| Other assets (noncurrent) | ¥ – | ¥ 1,005 | $ – |

The statement of income of Adores Inc. for the year ended March 31, 2006 has been included in consolidation; thus, only the balance of receivables outstanding at March 31, 2006 are presented in the above table.

Transactions with KOT LLC, which is 100%-owned by the Chairman of the Board of Directors of the Company:

| | March 31, | | |
|---|---|---|---|
| | **2007** | 2006 | **2007** |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Accrued liabilities | ¥ 6 | ¥ 0 | $ 50 |

## 18. Subsequent Events

a) The following appropriation of retained earnings of the Company, which has not been reflected in the consolidated financial statements for the year ended March 31, 2007, was approved at a shareholders' meeting held on June 28, 2007:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Cash dividends per share of ¥50 = U.S.$0.42 | ¥ 3,995 | $ 33,832 |

b) **Business transfer to wholly-owned US subsidiary**

Following resolutions of the Meeting of the Board of Directors held on March 15, 2007, the Company transferred its overseas casino machine gaming business to Aruze Gaming America, Inc. ("AGA"), a wholly-owned US subsidiary of the Company, on April 1, 2007.

(1) Name of company to be combined or business concerned, description of relevant business, legal form of business combination, name of company following business combination and outline of said transaction including purpose of said transaction:
① Name of company to be combined or business concerned, and description of relevant business
Gaming machine business of ARUZE CORP.
(Description of business: Development and sale of gaming machines for overseas casinos)
② Legal form of business combination
Transaction under common control (business transfer in which the Company acts as the transferor and AGA acts as the transferee)
③ Name of company following business combination
Aruze Gaming America, Inc.
④ Outline of said transaction including purpose of said transaction
Recognizing the necessity of establishing an R&D and sales framework capable of accommodating the growing US market in order to successfully expand its casino machine business, the Company concluded that transferring its R&D and Sales departments for that business to AGA and working towards strengthening its presence in the world's largest market would be the most appropriate course of action.

(2) Outline of accounting procedures conducted
The business transfer was eliminated as an internal transaction as it fell under a transaction under common control.

19

c) **Company separation**

Following resolutions of the Meeting of the Board of Directors held on March 15, 2007, a wholly-owned subsidiary newly founded through a company separation assumed the mobile website operation business from the Company.

(1) Name of company to be combined or business concerned, description of relevant business, legal form of business combination, name of company following business combination and outline of said transaction including purpose of said transaction:
  ① Name of company to be combined or business concerned, and description of relevant business
  Mobile website operation business of ARUZE CORP.
  (Description of business: Planning, development and sales of contents for mobile websites and operation of mobile websites, etc.)
  ② Legal form of business combination
  Transaction under common control (a separation accomplished through the simple incorporation-type split method (company split), under which the Company became the demerging corporation and the newly-established ARUZE MEDIA NET, INC. became the successor company)
  ③ Name of company following business combination
  ARUZE MEDIA NET, INC.
  ④ Outline of said transaction including purpose of said transaction
  Currently, the Company's R&D Division conducts the planning, development and operation of pay mobile websites, including "ARUZE Kingdom," "Super Real Mahjong" and "Shoryu Shogi." In order to boost the specialization and improve the competitiveness of this business to address intensified competition, as well as streamlining the business of the Company, the Company decided to separate this mobile website operation business and render it independent.

(2) Outline of accounting procedures conducted
  The business transfer was eliminated as an internal transaction as it fell under a transaction under common control.

d) **Corporate split for separation of sales and R&D departments from Company's Pachislot/Pachinko business and domestic arcade game machine business**
At the Meeting of the Board of Directors held on May 31, 2007, the Company passed a resolution regarding the corporate split of the sales and R&D departments from its Pachislot/Pachinko business and domestic arcade games business as of October 1, 2007 (scheduled date). The corporate split was then resolved at the 34th Annual General Shareholders' Meeting held on June 28, 2007.

(1) Name of company to be combined or business concerned, description of relevant business, legal form of business combination, name of company following business combination and outline of said transaction including the purpose of said transaction:
  ① Name of company to be combined or business concerned, and description of relevant business
  (i) Sales department of ARUZE CORP.
  (Description of business: Sales under Pachislot/Pachinko business and domestic arcade game machine business)
  (ii) R&D department of ARUZE CORP.
  (Description of business: Research and development under Pachislot/Pachinko business and domestic arcade game machine business)
  ② Legal form of business combination
  Transaction under common control (an absorption-type (physical) corporate split under which the Company will become the demerging company, (i) System Staff Co., Ltd., a wholly-owned subsidiary of the Company, will succeed the sales department, and (ii) ARUZE PREPARATORY CORPORATION, also a wholly-owned subsidiary of the Company, will succeed the R&D department)
  ③ Name of company following business combination
  (i) System Staff Co., Ltd.
  (ii) ARUZE PREPARATORY CORPORATION
  ④ Outline of said transaction including purpose of said transaction
  (i) Sales department
  Through an absorption-type corporate split (physical split), the sales department of the Pachislot/Pachinko business and domestic arcade game machine business, which represent the primary businesses of the Company, will be transferred to System Staff Co., Ltd., a wholly-owned subsidiary of the Company, and become an independent business corporation, whereby its responsibility and authority will be clarified and a flexible operational framework will be created (As a result of the split, System Staff Co., Ltd. will be renamed ARUZE MARKETING JAPAN CORPORATION.).
  (ii) R&D department
  Through an absorption-type corporate split (physical split), the R&D department of the Pachislot/Pachinko business and domestic arcade game machine business, which

represent the primary businesses of the Company, will be transferred to ARUZE PREPARATORY CORPORATION, a wholly-owned subsidiary of the Company, and will become an independent business corporation, whereby its responsibility and authority will be clarified and a flexible operational framework will be created (As a result of the split, ARUZE PREPARATORY CORPORATION is scheduled to be renamed SEVEN WORKS CORPORATION.).

(2) Outline of accounting procedures conducted
  The business transfer was eliminated as an internal transaction as it fell under a transaction under common control.

e) **Transfer of fixed assets of a subsidiary**
System Staff Co., Ltd., a wholly-owned subsidiary of the Company, resolved the transfer of its fixed assets at a Meeting of the Board of Directors held on June 14, 2007.

(1) Reason of transfer
  The fixed asset transfer was decided upon in order to improve asset efficiency for ARUZE GROUP as a whole.

(2) Description of transferee

| Trade Name | GT3 Special Purpose Company |
|---|---|
| Primary Business | Operations pertaining to securitization of specified assets under "Law Pertaining to the Securitization of Assets" |
| Location of Headquarters | 12-32, 1-chome, Akasaka, Minato-ku, Tokyo, Japan |
| Representative | Mitsuru Izumibe |
| Stated Capital | ¥100,000 ($846) |
| Major Shareholder and Holding % | GT3 Holdings Limited Liability Intermediary Corporation (100%) |
| Relationship with Company | N/A |

(3) Description of assets to be transferred

(Millions of yen)

| Description and Location of Assets | Book Value | Transfer Value | Present Condition |
|---|---|---|---|
| **Land located in Dotonbori, Chuo-ku, Osaka** | ¥ 4,910 | ¥ 7,787 | |
| | | | Operated as buildings for lease |
| **Buildings located at Dotonbori, Chuo-ku, Osaka** | ¥ 1,617 | ¥ 1,643 | |
| Total | ¥ 6,528 | ¥ 9,430 | |

(Thousands of U.S. dollars)

| Description and Location of Assets | Book Value | Transfer Value | Present Condition |
|---|---|---|---|
| **Land located in Dotonbori, Chuo-ku, Osaka** | $ 41,578 | $ 65,941 | |
| | | | Operated as buildings for lease |
| **Buildings located at Dotonbori, Chuo-ku, Osaka** | $ 13,692 | $ 13,913 | |
| Total | $ 55,279 | $ 79,854 | |

(4) Scheduled transfer dates
  Conclusion date of transfer agreement: June 14, 2007
  Delivery date of properties: June 27, 2007

f) **Acquisition of treasury stock by an affiliated company**
At a Meeting of the Board of Directors held on June 7, 2007, Wynn Resorts, Limited, an equity affiliate of the Company, made a resolution to acquire its shares (including convertible bonds) up to $1,200 million (¥141,708 million). 1,310,834 shares of common stock were acquired through the stock market for $123.4 million dollars (¥14,572 million) up through June 30, 2007.
Accordingly, in the consolidated financial statements for the fiscal year ending March 31, 2008, it is expected that an equivalent amount of goodwill will be added to affiliated companies' shares on the Company's balance sheet, and that equity in profit and losses of affiliates will be affected by the amount equivalent to the amortization of said goodwill on the Company's profit and loss statement.

Exhibit Page No. 43[20]

**Company Profile**

## Company Overview

| | |
|---|---|
| Name of Corporation: | ARUZE CORP. |
| Head Office: | Ariake Frontier Building A, 3-1-25 Ariake, Koto-ku, Tokyo 135-0063, Japan |
| Established: | December 1969 |
| Incorporated: | June 1973 |
| Paid-Up Capital: | 3,446 million yen |
| Annual Sales: | 32,033 million yen (for fiscal year ending March 31, 2007) |
| Number of Employees: | 941 (parent company) |
| Factories: | Yotsukaido (Chiba), Oyama (Tochigi) |
| Business Activities: | -Planning, development, manufacturing and sales of Pachislot and Pachinko machines.<br>-Planning, development, manufacturing and sales of gaming machines for overseas casino markets and other amusement machines and devices.<br>-Joint casino business with Wynn Resorts, Limited. |
| Banks (in alphabetical order): | Aozora Bank, Ltd.<br>Sumitomo Mitsui Banking Corporation<br>The Bank of Tokyo-Mitsubishi UFJ, Ltd. |

(as of September 30, 2007)

## Directors & Officers

| | |
|---|---|
| Representative Director and President | Kunihiko Yogo |
| Chairman of the Board of Directors/ International Business Overseer | Kazuo Okada |
| Member of the Board of Directors/ Domestic Sales Overseer | Hajime Tokuda |
| Member of the Board of Directors/ Compliance Overseer/ General Manager, Internal Auditing Office | Yoshito Hori |
| Member of the Board of Directors (Outside) | Hiroyuki Sawada |
| Corporate Auditor | Akitoshi Fukunaga |
| Corporate Auditors (Outside Corporate Auditors) | Tatsumi Tamura<br>Masataka Fuchigami<br>Minoru Sudo |
| Executive Officers | Koki Seki<br>Yoshiyuki Shoji<br>Nobuo Yaegashi |

(as of September 30, 2007)

## Stock Information

| | |
|---|---|
| **Total Shares Authorized to Issue:** | 324,820,000 |
| **Total Outstanding Shares:** | 80,195,000 |
| **Number of Shareholders:** | 5,862 |

**Major Shareholders:**

| Name | Number of Shares Held | Voting Rights as % of Total |
|---|---|---|
| Kazuo Okada | 25,350,000 | 31.7% |
| Tomohiro Okada | 23,665,600 | 29.6% |
| Goldman Sachs and Company Regular Account | 7,366,300 | 9.2% |
| Hiromi Okada | 5,325,000 | 6.7% |
| Hiroko Yokotsuka | 2,395,000 | 3.0% |
| Goldman Sachs International | 1,640,150 | 2.1% |
| The Chase Manhattan Bank NA London Special Omnibus Account Number One | 970,300 | 1.2% |

(as of September 30, 2007)

**Number of Shareholders by Category**

| | | |
|---|---|---|
| Individuals, etc. | 5,613 | 95.7% |
| Other Companies | 94 | 1.6% |
| Foreign Companies, etc. | 121 | 2.1% |
| Financial Institutions | 15 | 0.3% |
| Securities Companies | 18 | 0.3% |
| Treasury Stock | 1 | |

**Breakdown of Shares Held According to Shareholder Category**

| | | |
|---|---|---|
| Individuals, etc. | 60,227,548 | 75.2% |
| Other Companies | 278,800 | 0.3% |
| Foreign Companies, etc. | 17,874,961 | 22.3% |
| Financial Institutions | 1,477,300 | 1.8% |
| Securities Companies | 73,386 | 0.1% |
| Treasury Stock | 263,005 | 0.3% |

(as of September 30, 2007)

Exhibit Page No. 44

# List of ARUZE GROUP Subsidiaries and Offices

### ARUZE CORP.

Ariake Frontier Building A, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Factories: Yotsukaido, Oyama

Provision of shared services, intellectual property management, system management, investment management, group finance, manufacturing of Pachislot/ Pachinko and gaming machines, etc.

### ARUZE MARKETING JAPAN CORPORATION

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Sales of Pachislot and Pachinko machines and rental and sales agent services for Pachislot machines.

| Offices (26 total): | Sapporo | Sendai | Mito | Saitama | Kanagawa | Kanazawa | Kobe | Shikoku | Oita |
| | Aomori | Koriyama | Niigata | Tokyo | Shizuoka | Kyoto | Okayama | Fukuoka | Kagoshima |
| | Morioka | Kitakanto | Nagano | Chiba | Nagoya | Osaka | Hiroshima | Kumamoto | |

### ARUZE RENTAL SERVICE CORPORATION

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Rental operations, asset management and finance services pertaining to Pachislot machines.

### SEVEN WORKS CORPORATION

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Planning, development and design of contents for Pachislot and Pachinko machines.

### ARUZE GLOBAL TRADING CORPORATION

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Procurement of components and units for Pachislot and Pachinko machines.

### Macy Sales Co., Ltd.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Planning, development and manufacturing of Pachislot and Pachinko machines.

### Eleco Ltd.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Planning, development and manufacturing of Pachislot machines.

### Mizuho Corp.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Planning, development and manufacturing of Pachislot and Pachinko machines.

### Seta Corp.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Planning and development of products and systems peripheral to Pachinko and Pachislot machines.

### ARUZE MEDIA NET INC.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Operation of mobile websites.

### Japan Amusement Broadcasting Corp.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Production and broadcast of programming for satellite TV channel devoted to Pachinko and Pachislot-oriented amusement and entertainment.

### PtoPA Ltd.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Development of human interface systems.

### Forest Entertainment Inc.

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

IT management and fundamental R&D operations.

### Patent Information Development Corporation

Ariake Frontier Building, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan

Intellectual property research operations.

*ARUZE CORP. made the transition to an operating holding company on October 1, 2007.
Accordingly, the Company's sales and branch offices are now branches of ARUZE MARKETING JAPAN CORPORATION.

### Aruze USA, Inc.

745 Grier Drive, Las Vegas, Nevada 89119, USA

Management of investments in US (including that in Wynn Resorts, Limited).

### Aruze Gaming America, Inc.

745 Grier Drive, Las Vegas, Nevada 89119, USA

Distribution of gaming machines.

### Aruze Gaming Africa (Pty) Ltd.

Unit 1-3, Kyalami Village, 57 Forssman Close, Barbeque Downs Ext. 1, Kyalami, South Africa

Distribution of gaming machines.

### Aruze Gaming Australia Pty Ltd.

23-27 Bourke Road, Alexandria, N.S.W. 2015, Australia

Distribution of gaming machines.

### Beijing Aruze Development Co., Ltd.

P.C. 100084, D303 Academy of Arts & Design, Tsinghua University, Haidian, Beijing, P.R.C.

Development activities.

(as of October 1, 2007)



**ARUZE CORP.**

**Ariake Frontier Building A, 3-1-25 Ariake, Koto-ku, Tokyo 135-0063, Japan**
International Liaison Office   TEL +81-3-5530-3060
Japanese Main Office        TEL +81-3-5530-3055

◆ 26 Sales Offices in Japan (ARUZE MARKETING JAPAN CORPORATION)
◆ Overseas Sales Offices
   Aruze Gaming America, Inc. (Las Vegas)      TEL +1-702-361-3166
   Aruze Gaming Australia Pty Ltd. (Sydney)    TEL +61-2-9699-9133
   Aruze Gaming Africa (Pty) Ltd. (Kyalami)    TEL +27-11-466-3388

URL http://www.aruze.com/   i-mode http://www.aruze.com/i/

# EXHIBIT 5

## UEC's 2008 Annual Report

# EXHIBIT 5



# ANNUAL REPORT 2008

## FINANCIAL REVIEW



Exhibit Page No. 48

## Message from the President

# Evoking the feeling of "This is fun!" in everybody.

This is what ARUZE seeks to fulfill as a global entertainment company.



**Hajime Tokuda**
Representative Executive Officer and President

Allow me to extend my hearty greetings to you all. ARUZE CORP. concluded its 35th term (the period between April 1, 2007 and March 31, 2008) at the end of this March. In issuing you this Annual Report (Financial Review), we hope to provide you with a summary of our business performance for the 35th term as well as inform you of our prospects for the 36th term.

**Summary of 35th Term**

Under revisions to the "Law Concerning Regulation and Proper Operation of Businesses Affecting Public Morals" and the "Regulations Concerning Authorization of and Model Approval for Amusement Machines" conducted in July 2004, the environment surrounding the Pachislot market experienced a changeover of Pachislot machines based on the previous standard ("Type 4 machines" below) to those based on the new standard ("Type 5 machines" below) that concluded upon the end of September 2007. This changeover to Type 5 machines, the intention of which was to curb excessive volatility, resulted in a sizeable decrease in the Pachislot-based operating income of Pachinko parlors, ultimately leading to a decrease in the number of Pachislot units installed in said parlors. At the end of calendar 2007, the total number of Pachislot machines installed in the market as a whole was 1,635,000 (*Note), a significant decrease of 367,000 units from the end of calendar 2006. Conversely, the total installed base of Pachinko machines was 2,954,000

**Contents**

1  Message from the President
4  Analysis of Business Performance
7  Consolidated Balance Sheets
9  Consolidated Statements of Operations
10  Consolidated Statements of Change in Net Assets
11  Consolidated Statements of Cash Flows
13  Notes to Consolidated Financial Statements
33  Company Overview
33  Directors and Officers
34  Stock Information
34  Major Shareholders

Exhibit Page No. 49

machines, representing a 21,000-unit increase over the end of the previous calendar year.

As the above suggests, the Pachislot machine sector was characterized by severe market conditions. However, ARUZE CORP. succeeded in eliciting a favorable market response to two of our titles, "Ao-Don" and "Aka-Don," which resulted in a sizable increase in unit sales.

With regards to non-operating income and loss, ARUZE CORP. posted ¥6,468 million in investment profit on the equity method under non-operating income for the consolidated fiscal year in question.

This was due to the posting of US$258,148,000 (approximately ¥30.3 billion) in net income by Wynn Resorts, Limited (NASDAQ code: WYNN) for its full fiscal year. Wynn Resorts, Limited is an equity affiliate of ARUZE CORP. in which we hold a 22.0% stake.

Consequently, net sales for the consolidated fiscal year in question totaled ¥72,133 million (up 102.7% from the previous fiscal year), operating income totaled ¥16,088 million (against a ¥3,205 million operating loss for the previous fiscal year) and ordinary income totaled ¥23,311 million (against a ¥6,764 million ordinary loss for the previous fiscal year).

With regards to extraordinary income and loss, ARUZE CORP. posted ¥3,494 million under extraordinary income as a result of sales gains generated through the transfer of fixed assets by System Staff Co., Ltd. (currently ARUZE MARKETING JAPAN CORPORATION), a wholly-owned subsidiary of ours. Additionally, a capital increase conducted by Wynn Resorts, Limited in October 2007, as well as other factors, resulted in ARUZE GROUP's holding percentage of that affiliate to decrease from 24.1% to 21.5%. This resulted in ¥16,065 million in extraordinary income to be generated in the form of constructive sales gains under the equity method. Conversely, ¥2,795 million in extraordinary losses was generated in the form of losses on the disposal of inventories, appraisal losses and other items.

As a result of the above, net income for the fiscal year totaled ¥38,086 million (a 315.4%-increase over the previous fiscal year). Dividends in the amount of ¥60 are scheduled to be paid for the full fiscal year as a return of profits to our shareholders.

(*Note) Number of installed units of Pachislot and Pachinko taken from National Police Agency's "The Present Status of Incidents Affecting Public Morals in 2007"

## Outlook for 36th Term

During the consolidated fiscal year in question, sales of Type 5 Pachislot machines progressed favorably in line with the widespread replacement of Type 4 machines with Type 5 machines. Additionally, the strong business performance of Wynn Resorts, Limited contributed greatly to ARUZE CORP.'s ordinary profit, with these factors leading to operating results that considerably exceeded original business performance forecasts. The fiscal year outlook for each business segment is as follows:

### (1) Pachislot and Pachinko Business

ARUZE CORP., which began to address Type 5 machines earlier than the competition, successfully revitalized our market reputation and share primarily through "Ao-Don" and "Aka-Don" over the last year. However, the Pachislot market as a whole continues to suffer from an exodus of players due to the curbing of volatility brought upon by the transition to Type 5 machines. This has caused a drop in the purchasing volition of parlors and an accompanying decrease in the average number of machines per title placed in those parlors, thereby perpetuating severe market conditions in the process. Given this current state of affairs, ARUZE CORP. will form more tenuous bonds of trust with parlors through conducting frequent parlor visits to actively market replacement titles based on new models. In the process, we will stimulate parlor desire to replace titles on a regular basis. Based on this policy, in addition to proceeding with the implementation of a new rental system, we will choose a number of employees with particularly high selling skills to comprise new specialized teams to focus exclusively on increasing the number of parlor customers, with a rental specialty team and sales specialty team to be established. Utilizing these sales reinforcement measures, we intend to sell approximately 180,000 units of Pachislot over the course of the fiscal year.

Additionally, ARUZE intends to enter the Pachinko market, which, unlike its Pachislot counterpart, continues to exhibit favorable conditions. Through releasing appealing machines that incorporate new concepts and offer a high degree of

Exhibit Page No. 50

competitiveness, we plan to sell 50,000 Pachinko machines during the fiscal year.

**(2) Overseas Gaming Machine Business**

In regards to the overseas casino gaming machine business, business development efforts will be chiefly conducted through Aruze Gaming America, Inc., a subsidiary of ARUZE CORP. In Las Vegas, with machines in mid-application looking to be approved during the 2nd Half of the fiscal year, we will make concerted efforts to strengthen our sales framework and fully initiate sales activities upon the approval of said machines. Furthermore, in addition to laying out sales reinforcement measures for our outposts in Australia and South Africa, we have established a sales outpost in the booming Macau market in October 2008, and intend to serve the expansion in casino demand there. Furthermore, in order to more flexibly handle local needs, achieve reductions in production costs and enhance flexibility in cost control to reflect fluctuations in foreign currency, as of December 2008, ARUZE CORP. will establish a new factory in the Philippines tailored to the production of gaming machines.

**(3) Casino Resort Operation Business**

In Las Vegas, on the plot of land adjoining "Wynn Las Vegas," the opening of the even more gorgeous "Encore at Wynn Las Vegas" is scheduled for December 2008. This expansion will feature 2,043 rooms spread across VIP suites with a floor area exceeding 530m$^2$ and standard suites with a floor area exceeding 65m$^2$, a 6,700-m$^2$ casino space, fine dining, eleven brand-name shops and more.

In Macau, in order to further enhance its VIP experience and competitiveness, Wynn Macau will play host to a large-scale expansion entitled "Encore at Wynn Macau," which will integrate 400 luxury suits and four villas with the former. Construction of this expansion is already underway, with the opening targeted for the first half of 2010.

Through these dual "Encore" projects, we believe that Wynn Resorts, Limited can achieve both a more established brand presence and an increase in profits.

Furthermore, in Asia, ARUZE GROUP is currently planning the operation of a casino resort on our own terms as a component of the "Bagong Nayong Pilipino Entertainment City Manila" project currently being developed on the area of reclaimed land in the Philippine capital of Manila. The concept proposed by us for this casino resort has been highly received by the Philippine government, and, in materializing this business, the project is being conducted by an in-house team consisting primarily of reputed specialists in hotel-affiliated industries in order to ensure the creation and operation of world-class facilities. Additionally, we have successfully secured 30 hectares of land in July of this year, as well as the provisional license required to operate the casino portion of the project in August.

We are truly grateful for and hope to continue to benefit from your patronage. Thank you very much.

Exhibit Page No. 51

# Analysis of Business Performance

## Net Sales

For the current consolidated fiscal year, net sales for the Pachislot and Pachinko business, which is the main business of ARUZE CORP. (the "Company"), increased by 114.2% to ¥66,003 million over the previous fiscal year. The Company placed eight Pachislot titles on the market, out of which "Ao-Don" and "Aka-Don" are of particular note. As "Aka-Don" sold approximately 90,000 units, and "Aka-Don" sold approximately 60,000 units, these two machines became hit titles on the market, and served to contribute greatly to the recovery of the Company's business performance. Total net sales grew by 107.2% over the previous fiscal year to ¥72,133 million.

## Cost of Sales

The total amount of cost of sales increased by 78.5% to ¥31,671 million as compared to the previous fiscal year, and the cost of sales ratio became 43.9%. The cost of sales ratio improved by 6.0 points relative to the previous fiscal year.

## Selling, General and Administrative Expenses

The total amount of selling, general and administrative expenses increased by 15.8% over the previous fiscal year to ¥24,374 million. This was due to the increases in sales.

## Non-Operating Profit/Loss

Non-operating income and loss improved by ¥10,781 million over the previous fiscal year, with income of ¥7,223 million recorded.

This was principally due to equity in the earnings of affiliates, which was posted under non-operating income in the amount of ¥6,468 million that stemmed from Wynn Resorts, Limited, an equity affiliate in which the Company owns a 21.5%-share.

## Net Profit/Loss

Extraordinary income came to ¥20,394 million. This was principally due to a gain on changes in equity, which amounted to ¥16,065 million that stemmed from a capital increase conducted by Wynn Resorts, Limited, as well as due to gains on the sale of noncurrent assets in the amount of ¥3,494 million.

Extraordinary losses came to ¥2,795 million. This was principally due to ¥1,191 million in losses on the disposal of inventories, ¥520 million in losses on the valuation of inventories and ¥505 million in impairment losses on goodwill.

As a result of the above, net income for the consolidated fiscal year in question increased 315.4% over the previous consolidated fiscal year to ¥38,086 million, net income per share increased by ¥361.76 over the end of the previous consolidated fiscal year to become ¥476.52 and the ratio of income to shareholders' equity increased by 20.7 points from the end of the previous consolidated fiscal year to become 28.9%.

## Overview of Finance

### (1) Assets

The amount of total assets at the end of the current consolidated fiscal year was ¥184,826 million, an increase of ¥13,145 million over the previous consolidated fiscal year. For current assets, cash and deposits increased by ¥11,572 million, notes and accounts receivable trade increased by ¥9,978 million, short-term investment securities increased by ¥5,283 million, inventories increased by ¥2,535 million and deferred tax assets increased by ¥1,556 million, while accounts receivable-other decreased by ¥3,602 million. Total current assets increased by ¥22,499 million over the previous consolidated fiscal year to ¥108,543 million. For noncurrent assets, long-term accounts receivable-other decreased by ¥2,393 million. Total noncurrent assets decreased by ¥9,345 million as compared to the previous consolidated fiscal year, to ¥76,267 million.

(2) *Liabilities*

Regarding the amount of liabilities at the end of the current consolidated fiscal year, relative to the previous consolidated fiscal year, income taxes payable increased by ¥3,273 million. Conversely, the provision for losses on litigation decreased by ¥1,412 million, advances received decreased by ¥3,064 million and interest-bearing liabilities (the total amount of short-term loans payable, long-term loans payable and bonds) decreased by ¥19,047 million . As a result, total liabilities were reduced by ¥17,567 million to ¥37,499 million.

(3) *Net Assets*

The amount of net assets at the end of the current consolidated fiscal year was ¥147,327 million, as a result of an increase of ¥33,933 million in retained earnings. The shareholders' equity ratio increased by 11.8 points to 79.7% as compared to the previous fiscal year, and net assets per share increased by ¥383.95 to ¥1,841.84.

## Cash Flow

As of the end of the consolidated fiscal year in question, the balance of cash and cash equivalents totaled ¥56,004 million. The status of each cash flow and the primary reasons for increases/decreases as of the end of the consolidated fiscal year in question are as follows:

(1) *Cash Flow from Operating Activities*

Cash flow from operating activities totaled ¥17,063 million in income (against ¥808 million in income for the same term of the previous fiscal year). This was primarily due to the generation of ¥40,910 million in pretax profit that resulted from an increase in sales, as well as in increase of ¥10,128 million in notes and accounts receivable-trade.

(2) *Cash Flow from Investment Activities*

Cash flow from investment activities totaled ¥23,999 million in income (against ¥15,534 million in income for the same term of the previous fiscal year). This was primarily due to income generated from the sale of property, plant and equipment in the amount of ¥13,504 million and the sale of investment securities resulting in income of ¥4,024 million.

(3) *Cash Flow from Financing Activities*

Cash flow from financing activities totaled ¥22,946 million in expenditure (against ¥15,033 million in expenditure for the previous fiscal year). This was primarily due a ¥9,796 million decrease in short-term loans payable, ¥7,388 million in expenditure caused by repayments of long-term loans payable, ¥2,800 million in expenditure as a result of the redemption of bonds and ¥3,995 million in expenditure through cash dividends paid.

## Capital Investment

Capital investment in the current consolidated fiscal year amounted to ¥9,664 million, and it was principally for the acquisition of assets for rent pertaining to Pachislot/Pachinko business and tools, furniture and fixtures.

## Research and Development Activities

The fundamental policy of the Company group is to be a pioneer company producing things that are attractive and novel with creativity and foresight at all times. As a global entertainment company that provides high-quality entertainment to people of all generations, our mission is to provide "excitement" to society.

The R&D of the Company group is centered on the Pachinko and Pachislot industry and the game machine industry. We mainly develop Pachislot and Pachinko, gaming machines, amusement machines (for commercial use), digital contents for mobiles and management/operation systems.

Not content with conventional technologies, we have always taken up the challenge of new technologies, exploited

the latest technology, and continuously developed new and innovative products. In order to realize new dreams of our customers, we strive to advance from being "ARUZE: The Technology Company" to become "ARUZE: The Innovative Technology and Patent Company."

The R&D staff of the Company group now numbers 630, which is 47.5% of our workforce. In the current consolidated fiscal year, total R&D expenses amounted to ¥6,101 million. We strive to develop more sophisticated technology and achieve higher efficiency for the audio and visual components, reduce production costs, and promote the reuse, recycling and reduction (3R) of materials of Pachislot and Pachinko machines and video game machines for commercial and home use.

Recognizing the arrival of the next generation of IT technologies, we strive to develop advanced technologies to incorporate algorithms for thinking routines from artificial intelligence (AI) into IT computer systems, connect AI management system terminals with LAN, institute human biometric authentication and automate various organizational process management systems. We are also making strides in building development management system for conversation-based AI and IT computer systems equipped with voice communication engines.

**Depreciation and Amortization Expenses**

Depreciation and amortization expenses decreased 6.8% to ¥4,797 million.



Exhibit Page No. 54

## Consolidated Balance Sheets

Years ended March 31, 2008 and 2007

| | | March 31, | | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | |
| | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) | |
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and bank deposits (Note 10) | ¥ 32,613 | ¥ 21,041 | $ 325,515 | |
| Trade notes and accounts receivable | 15,331 | 5,352 | 153,020 | |
| Less: Allowance for doubtful accounts | (175) | (36) | (1,748) | |
| Securities (Note 10) | 23,391 | 18,108 | 233,471 | |
| Inventories | 27,995 | 25,459 | 279,421 | |
| Deferred tax assets (Note 4) | 3,005 | 1,449 | 30,000 | |
| Prepaid expenses and other current assets (Note 17) | 6,381 | 14,669 | 63,696 | |
| Total current assets | 108,543 | 86,043 | 1,083,375 | |
| | | | | |
| **Property, plant and equipment, at cost:** | | | | |
| Land (Note 3) | 7,073 | 13,522 | 70,604 | |
| Buildings and structures (Note 3) | 7,814 | 10,342 | 77,994 | |
| Machinery and equipment | 25,722 | 21,556 | 256,738 | |
| Less: Accumulated depreciation | (20,846) | (18,341) | (208,068) | |
| Property, plant and equipment, net | 19,764 | 27,078 | 197,268 | |
| | | | | |
| **Investments and other assets:** | | | | |
| Investment securities (Note 11) | 51,635 | 51,725 | 515,375 | |
| Long-term loans receivable | 899 | 668 | 8,981 | |
| Goodwill | 602 | 386 | 6,016 | |
| Deferred tax assets (Note 4) | 69 | - | 690 | |
| Other assets | 5,667 | 9,542 | 56,571 | |
| Less: Allowance for doubtful accounts | (2,371) | (3,788) | (23,672) | |
| Total investments and other assets | 56,503 | 58,533 | 563,961 | |
| | | | | |
| **Deferred charges:** | | | | |
| Bond issuance expenses | - | 21 | - | |
| New stock issuance expenses | 15 | 4 | 152 | |
| **Total assets** | ¥ 184,826 | ¥ 171,681 | $ 1,844,756 | |

(See Notes to Consolidated Financial Statements.)

| | | March 31, | | | |
|---|---|---|---|---|---|
| | | 2008 | 2007 | | 2008 |
| | | (Millions of yen) | | | (Thousands of U.S. dollars) (Note 2) |

**Liabilities and shareholders' equity**

**Current liabilities:**

| | | | | | |
|---|---|---:|---:|---|---:|
| Short-term borrowings (Note 3) | ¥ | 49 | ¥ 9,845 | $ | 496 |
| Current portion of long-term debt (Note 3) | | 872 | 10,188 | | 8,708 |
| Notes and accounts payable: | | | | | |
| Trade | | 7,497 | 7,523 | | 74,836 |
| Other | | 1,970 | 2,045 | | 19,664 |
| Advances received (Note 17) | | 1,970 | 5,035 | | 19,670 |
| Deferred revenues | | 6,014 | 5,939 | | 60,030 |
| Accrued income taxes | | 3,965 | 692 | | 39,581 |
| Accrued consumption taxes | | 907 | - | | 9,057 |
| Provision for bonuses | | 298 | - | | 2,975 |
| Short-term deferred tax liabilities (Note 4) | | 0 | - | | 0 |
| Other current liabilities | | 4,302 | 3,268 | | 42,942 |
| Total current liabilities | | 27,849 | 44,538 | | 277,964 |
| **Long-term liabilities:** | | | | | |
| Long-term debt (Note 3) | | 5,069 | 7,305 | | 50,598 |
| Deferred tax liabilities (Note 4) | | 31 | 156 | | 310 |
| Other long-term liabilities | | 4,549 | 3,066 | | 45,409 |
| Total long-term liabilities | | 9,650 | 10,528 | | 96,318 |
| Total liabilities | | 37,499 | 55,067 | | 374,282 |
| | | | | | |
| **Net assets** | | | | | |
| Shareholders' equity (Note 7): | | | | | |
| Common stock: | | | | | |
| Authorized – 324,820,000 shares | | | | | |
| Issued – 80,195,000 shares | | 3,446 | 3,446 | | 34,403 |
| Capital surplus | | 7,503 | 7,503 | | 74,890 |
| Retained earnings | | 138,270 | 104,337 | | 1,380,087 |
| Treasury stock at cost: 260,034 shares in 2008 and 289,415 shares in 2007 | | (1,636) | (1,821) | | (16,333) |
| Total shareholders' equity | | 147,584 | 113,465 | | 1,473,048 |
| Valuation and translation adjustments | | | | | |
| Unrealized holding gain on securities | | 31 | 32 | | 317 |
| Translation adjustments | | (389) | 2,996 | | (3,882) |
| Total valuation and translation adjustments | | (357) | 3,028 | | (3,564) |
| Subscription rights to shares | | 99 | 12 | | 995 |
| Minority interests | | 0 | 108 | | 0 |
| Total net assets | | 147,327 | 116,614 | | 1,470,479 |
| **Total liabilities and net assets** | ¥ | 184,826 | ¥ 171,681 | $ | 1,844,761 |

(See Notes to Consolidated Financial Statements.)

Exhibit Page No. 56

## Consolidated Statements of Operations

Years ended March 31, 2008, 2007 and 2006

| | | Year ended March 31, | | | |
|---|---|---|---|---|---|
| | | **2008** | 2007 | 2006 | **2008** |
| | | (Millions of yen) | | | (Thousands of U.S. dollars) (Note 2) |
| Net sales | ¥ | 72,133 | ¥ 35,580 | ¥ 48,506 | $ 719,969 |
| Cost of sales | | 31,671 | 17,743 | 31,099 | 316,111 |
| Gross profit | | 40,462 | 17,837 | 17,406 | 403,858 |
| Selling, general and administrative expenses (Note 17) | | 24,374 | 21,043 | 22,717 | 243,281 |
| Operating income (loss) | | 16,088 | (3,205) | (5,310) | 160,576 |
| Other income (expenses): | | | | | |
| Interest and dividend income | | 1,139 | 179 | 95 | 11,372 |
| Gain on sales and retirement of property, plant and equipment | | 3,494 | - | - | 34,881 |
| Gain on sales of investment securities | | 312 | - | 2,274 | 3,116 |
| Interest expense | | (290) | (477) | (650) | (2,898) |
| Gain (loss) on equity method investments | | 22,534 | 17,683 | (2,699) | 224,914 |
| Loss on impairment of fixed assets (Notes 1(p) and 13) | | | (64) | (1,818) | |
| Loss on impairment of goodwill | | (505) | | | (5,045) |
| Loss on write-downs of inventories | | - | (2,140) | (3,143) | - |
| Loss on write-downs of investments | | (520) | | | (5,197) |
| Loss on disposal of inventories | | (1,191) | - | - | (11,893) |
| Loss on sales and retirement of property, plant and equipment | | (259) | (211) | (366) | (2,586) |
| Other, net (Note 12) | | 109 | (372) | 182 | 1,089 |
| Total other income (expenses), net | | 24,822 | 14,597 | (6,126) | 247,754 |
| Income (loss) before income taxes and minority interests | | 40,910 | 11,391 | (11,436) | 408,331 |
| Income taxes (Note 4): | | | | | |
| Current | | 4,745 | 705 | 168 | 47,367 |
| Deferred | | (1,813) | 1,761 | 1,734 | (18,100) |
| | | 2,932 | 2,466 | 1,902 | 29,267 |
| Minority interests | | (107) | (244) | (625) | (1,073) |
| Net income (loss) | ¥ | 38,086 | ¥ 9,169 | ¥ (12,713) | $ 380,138 |

(See Notes to Consolidated Financial Statements.)

Exhibit Page No. 57

## Consolidated Statements of Change in Net Assets

Years ended March 31, 2008, 2007 and 2006

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2008** | 2007 | 2006 | **2008** |
| | | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) |
| **Common stock** | | | | |
| Balance at beginning and end of year (80,195,000 shares) | ¥ 3,446 | ¥ 3,446 | ¥ 3,446 | $ 34,403 |
| **Capital surplus** | | | | |
| Balance at beginning and end of year | ¥ 7,503 | ¥ 7,503 | ¥ 7,503 | $ 74,891 |
| **Retained earnings** | | | | |
| Balance at beginning of year | ¥ 104,337 | ¥ 96,775 | ¥ 111,823 | $ 1,041,392 |
| Adjustments to retained earnings: | | | | |
| Disposal of treasury shares | (103) | (9) | - | (1,028) |
| Adjustments for inclusion/exclusion of subsidiaries in/from consolidation | - | - | 62 | - |
| Increase resulting from change in equity interest in an affiliate | (52) | - | - | (525) |
| Adjustment to retained earnings arising from merger of consolidated subsidiaries | (1) | - | - | (13) |
| As adjusted | 104,180 | 96,765 | 111,885 | 1,039,827 |
| Net income (loss) | 38,086 | 9,169 | (12,713) | 380,138 |
| Cash dividends paid | (3,995) | (1,598) | (2,397) | (39,877) |
| Balance at end of year | ¥ 138,270 | ¥ 104,337 | ¥ 96,775 | $ 1,380,088 |
| **Treasury stock at cost: 260,034 shares in 2008 and 289,415 shares in 2007** | | | | |
| Balance at beginning of year | ¥ (1,821) | ¥ (1,837) | ¥ (1,836) | $ (18,184) |
| Net changes during the year | 185 | 15 | (1) | 1,850 |
| Balance at end of year | ¥ (1,636) | ¥ (1,821) | ¥ (1,837) | $ (16,334) |
| **Unrealized holding gain on securities** | | | | |
| Balance at beginning of year | ¥ 32 | ¥ 42 | ¥ 22 | $ 322 |
| Net changes during the year | (0) | (10) | 20 | (4) |
| Balance at end of year | ¥ 31 | ¥ 32 | ¥ 42 | $ 318 |
| **Translation adjustments** | | | | |
| Balance at beginning of year | ¥ 2,996 | ¥ 2,090 | ¥ (3,600) | $ 29,905 |
| Net changes during the year | (3,385) | 906 | 5,690 | (33,788) |
| Balance at end of year | ¥ (389) | ¥ 2,996 | ¥ 2,090 | $ (3,883) |
| **Subscription rights to shares** | | | | |
| Balance at beginning of year | ¥ 12 | ¥ - | ¥ - | $ 123 |
| Net changes during the year | 87 | 12 | - | 873 |
| Balance at end of year | ¥ 99 | ¥ 12 | ¥ - | $ 996 |
| **Minority interests** | | | | |
| Balance at beginning of year | ¥ 108 | ¥ 306 | ¥ 4,851 | $ 1,078 |
| Net changes during the year | (108) | (197) | (4,545) | (1,078) |
| Balance at end of year | ¥ 0 | ¥ 108 | ¥ 306 | $ 0 |

(See Notes to Consolidated Financial Statements.)

Exhibit Page No. 58

## Consolidated Statements of Cash Flows

Years ended March 31, 2008, 2007 and 2006

| | 2008 | 2007 | 2006 | 2008 |
|---|---|---|---|---|
| | | (Millions of yen) | | (Thousands of U.S. dollars) (Note 2) |
| **Cash flows from operating activities** | | | | |
| Income (loss) before income taxes and minority interests | ¥ 40,910 | ¥ 11,391 | ¥ (11,436) | $ 408,331 |
| Depreciation and amortization of: | | | | |
| Property, plant and equipment | 7,417 | 4,797 | 5,149 | 74,036 |
| Loss on impairment of fixed assets | 531 | 64 | 1,818 | 5,304 |
| Goodwill | 144 | 126 | 319 | 1,444 |
| Loss on impairment of fixed assets | 531 | 64 | 1,818 | 5,304 |
| Provision for allowance for doubtful accounts | (1,276) | 43 | 1,478 | (12,743) |
| Interest and dividend income | (1,139) | - | - | (11,373) |
| Interest expense | 290 | 477 | 650 | 2,898 |
| Equity in losses of affiliates | (22,534) | (17,683) | 2,699 | (224,915) |
| Loss on disposal of property, plant and equipment | 1 | 23 | 187 | 13 |
| Other | (3,235) | - | - | (32,295) |
| Gain on sales of investment securities | (312) | - | (2,274) | (3,116) |
| Changes in operating assets and liabilities: | | | | |
| Trade notes and accounts receivable | (10,128) | 6,225 | (4,377) | (101,093) |
| Inventories | (2,565) | (2,641) | 1,502 | (25,608) |
| Prepaid expenses and other current assets | 8,296 | (5,977) | (4,021) | 82,810 |
| Notes and accounts payable | 28 | (412) | (1,258) | 284 |
| Advances received | (2,989) | 4,751 | 6,859 | (29,843) |
| Other current liabilities | (432) | 3,045 | (175) | (4,318) |
| Other noncurrent assets | 3,804 | (2,829) | (923) | 37,974 |
| Other noncurrent liabilities | 817 | (55) | 723 | 8,163 |
| Other | 11 | (147) | 243 | 110 |
| Subtotal | 17,639 | 1,198 | (2,835) | 176,064 |
| Interest and dividends received | 1,139 | 48 | 112 | 11,374 |
| Interest paid | (243) | (418) | (653) | (2,429) |
| Income taxes paid | (1,472) | (19) | (278) | (14,697) |
| Net cash provided by (used in) operating activities | 17,063 | 808 | (3,655) | 170,311 |
| | | | | |
| **Cash flows from investing activities** | | | | |
| Purchases of investment securities | - | | (12) | - |
| Proceeds from sales of investment securities | 4,024 | 17,145 | 0 | 40,163 |
| Purchases of property, plant and equipment | (9,652) | (8,739) | (8,890) | (96,341) |
| Proceeds from sales of property, plant and equipment | 13,504 | 7,757 | 519 | 134,786 |
| Net increase in long-term loans receivable | - | - | (128) | - |
| (Increase) decrease in purchases of shares of subsidiaries | (865) | (423) | 240 | (8,641) |
| Other | 16,989 | (205) | 535 | 169,570 |
| Net cash provided by (used in) investing activities | 23,999 | 15,534 | (7,734) | 239,539 |

**Cash flows from financing activities**

| | | | | |
|---|---:|---:|---:|---:|
| Net decrease in short-term borrowings | (9,796) | (7,004) | (6,986) | (97,776) |
| Proceeds from issuance of long-term debt | 965 | - | 1,800 | 9,638 |
| Repayment of long-term debt | (7,388) | (3,627) | (3,139) | (73,740) |
| Proceeds from issuance of bonds | - | - | 6,895 | - |
| Proceeds from issuance of common stock | (14) | - | - | (141) |
| Payments for redemption of bonds | (2,800) | (2,800) | (2,100) | (27,947) |
| Purchases of treasury stock | (0) | (0) | (0) | (9) |
| Cash dividends paid | (3,995) | (1,598) | (2,397) | (39,877) |
| Other | 82 | (3) | (8) | 822 |
| Net cash used in financing activities | (22,946) | (15,033) | (5,937) | (229,030) |
| | | | | |
| Effect of exchange rate changes on cash and cash equivalents | (1,261) | 400 | 4 | (12,586) |
| Net increase (decrease) in cash and cash equivalents | 16,855 | 1,710 | (17,322) | 168,234 |
| Cash and cash equivalents at beginning of year | 39,149 | 37,439 | 55,080 | 390,753 |
| Effect of merger of subsidiaries on cash and cash equivalents | - | - | (318) | - |
| **Cash and cash equivalents at end of year (Note 10)** | ¥ 56,004 | ¥ 39,149 | ¥ 37,439 | $ 558,987 |

(See Notes to Consolidated Financial Statements.)

Exhibit Page No. 60

# Notes to Consolidated Financial Statements

## 1. Summary of Significant Accounting Policies

*(a) Basis of preparation*

The accompanying consolidated financial statements of ARUZE CORP. (the "Company") and consolidated subsidiaries (collectively, the "Group") are compiled from the consolidated financial statements prepared by the Company as required by the Financial Instruments and Exchange Law of Japan and have been prepared on the basis of accounting principles generally accepted in Japan, which are different in certain respects as to the application and disclosure requirements of International Financial Reporting Standards.

For the purposes of this document, certain reclassifications have been made in order to present the accompanying consolidated financial statements in a format that is familiar to readers outside Japan. In addition, certain amounts in the prior years' financial statements have been reclassified to conform to the current year's presentation.

As permitted, amounts of less than one million yen have been omitted. As a result, the totals shown in the accompanying consolidated financial statements (both in yen and in U.S. dollars) do not necessarily agree with the sum of the individual amounts.

*(b) Basis of consolidation*

The accompanying consolidated financial statements include the accounts of the Company and 16 major subsidiaries in 2008 (13 in 2007 and 2006) over which substantial control is exerted either through majority ownership of voting stock and/or by other means. All significant intercompany balances and transactions have been eliminated from consolidation.

Effective the current fiscal year, the scope of consolidated subsidiaries include ARUZE MEDIA NET, INC. as a result of incorporation-type company splits from the Company on April 2, 2007, ARUZE RENTAL SERVICE CORPORATION due to a stock acquisition and capital increase by the Company conducted respectively on September 25 and September 27, 2007, and SEVEN WORKS CORPORATION (formerly known as ARUZE PREPARATORY CORPORATION) in accordance with its increased significance.

Aruze USA, Inc., Aruze Gaming America, Inc., Aruze Gaming Australia Pty Ltd. and Aruze Gaming Africa (Pty) Ltd. are consolidated on the basis of fiscal periods ended December 31, a balance sheet date that differs from that of the Company; however, the necessary adjustments have been made if the effect of the difference is material.

Investments in unconsolidated subsidiaries are stated at cost because their impact on the consolidated financial statements was not material.

Investments in affiliates (companies over which the Company has the ability to exercise significant influence) are stated at cost plus equity in their undistributed earnings or losses. Consolidated net (loss) income includes the Company's equity in the current net income or loss of such companies after the elimination of unrealized intercompany profits.

All assets and liabilities of the consolidated subsidiaries have been revalued on acquisition and the excess of cost over the underlying net assets at their respective dates of acquisition is being amortized over a period of five years on a straight-line basis.

*(c) Foreign currency translation*

**Translation of foreign currencies**

All monetary assets and liabilities denominated in foreign currencies are translated into yen at the rates of exchange in effect at the balance sheet date. Gain or loss on translation resulting from the settlement of these items at such rates as of the balance sheet date is credited or charged currently to operations.

**Translation of accounts of overseas consolidated subsidiaries**

The accounts of the overseas consolidated subsidiaries, except for the components of shareholders' equity, are translated into yen at the rates of exchange in effect at the balance sheet dates of these subsidiaries. The components of shareholders' equity are translated at their historical exchange rates. The differences arising from translation are presented as translation adjustments in consolidated shareholders' equity and minority interests.

*(d) Cash equivalents*

All highly liquid investments, generally with a maturity of three months or less when purchased, which are readily convertible into known amounts of cash and are so near maturity that they represent only an insignificant risk of any change in their value as a result of changes in interest rates, are considered cash equivalents.

-13-

Under the accounting standard for statements of cash flows, the definitions of "Cash and cash equivalents" in the consolidated statements of cash flows and of "Cash and bank deposits" in the consolidated balance sheets differ with respect to certain components. A reconciliation between the cash definitions above is presented in Note 10.

*(e) Securities*

Available-for-sale ("other") securities with quoted market value are carried at market value, with unrealized gain, net of taxes, reported as a separate component of shareholders' equity, and with unrealized loss charged to income. The cost of securities sold is determined by the moving average method. Other securities whose market value is not available are stated at cost by the moving average method.

*(f) Inventories*

**Merchandise, products and raw materials**

Merchandise, products, and raw materials are principally stated at cost determined by the average method.

**Work in process**

Work in process is principally stated at cost determined by the average method. For work in process concerning production of contents, etc., a specific costing method is applied.

Effective the year ended March 31, 2008, the Company has changed its posting method of production costs of digital contents, etc. that were expensed as incurred in previous method.

This change was due to the increasing promotion of items classified as contents such as video images, audio and others and the prospect of their further increase in future. Furthermore, the development works in process accounted for are being posted as a singular sum under cost of sales upon the commencement of sales of the relevant individual titles.

As a result of this change, selling, general and administrative expenses decreased by ¥1,695 million ($16,918 thousand), cost of sales increased by ¥168 million ($1,677 thousand) and inventories increased by ¥1,527 million ($15,241 thousand) for the year ended March 31, 2008.

See Note 15 for the related effect on the segment information.

**Supplies**

Supplies are stated at cost determined by the last purchase price method.

*(g) Depreciation and amortization*

**Depreciation**

1)  Depreciation of property, plant and equipment of the Company and its domestic consolidated subsidiaries is calculated by the declining balance method at the rates prescribed in the Corporation Tax Law of Japan. However, buildings (excluding structures attached to the buildings) acquired on or subsequent to April 1, 1998 by the Company and its domestic consolidated subsidiaries are depreciated by the straight-line method over the periods stipulated in the Corporation Tax Law.

Properties for the rental business are depreciated by the straight-line method. Depreciation for properties including Pachislot machines leased to customers is calculated by the straight-line method over the periods specified in the respective lease contracts.

Effective the year ended March 31, 2008, following the amendments to the Corporate Tax Law in Japan, the Company and a number of domestic consolidated subsidiaries changed their depreciation and amortization methods to those pursuant to the amended Corporate Tax Law for property, plant and equipment obtained after April 1, 2007. The said change has a slight impact on the Company's profit and loss and segment information.

Regarding assets obtained on or before March 31, 2007, following the amendments to the Corporate Tax Law in Japan, the Company and its domestic consolidated subsidiaries amortize the difference between the amount corresponding to 5% of the asset's acquisition price and its memorandum value evenly over 5 years, and post the amortization in the item of Depreciation. Such amortization commences from the following consolidated fiscal year of the year in which the asset's depreciation reaches the amount corresponding to 5% of the asset's acquisition price in accordance with the depreciation method provided in the former Corporate Tax Law. The said change has a slight impact on the Company's profit and loss and segment information.

-14-

2)   Depreciation of property, plant and equipment of the overseas consolidated subsidiaries is calculated by the straight-line method over the estimated useful lives of the respective assets.

**Amortization**

Software intended to be marketed for sale is amortized at the higher of either the amounts calculated based on the estimated salable units or the amounts allocated equally over the remaining useful lives of the assets (3 years). Costs for the development of software intended for internal use are amortized by the straight-line method over an estimated useful life of 5 years. Other software is amortized at the rates prescribed in the Corporation Tax Law.

*(h) Deferred charges*

New stock issuance expenses and bond issuance expenses are amortized uniformly over 3 years.

*(i) Allowance for doubtful accounts*

The allowance for doubtful accounts is provided at an amount sufficient to cover possible losses on the collection of receivables and has been determined based on the Group's historical experience with write-offs plus an estimated amount for probable doubtful accounts based on a review of the collectibility of individual receivables.

At overseas consolidated subsidiaries, doubtful accounts, primarily individually designated receivables, are provided for at estimated amounts.

*(j) Accrued employees' bonuses*

The Company and its domestic consolidated subsidiaries provide an accrual for the current fiscal year's portion of the anticipated total amount of future bonus payments.

*(k) Leases*

Non-cancelable leases are accounted for as operating leases regardless of whether such leases are classified as operating or finance leases, except that leases that stipulate the transfer of ownership of the leased assets to the lessees are accounted for as finance leases.

*(l) Income taxes*

Deferred income taxes are recognized by the asset and liability method under which deferred tax assets and liabilities are determined based on the differences between financial reporting and the tax bases of the assets and liabilities, and are measured using the enacted tax rates and laws which will be in effect when the differences are expected to reverse.

*(m) Research and development costs*

Research and development costs are charged to income when incurred.

*(n) Derivatives*

Open derivatives positions are stated at fair value. A gain or loss on derivatives designated as hedging instruments is deferred until the loss or gain on the underlying hedged item is recognized. The related interest differential paid or received under interest-rate swaps is recognized in interest expense over the terms of the swap agreements if certain conditions are met.

*(o) Appropriation of retained earnings*

Under the Companies Act of Japan and the Articles of Incorporation of the Company, the appropriation of retained earnings with respect to a given financial period is made by resolution of the shareholders at a general meeting or by resolution of the Board of Directors. Appropriations from retained earnings are reflected in the consolidated financial statements applicable to the period in which such resolutions are approved. See Note 19.

## 2. Japanese Yen and U.S. Dollar Amounts

The U.S. dollar amounts presented in the accompanying consolidated financial statements represent the arithmetic results of translating Japanese yen into U.S. dollars at ¥100.19 = U.S.$1.00, the approximate exchange rate prevailing on March 31, 2008. The inclusion of U.S. dollar amounts is solely for the convenience of the reader and is not intended to imply that Japanese yen have been or could be converted, realized or settled in U.S. dollars at that or any other rate.

## 3. Short-Term Borrowings and Long-Term Debt

Short-term borrowings substantially represent short-term borrowings from banks at an average interest rate of 2.6% per annum at March 31, 2008 and 1.0% at 2007.

Long-term debt at March 31, 2008 and 2007 consisted of the following:

|  | 2008 | 2007 | 2008 |
|---|---|---|---|
|  | (Millions of yen) | | (Thousands of U.S. dollars) |
| Japanese yen bonds, due from 2009 to 2014, at rates ranging from six-month yen TIBOR + 0.10% to + 0.87% | ¥ 5,650 | ¥ 8,450 | $ 56,393 |
| Loans from banks, due through 2010, at an average interest rate of 1.8% | 2,591 | 9,043 | 25,861 |
| Less: Current portion | (3,172) | (10,188) | (31,660) |
|  | ¥ 5,069 | ¥ 7,305 | $ 50,594 |

Assets pledged as collateral for long-term debt at March 31, 2008 and 2007 are summarized as follows:

|  | 2008 | 2007 | 2008 |
|---|---|---|---|
|  | (Millions of yen) | | (Thousands of U.S. dollars) |
| Buildings and structures | ¥ - | ¥ 465 | $ - |
| Land | - | 1,563 | - |
|  | ¥ - | ¥ 2,028 | $ - |

The related debt for which the above assets were pledged as collateral at March 31, 2008 and 2007 are summarized as follows:

|  | 2008 | 2007 | 2008 |
|---|---|---|---|
|  | (Millions of yen) | | (Thousands of U.S. dollars) |
| Current portion of long-term debt | ¥ - | ¥ 6,492 | $ - |
|  | ¥ - | ¥ 6,492 | $ - |

The aggregate annual maturities of long-term debt subsequent to March 31, 2008 are summarized as follows:

| Year ending March 31, | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| 2009 | ¥ 3,172 | $ 31,660 |
| 2010 | 3,019 | 30,133 |
| 2011 | 450 | 4,491 |
| 2012 | 1,000 | 9,981 |
| 2013 and thereafter | 200 | 1,996 |
|  | ¥ 7,841 | $ 78,261 |

Exhibit Page No. 64

## 4. Income Taxes

The major components of deferred tax assets and liabilities at March 31, 2008 and 2007 are summarized as follows:

| | 2008 | 2007 | 2008 |
|---|---|---|---|
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Deferred tax assets – current: | | | |
| Inventories | ¥ 1,057 | ¥ 3,132 | $ 10,550 |
| Accrued employees' bonuses | 122 | 98 | 1,218 |
| Allowance for doubtful accounts | 489 | - | 4,881 |
| Operating loss carryforwards | 1,383 | 2,506 | 13,804 |
| Timing difference of sales recognition | 852 | 2,519 | 8,504 |
| Other | 764 | 1,296 | 7,626 |
| Gross deferred tax assets – current: | 4,670 | 9,553 | 46,611 |
| Valuation allowance | (1,656) | (8,092) | 16,529 |
| Total deferred tax assets – current | 3,014 | 1,460 | 30,083 |
| Offset against deferred tax liabilities – current | (8) | (11) | (80) |
| Net deferred tax assets – current | 3,005 | 1,449 | 29,993 |
| Deferred tax liabilities – current: | | | |
| Other | (8) | (11) | (80) |
| Total deferred tax liabilities – current | (8) | (11) | (80) |
| Offset against deferred tax assets – current | 8 | 11 | 80 |
| Net deferred tax liabilities – current | - | - | - |
| | | | |
| Deferred tax assets – noncurrent: | | | |
| Allowance for doubtful accounts | 355 | 1,072 | 3,543 |
| Loss on devaluation of real estate | - | 50 | - |
| Investment securities | 1,015 | - | 10,131 |
| Research and development cots | 232 | 329 | 2,316 |
| Loss on investments | 284 | 284 | 2,835 |
| Loss on impairment of fixed assets | 313 | 503 | 3,124 |
| Operating loss carryforwards | 3,883 | 2,081 | 38,756 |
| Excess of metal molds depreciation | 708 | 101 | 7,067 |
| Other | 283 | 143 | 2,825 |
| Gross deferred tax assets – non-current | 7,077 | 4,568 | 70,636 |
| Valuation allowance | (6,850) | (4,446) | (68,370) |
| Total deferred tax assets – non-current | 226 | 122 | 2,256 |
| Offset against deferred tax liabilities – non-current | (156) | - | (1,557) |
| Net deferred tax assets – non-current | 69 | 122 | 689 |
| Deferred tax liabilities – non-current: | | | |
| Additional enterprise tax | (135) | (135) | (1,347) |
| Other | (52) | (143) | (519) |
| Total deferred tax liabilities – non-current | (187) | (279) | (1,866) |
| Offset against deferred tax assets – non-current | 156 | - | 1,557 |
| Net deferred tax liabilities – non-current | ¥ (31) | ¥ (156) | $ (309) |

A reconciliation between the statutory tax rates and the effective tax rates as a percentage of loss or income before income taxes for the years ended March 31, 2008, 2007 and 2006 is summarized as follows:

Exhibit Page No. 65

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Statutory tax rates | 40.7% | 40.7% | 40.7% |
| Reconciliation: | | | |
| Valuation allowance | (9.7) | 45.7 | (46.1) |
| Loss on change in equity interest in subsidiaries | (16.0) | (2.7) | - |
| Equity in losses of affiliates | (6.4) | (63.2) | (9.6) |
| Amortization of goodwill | 0.6 | 0.4 | (1.1) |
| Other | (2.0) | 0.7 | (0.5) |
| Effective tax rates | 7.2% | 21.6% | (16.6)% |

## 5. Research and Development Costs

Research and development costs that were included in cost of sales and selling, general and administrative expenses for the years ended March 31, 2008, 2007 and 2006 were as follows:

| Year ended March 31, | | | |
|---|---|---|---|
| 2008 | 2007 | 2006 | 2008 |
| (Millions of yen) | | | (Thousands of U.S. dollars) |
| ¥       6,101 | ¥       5,917 | ¥       6,477 | $       60,894 |

## 6. Leases

*(a) As lessee*

The following pro forma amounts represent the acquisition costs, accumulated depreciation and net book value of the leased assets as of March 31, 2008 and 2007, which would have been reflected in the consolidated balance sheets if lease accounting had been applied to finance leases currently accounted for as operating leases:

| | Year ended March 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2008 |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Fixed assets: | | | |
| Acquisition costs | ¥       1,118 | ¥       871 | $       11,159 |
| Accumulated depreciation | (538) | (145) | (5,370) |
| Net book value | 578 | 725 | 5,769 |
| Intangible fixed assets: | | | |
| Acquisition costs | 8 | 2 | 80 |
| Accumulated depreciation | (2) | (2) | (20) |
| Net book value | 5 | 0 | 50 |
| Total: | | | |
| Acquisition costs | 1,127 | 875 | 11,249 |
| Accumulated depreciation | (542) | (148) | (5,410) |
| Net book value | ¥       584 | ¥       726 | $       5,829 |

Lease payments relating to finance leases accounted for as operating leases in the accompanying consolidated financial statements amounted to ¥339 million ($3,384 thousand), ¥93 million and ¥245 million for the years ended March 31, 2008, 2007 and 2006, respectively.

Depreciation of the leased assets computed by the straight-line method over the respective lease terms and the interest portion included in these lease payments are summarized as follows:

-18-

| | Year ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2008** | | 2007 | | 2006 | **2008** |
| | (Millions of yen) | | | | | (Thousands of U.S. dollars) |
| Depreciation | ¥ | 299 | ¥ | 82 | ¥ | 237 | $ | 2,984 |
| Interest expense | ¥ | 51 | ¥ | 17 | ¥ | 10 | $ | 509 |

Future minimum lease payments (including the interest portion thereon) subsequent to March 31, 2008 for non-cancelable operating leases and finance leases accounted for as operating leases are summarized as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Due within one year or less | ¥  1,594 (1,249) | $  15,910 (12,466) |
| Due subsequent to one year | 969  (508) | 9,672  (5,070) |
| Total | ¥  2,563 (1,757) | $  25,581 (17,537) |

Note: The amounts in parentheses in the above table represent future minimum lease payments to be made by sublessees.

Obligations under non-cancelable operating leases as of March 31, 2008 were as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Due within one year | ¥  2 | $  20 |
| Due over one year | 2 | 20 |
| Total | ¥  4 | $  40 |

*(b) As lessor*

Information relating to finance leases of the Group at March 31, 2008 and 2007 is summarized as follows:

| | March 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | | 2007 | | **2008** |
| | (Millions of yen) | | | | (Thousands of U.S. dollars) |
| Leased properties: | | | | | |
| Acquisition cost | ¥ | 6,378 | ¥ | 4,867 | $  63,659 |
| Accumulated depreciation | | (2,265) | | (2,027) | (22,607) |
| Net book value | ¥ | 4,113 | ¥ | 2,839 | $  41,052 |

Lease revenues relating to finance leases accounted for as operating leases amounted to ¥3,362 million ($33,556 thousand) for the year ended March 31, 2008.

Depreciation of the leased properties computed by the straight-line method and interest income included in lease revenues for the year ended March 31, 2008 amounted to ¥2,125 million ($21,210 thousand) and ¥1,314 million ($13,115 thousand), respectively.

Interest income is computed as the difference between future lease revenues from lessees and estimated acquisition costs. Interest income is allocated to each fiscal period based on the interest method.

Future lease revenues (including the interest portion thereon) subsequent to March 31, 2008 for non-cancelable operating leases and finance leases accounted for as operating leases are summarized as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Due within one year or less | ¥  2,711 (1,249) | $  27,059 (12,466) |
| Due subsequent to one year | 2,879  (508) | 28,735  (5,070) |
| Total | ¥  5,590 (1,757) | $  55,794 (17,537) |

Note: The amounts in parentheses in the above table represent future minimum lease payments to be made by sublessees.

Obligations under non-cancelable operating leases as of March 31, 2008 were as follows:

|  | (Millions of yen) | | (Thousands of U.S. dollars) | |
|---|---|---|---|---|
| Due within one year | ¥ | 722 | $ | 7,206 |
| Due over one year |  | 631 |  | 6,298 |
| Total | ¥ | 1,354 | $ | 13,514 |

## 7. Shareholders' Equity

In accordance with the Companies Act of Japan, the Group has provided a legal reserve as an appropriation of retained earnings. The Companies Act of Japan provides that an amount equal to at least 10% of the amounts to be disbursed as distributions of earnings be appropriated to the legal reserve until the sum of the legal reserve and additional paid-in capital equals 25% of the common stock account.

## 8. Stock Option Plans

**Stock option plan approved at a shareholders' meeting held on June 27, 2002**

On June 27, 2002, the shareholders approved a stock option plan for directors, statutory auditors and certain employees of the Company and wholly-owned subsidiaries to purchase warrants for the purchase of shares of the Company's common stock at advantageous prices. The exercise price of each stock option was ¥302,000 per share. The stock options outlined above were exercisable during the period from June 27, 2004 through June 26, 2007.

**Stock option plan approved at a shareholders' meeting held on June 29, 2004**

On June 29, 2004, the shareholders approved a stock option plan for employees of the Company and directors and employees of wholly-owned subsidiaries to purchase warrants on shares of the Company's common stock at advantageous prices. The exercise price of each stock option is ¥243,400. The stock options outlined above were/are exercisable during the period from July 1, 2006 through June 30, 2009.

**Stock option plan approved at a shareholders' meeting held on June 29, 2006**

On June 29, 2006, the shareholders approved a stock option plan for directors, officers, certain advisors and certain employees of the Company and subsidiaries to purchase warrants on shares of the Company's common stock at advantageous prices. The exercise price of each stock option is ¥391,000. The stock options outlined above are exercisable during the period from July 1, 2008 through January 25, 2011.

**Stock option plan approved at a shareholders' meeting held on June 28, 2007**

On June 28, 2007, the shareholders approved a stock option plan for directors, officers, and certain employees of the Company and subsidiaries to purchase warrants on shares of the Company's common stock at advantageous prices. The exercise price of each stock option is ¥445,200. The stock options outlined above are exercisable during the period from July 1, 2009 through December 9, 2011.

## 9. Amounts per Share

The following tables present net (loss) income per share for the years ended March 31, 2008, 2007 and 2006 and net assets per share at March 31, 2008 and 2007:

| | Year ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | |
| | (Yen) | | | (U.S. dollars) | |
| Net (loss) income: | | | | | |
| Basic | ¥ 476.52 | ¥ 114.76 | ¥ (159.11) | $ 4.76 | |
| Diluted (*1) | 476.45 | 114.75 | - | 4.76 | |

-20-

| | March 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2008 |
| | (Yen) | | | | (U.S. dollars) |
| Net assets | ¥ | 1,841.84 | ¥ | 1,457.89 | $ | 18.38 |

(*1) Diluted net income per share has not been presented since the full dilution of common stock equivalents would have had no dilutive effect on net (loss) income per share for the year ended March 31, 2006.

## 10. Cash and Cash Equivalents

The following table represents a reconciliation of cash and cash equivalents as of and for the years ended March 31, 2008 and 2007:

| | Year ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2008 |
| | (Millions of yen) | | | | (Thousands of U.S. dollars) |
| Cash and bank deposits | ¥ | 32,613 | ¥ | 21,041 | $ | 325,512 |
| Securities | | 23,391 | | 18,108 | | 233,466 |
| Cash and cash equivalents | ¥ | 56,004 | ¥ | 39,149 | $ | 558,978 |

## 11. Investment Securities

The components of unrealized gain or loss on marketable securities classified as other securities at March 31, 2008 and 2007 are summarized as follows:

| | March 31, 2008 | | | | | |
|---|---|---|---|---|---|---|
| | Acquisition costs | | Carrying value | | Unrealized gain (loss) | |
| | (Millions of yen) | | | | | |
| Other securities whose carrying value recorded in the balance sheet exceeds their acquisition costs: | | | | | | |
| Equity securities | ¥ | 96 | ¥ | 152 | ¥ | 55 |
| Total | ¥ | 96 | ¥ | 152 | ¥ | 55 |

| | March 31, 2008 | | | | | |
|---|---|---|---|---|---|---|
| | Acquisition costs | | Carrying value | | Unrealized gain (loss) | |
| | (Thousands of U.S. dollars) | | | | | |
| Other securities whose carrying value recorded in the balance sheet exceeds their acquisition costs: | | | | | | |
| Equity securities | $ | 958 | $ | 1,517 | $ | 549 |
| Total | $ | 958 | $ | 1,517 | $ | 549 |

| | March 31, 2007 | | | | | |
|---|---|---|---|---|---|---|
| | Acquisition costs | | Carrying value | | Unrealized gain (loss) | |
| | (Millions of yen) | | | | | |
| Other securities whose carrying value recorded in the balance sheet exceeds their acquisition costs: | | | | | | |
| Equity securities | ¥ | 12 | ¥ | 65 | ¥ | 52 |
| Total | ¥ | 12 | ¥ | 65 | ¥ | 52 |

Sales of securities classified as other securities for the year ended March 31, 2008 are summarized as follows:

|  | March 31, 2008 | |
|---|---|---|
|  | (Millions of yen) | (Thousands of U.S. dollars) |
| Proceeds from sales | ¥ 4,024 | $ 40,164 |
| Gain on sales | 312 | 3,114 |

There are no sales of securities classified as other securities for the year ended March 31, 2007.


## 12. Other Income (Expenses)

The components of "Other, net" in "Other income (expenses)" for the years ended March 31, 2008, 2007 and 2006 were as follows:

|  | Year ended March 31, | | | |
|---|---|---|---|---|
|  | 2008 | 2007 | 2006 | 2008 |
|  | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Rent received | ¥ 40 | ¥ 7 | ¥ 116 | $ 399 |
| Additional tax refunds | 333 | - | - | 3,324 |
| Gain on reappraisal of swaps | | - | 145 | - |
| Gain on sale of fixed assets | - | 760 | 58 | - |
| Foreign exchange loss | (147) | - | - | (1,467) |
| Recovery of bad debt | 35 | - | - | 349 |
| Other | (154) | (1,928) | (138) | (1,537) |
| Total | ¥ 109 | ¥ (1,161) | ¥ 182 | $ 1,089 |


## 13. Loss on Impairment of Fixed Assets

There is no impairment loss on fixed assets for the year ended March 31, 2008.

The following table presents the components of "Loss on impairment of fixed assets" reflected in the consolidated statement of operations for the year ended March 31, 2007:

| Impaired asset | Category | Location | Impaired loss |
|---|---|---|---|
|  |  |  | (Millions of yen) |
| Idle assets and other | Machinery and equipment | Yotsukaido City, and other | 64 |
| Total |  |  | 64 |

(Principal circumstances leading to recognition of impairment loss)

The impairment loss on idle assets and other referred to above relates to assets that are not expected to be utilized in future operations and whose real estate market value has declined significantly. This loss, recorded in other expenses, amounted to ¥64 million and the carrying value of the related assets was written down to their respective recoverable amounts.

(Grouping of assets)

Assets are classified into groups by business segment. Shops and real estate for rental business, and idle assets that are not expected to be utilized in the future and related assets are further grouped at each individual asset.

(Determination of recoverable amounts)

– Idle assets and other, and assets in the game machines business:

The recoverable amounts of these assets are determined based on their net realizable value. Real estate is measured based on appraisals conducted by real estate appraisers. Other assets are measured based on their residual value under the tax regulations.

– Shops and real estate in the rental business:

The recoverable amounts of these assets are measured principally by their value in use and their estimated future cash flows at a discount rate of 3.5%.

## 14. Business Combination

(Application of Purchase Method)

1. Acquisition of subsidiary's stock

    (1) Outline of the business combination

| | |
|---|---|
| Name of the acquired company | Japan Rental Service Co., Ltd. |
| Primary business of the acquired company | Rental / lease businesses of Pachinko and Pachislot machines |
| Reason for business combination | To strengthen the management of rental assets and expedite financing in response to the future expansion of rental business |
| Date of business combination | September 25, 2007 |
| Legal form of the business combination | Stock acquisition |
| Name of the company after the business combination | Aruze Rental Service Corp. |
| Ratio of voting rights acquired | 100% |

    (2) Business period acquired company included in consolidated financial statements

    From October 1, 2007 to March 31, 2008

    (3) Acquisition cost and its details

| | | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|---|
| Compensation of acquisition | Cash | ¥    20 | $    200 |
| Acquisition cost | | ¥    20 | $    200 |

    (4) Accrued amount of goodwill, cause of accrual, method and period of amortization

| | |
|---|---|
| Accrued amount of goodwill | ¥10 million ($100 thousand) |
| Cause of accrual | Excess earning power |
| Method and period of amortization | Amortization for 5 years based on fixed rate method |

    (5) Amount and the details of assets and liabilities accepted on the company combination date

| | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|
| Current assets | ¥    10 | $    100 |
| Total assets | ¥    10 | $    100 |

(Deal under common control)

1. Business transfer

    (1) Outline of the business combination

| | |
|---|---|
| Name of the business to be subjected | Gaming machine business |
| Primary business | Development and sale of gaming machines for overseas casinos |
| Legal form of business combination | Business transfer in which the Company acts as a transferor and Aruze Gaming America, Inc. acts as a transferee. |
| Name of the company after the business combination | No change |

-23-

| Outline of the detail including the purpose of said deal | Recognizing the necessity of establishing an R&D and sales framework capable of accommodating the growing US market in order to successfully expand its casino machine business, the Company concluded that transferring its R&D and Sales departments for that business to Aruze Gaming America and working towards strengthening its presence in the world's largest market would be the most appropriate course of action. |
|---|---|

(2) Outline of accounting procedures conducted

The business transfer was processed as a deal under common control pursuant to Accounting Criteria Related To Business Combination (Business Accounting Council, October 31, 2003) and Application Guidance Related To Accounting Criteria On Business Combination and Company Separation, Etc. (Application Guidance On Company Accounting Criteria No. 10, final revision on December 22, 2006.)

2.  Company separation

(1)  Outline of business combination

| Name of the business to be subjected | Mobile website operation business |
|---|---|
| Primary business | Planning and sales of contents for mobile websites and operation of mobile websites, etc. |
| Legal form of business combination | The separation accomplished by the method of incorporation-type split under which the Company became a demerging corporation and ARUZE MEDIA NET, INC., a wholly-owned subsidiary newly established by company separation, became a succeeding company. |
| Name of the company after the business combination | ARUZE MEDIA NET, INC. |
| Outline of the detail including the purpose of said deal | Currently, the Company's R&D Division conducts the planning, development and operation of pay mobile websites, including "Aruze Kingdom," "Super Real Mahjong" and "Shoryu Shogi." In order to boost the specialization and improve the competitiveness of this business to address intensified competition, as well as streamline the business of the Company, the Company has decided to separate this mobile website operation business and render it independent. |

(2) Outline of accounting procedures conducted

The business transfer was processed as a deal under common control pursuant to Accounting Criteria Related To Business Combination (Business Accounting Council, October 31, 2003) and Application Guidance Related To Accounting Criteria On Business Combination and Company Separation, Etc. (Application Guidance On Company Accounting Criteria No. 10, final revision on December 22, 2006.)

(3)  Matters related to the additional acquisition of stocks of the subsidiary

Acquisition cost of acquired company and the details

|  |  | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|---|
| Compensation of acquisition | Mobile website operation business | ¥          173 | $          1,727 |
| Acquisition cost |  | ¥          173 | $          1,727 |

3.  Company separation

(1)  Outline of business combination

| Name of the business to be subjected | Sales business |
|---|---|
| Primary business | Sales of Pachislot/Pachinko machines and amusement machines for commercial use in Japanese market, etc. |
| Legal form of business combination | The sink decomposition in which the Company became a demerging corporation and ARUZE MARKETING JAPAN CORPORATION, a wholly-owned subsidiary of the Company, became a succeeding company. |

-24-

| Name of the company after the business combination | ARUZE MARKETING JAPAN CORPORATION (formerly System Staff Co., Ltd.) |
|---|---|
| Outline of the detail including the purpose of said deal | For the purpose of clarifying responsibility and authority and creating an environment to conduct business flexibly, the sales business of Pachislot/Pachinko and amusement machines for commercial use in Japan market was shifted to the independent business company. |

(2) Outline of accounting procedures conducted

The company separation was processed as a deal under common control pursuant to Accounting Criteria Related To Business Combination (Business Accounting Council, October 31, 2003) and Application Guidance Related To Accounting Criteria On Business Combination and Company Separation, Etc. (Application Guidance On Company Accounting Criteria No. 10, final revision on December 22, 2006.)

(3) Matters related to the additional acquisition of stocks of the subsidiary

Acquisition cost of acquired company and the details

|  |  | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|---|
| Compensation acquisition | Sales business | ¥ 4,871 | $ 48,618 |
| Acquisition cost |  | 4,871 | 48,618 |

4. Company separation

(1) Outline of business combination

| Name of the business to be subjected | Planning and development business of contents |
|---|---|
| Primary business | Planning and development of contents for Pachislot/Pachinko machines and amusement machines for business use in Japanese market, etc. |
| Legal form of business combination | The sink decomposition in which the Company became a demergering corporation and SEVEN WORKS CORPORATION, a wholly-owned subsidiary of the Company, became a succeeding company. |
| Name of the company after the business combination | SEVEN WORKS CORPORATION (formerly ARUZE PREPARATORY CORPORATION) |
| Outline of the detail including the purpose of such deal | For the purpose of clarifying responsibility and authority and creating an environment to conduct business flexibly, the contents planning and development business of Pachislot/Pachinko machines and amusement machines for commercial use in Japan market was shifted to the independent business company. |

(2) Outline of accounting procedures conducted

The company separation was processed as a deal under common control pursuant to Accounting Criteria Related To Business Combination (Business Accounting Council, October 31, 2003) and Application Guidance Related To Accounting Criteria On Business Combination and Company Separation, Etc. (Application Guidance On Company Accounting Criteria No. 10, final revision on December 22, 2006.)

(3) Matters related to the additional acquisition of stocks of the subsidiary

|  |  | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|---|
| Compensation acquisition | Planning and development business of contents | ¥ 382 | $ 3,813 |
| Acquisition cost |  | 382 | 3,813 |

Exhibit Page No. 73

5. Additional acquisition of stocks of a subsidiary

  (1) Outline of business combination

| | |
|---|---|
| Name of the business to be subjected | Seta Corp. |
| Primary business | Pachislot/Pachinko business, amusement machine business |
| Legal form of business combination | Share acquisition through tender offer |
| Name of the company after the business combination | No change |
| Outline of the detail including the purpose of such deal | In order to enforce the mobility for the enhancement of peripheral device business of amusement machines, to enhance the synergy with amusement machine business and to improve the fundamental business culture of Seta Corp., the Company conducted a tender offer for the stocks of Seta Corp. |

  (2) Outline of accounting procedures conducted

      The additional acquisition of stocks of the subsidiary was processed as a deal under common control pursuant to Accounting Criteria Related To Business Combination (Business Accounting Council, October 31, 2003) and Application Guidance Related To Accounting Criteria On Business Combination and Company Separation, Etc. (Application Guidance On Company Accounting Criteria No. 10, final revision on December 22, 2006.)

  (3) Matters related to the additional acquisition of stocks of the subsidiary

| | | (Millions of yen) | (Thousands of U.S. dollars) |
|---|---|---|---|
| Compensation acquisition | Cash | ¥ 824 | $ 8,224 |
| Acquisition cost | | 824 | 8,224 |

  (4) Accrued amount of goodwill, cause of accrual, method and period of amortization

| | |
|---|---|
| Accrued amount of goodwill | ¥824 million ($8,224 thousand) |
| Cause of accrual | Excess of the cost for the Company's share acquisition of Seta Corp. over the amount of minority equity decreased from the additional acquisition. |
| Method and period of amortization | Amortization with straight-line method for 5 years except the part of impairment loss of goodwill. |

## 15. Segment Information

The business segments of the Group for the years ended March 31, 2008, 2007 and 2006 are outlined as follows:

| Business segments | Year ended March 31, 2008 (Millions of yen) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Pachislot/ Pachinko | Real estate | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
| **I. Sales and operating income (loss):** | | | | | | | |
| Sales to external customers | ¥ 66,000 | ¥ 205 | ¥ 4,448 | ¥ 1,479 | ¥ 72,133 | ¥ - | ¥ 72,133 |
| Intra-segment sales | 2 | 25 | - | 685 | 713 | (713) | - |
| Total sales | 66,003 | 230 | 4,448 | 2,164 | 72,846 | (713) | 72,133 |
| Operating expenses | 40,274 | 221 | 5,918 | 1,783 | 48,197 | 7,848 | 56,045 |
| Operating income (loss) | ¥ 25,728 | ¥ 9 | ¥ (1,470) | ¥ 381 | ¥ 24,649 | ¥ (8,561) | ¥ 16,088 |
| **II. Total assets, depreciation, loss on impairment of fixed assets and capital expenditures** | | | | | | | |
| Total assets | ¥ 72,694 | ¥ - | ¥ 7,863 | ¥ 1,522 | ¥ 82,081 | ¥ 102,745 | ¥ 184,826 |
| Depreciation | 6,845 | 19 | 153 | 22 | 7,041 | 378 | 7,420 |
| Loss on impairment of fixed assets | 11 | - | 0 | - | 11 | 14 | 25 |
| Capital expenditures | 9,442 | - | 190 | 3 | 9,637 | 26 | 9,664 |

| Business segments | Year ended March 31, 2008 (Thousands of U.S. dollars) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Pachislot/ Pachinko | Real estate | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
| **I. Sales and operating income (loss):** | | | | | | | |
| Sales to external customers | $ 658,748 | $ 2,046 | $ 44,396 | $ 14,762 | $ 719,962 | $ - | $ 719,962 |
| Intra-segment sales | 20 | 250 | - | 6,837 | 7,116 | (7,116) | - |
| Total sales | 658,778 | 2,296 | 44,396 | 21,599 | 727,079 | (7,116) | 719,962 |
| Operating expenses | 401,976 | 2,206 | 59,068 | 17,796 | 481,056 | 78,331 | 559,387 |
| Operating income (loss) | $ 256,792 | $ 90 | $ (14,672) | $ 3,803 | $ 246,023 | $ (85,448) | $ 160,575 |
| **II. Total assets, depreciation, loss on impairment of fixed assets and capital expenditures** | | | | | | | |
| Total assets | $ 725,561 | $ - | $ 78,481 | $ 15,191 | $ 819,253 | $ 1,025,502 | $ 1,844,755 |
| Depreciation | 68,320 | 190 | 1,527 | 220 | 70,276 | 3,773 | 74,059 |
| Loss on impairment of fixed assets | 110 | - | 0 | - | 110 | 140 | 250 |
| Capital expenditures | 94,241 | - | 1,896 | 30 | 96,187 | 260 | 96,457 |

Notes:

a) Basis of segmentation

(1) The Group's businesses are divided into segments based on the classification of its products, as well as similarities of sales markets characteristics.

(2) The major products and merchandise in each business segment are summarized as follows:

| | |
|---|---|
| Pachislot/Pachinko | Pachislot, Pachinko, related parts and peripheral equipment |
| Real estate | Leasing of real estate |
| Game machines | Commercial and home use game machines (including game software) |
| Other | Broadcasting business |

b) Operating expenses in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥9,133 million ($91,157 thousand) which consisted of expenses incurred in the administrative department of the Company.

c) Regarding production costs of contents, etc. originally, the Company posted the full amount as expenses at the time said cost was incurred. Starting the current consolidated fiscal year, the costs directly relating to production of individual titles are posted as development works in process under assets, as stated in "Important Matters Serving as Basis for Preparation of Consolidated Financial Statements". This change caused a ¥1,527 million ($15,241 thousand) decrease in unallocable operating expenses included in the items of eliminations or unallocated amounts relative to the old method.

d) Total assets in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥105,734 million ($1,055,335 thousand) which consisted primarily of investments in affiliates, surplus operating funds (cash and deposits, and short-term investment securities) as well as assets associated with the administrative departments of these companies.

e) Amortization of, and additions to, long-term prepaid expenses are included under depreciation and capital expenditures.

Exhibit Page No. 75

| Business segments | Year ended March 31, 2007 (Millions of yen) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Pachislot/ Pachinko | Real estate | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
| **I. Sales and operating income (loss):** | | | | | | | |
| Sales to external customers | ¥ 30,808 | ¥ 1,022 | ¥ 2,553 | ¥ 1,196 | ¥ 35,580 | ¥ - | ¥ 35,580 |
| Intra-segment sales | - | 53 | 66 | 1,810 | 1,930 | (1,930) | - |
| Total sales | 30,808 | 1,075 | 2,620 | 3,006 | 37,511 | (1,930) | 35,580 |
| Operating expenses | 25,137 | 456 | 3,936 | 2,403 | 31,934 | 6,852 | 38,786 |
| Operating income (loss) | ¥ 5,670 | ¥ 618 | ¥ (1,316) | ¥ 603 | ¥ 5,576 | ¥ (8,782) | ¥ (3,205) |
| **II. Total assets, depreciation, loss on impairment of fixed assets and capital expenditures** | | | | | | | |
| Total assets | ¥ 55,059 | ¥ 8,844 | ¥ 5,725 | ¥ 984 | ¥ 70,613 | ¥ 101,068 | ¥ 1,71,681 |
| Depreciation | 4,175 | 129 | 190 | 36 | 4,531 | 265 | 4,797 |
| Loss on impairment of fixed assets | 54 | - | 10 | - | 64 | - | 64 |
| Capital expenditures | 8,360 | - | 85 | 7 | 8,453 | 170 | 8,624 |

Notes:

a) Basis of segmentation

(1) The Group's businesses are divided into five segments based on the internal classification of their products, merchandise and sales markets.

(2) Adores, Inc, which was mainly classified under the Amusement facilities management business, was changed to an affiliated company on the equity method at the end of March 2006 fiscal year. Due to this change, the "Amusement facilities management business" was not the object for disclosure.

(3) The major products, merchandise and services in each business segment are summarized as follows:

| | |
|---|---|
| Pachislot/Pachinko | Pachislot, Pachinko, related parts and peripheral equipment |
| Real estate | Leasing of real estate |
| Game machines | Game machines and the related software for business or family use |
| Other | Planning, design and construction of Pachinko parlors |

b) Operating expenses in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥8,290 million that consisted of expenses incurred in the administrative department of the Company.

c) Total assets in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥109,770 million which consisted primarily of surplus funds (cash and marketable securities) of the Company, investments in overseas affiliates at the pre-operating stage, and property and equipment controlled by the administrative departments of these companies.

d) Amortization of, and additions to, long-term prepaid expenses are included under depreciation and capital expenditures.

| Business segments | Year ended March 31, 2006 (Millions of yen) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Pachislot/ Pachinko | Real estate | Amusement facilities management | Game machines | Other | Total | Eliminations or unallocated amounts | Consolidated |
| **I. Sales and operating income (loss):** | | | | | | | | |
| Sales to external customers | ¥ 25,038 | ¥ 2,049 | ¥ 16,011 | ¥ 3,999 | ¥ 1,407 | ¥ 48,506 | ¥ - | ¥ 48,506 |
| Intra-segment sales | - | 53 | 18 | 1,269 | 711 | 2,052 | (2,052) | - |
| Total sales | 25,038 | 2,102 | 16,030 | 5,268 | 2,118 | 50,559 | (2,052) | 48,506 |
| Operating expenses | 22,204 | 1,468 | 14,103 | 7,824 | 2,445 | 48,046 | 5,770 | 53,816 |
| Operating income (loss) | ¥ 2,834 | ¥ 634 | ¥ 1,927 | ¥ (2,556) | ¥ (327) | ¥ 2,513 | ¥ (7,823) | ¥ (5,310) |
| **II. Total assets, depreciation, loss on impairment of fixed assets and capital expenditures** | | | | | | | | |
| Total assets | ¥ 57,739 | ¥ 10,718 | ¥ - | ¥ 4,537 | ¥ 20,978 | ¥ 93,974 | ¥ 74,016 | ¥ 167,990 |
| Depreciation | 2,098 | 161 | 2,408 | 94 | 64 | 4,826 | 322 | 5,149 |
| Loss on impairment of fixed assets | 368 | 136 | 294 | 342 | - | 1,142 | 676 | 1,818 |
| Capital expenditures | 6,449 | 0 | 2,259 | 43 | 17 | 8,770 | 179 | 8,950 |

Exhibit Page No. 76

Notes:

a) Basis of segmentation

(1) The Group's businesses are divided into five segments based on the internal classification of their products, merchandise and sales markets.

(2) The major products, merchandise and services in each business segment are summarized as follows:

| Pachislot/Pachinko | Pachislot, Pachinko, related parts and peripheral equipment |
|---|---|
| Real estate | Leasing of real estate |
| Amusement facilities management | Management of amusement facilities |
| Game machines | Game machines and the related software for business or family use |
| Other | Planning, design and construction of Pachinko parlors |

b) Operating expenses in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥7,849 million that consisted of expenses incurred in the administrative department of the Company.

c) Total assets in "Eliminations or unallocated amounts" include certain unallocable amounts totaling ¥86,833 million that consisted primarily of surplus funds (cash and marketable securities) of the Company, investments in overseas affiliates at the pre-operating stage, and property and equipment controlled by the administrative departments of these companies.

d) Amortization of, and additions to, long-term prepaid expenses are included under depreciation and capital expenditures.

**Geographical segments**

As permitted, the disclosure of geographical segments for the years ended March 31, 2008, 2007 and 2006 has been omitted because the Japan segment constituted more than 90% of total consolidated sales and total assets.

**Overseas sales**

As permitted, the disclosure of overseas sales for the years ended March 31, 2008, 2007 and 2006 has been omitted because sales in Japan constituted more than 90% of total consolidated sales.

## 16. Contingent Liabilities and Litigations

a) Corporation tax and additional taxes of ¥1,289 million ($12,865 thousand) were levied against the Company for the year ended March 31, 1998 during a previous tax examination. The Company lodged an objection to this tax assessment with the Tokyo National Tax Claim Court (the "Claim Court"). As a result, the Claim Court issued a ruling on January 29, 2004 that decreased the additional taxable income of ¥2,949 million ($29,434 thousand) determined by the original tax assessment by ¥16 million to ¥2,932 million. The Company lodged an objection to the Claim Court's judgment with the Tokyo District Court on April 27, 2004 to seek a reversal of the decision of the Claim Court. On February 23, 2007, the Court almost entirely awarded the Company's claim and handed down a revocation of the disposition. The tax authorities were dissatisfied with the decision and filed an appeal on March 9, 2007.

The Tokyo High Court ruled in favor of the Company on February 20, 2008, and the Appellant did not issue a re-appeal by the time limit. Therefore, the case closed. Incidentally, the Toyo Regional Taxation Bureau paid ¥1,665 million ($16,618 thousand) as the Company's corporate tax refund on March 14, 2008. The balance, which is the local tax paid by the Company, is anticipated to be received in the future.

b) A lawsuit was filed against the Company by KM Enterprise K.K. ("KM"), which is 100%-owned by Mr. Manabe, a former director of the Company, with the Tokyo District Court on October 31, 2002 claiming damages of $30 million (equivalent to ¥3,524 million). This lawsuit alleges that the Company was not able to obtain permission from the U.S. Gaming Board for the transfer of shares of common stock of Sigma Game, Inc. held by KM, although the Company and KM had agreed to this transfer. On January 17, 2006, the Court ruled fully in favor of KM. The Company filed a notice of appeal against this judgment on January 18, 2006.

With regard to this case, Adores, Inc. filed a lawsuit against Mr. Manabe for the repayment of a loan in the amount of ¥2,074 million made to Mr. Manabe that was guaranteed by the Company. The Court subsequently ruled in favor of Adores, Inc. As of March 30, 2006, the loan was transferred from Adores, Inc. to the Company, thereby making the Company the creditor, and the related loan guarantee was cancelled at the time of this transfer. In addition, the Company has become a party to this lawsuit and assumed the rights and obligations as plaintiff from Adores, Inc.

After assuming claims on ¥2,074 million out of the total amount of damage claims from KM on July 27, 2006, Mr. Manabe participated in said litigation to seek a setoff against the loan assigned to the Company from Adores, Inc on August 7, 2006. On October 31, 2006, the Tokyo High Court handed down a decision to award the claims of KM on the remaining amount of damages of $11,800,880 owed by KM following the setoff. The Company filed a petition for the acceptance of an appeal to the Supreme Court on November 13, 2006. However, on October 4, 2007, the Court decided not to accept the Company's petition.

In accordance with a declaration of provisional execution of the ruling, in December 2006, KM Enterprise Co., Ltd. acquired ¥1,412 million by compulsory execution against ¥3,200 million deposited by the Company as a guarantee to suspend to execute the decision by the lower court. On March 2, 2007, the Company filed a petition for revocation of the deposit to the balance, ¥1,788 million; however, the petition was dismissed on June 4, 2007. Immediately thereafter, the Company filed an appeal to Tokyo High Court. On July 20, 2007, the Court, however, rejected this appeal. On December 26, 2007, the Company re-filed the petition for revocation of the deposit with Tokyo District Court in response to the dismissal of the Company's petition for acceptance of an appeal in the principal action. On February 6, 2008, it was decided that the revocation of the deposit would be accepted by the court. Based on the decision, the Company went through the process to recover the balance of deposit, ¥1,788 million ($17,846 thousand), which was repaid to the Company on February 26, 2008.

c) 48 customers who had purchased "Gold X" Pachislot machines from the Company in June 2003 filed six lawsuits against the Company with the Tokyo District Court during the period from August 2004 to April 2007. The plaintiffs initially claimed compensation totaling ¥335 million for earnings lost as a result of the temporary closure of their Pachinko parlors because of a suspected defect in their Gold X machines.

Twenty-three of these customers have subsequently withdrawn from the lawsuit, one is in process of settlement and 24 Pachinko parlor operators (in four lawsuits) are still participating in the lawsuit as of March 31, 2008. The claims for damages have, accordingly, been reduced to ¥260 million ($2,595 thousand).

Among two out of the said four cases, in one case, the court handed down a decision on April 17, 2007 to order the Company to pay ¥4.8 million for the plaintiff's claim to pay ¥5.11 million. Dissatisfied with the Judgment, the Company appealed the case. In another case, the court handed down a decision on October 31, 2007 to order the Company to pay ¥2.3 million for the plaintiff's claim of ¥7.03 million. The Company was dissatisfied with the rulings and filed an appeal.

d) On May 26, 2006, the Japan Electric Amusement Machine Patent Association filed a complaint against the Company in the Tokyo District Court to seek the payment of ¥3,435 million yen as fees for a patent sublicense used from 1998 to 2005, asserting that it had claim to said fees in accordance with a patent license agreement based on the patent pool method. The Company is responding with the argument that the reasons for the claims under the complaint have no basis.

e) Contingent liabilities as of March 31, 2008 and 2007 were as follows:

| | Year ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2008 |
| | (Millions of yen) | | | | (Thousands of U.S. dollars) |
| Note receivable discounted | ¥ | - | ¥ | 48 | $ | - |
| Note receivable endorsed | | 1,420 | | 8,785 | | 14,173 |
| Account receivable transferred as a result of fluidity | | - | | 1,616 | | - |

## 17. Related Party Transactions

The Company has entered into significant related party transactions with certain companies controlled by the Chairman of the Board of Directors of the Company. These transactions were conducted on an arm's-length basis.

-30-

Transactions with Transorbit Corporation, which is 70% owned by the Chairman of the Board of Directors of the Company:

| | Year ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2006 | 2008 |
| | (Millions of yen) | | | (Thousands of U.S. dollars) |
| Business trip expenses | ¥ 82 | ¥ 73 | ¥ 56 | $ 818 |

| | March 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2008 |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Short-term loans receivable | ¥ 94 | ¥ - | $ 938 |
| Accrued liabilities | 13 | 6 | 130 |

Transactions with KOT LLC, which is 100%-owned by the Chairman of the Board of Directors of the Company:

| | March 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2008 |
| | (Millions of yen) | | (Thousands of U.S. dollars) |
| Accrued liabilities | ¥ - | ¥ 6 | $ - |

## 18. Supplemental Cash Flow Information

Assets and liabilities of a newly consolidated subsidiary, Japan Rental Service Co., Ltd. through the acquisition of stocks for the year ended March 31, 2008 were as follows:

| | (Millions of yen) | (Thousands of U.S. dollars) |
| --- | --- | --- |
| Current assets | ¥ 10 | $ 100 |
| Goodwill | 10 | 100 |
| Purchase price of newly consolidated subsidiary | 20 | 200 |
| Cash and cash equivalents of newly consolidated subsidiary | 10 | 100 |
| Expense on acquisition of newly consolidated subsidiary's stock | ¥ 10 | $ 100 |

## 19. Subsequent Events

a) The following appropriation of retained earnings of the Company, which has not been reflected in the consolidated financial statements for the year ended March 31, 2008, was approved at a shareholders' meeting held on June 27, 2008:

| | (Millions of yen) | (Thousands of U.S. dollars) |
| --- | --- | --- |
| Cash dividends | | |
| per share of ¥60 = U.S. $0.60 | ¥ 4,796 | $ 47,869 |

b) Establishment of a subsidiary:

Aruze USA, Inc., a subsidiary of the Company submitting the consolidated financial statements, established the following subsidiary with a 49% shareholding ratio investment:

Exhibit Page No. 79

| Name of the subsidiary | Aruze Investment Co., Ltd. |
|---|---|
| Country | Kingdom of Cambodia |
| Date of registration | February 20, 2008 |
| Capital Stock | $1,000 |
| Total number of shares | 1,000 shares (Aruze USA, Inc. acquired 490 shares) |
| Representative director | Takahiro Usui (The Company's employee) |
| Description of business | Operations of business relating to tourism such as hotel and spa, transactions of real estate including purchase and sales thereof and operations of real estate/investment business. |

c) Establishment of a subsidiary

The Company established the following subsidiary with a 99.9% shareholding ratio investment:

| Name of the subsidiary | Molly Investment Cooperatieve U.A. |
|---|---|
| Country | Netherlands |
| Date of registration | May 19, 2008 |
| Investor | Aruze Corp. 99.9% |
| Business activities | Investment in and financing for land tenant corporations and other entities, as well as incorporation, operation and administration of companies in the Philippines. |
| Others | Aruze USA, Inc., financed $172 million in April and May 2008 and the Company financed $128 million in May 2008 for the purpose of purchasing land lots in the Philippines. |

Exhibit Page No. 80

## Company Overview (As of March 31, 2008)

| | |
|---|---|
| Name of Corporation: | ARUZE CORP. |
| Head Office: | Ariake Frontier Building A, 3-1-25 Ariake, Koto-ku, Tokyo 135-0063, Japan |
| Business Commenced: | December 1969 |
| Incorporated: | June 1973 |
| Paid-Up Capital: | 3,446 million yen |
| Number of Employees: | Consolidated: 1,325; Non-Consolidated: 366 |
| Overseas Subsidiaries: | USA (Las Vegas), Australia (Sydney), South Africa (Kyalami) |
| Factories: | Yotsukaido (Chiba), Oyama (Tochigi) |
| Business Activities: | -Planning, development, manufacturing and sales of Pachislot and Pachinko machines.<br>-Planning, development, manufacturing and sales of gaming machines for overseas casino markets and other amusement machines and devices.<br>-Joint casino business with Wynn Resorts, Limited. |
| Banks (in alphabetical order): | Aozora Bank, Ltd., The Bank of Tokyo-Mitsubishi UFJ, Ltd., Sumitomo Mitsui Banking Corporation |

## Directors and Officers (As of June 27, 2008)

| | |
|---|---|
| Kazuo Okada | Chairman of the Board of Directors (Member of Nominating Committee and Compensation Committee) |
| Tomohiro Okada | Director (Member of Audit Committee) |
| Hiroyuki Sawada | Outside Director (Chairman of Audit Committee) |
| Mitsuhiro Kitabatake | Outside Director (Member of Audit Committee) |
| Naoko Ohtsuka | Outside Director (Member of Audit Committee) |
| Masanori Iwabuchi | Outside Director (Chairman of Nominating Committee and Member of Compensation Committee) |
| Hideki Nakagome | Outside Director (Chairman of Compensation Committee and Member of Nominating Committee) |
| Hajime Tokuda | Representative Executive Officer and President |
| Koki Seki | Executive Officer |
| Mikio Tanji | Executive Officer |
| Kazuhiko Yamazaki | Executive Officer |

## Stock Information (As of March 31, 2008)

| Total Shares Authorized to Issue: | 234,820,000 |
|---|---|
| Total Outstanding Shares: | 80,195,000 |
| Number of Shareholders: | 6,056 |

## Major Shareholders (As of March 31, 2008)

| Name | Number of Shares Held | Voting Rights as % of Total |
|---|---|---|
| Kazuo Okada | 25,228,300 | 31.6% |
| Tomohiro Okada | 23,615,600 | 29.5% |
| Goldman Sachs & Co. Regular Account | 7,343,452 | 9.2% |
| Hiromi Okada | 5,325,000 | 6.7% |
| Hiroko Yokotsuka | 2,390,000 | 3.0% |
| Morgan Stanley & Co., Inc. | 1,410,800 | 1.8% |
| JP Morgan Chase Bank 380055 | 897,400 | 1.1% |

### Number of Shareholders by Category

| Individuals, etc. | 5,795 | 95.7% |
|---|---|---|
| Other companies | 89 | 1.5% |
| Foreign corporations | 129 | 2.1% |
| Financial institutions | 16 | 0.3% |
| Securities companies | 26 | 0.4% |
| Treasury stock | 1 | |

### Breakdown of Shares Held According to Shareholder Category

| Individuals, etc. | 60,226,085 | 75.1% |
|---|---|---|
| Other companies | 279,300 | 0.4% |
| Foreign corporations | 17,960,297 | 22.4% |
| Financial institutions | 1,393,700 | 1.7% |
| Securities companies | 75,584 | 0.1% |
| Treasury stock | 260,034 | 0.3% |

Exhibit Page No. 82

Communication & Commitment
## "All in the name of fun."



**ARUZE CORP.**

**Ariake Frontier Bldg. A, 3-1-25 Ariake, Koto-ku, Tokyo, 135-0063 Japan**

| | |
|---|---|
| International Liaison Office | TEL +81-3-5530-3060 |
| Japanese Main Office | TEL +81-3-5530-3055 |

*www.aruze.com/en/*

◆ 24 Sales Offices in Japan (ARUZE MARKETING JAPAN CORPORATION)
◆ Overseas Subsidiaries
   U.S.A. (Las Vegas)      TEL +1-702-361-3166
   Australia (Sydney)      TEL +61-2-9699-9133
   South Africa (Kyalami)  TEL +27-11-466-3388

Exhibit Page No. 83