1

2

3

4                    UNITED STATES DISTRICT COURT

5                          DISTRICT OF NEVADA

6                                  * * *

7    UNIVERSAL ENTERTAINMENT                Case No. 2:18-cv-00585-RFB-NJK
     CORPORATION,
8                                                         ORDER
                                Plaintiff,
9
            v.
10
     ARUZE GAMING AMERICA, INC., et al,
11
                                Defendant.
12

13

14   **I.      INTRODUCTION**

15        Before the Court are Plaintiff Universal Entertainment Corporation (Universal) and

16   Counter-Defendant Aruze USA, Inc.'s (Aruze USA) Motion to Dismiss Counterclaims, ECF No.

     59; and Counter-Defendant Jun Fujimoto's Motion to Dismiss Counterclaims, ECF No. 60.
17

18
     **II.    PROCEDURAL BACKGROUND**
19
          Plaintiff Universal Entertainment Corporation (Universal) sued Aruze Gaming America,
20
     Inc. ("Aruze") and Okada on March 20, 2018.  ECF No. 1. Aruze and Okada moved to dismiss the
21
     complaint on May 29, 2018.  ECF No. 13. The Court granted leave to file an amended complaint
22
     on July 16, 2008.  ECF No. 25. Universal filed the First Amended Complaint on July 19, 2018.
23
     ECF No. 29. Aruze and Okada moved to dismiss the First Amended Complaint.  ECF No. 33.
24
     Universal then filed the Second Amended Complaint on August 23, 2018.  ECF No. 43. The
25
     Second Amended Complaint is the operative complaint in this matter.
26
          Aruze and Okada moved to dismiss the complaint on September 6, 2018.  ECF No. 44.
27
     Universal opposed, and Aruze and Okada replied.  ECF Nos. 49, 53.
28
          On September 20, 2018, Aruze and Okada also answered the complaint, asserting eighteen

1  counterclaims.  ECF No. 50.  They amended the answer on October 11, 2018.  ECF No. 58.  In the

2  Amended Answer, Okada and Aruze assert counterclaims against Universal, Aruze USA, Inc., and

3  Jun Fujimoto.

4  Universal now moves to dismiss the counterclaims.  ECF No. 59. Aruze and Okada

5  opposed, and Universal replied.  ECF Nos. 64, 68.

6  Fujimoto also moves to dismiss the counterclaims.  ECF No. 60. Aruze and Okada

7  opposed, and Fujimoto replied.  ECF No. 63, 67.

8  The parties engaged in a settlement conference on March 5, 2019, but no settlement was

9  reached.  ECF No. 78.

10  A hearing was held on May 29, 2019 on the instant motions, as well as Aruze and Okada's

11  Motion to Dismiss. ECF No. 44.  The Court denied in part without prejudice Fujimoto's Motion

12  to Dismiss as to the issue of personal jurisdiction and advised the parties that the Court will

13  consider the personal jurisdiction claim separately after jurisdictional discovery. Tr. at 51-53, ECF

14  No. 90. The Court does not therefore consider the personal jurisdiction claim in the instant order.

15

16  ### III.     FACTUAL BACKGROUND

17  The Court summarizes the facts as alleged in the Counterclaims against Universal, Aruze

18  USA and Fujimoto. ECF No. 58.

19  Aruze is a Nevada corporation with its principal place of business in Nevada. Okada is an

20  individual residing in the Hong Kong Special Administrative Region of the People's Republic of

21  China. Okada founded Universal and served as an officer and director until he was wrongfully

22  ousted in June 2017. Universal is a corporation organized under the laws of Japan with its

23  headquarters and principal place of business located in Tokyo, Japan.  Fujimoto is an individual

24  residing in Tokyo, Japan. Aruze USA is a corporation organized and existing under the laws of the

25  State of Nevada with its principal place of business in Nevada and is a wholly owned subsidiary

26  of Universal. Aruze USA's primary asset was its ownership of stock in Wynn Resorts Limited.

27  //

28  //

2

**A.  Okada's Formation of Universal and its Evolution**

Okada is an entrepreneur, engineer, and pioneer in the gaming industry.  In 1969, Okada founded Universal Lease Co. Ltd and owned 100% of the shares of Universal Lease. After a trip to Las Vegas that same year, Okada decided to enter the slot machine manufacturing business.

Universal Lease changed its name multiple times, but Okada continued to own 100% of the shares. Universal Lease ultimately became Aruze Corporation and registered its shares in April 1998 with the Tokyo Stock Exchange for the first time. Okada served as Director and Chairman of the Aruze Corporation board of directors.

In 1983, Aruze was incorporated in Nevada under the name Universal Distributing of Nevada, Inc. ("UDN"). UDN was formed to manufacture and sell gaming devices outside of Japan, including in the United States. In 2005, Okada, who owned all of the stock of UDN, sold his UDN stock to Universal. From 2005 until August 2008, UDN was a wholly owned subsidiary of Universal. In 2005, UDN changed its name to Aruze Gaming America, Inc.

In August 2008, Okada purchased shares of Aruze from Aruze Corporation (which later became Universal), and Aruze Corporation issued additional Aruze stock to Okada, resulting in Mr. Okada holding a 49.95% ownership interest in Aruze.  Aruze Corporation owned the remaining 50.05% interest at that time. In December 2008, Okada commenced the process to purchase from Aruze Corporation the remaining 50.05% shares in Aruze, completed in March 2009. Okada then owned 100% of the stock in Aruze, and Aruze ceased operating as a Universal subsidiary.

On November 1, 2009, Aruze Corporation changed its name to Universal Entertainment Corporation.

In June 2010, Universal changed its corporate governance structure from a "company with committees," a type of stock corporation organized by a series of committees including a Nominating Committee, Audit Committee, and Compensation Committee, and represented by a Representative Executive Officer, to a "company with board of auditors."

Universal sold its stock in Aruze to Okada, but one of the assets Aruze retained in the sale to Okada was its rights to use Universal's patents, trademarks, and other intellectual property

1   related to Aruze's gaming machine business outside of Japan, and the right to make, have made,

2   import, offer for sale, and sell all gaming machines and games played thereon that Aruze

3   developed, was developing or having developed, manufactured or sold from 2005 through March

4   31, 2009, and to develop, manufacture and sell new gaming machines and games played thereon

5   based on, modifying, replacing or supplementing the gaming machines.

6

7   **B.   Okada Family Ownership of Universal and Formation of Okada Holdings Limited**

8        Okada had two children with his first wife: Tomohiro Okada and Hiromi Okada.

9        In March 1991, Okada gifted Tomohiro approximately 9% of the shares in Universal Sales.

10   At the same time, Okada gifted approximately 9% of the shares in Universal Sales to Hiromi.

11   Okada's "transfer" of shares to his children was in name only for the purpose of obtaining

12   favorable tax consequences and in anticipation of the true transfer to his children.

13        Tomohiro and Hiromi would need to become Hong Kong residents to benefit from the

14   waiver of the transfer/gift tax and have not yet taken this step. Nor have his children paid the

15   appropriate gift/transfer tax, which would be owed if they claim the shares had truly been

16   transferred.

17        At the time he nominally gifted the shares to his children, Okada considered Universal

18   Sales to be his creation, which required his active input to grow and remain successful. Okada had

19   no intention to allow Tomohiro and Hiromi to control or vote the shares, but rather, intended to

20   remain in control of 100% of the shares himself. Accordingly, prior to the transfers, he told both

21   Tomohiro and Hiromi that the shares would be given to them on certain additional terms and

22   conditions, including: (a) Okada would retain full control of the shares, including but not limited

23   to the exercise of voting rights attached to them; (b) Tomohiro and Hiromi would not take any

24   steps that would cause Okada to lose control of the shares; and (c) Okada would continue to serve

25   as director until such time as he decided otherwise.

26        The terms and conditions of the share transfer were not reduced to writing due to two

27   important aspects of Japanese culture: (1) Japanese children of Tomohiro and Hiromi's generation

28   are expected to, and do, follow the instructions and wishes of their father; and (2) Japanese culture

4

places great emphasis on trust and the familial relationship, meaning that it is regarded as unnecessary to record agreements and understandings between family members, even for very important matters.

Both Tomohiro and Hiromi orally agreed to the terms and conditions on which the share transfers were premised. Okada would not have transferred the shares to his children if they had not agreed to his terms and conditions. Following the share transfers, Mr. Okada, Tomohiro, and Hiromi all acted in accordance with the terms and conditions set forth above; Okada continued to exercise full control over 100% of the shares.

In 1993 or 1994, as a result of a company merger, Okada allocated additional shares to Tomohiro. These shares were transferred on the same terms and conditions as were agreed to in March 1991. Tomohiro again agreed to the conditions, and Okada continued to exercise full control over the shares.

In April 1991, Tomohiro joined Universal as an employee. In about August 1995, Tomohiro became a director of Universal. Between June 1995 and June 2002, Tomohiro had roles in various aspects of business. All roles in the business were assigned by Okada, including: Director of Corporate Planning; Director of Research and Development; Director of the Administration Department; and Director of Investor Relations.

Tomohiro did not perform well at Universal and his employment was terminated in June 2002. In March 2008, Okada gave Tomohiro a second chance to involve himself in the management of Universal. Okada arranged for Tomohiro to become the director of a Universal subsidiary, Aruze USA. Tomohiro was also appointed as a director of Universal. Tomohiro was again unsuccessful in his duties as director. In 2015, Tomohiro was removed as director of Universal and Aruze USA.

Okada and Tomohiro have had little contact with each other since about 2010. Okada and Tomohiro generally only meet at formal family ceremonies and gatherings.

Tomohiro is Hiromi's closest family member. Due to this close relationship, Hiromi trusted him.

In 1999, Mr. Okada married his second wife, Ms. Takako Okada. By September 2010,

Okada, Tomohiro, Hiromi, and Takako collectively owned 67.9% of the publicly traded shares of Universal.

In September 2010, Okada incorporated Okada Holdings Limited, a Hong Kong company, to serve as a holding company for all Universal shares held under the names of Okada's family members. Okada informed Hiromi that all the shares in Universal owned by the Okada family would be held by Okada Holdings. Hiromi did not object to this arrangement.

The ownership structure of Okada Holdings at the time of its formation was as follows: Okada – 46.3%; Tomohiro – 43.4%; Hiromi – 9.78%; and Takako – 0.36%. This ownership structure was set up on the same terms and conditions that Tomohiro and Hiromi originally agreed to in March 1991. Okada continued to exercise control over all Universal shares owned by Okada Holdings.

From the time of the company's inception until June 2017, with limited exception, Okada had majority shareholder control over Universal through his control of his and his family's shares, and his position as Okada Holdings' sole director, was involved in the management of Universal, and served as one of the Universal Directors and served as the Chairman. Accordingly, Okada's name is often associated with Universal; one of Universal's latest business projects is a casino resort in the Philippines, "Okada Manila," which bears Okada's name.

### C. Okada's Oversight of and Responsibility for Universal's Foreign Patents

In 2002, Universal created a patent department to manage its intellectual property rights. Nobuo Yaegashi was appointed as the General Manager for the patent department.

On March 31, 2009, shortly after the Aruze share transfer, Aruze and Universal (then Aruze Corporation) executed a contract titled "Agreement to Transfer the Right to Receive Patents" ("First IP Agreement").  Under the First IP Agreement, Aruze transferred one-half of the right to receive patents to Universal. Universal was responsible for the costs incurred for filing patent applications, was required to file patent applications as joint applications by Universal and Aruze and was also responsible for maintaining the joint patent rights. Aruze was obligated to cooperate with patent applications, report obstructions to patent rights, and not cause loss of novelties or

disclose inventions to third parties without prior approval by Universal. Both Universal and Aruze operated under the understanding that Aruze shared in the patent rights obtained by Universal.

In June 2010, Universal appointed Fujimoto to head its domestic (Japanese) business. Fujimoto was therefore responsible for Universal's domestic patents. At the same time, Okada was placed in charge of the foreign business and was responsible for the foreign patents.

### D.  Universal's Asserted Patents

On May 21, 2008, Universal (then Aruze Corporation) filed U.S. Patent Application No. 12/124,754, and on January 3, 2012, U.S. Patent 8,088,013 (the "'013 Patent") was issued.

On December 10, 1998, Universal filed U.S. Patent Application No. 09/208,696, and on August 21, 2012, U.S. Patent No. 8,246,047 (the "'047 Patent") was issued.

On December 7, 2015, Universal filed U.S. Patent Application No. 14/961,361, and on July 11, 2017, U.S. Reissue Patent No. 46,472 (the "'472 Patent") was issued.

On December 8, 2015, Universal filed U.S. Patent Application No. 14/962,087, and on July 11, 2017, U.S. Reissue Patent No. 46,473 (the "'473 Patent") was issued. (The Court shall refer to these patents collectively as the "Asserted Patents.")

### E.  The Wynn Litigation

Okada met Steve Wynn when Aruze was selling electronic gaming machines in Nevada. In June 2000, Wynn was ousted from Mirage Resorts, Inc., the casino conglomerate that he had developed, following Mirage Resorts, Inc.'s hostile takeover by MGM Grand Inc. Wynn purchased the Desert Inn casino with plans to build a new casino on the site, to be called "Wynn."

Beginning in October 2000, Wynn used a Nevada limited liability company called Valvino Lamore, LLC ("Valvino") as the holding entity for his new casino project. Wynn sought capital to fund the development of the casino and called on Okada as a source of investment funds. Aruze USA made a contribution of $260 million in cash to Valvino in exchange for approximately 50% of the membership interests in Valvino effective October 3, 2000. This contribution was the seed capital that allowed for the development of what is now Wynn Resorts, Limited ("WRL"). In April

1    2002, Aruze USA made two additional contributions totaling $120 million to Valvino.

2        From October 2002 to February 2012, Okada served as a director of WRL. From October
3    2002 through October 2011, Okada also served as Vice Chairman of WRL. After an initial public
4    offering which closed in October 2002, Aruze USA became a 24.5% shareholder of WRL. As of
5    February 2012, Aruze USA was a 19.66% shareholder of WRL.

6        In February 2012, WRL ousted Okada from his position as director of WRL and redeemed
7    the Aruze USA stock at a 30% discount. WRL also sued Okada, Universal, and Aruze USA in
8    Nevada District Court for declaratory judgment that WRL's actions were proper, breach of
9    fiduciary duty, and aiding and abetting the same. WRL's allegations against Okada for breach of
10   fiduciary duty were based on actions taken in Okada's capacity as a director and officer of
11   Universal and Aruze USA. Specifically, WRL brought suit against Okada, Universal, and Aruze
12   USA based on allegations of improper conduct pertaining to the development of Universal's casino
13   resort in Manila, Philippines, including the alleged bribery of Filipino gaming officials by
14   Universal's board of directors.

15       Because the claims against Okada in the Wynn Litigation stemmed from his role as a
16   director of Universal and Aruze USA, both Universal and Aruze USA had a duty to indemnify
17   Okada from all legal expenses and costs pursuant to Nevada statutory law and the Articles of
18   Incorporation and/or Bylaws of each company. For example, the Aruze USA Articles of
19   Incorporation provide, in relevant part: Each person who is or was a director of the corporation
20   (including the heirs, executors, administrators or estate of such person) shall be indemnified by the
21   corporation as of right to the full extent permitted by Chapter 78 of the Nevada Revised Statutes
22   against any liability, cost or expense asserted against such director and incurred by such director
23   by reason of the fact that such person is or was a director. The expenses of directors, past or present,
24   incurred in defending a civil or criminal action, suit, or proceeding must be paid by the corporation
25   as incurred and in advance of the final disposition of the action, suit or proceeding upon receipt of
26   an undertaking by or on behalf of the director to repay the amount if it is ultimately determined by
27   a court of competent jurisdiction that he is not entitled to be indemnified by the corporation.

28       Similarly, the Aruze USA Bylaws provide, in relevant part: Each person who is or was a

director or officer of the corporation (including the heirs, executors, administrators, or estate of such person) shall be indemnified by the corporation as of right against any liability, cost, or expense incurred by such director or officer by reason of the fact that such person is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, except to the extent that such indemnification is prohibited by Chapter 78 of the Nevada Revised Statutes. The expenses of directors or officers, past or present, incurred in defending a civil or criminal action, suit, or proceeding must be paid by the corporation as incurred and in advance of the final disposition of the action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by the corporation.

Finally, the Universal Articles of Incorporation provide, in relevant part: The Company may, pursuant to Paragraph 1, Article 426 of the Companies Act, exempt the Directors (including former Directors) from their liabilities provided in Paragraph 1, Article 423 of the Companies Act, to the extent permitted by laws and regulations, based upon a resolution adopted by the Board of Directors.

In or about April 2014, while Okada was a director of both Universal and Aruze USA, he retained the law firm of Holland & Hart to represent Universal, Aruze USA, and Okada personally in the Wynn Litigation. Holland & Hart replaced the previous counsel. During the course of Holland & Hart's representation, Holland & Hart regularly remitted invoices for attorneys' fees and costs to Universal, which were routinely paid by Universal. Holland & Hart represented the parties until July 21, 2017, after Okada was removed from his position as a director of Universal. At that point, Holland & Hart, with the consent of Universal and Aruze USA, proceeded to represent Okada only. Universal and Aruze USA were represented by other counsel.

In recognition of, and in accordance with, their duty to indemnify Okada as a former director, Universal and Aruze USA continued to routinely pay Holland & Hart's attorneys' fees invoices for legal services rendered to Okada personally following Holland & Hart's withdrawal

from representation of Universal and Aruze USA.

A trial date in the Wynn Litigation was set for April 16, 2018. Okada was prepared to go to trial and opposed settlement of claims throughout the Wynn Litigation, both while a director of Universal and Aruze USA and after his ouster.

In December 2017, with the impending trial in the Wynn Litigation less than six months away, Okada retained the law firm of Bartlit Beck Herman Palenchar & Scott, LLP ("Bartlit Beck") to serve as co-lead counsel along with Holland & Hart. The terms of Okada's engagement of Bartlit Beck included a flat monthly fee and a success bonus. A dispute is currently pending in Clark County District Court with respect to the validity of the success bonus.

In March 2018, after significant trial preparation by Holland & Hart and Bartlit Beck, and with trial just over one month away, Universal, Aruze USA, and WRL engaged in settlement discussions without Okada's knowledge. WRL agreed to settle all claims asserted against Universal and Aruze USA for approximately $2.63 billion. Okada was not apprised of the settlement until after it had been consummated. Although Okada was not a party to the settlement, subsequently, WRL voluntarily dismissed, with prejudice, all claims against Okada.

Universal and Aruze USA's settlement of claims for $2.63 billion came at a significant discount in favor of WRL and to the detriment of Universal and Aruze USA. Based on a February 16, 2018 press release issued by Universal, Universal's own expert opined that Universal was "entitled to approximately $4.5 billion in damages for the invalid redemption as of October 31, 2017." Accordingly, Universal and Aruze USA settled the Wynn Litigation for approximately $1.87 billion less than it was entitled. The day the settlement was announced, Universal's stock price dropped 16%, while WRL's stock price rose 6.4%. Had Okada been a director of Universal and Aruze USA in March 2018, he would not have voted to approve the settlement, and, as representative of the majority shareholder in Universal, Okada Holdings, would have prevented the settlement.

**F.  Okada's Removal from Universal**

In May and June 2017, Okada's son Tomohiro and his colleague Fujimoto executed a "coup d'état to strip Okada of control" of Okada Holdings and Universal. Okada alleges these

efforts were fraudulent and unlawful and therefore without legal effect. As a result, Okada asserts he remains the rightful controlling owner of both Okada Holdings and Universal, despite claims and actions to the contrary.

Okada and Fujimoto would often disagree over the direction of the company. Okada alleges that in about 2012, Fujimoto began putting a plan in place to take over Universal and discredit Okada by framing him as a criminal so that Fujimoto could take control of the company and prevent Okada from reasserting control. Additionally, in about May 2017, Okada objected to two major changes in a proposed Universal resolution: an increase in Universal director compensation from 1 billion yen (approximately 9 million USD) per year to 2 billion yen per year (approximately 18 million USD) and an extension in director terms from one year to two years. Further, as the Wynn Litigation progressed to 2017 and neared trial, Fujimoto and Okada differed strongly in their preferred disposition of the case.

Fujimoto preferred to settle the case expeditiously, because a settlement in the billions of dollars would advance Universal's bottom line and lead to larger performance bonuses for its directors. Proceeding to trial would delay bonuses. Fujimoto knew that Okada opposed any such settlement and wished to go to trial. Consequently, in 2017, Fujimoto, along with several directors of Universal and Okada's son, sought to oust Okada and seize control over the company and the upcoming decisions with respect to director compensation, term length, and settlement of the Wynn Litigation. Okada asserts this ouster had a "two-pronged approach:" (1) divest Okada of his controlling status in Okada Holdings—Universal's majority shareholder; and (2) remove Okada as a director of Universal under false pretenses.

### G. Okada Holdings

Since about 2015, Hiromi suffered from significant anxiety and stress due to a fear that she was being stalked, which she confided in Tomohiro. Okada asserts this permitted Tomohiro to take advantage of Hiromi in furtherance of Fujimoto's plan to oust Okada from Universal, which included a scheme to secure control of Hiromi's 9.78% minority share of Okada Holdings, which, combined with Tomohiro's 43.4% stake, would give him control over Okada Holdings. Okada

11

asserts Tomohiro's plan was heavily influenced by Fujimoto, who needed control of Okada Holdings in order to seize control of Universal.

Tomohiro suggested that Hiromi travel overseas for vacation and to avoid the alleged stalker. Following her trip to Hawaii, Hiromi was scheduled to spend one night in Tokyo before departing for Thailand. Tomohiro telephoned Hiromi while she was in Hawaii and asked to see her immediately upon her arrival in Tokyo. Hiromi complied.

On about May 2, 2017, Tomohiro requested that Hiromi sign signature pages of various documents, drafted in English, a language in which Hiromi is not fluent. Tomohiro provided Hiromi no opportunity to read through the documents and provided no explanation as to the purpose of the documents or the effect of Hiromi's signature. Hiromi complied with his request. Hiromi did not realize the nature of the papers.

On about May 11, 2017, Tomohiro met Hiromi at her house and requested that she sign additional papers. Hiromi signed the papers without any opportunity to review them or learn of their significance. These documents were drafted in English. During the meeting, Tomohiro appeared rushed and left once the papers were signed, approximately ten minutes after his arrival.

On May 21, 2017, Tomohiro sent a text message to Hiromi and requested that she meet him at Tokyo station two days later, on May 23, 2017, because he had made an appointment at a notary's office. Hiromi complied. On the way to the notary's office on May 23, Tomohiro stated to Hiromi that unless she signed the documents, Universal could come to an end. Upon arriving at the notary's office, Hiromi was greeted by two people who introduced themselves as Tomohiro's lawyers. They presented documents for both Hiromi and Tomohiro to sign. Hiromi was asked to sign the documents quickly because the notary allegedly had another appointment he needed to attend.

Tomohiro's lawyers did not provide Hiromi with an opportunity to read through the papers, provided no explanation of their purpose or effect, and was not represented by separate counsel at the signing. Hiromi signed the documents in a process that took approximately ten minutes.

The documents that Tomohiro deceived Hiromi into signing on or about May 2, 2017, May 11, 2017, and May 23, 2017, were both against Hiromi's interest and contrary to Tomohiro and

12

Hiromi's earlier oral agreement with Okada that Okada would continue to control 100% of the shares of Okada Holdings. Okada alleges that had Hiromi been aware of the content and nature of the documents, she would not have signed them.

The document Hiromi was induced to sign, titled "Share Management and Disposal Trust Agreement" and dated March 2, 2017, purports to have the effect of, inter alia, (i) granting Tomohiro a thirty-year irrevocable right to solely control and vote Hiromi's shares in Okada Holdings; (ii) granting Tomohiro the right to exercise Hiromi's voting rights at his sole discretion and with Hiromi having no right to give Tomohiro instructions on how to vote her shares; and (iii) barring Hiromi from transferring, pledging, or disposing of her beneficial interest in her shares without the prior written consent of Tomohiro.

The document Hiromi was induced to sign, the Notice of Appointment dated May 12, 2017, purportedly authorized the appointment of two persons unknown to Hiromi, Mr. Takada and Mr. Ishida, to the board of directors of Okada Holdings.

Following the execution of the Notice of Appointment, Takada and Ishida signed a Notice of Removal of Director, dated May 12, 2017, which removed Okada as a director of Okada Holdings. The Notice of Removal of Director was subsequently mailed to Okada. On May 12, 2017, Takada and Ishida signed a written resolution purporting to remove Okada as a director of Okada Holdings and filed with the Hong Kong Company Registry a Notice of Change of Company Secretary and Director relating to Okada Holdings. This filing provided notice that Okada had been removed as a director of Okada Holdings, and that both Ishida and Takada replaced Okada as directors as Okada Holdings.

Once Okada was purportedly removed as a director of Okada Holdings, he effectively lost control of both Okada Holdings and Universal (and its affiliates) by virtue of the fact that the Okada family's collective 67.9% controlling interest in Universal was held and controlled by Okada Holdings, now under the ostensible control of Takada and Ishida.

On May 23, 2017, Tomohiro induced Hiromi to sign another version of the Share Management and Disposal Trust Agreement (the March 2, 2017 and May 23, 2017 versions are collectively referred to hereafter as "Trust Agreements").

The document signed on May 23, 2017 was similar to the document dated March 2, 2017, but this time was notarized. The Trust Agreements provided that Hiromi would transfer her shares of Okada Holdings into the trust created by the Trust Agreements via an Instrument of Transfer to be executed on the same date as the respective Trust Agreements. However, the Instrument of Transfer was not executed contemporaneously with the Trust Agreements.

On August 9, 2017, prior to execution of the Instrument of Transfer and while Hiromi retained legal title to her shares of Okada Holdings, Hiromi executed a Power of Attorney in favor of Okada, authorizing him to exercise Hiromi's rights as a registered shareholder of Okada Holdings.

On August 11, 2017, pursuant to Hiromi's Power of Attorney, Okada issued two notices: (1) a notice appointing himself as Director of Okada Holdings; and (2) a notice removing Takada and Ishida as Okada Holdings' directors.

On August 14, 2017, Hiromi allegedly signed the Instrument of Transfer, which purported to transfer her shares to Tomohiro (individually, not as Trustee), for no consideration whatsoever. Hiromi has no recollection of signing this document.

On or about August 22, 2017, Hiromi learned that she purportedly transferred her shares in Okada Holdings to Tomohiro without her knowledge. Hiromi went to Hong Kong to meet with Li & Partners, a corporate law firm, to sign documents to rescind whatever documents she might have signed which purportedly transferred her shares to Tomohiro. In addition, on September 7, 2017, Hiromi signed a statutory declaration attesting to facts surrounding the purported share transfer, in which she disclaimed the document she previously signed affirming Tomohiro's affirmation, denied authorizing the transfer of her shares in Okada Holdings to Tomohiro, and implicated Tomohiro in a scheme to defraud her, claiming that Tomohiro had been a victim of brainwashing.

On September 8, 2017, Okada held an Extraordinary General Meeting of Okada Holdings, attended by himself and Hiromi, at which it was resolved that the purported removal of Okada as director of Okada Holdings on May 12, 2017 was declared invalid, that any notice, resolution or other documents approving or confirming Okada's removal were rescinded and revoked, and that

14

1    Okada was appointed a director of Okada Holdings effective August 11, 2017.

2         On October 4, 2017, Okada wrote letters to the Philippine Amusement and Gaming

3    Corporation (PAGCOR) and the United States Security and Exchange Commission (SEC),

4    informing the latter that he had officially regained majority ownership and control of Okada

5    Holdings, which owned 67.9% of Universal. Despite Okada's efforts to regain control over Okada

6    Holdings, Universal refuses to recognize his authority.

7         Hiromi has since filed a lawsuit in Hong Kong against Tomohiro and Okada Holdings,

8    alleging that Tomohiro engaged in fraud by having her sign documents that purportedly allowed

9    Tomohiro to irrevocably control her shares in Okada Holdings and have Okada removed as a

10   director of Okada Holdings. The lawsuit remains pending in Hong Kong.

11

12        **H.  Universal**

13        Although Takada and Ishida's ostensible control over Okada Holdings meant that they

14   could have prevented Okada from being on the proposed Universal slate of directors, Fujimoto

15   knew that Okada would vigorously challenge Tomohiro's illegal seizure of control of Okada

16   Holdings. Accordingly, Okada alleges that Universal, under the direction of Fujimoto, engaged in

17   further efforts to deem Okada unsuitable as a director of a publicly traded company to ensure that

18   he had no further influence or control over Universal's affairs.

19        These efforts involved perpetuating a false narrative about Okada and generating suspicion

20   about fraudulent acts in which he allegedly engaged. Specifically, on May 23, 2017, Universal

21   held an extraordinary Board of Directors meeting, during which Nobuyoshi Ichikura, a full-time

22   Universal corporate auditor, gave a report regarding suspected fraudulent acts that occurred in

23   March 2015. Ichikura alleged that Okada was involved in a 2 billion yen loan made by Tiger

24   Resorts Asia ("Tiger Resorts"), a Universal subsidiary, to a third party, which loan violated

25   Universal's internal approval process. This improper loan was allegedly processed by Okada and

26   Yoshinao Negishi, Director and General Manager of Universal's Administrative Division. Okada

27   has denied and continues to deny these false allegations.

28        Notwithstanding Ichikura's Report, Universal acknowledged that if it were concluded that

there was an unauthorized outflow of funds, there would be no financial loss to the company. As a result of these allegations, Universal, led by Fujimoto, suspended Okada and Negishi from exercising any authority and relieved them of all their responsibilities. As the head of Universal's domestic Japanese business, Fujimoto exerted complete control over the Corporate Audit Department, where Ichikura was employed.

On May 31, 2017, Universal issued a press release titled "Proposed Change of Board Members," in which it announced that pursuant to a Board of Directors meeting held earlier that day, two individuals – Kenji Asano and Masayoshi Miyanaga – were being proposed as new directors for approval at the upcoming Meeting of Shareholders on June 29, 2017. Additionally, five other directors were slated for reappointment: Fujimoto, Hajime Tokuda, Takako Okada, Seisui Kamigaki, and Sadao Otani. For the first time in the company's history, Okada was not identified on the slate of proposed directors.

The May 31, 2017 press release stated that Universal shall operate under "the continuous leadership of Mr. Jun Fujimoto as its Representative Director and President." It further stated that Okada Holdings, which owned 67.9% of the voting rights of Universal, had stated its intention to approve the proposed slate of directors at the June 29, 2017 Meeting of Shareholders.

With Okada effectively silenced with respect to Universal's corporate governance pending his formal removal as a director, Universal announced that its directors had passed a resolution at the May 31, 2017 Board meeting to submit a proposal to shareholders to increase the remuneration of directors from 1 billion yen to 2 billion yen per year (out of which the amount of remuneration for outside directors would be no more than 200 million yen per year), which did not include the salary portion paid to directors who also served as employees. Moreover, the directors proposed that director terms be extended from one year to two years. Although Okada expressed his opposition to both measures, the resolution passed.

On June 1, 2017, Fujimoto e-mailed Tomohiro and expressed concern about Okada filing legal documents in Hong Kong within the next two to three weeks to regain control of Okada Holdings. Fujimoto had apparently learned that Okada was confident that his legal filings would show that Hiromi's signature was not her true intention and that he could persuade Hiromi to

acknowledge the same. Okada alleges that Fujimoto therefore told Tomohiro that Hiromi needed to disappear for one month to prevent Okada from securing her cooperation.

Tomohiro represented to Hiromi that Okada would soon be arrested and that she must avoid further contact with Okada. Hiromi refrained from further communications with Okada.

### I.    Special Investigation Committee

On June 8, 2017, Universal announced that it had established an independent Special Investigation Committee ("SIC") consisting of three independent external experts – Michio Masaki, Sotaro Matsuo, and Miya Fukayama. Okada asserts that the SIC lacked any form of independence. First, Fujimoto hand selected the three members of the SIC. Second, Masaki, Matsuo, and Fukayama had all previously assisted Universal's internal audit team in its investigation, which was overseen by Fujimoto. Third, Fujimoto spearheaded the SIC and generally exerted influence over the SIC process. Fourth, Masaki, Matsuo, and Fukuyama are all members of the same firm. Finally, on July 14, 2017, Fujimoto was personally involved in leading a group of seven people, including the three SIC members, in interrogating an Aruze employee, former Okada Manila employee, and TRA board member. This interrogation was conducted in such a way as to place as much blame as possible on Okada. In the interrogation, Okada alleges that Fujimoto stated that he wanted to "eliminate Okada completely" and threatened to bring claims against Aruze and the Aruze employee unless he agreed to say negative things about Okada.

### J.    Documentation

In early June 2017, Hiromi received a text message from a Hong Kong lawyer stating that Okada had commenced legal action against her.  Hiromi was shocked to learn this information. In mid-to-late June 2017, Tomohiro asked Hiromi to accompany him to a Notary Public's office to formally acknowledge the lawsuit that Okada had initiated against her. Upon her arrival at the Notary Public's office, Hiromi was met by Tomohiro's Japanese lawyer who informed her that she was a defendant in a lawsuit and her signature was required to acknowledge the claim. In reliance on these representations, Hiromi signed the document.

17

Hiromi subsequently learned that the document she had signed was not an acknowledgement of service of a lawsuit filed by Okada, but rather was an acknowledgement confirming the veracity of a 327-page affirmation by Tomohiro, which she had never seen. Tomohiro's affirmation, which purported to speak on behalf of Hiromi, asserted that Tomohiro and Hiromi had never agreed with Okada that Okada would remain in control of all Universal shares owned by the Okada family, that it was not customary in Japanese culture for children to obey their father's wishes, and that Tomohiro and Hiromi had acted together to remove Okada from control of Okada Holdings due to acts of misfeasance on his part. Okada alleges that the nature of the document signed by Hiromi was completely contrary to the explanation that had been provided to her.

### K.  Universal Shareholders' Vote Results in Company Changes and Okada's Removal

On June 29, 2017, Universal held its General Meeting of Shareholders, at which shareholders voted on the proposed slate of directors, the director compensation increase, and the director term increase. For the first time since Okada founded Universal in 1969, he was prevented from voting his interest in Universal, as Tomohiro, through his appointed directors of Okada Holdings, Takada and Ishida, purportedly controlled Okada Holdings' 67.9% interest in Universal. Had Okada been in control of Okada Holdings' shares as of the date of the Meeting of Shareholders, he would have voted to disapprove of the director slate, the director compensation increase, and the director term increase. Instead, the shareholders voted to approve all three measures. After the June 29, 2017 shareholder vote, Okada's involvement with Universal formally ceased.

### L.  Universal's SIC Report Is Issued as Belated Support for Okada's Removal

On August 30, 2017, Universal issued a press release titled "Notice on Results of Investigation by Special Investigation Committee and Future Actions," which attached a copy of the SIC's report. The SIC Report concluded that "[a]s a result of the investigation of the Special Investigation Committee, it has become clear that Mr. Okada led and conducted the fraudulent acts

. . . ." The alleged fraudulent acts referenced by the SIC Report involved a HKD 135 million (USD 17 million) loan from Tiger Resorts to a third party in October 2014, which loan was used largely to repay an earlier loan by Okada Holdings, which loan was for the benefit of Okada Manila. The SIC Report alleges that Okada sought to invest in junkets (business operators that solicit and bring in wealthy customers to the casino) by going through the borrower that received the allegedly improper loan from Tiger Resorts. Okada asserts the SIC Report omitted that at this time, Universal's subsidiary, Tiger Resort Leisure and Entertainment, Inc. ("TRLEI"), was in the process of constructing Okada Manila, its large-scale casino resort in the Philippines, the success of which was largely dependent on junkets. Okada denies these allegations in the SIC Report.

The SIC Report also contends Okada engaged in nefarious and improper conduct when he asked that a HKD 16 million payment (approximately USD 2 million) be made to a highly-experienced consultant in the hospitality industry who was engaged to provide, and did provide, services related to the operation of Okada Manila.

Despite these allegations, the SIC Report provided no evidence that Okada personally benefitted from this payment or that the monies were used for any improper purpose. Okada denies these allegations in the SIC Report.

Third, the SIC Report concluded that Okada approved an improper HKD 16 million (approximately USD 2 million) payment by Tiger Resorts to an unknown payee for "payment handling fees for the art work." The SIC Report assumes that Okada, who is an avid art collector, purchased artwork for personal use, but does not address whether it investigated if the artwork was purchased for the Okada Museum of Art or Tiger Resorts' Manila Casino, both of which are operated by Universal. Okada denies any allegation that he improperly purchased artwork for personal use. Rather, the payment went to purchase artwork for Okada Manila, and the artwork purchased had, upon information and belief, been delivered to Okada Manila prior to the writing of the SIC Report.

Finally, the SIC Report concluded that, in 2014, Okada pledged as collateral assets of UE Korea, a subsidiary of Universal, to acquire land in South Korea. Although the SIC Report characterizes this act as improper, it acknowledges that Okada did not conceal his intentions and

in fact disclosed the proposed transaction to Universal on February 21, 2014. Although one employee objected to the proposed transaction, Okada proceeded with the loan, but shortly thereafter cancelled the loan and the pledging of collateral. The acquisition of the land in Korea was for the benefit of Universal and UEC Korea with an anticipated development of a hotel casino by UEC Korea in Incheon, Korea.

Okada asserts the SIC Report's conclusions were made at Fujimoto's direction in an effort to provide retroactive support for Ichikura's Audit Report finding Okada unsuitable as a Universal director, to provide independent support to prevent Okada from reinstating himself as a director, and to prevent discovery of illegal acts by Fujimoto. Specifically, Okada alleges that Fujimoto knew that Okada would fight to regain control of Okada Holdings, and that there was a likelihood of success. Accordingly, Fujimoto orchestrated these allegations against Okada, which, if believed to be true, would prevent Okada from serving as a director due to suitability issues associated with Universal's gaming license for its new casino resort in the Philippines. Thus, the public release of such allegations virtually ensured that Okada could not resume control of Universal, even if he regained control of Okada Holdings.

**M. Universal Settles the Wynn Litigation**

Once Okada was ousted from control of Universal's largest shareholder, Okada Holdings, and removed as a Universal director, Fujimoto had the ability to pursue settlement of the Wynn Litigation. Okada notes that Universal directors, including Fujimoto, were compensated under a performance-based standard, meaning that after reappointment of a director at the June Meeting of Shareholders, the amount of compensation to be paid to a director is determined based on Universal's performance in the previous business year. This meant that if Fujimoto could settle the Wynn Litigation in 2018, rather than risk going to trial, Universal would receive an influx of cash, strengthening the company's performance for the year, increasing his and the other directors' performance-based compensation, and paying debt to Deutsche Bank at the urging of a Universal senior executive who was a former Deutsche Bank executive.

On March 6, 2017, Universal, Aruze USA, and WRL ultimately settled all claims between

and among them for a $2.63 billion payment from WRL to Universal.  The settlement was entered without the knowledge or consent of Okada, though Okada was a co-defendant in the Wynn Litigation and WRL's claims in the Wynn Litigation stemmed largely from allegations involving actions of Okada in his capacity as an officer and director of Universal and Aruze USA.

### N.  Universal Files a Criminal Complaint in the Philippines Against Okada

In or about early 2018, TRLEI, the subsidiary that operates the Okada Manila resort in the Philippines, under the direction of Fujimoto, filed a criminal complaint against Okada in the courts of the Philippines for fraud. The criminal complaint generally alleged that during Okada's stint as CEO of TRLEI, he illegally disbursed company funds worth more than $3 million for his consultancy fees and salaries during his one-month tenure. The complaint alleged that the TRLEI board of directors did not authorize or approve the payment. The complaint's second count stemmed from Okada's decision to award a $7 million supply contract for the installation of LED fixtures in Okada Manila to his own company, Aruze Philippines Manufacturing, Inc.

In response to the filing of the criminal complaint, Philippine authorities ordered border guards at the country's airports and seaports to be on the lookout for Okada and monitor his activity. Not long after the filing of the criminal complaint, Philippine prosecutors dismissed the complaint and ruled that the "facts in the case are insufficient to engender a well-founded belief that a crime of fraud has been committed." The dismissal resolution further found that the nature of the case was civil, not criminal.

Following the dismissal of the complaint against Okada, in about June 2018, Universal through its subsidiary TRLEI asked the Philippines Department of Justice to start a new investigation into the complaint against Okada.

The original filing of the criminal complaint, the resulting monitor order, and the unfounded renewed request to investigate alleged criminal activity damaged Okada's reputation and business dealings and Okada alleges was another component of the ongoing scheme by Universal and Fujimoto to discredit him.

**O.  Universal Issues Press Releases**

Following Fujimoto, Universal, and Aruze USA's successful ouster of Okada, Okada alleges counter-defendants continued to pursue any means necessary to interfere with the business interests of Okada and Aruze, causing damage to them and their respective reputations by issuing numerous false and misleading press releases.

On September 22, 2017, Universal published a press release titled "Action Taken Against Infringement of Company-Held Patent Rights by Aruze Gaming America, Inc." (the "September 2017 Press Release"). According to Okada, the September 2017 Press Release contained several false and defamatory statements. First, Universal stated that Aruze "has continued to violate an agreement that it has executed with the Company to pay it patent licensing fees for Company-held patents." Second, Universal stated that it "has verified that [Aruze] has continued to use Company-held patents without permission." The September 2017 Press Release listed Fujimoto under "Name of Representative" as the representative responsible for approval of the press release.

On April 2, 2018, Universal published a press release titled "Notice of Filing of Lawsuit in United States." (the "April 2018 Press Release"). There, Universal falsely stated that "it became clear that [Aruze] had illegally used patents on gaming machines belonging to the Company to conduct sales of gaming machines in the United States, and that Kazuo Okada, a former Director of the Company, had illegal involvement in those activities." The April 2018 Press Release listed Fujimoto under "Name of Representative" as the representative responsible for approval of the press release.

On May 14, 2018, Universal published a press release titled "Notice of Decision to File Lawsuits to Aruze Gaming America, Inc. Group" (the "May 2018 Press Release"). There, Universal falsely stated that "[Aruze] Group companies had illegally used patents on gaming machines belonging to the Company to conduct the sales of gaming machines in each country indicated below, the Company therefore has decided to file criminal complaints and civil lawsuits based on violations of patent rights and other rights against AGA Group companies and Kazuo Okada." The May 2018 Press Release listed Fujimoto under "Name of Representative" as the

representative responsible for approval of the press release.

Okada alleges the defamatory statements in the September 2017 Press Release, the April 2018 Press Release, and the May 2018 Press Release (collectively, the "Defamatory Statements") have caused damage to Okada and Aruze's current and prospective business relationships and to their respective reputations.

### P.  A Second Criminal Investigation in Hong Kong

In about early August 2018, the Hong Kong Independent Commission Against Corruption ("ICAC") received a complaint regarding alleged corruption on the part of Okada. While the ICAC has not released who made the complaint against Okada, Okada believes that Universal was involved. On August 6, 2018, Universal issued a public press release stating that Okada had been "arrested by the ICAC in relation to various corruption related offenses," and that Universal would "render [its] full support and assistance to ICAC and other law enforcement authorities should the same be required." ("August 2018 Press Release"). Many news sources that reported on Okada's arrest by the ICAC cited directly to Universal's August 2018 Press Release as their source of information.

Okada alleges that Universal's involvement in the ICAC corruption complaint, its cooperation with the ICAC, and its public reporting of the arrest are additional examples of Universal and Fujimoto's intention to discredit Okada, his business reputation, and his livelihood, and have caused Okada damage.

### IV.    LEGAL STANDARD

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). If subject matter jurisdiction is challenged, the burden is on the party asserting jurisdiction to establish it. In re Dynamic Random Access Memory Antitrust Litigation, 546 F.3d 981, 984 (9th Cir. 2008) (citations omitted). Dismissal under Rule 12(b)(1) is appropriate if the complaint, considered in its entirety, fails to allege facts on its face that are sufficient to establish subject matter jurisdiction. Id. at 984–85.

A defendant may also move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  In order to state a claim upon which relief can be granted, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In ruling on a motion to dismiss for failure to state a claim, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  Faulkner v. ADT Security Servs., Inc., 706 F.3d 1017, 1019 (9th Cir. 2013).  To survive a motion to dismiss for failure to state a claim, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

## V.      DISCUSSION

### A. Fujimoto's Motion to Dismiss Counterclaims. ECF No. 60.

Defendants have asserted five counterclaims against Counter-Defendant Fujimoto including: 1) defamation; 2) intentional interference with contractual relations; 3) intentional interference with prospective economic advantage; 4) civil conspiracy; and 5) sham patent litigation. Fujimoto moves to dismiss the counterclaims against him for 1) lack of personal jurisdiction; 2) improper joinder under Federal Rules of Civil Procedure 13(h) and 20; 3) lack of subject matter jurisdiction; and 4) forum non conveniens.  Pursuant to its minute order on May 29, 2019, the Court does not consider the personal jurisdiction claim here. ECF No. 89.

#### 1.  Improper Joinder

Regarding Defendants' civil conspiracy claim, Fujimoto asserts he must be first joined to the case before the claim can be named against him alone. Okada and Aruze argue that since the other counterclaims are brought against Fujimoto and named defendants in the complaint, the civil conspiracy counterclaim may proceed.

"Rules 19 and 20 govern the addition of a person as a party to a counterclaim or

24

1    crossclaim." Fed. R. Civ. P. 13(h). To add parties under Rule 13(h), the defendant must show that

2    the court has a basis for the assertion of federal jurisdiction over the additional parties, whether by

3    supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) or some independent ground. See

4    Danner v. Himmelfarb, 858 F.2d 515, 522 (9th Cir. 1988).

5           "A party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as

6    independent or alternative claims, as many claims as it has against an opposing party." Fed. R.

7    Civ. P. 18(a). Rule 19 governs compulsory counterclaims. It states, *inter alia*, that a person must

8    be joined if in their absence, "the court cannot accord complete relief among existing parties; or

9    that person claims an interest relating to the subject of the action and is so situated that disposing

10   of the action in the person's absence may: 1) as a practical matter impair or impede the person's

11   ability to protect the interest; or 2) leave an existing party subject to a substantial risk of incurring

12   double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19.

13   Rule 20 governs permissive counterclaims. It states, *inter alia*, that an individual may be joined as

14   a party if: 1) "any right to relief is asserted against them jointly, severally, or in the alternative with

15   respect to or arising out of the same transaction, occurrence, or series of transactions or

16   occurrences; and [2)] any question of law or fact common to all defendants will arise in the action."

17   Fed. R. Civ. P. 20(a)(2)(A)-(B).

18          While the Court recognizes that some district courts have held that a counterclaim cannot

19   be asserted *solely* against a nonparty even if other counterclaims are asserted against the same

20   nonparty and a previously named party, the Court finds no binding jurisdiction guiding it to rule

21   the same. See AllTech Commc'ns, LLC v. Brothers, 601 F. Supp. 2d 1255, 1261 n.3 (N.D. Okla.

22   2008) ("This Court finds the better interpretation to be that each individual counterclaim against a

23   non-party must also be asserted against an existing party, rather than merely asserted in the same

24   pleading as those asserted against existing parties."). Thus, the Court looks to Rule 19 and finds

25   that the claim may be asserted. Without Fujimoto, the Court "cannot accord complete relief"

26   among the existing parties as it pertains to the civil conspiracy claim. See Fed. R. Civ. P. 19 (A).

27   This ruling furthers the goal of Rule 13 by limiting the number of matters related to the issues at

28   hand.

1

2          ***2.   Lack of Subject Matter Jurisdiction***

3          Second, Fujimoto argues that claims six through nine must be dismissed since they are

4   permissive, rather than compulsory counterclaims, and therefore require an independent basis for

5   subject matter jurisdiction, which does not exist. Additionally, Fujimoto asserts that the

6   counterclaims may predominate over the patent claims, relates to actions pending overseas, and

7   relies on Japanese law with foreign witnesses. Okada and Aruze argue that the claims are

8   compulsory because they arise from the same transaction or occurrence that is the subject matter

9   of the opposing party's claims or because they are so related to the complaint that they form part

10  of the same case or controversy, thereby allowing for supplemental jurisdiction.

11         28 U.S.C. § 1367 governs supplemental jurisdiction. It states, *inter alia*:

12

13         (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise
           by Federal statute, in any civil action of which the district courts have original
14         jurisdiction, the district courts shall have supplemental jurisdiction over all other
           claims that are so related to claims in the action within such original jurisdiction
15         that they form part of the same case or controversy under Article III of the United
           States Constitution. Such supplemental jurisdiction shall include claims that
16         involve the joinder or intervention of additional parties.
           (b) In any civil action of which the district courts have original jurisdiction founded
17         solely on section 1332 of this title, the district courts shall not have supplemental
           jurisdiction under subsection (a) over claims by plaintiffs against persons made
18         parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over
           claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules,
19         or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising
           supplemental jurisdiction over such claims would be inconsistent with the
20         jurisdictional requirements of section 1332.
21

22

23  To be "so related to claims in the action," the claims over which the Court exercises supplemental

24  jurisdiction must arise from "a common nucleus of operative fact" and "form but one constitutional

25  case." Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1173 (9th Cir. 2002) (quoting United Mine

26  Workers of America v. Gibbs, 383 U.S. 715, 725 (1966)).

27         The Court finds that there is supplemental jurisdiction over the civil conspiracy

28  counterclaim asserted against Fujimoto. The allegations assert the alleged conspiracy centered on

removing Okada from his role as Universal director and sole director of Okada Holdings, which arises from the same "nucleus of operative fact" at issue in the claims Universal has asserted against Okada and Aruze. In particular, Okada and Aruze have asserted in their Amended Answer to the Second Amended Complaint that Okada is the "rightful controlling owner of Okada Holdings Limited" and that he was "wrongfully removed from his positions of control over Universal . . . by Mr. Fujimoto . . . ." Am. Answer at 24, ECF No. 58. These allegations include a discussion of various improper or wrongful actions coordinated or supervised by Fujimoto.  Thus, part of the basis of Aruze and Okada's defense against the action forming the basis for the Court's subject matter jurisdiction is a dispute over leadership of Universal and Okada Holdings. The civil conspiracy claim directly addresses this dispute by alleging that Okada is no longer in those leadership positions as a result of a conspiracy in which Fujimoto was a leading participant. Thus, the civil conspiracy claim arises from a "common nucleus of operative fact" with the anchor claim, and the Court therefore has supplemental jurisdiction over the claim, pursuant to 28 U.S.C. § 1367.

### 3. Forum Non Conveniens

Finally, Fujimoto argues that claims six through nine should be dismissed under the doctrine of forum non conveniens because the claims concern matters being litigated in Japan, foreign individuals, evidence located mostly in Japan, require the interpretation of Japanese law, and involve matters of no interest to Nevada. Okada and Aruze argue that four of the five counterclaims against Fujimoto are brought by a Nevada corporation, the claims are Nevada state-law claims, the witnesses and evidence will be in Nevada due to Universal filing suit in this district for the patent claims, and the Japanese lawsuits brought by Okada's daughter do not involve the same claims.

 "The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947). Historically, the doctrine's purpose is to root out cases in which the "open door" of broad jurisdiction and venue laws "may admit those who seek not simply justice but perhaps justice blended with some harassment," and particularly cases in

which a plaintiff resorts "to a strategy of forcing the trial at a most inconvenient place for an adversary." Id. See also Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 n.15 (1981) ("[D]ismissal may be warranted where a plaintiff chooses a particular forum, not because it is convenient, but solely in order to harass the defendant or take advantage of favorable law."). The doctrine "is based on the inherent power of the courts to decline jurisdiction in exceptional circumstances." Paper Operations Consultants Int'l, Ltd. v. S.S. Hong Kong Amber, 513 F.2d 667, 670 (9th Cir. 1975); Carijano v. Occidental Petroleum Corp., 643 F.3d 1216, 1224 (9th Cir. 2011).

"Dismissal is appropriate only if the defendant establishes '(1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal.'" Ayco Farms, Inc. v. Ochoa, 862 F.3d 945, 948 (9th Cir. 2017) (quoting Bos. Telecomms. Grp., Inc. v. Wood, 588 F.3d 1201, 1206 (9th Cir. 2009)). The Ninth Circuit has explained, "Although we have not previously addressed the question squarely, we have typically applied the doctrine of forum non conveniens by comparing the burdens and benefits of litigation in a foreign country against the burdens and benefits of litigation in a particular state." Id. at 949.

"Although a plaintiff is generally entitled to deference in its choice of forum, especially if the plaintiff is a U.S. citizen or resident, that deference is '"far from absolute."' Id. at 949-50 (quoting Ranza v. Nike, Inc., 793 F.3d 1059, 1076 (9th Cir. 2015)). "Of course, 'less deference is not the same thing as no deference.' For a U.S. citizen's choice of forum to be rejected, the private and public interest factors must 'strongly favor trial in a foreign country.'" Id. at 950 (citations omitted).

"The private interest factors are: (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) 'all other practical problems that make trial of a case easy, expeditious and inexpensive.' The public interest factors are '(1) [the] local interest of [the] lawsuit; (2) the court's familiarity with governing law; (3) [the] burden on local courts and juries; (4) [the amount of] congestion in the court; and (5) the costs of resolving a dispute unrelated to [the] forum.'" Id. (citations omitted).

28

The Court finds that the private and public interest factors weigh in favor of Okada and Aruze. Aruze is a Nevada corporation, thus the Court affords Aruze deference in its choice of forum as a U.S. citizen. The private interest factors do not strongly favor trial in a foreign country. As the Court has already discussed, the counterclaims at issue arise from a "common nucleus of operative facts," and the Court finds persuasive Okada and Aruze's argument that the witnesses and evidence necessary to these claims will already be in this forum due to the underlying suit. The public interest factors also do not strongly favor trial in a foreign country.  As the claims concern a Nevada resident, there is significant local interest in the lawsuit; the Court is familiar with the state-law claims as a federal district court sitting in the State of Nevada, and the burden and congestion of litigating the case in this forum is not substantial. Moreover, as the Court has already discussed, the dispute is related to the underlying action, which is related to the forum.

Accordingly, the Court denies Fujimoto's Motion to Dismiss as it relates to joinder, subject matter jurisdiction, and forum non conveniens.

### 4.   Universal's Motion to Dismiss Counterclaims. ECF No. 59.

Defendants have asserted several counterclaims against Plaintiff Universal and Counter-Defendant Aruze USA. Universal and Aruze USA rely upon many of the same arguments made by Fujimoto and move to dismiss these claims for lack of subject matter jurisdiction, improper joinder, forum non conveniens, and failure to state a claim upon which relief can be granted. Fujimoto joins Universal's Motion to Dismiss Counterclaims six through eight and twelve for failure to state a claim upon which relief can be granted. ECF No. 60 at 9 n.3.

#### 1.   *Lack of Subject Matter Jurisdiction*

Universal and Aruze USA argue that claims one through eight and eighteen are permissive, and do not have their own basis for subject matter jurisdiction. They argue that diversity jurisdiction does not exist for the claims, except claim three, because the claims involve a foreign plaintiff suing a foreign defendant. They further argue that supplemental jurisdiction does not exist because the claims do not arise from the same nucleus of operative fact as those in the complaint

and the claims will predominate over the patent claims and relate to matters being litigated in Japan. Aruze and Okada counter that counterclaims six through eight and eighteen are compulsory and therefore that the Court has subject matter jurisdiction over these claims, and that supplemental jurisdiction exists over counterclaims one through eight and eighteen because they form part of the same case or controversy.

The Court applies the same legal standards and incorporates the same reasoning as discussed *supra* with regard to Fujimoto's supplemental jurisdiction claim. Like the claims asserted against Fujimoto, the Court finds that the counterclaims asserted against Universal and Aruze USA arise from a "common nucleus of operative fact" forming "but one constitutional case." Accordingly, the Court denies Universal and Aruze USA's subject matter jurisdiction claim.

### 2. Improper Joinder

With regard to joinder, Universal and Aruze USA argue that claim three must be dismissed even if diversity jurisdiction exists because it names only Aruze USA as a defendant, who was not a party to the original action, and must have therefore been named with another defendant in the counterclaim under Rule 13(h) and Rule 20.

The Court has addressed and dismissed this identical argument with regard to Fujimoto, *supra*. The Court incorporates the legal standard and reasoning here, and accordingly denies Universal and Aruze USA's motion to dismiss on the basis of improper joinder.

### 3. Forum Non Conveniens

Universal and Aruze USA further argue that all permissive counterclaims should be dismissed on the ground of forum non conveniens because they relate to the Wynn litigation, the criminal complaints, and the alleged ouster, which all concern witnesses and evidence located in Japan and involve matters not at interest to Nevada. Further, they argue that the Court would have to educate itself about Japanese law.

The Court applies the same legal standards and incorporates the same reasoning and conclusion as discussed *supra* with regard to Fujimoto's forum non conveniens claim. The Court

sees no substantial difference in the nature of Fujimoto's claim as compared to Universal and Aruze USA's and the same analysis applies. The Court affords deference to Aruze as a citizen of Nevada, and the private and public interest factors do not strongly favor trial in a foreign country.

### 4. *Failure to State a Claim Under Rule 12(b)(6)*

Finally, Universal and Aruze USA argue that claims one through five, seven, eight, and ten through eighteen should be dismissed for failure to state a claim upon which relief can be granted. ECF No. 59 at 11-24.

#### a. **Claims One and Two: Breach of Duty to Indemnify and Declaratory Relief**

Taking each claim in turn, the Court first considers Universal and Aruze USA's argument pertaining to claims one and two, which allege breach of duty to indemnify under NRS 78.7502 and seek declaratory relief under NRS 78.7502, respectively.

NRS 78.7502 states, *inter alia*, that:

> A corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, except an action by or in the right of the corporation, by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding if the person:
> (a) Is not liable pursuant to NRS 78.138; or
> (b) Acted in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the corporation . . . .

Nev. Reg. Stat. 78.7502(1).

The statute further states that:

> To the extent that a director, officer, employee or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections 1 and 2, or in defense of any claim, issue or matter therein, the corporation shall indemnify him or her against expenses, including attorneys'

31

fees, actually and reasonably incurred by him or her in connection with the defense.

Id. at § 3.

Universal and Aruze USA assert that both of these claims fail as to Universal due to the "internal affairs doctrine," which maintains that the applicable law is that in which the company is incorporated, and the fact that Universal is a Japanese company necessarily means that NRS 78.7502 does not apply. Id. at 12. Aruze USA further asserts that these claims fail because even if NRS 78.7502 applies, Okada and Aruze did not adequately plead non-indemnified fees that were actually incurred or reasonable, in accordance with the statute. Id. at 13.

Okada and Aruze concede that claims one and two cannot apply to Universal. ECF No. 64 at 7 n.9. With regard to Aruze USA, they counter that Okada alleged that he incurred expenses and attorneys' fees from Holland & Hart, LLP as well as monthly fees and a success bonus from Bartlit Beck Herman Palenchar & Scott LLP for successfully defending Okada during the Wynn Litigation. Id. at 7. Moreover, they assert that Okada alleged that he was entitled to indemnification of all expenses "incurred by him." Id. at 8.

The Court dismisses claims one and two against Universal as the parties agree Universal is not subject to NRS 78.7502. With regard to Aruze USA, the Court finds that Okada has adequately pled allegations to state a claim for relief under NRS 75.7502. Okada alleges that he was involved in the Wynn Litigation in his capacity as an officer or director of Universal and Aruze USA and that because the claims against him were voluntarily dismissed, he was successful in his defense and therefore entitled to mandatory indemnification of "all expenses incurred by him." ECF No. 58 at 56-7. He further asserts that Universal and Aruze USA's failure to indemnify him resulted in $75,000 of damages. Id. at 57. These allegations with regard to attorneys' fees satisfy the statute. As such, the Court denies the motion as it pertains to claims one and two, asserted against Aruze USA, and grants the motion as to claims one and two in favor of Universal.

**b.  Claims Three and Four: Breach of Indemnity**

Turning to the breach of indemnity claims, Okada asserts that pursuant to their Articles and

1   Bylaws, both Aruze USA and Universal had a duty to indemnify. ECF No. 58 at 58-9.

2       "'Contractual indemnity is where, pursuant to a contractual provision, two parties agree

3   that one party will reimburse the other party for liability resulting from the former's work.' The

4   scope of a contractual indemnity clause is determined by the contract and is generally interpreted

5   like any contract." <u>George L. Brown Ins. V. Star Ins. Co.</u>, 237 P.3d 92, 96 (Nev. 2010).

6       Aruze USA and Universal argue that Okada has failed to plead that he discharged a legal

7   obligation owed to a third party and that a Universal party was actually liable to this third-party

8   for the obligation, both of which are material elements to indemnity claims. Okada counters

9   Universal and Aruze USA have relied on the material elements of implied indemnity, and that

10  under Nevada law, for contractual indemnity claims the terms of the relevant contractual provision

11  control. ECF No. 64 at 8-9. Thus, because Okada has alleged the relevant contractual provisions

12  and that Universal and Aruze USA have breached them, he has adequately pled a claim for breach

13  of indemnity.

14      Okada has adequately pled breach of indemnity claims against both Aruze USA and

15  Universal. The complaint cites to the relevant provisions of both corporations' bylaws that imposes

16  a duty to indemnify and alleges breach of that duty. ECF No. 58 at 58. As such, the Court denies

17  the motion as to claims three and four.

18                  **c. Claim Five: Equitable Estoppel**

19      Claim five is an equitable estoppel claim by Okada asserted against Universal and Aruze

20  USA, asserting that because Universal and Aruze USA consistently paid Okada's attorneys' fees

21  and costs incurred during the Wynn litigation, Okada was unaware the corporations did not intend

22  to pay for the success fee owed to Bartlit Beck, and that Aruze USA and Universal should therefore

23  be estopped from denying payment. <u>Id.</u> at 59-60.

24      "Equitable estoppel has been characterized as comprising four elements: (1) the party to be

25  estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon,

26  or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the

27  party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to

28  his detriment on the conduct of the party to be estopped. Further, this court has noted that silence

can raise an estoppel quite as effectively as can words. Whether these elements are present, so that the doctrine of equitable estoppel should be applied, depends upon the particular facts and circumstances of a given case." Cheqer, Inc. v. Painters and Decorators Joint Committee, Inc., 655 P.2d 996, 998-99 (Nev. 1982) (citations omitted).

Universal and Aruze USA argue that Okada has failed to alleged that either party was apprised of the "true facts," which they construe to be that Okada had retained an additional law firm, contracted with that law firm to pay them a "success fee" of $50,000,000, and that Universal and/or Aruze USA were expected to indemnify Okada for this fee. ECF No. 59 at 14. Okada characterizes the "true facts" not to be the retention of Bartlit Beck, but to be the fact that Universal and Aruze USA had no intention of indemnifying Okada for the success fee. See ECF No. 64 at 10. As such, because Okada has pled that Universal and Aruze USA "were apprised" of the fact they had no intention of indemnifying Okada and Okada did not know of this fact, and because they consistently paid Okada's attorneys' fees and costs incurred and Okada relied on those payments, and because they have continued to refuse payment, Okada has adequately pled an equitable estoppel claim.

The Court finds that Okada has adequately pled an equitable estoppel claim. He has made factual allegations for each element of an equitable estoppel claim, and his claim cannot be defeated by Universal and Aruze USA's self-serving characterization of which facts are indeed the "true facts" at issue. Consequently, the Court denies the motion with regard to claim five.

### d.  Claim Seven: Intentional Interference with Contractual Relations

Claim seven alleges intentional interference with contractual relations by Okada and AGA against Fujimoto and Universal, alleging that Universal and Fujimoto knew of AGA's existing contracts with gaming machine customers in the United States and intentionally disrupted these contractual relationships by making public assertions that AGA was unlawfully utilizing Universal patents and that AGA and Okada were engaged in other misconduct. ECF No. 58 at 61. Furthermore, Okada asserts that Fujimoto and Universal knew of the contracts between Okada and his children, and intentionally sought to disrupt them by conspiring to deceive Hiromi into signing

1    away her rights and depriving Okada of control over Okada Holdings. Id. at 61-62.

2           In order to prevail on a claim for intentional interference with contractual relations under

3    Nevada law, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's

4    knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual

5    relationship; (4) actual disruption of the contract; and (5) resulting damages. Sutherland v. Gross,

6    772 P.2d 1287, 1290 (Nev. 1989) (citing Ramona Manor Convalescent Hosp. v. Care Ent., 225

7    Cal.Rptr. 120, 124 (Cal.Ct.App.1986)). "[M]ere knowledge of the contract is insufficient to

8    establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship;

9    instead, the plaintiff must demonstrate that the defendant intended to induce the other party to

10   breach the contract with the plaintiff." J.J. Indus. v. Bennett, 71 P.3d 1264, 1268 (Nev.2003).

11          Universal and Aruze USA argue that Okada has failed to plead the specific contracts with

12   gaming machine customers allegedly interfered with. ECF No. 59 at 15. Furthermore, they contend

13   that Okada has failed to show that the contracts with his children were made with consideration

14   and are therefore valid contracts subject to this claim. Id. Okada and Aruze argue the complaint

15   identifies a specific contract and that Universal and Fujimoto knew of Aruze's contracts with

16   gaming machine customers and interfered with them. ECF No. 64 at 11. Furthermore, Okada and

17   Aruze argue that the complaint referenced a "cross-license" agreement with International Gaming

18   Technology ("IGT") with which Universal and Fujimoto interfered, that Aruze had "illegally"

19   used patents on gaming machines belonging to Universal to conduct sales of gaming machines in

20   the U.S., and that Universal identified the countries in which Aruze allegedly sold infringing

21   gaming machine in a press release, demonstrating Universal knew of these contractual

22   relationships. Id. They further allege that Universal had conceded knowledge of the contracts

23   through its own allegations because it accuses Aruze of "selling" gaming machines to customers

24   in violation of Universal's patent rights. Id. Furthermore, Okada argues that he is not required to

25   plead consideration, but even if he were, he has alleged that he transferred shares to his children

26   on the condition and promise they would hold them and not cause Okada to lose control of those

27   shares. Id. at 11-12.

28          The Court finds that Okada and Aruze have adequately pled factual allegations sufficient

to state a claim for relief under an intentional interference with contractual relations claim. At the pleading stage, they need not identify specifically which contracts were at issue, so long as they have asserted that Universal and Fujimoto knew of them and intentionally interfered with them, resulting in disruption and damages, as they have here. The Court also finds that Okada has adequately pled allegations to satisfy the existence of a valid and existing contract between Okada and his children. The complaint states that the transfer of the holding shares was predicated on his children promising not to cause Okada to lose control of those shares. ECF No. 58 at 31-2. Taking the allegations in the light most favorable to Okada and Aruze, the Court finds these allegations to be sufficient to defeat the motion. Accordingly, the motion is denied as to the intentional interference with contractual relations claim.

### e. Claim Eight: Intentional Interference with Prospective Economic Advantage

The eighth claim for relief is an intentional interference with prospective economic advantage claim, asserted by Okada and Aruze against Universal and Fujimoto. Okada and Aruze allege that they had prospective contractual relationships with third parties, including gaming regulators, customers, potential customers, and potential investors, and that Fujimoto and Universal intentionally interfered with these prospective relationships by publishing false and defamatory statements, interfering with Aruze's ability to maintain its Nevada gaming license by publicly accusing it of wrongdoing, sending a letter to a company with whom Aruze has a cross-license, IGT, with disparaging and falsely misleading statements regarding Aruze's license to certain patents, and "other ways to be proven at trial." ECF No. 58 at 62-3.

Under Nevada law, a party intentionally interferes with prospective economic advantage when the party demonstrates the following factors: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." In re Amerco Derivative Litigation, 252 P.3d 681, 702 (Nev. 2011) (internal

citations omitted).

Universal and Aruze USA argue these allegations are insufficient because Okada and Aruze have not alleged that they "would have been awarded the contract but for the defendant's interference." ECF No. 59 at 16 (quoting Rimini St., Inc. v. Oracle Int'l Corp., 2017 WL 5158658, at *8 (D. Nev. 2019)). They also state that Aruze and Okada have failed to state with specificity the parties with whom Universal and Aruze USA allegedly interfered. Finally, they argue that with regard to allegations that they made "misrepresentations." Aruze and Okada have failed to adequately meet the pleading standard of Federal Rule of Civil Procedure 9(b) by neglecting to identify to whom the allegedly false statements that interfered with prospective advantage were made. Id. at 16-17. Aruze and Okada counter that they did plead that but-for Universal and Aruze USA's interference, they would have realized certain contractual benefits, including the award of contracts. ECF No. 64 at 12. They also argue that courts are split on whether naming specific individuals is required to state a claim for interference with prospective advantage, and that even so, they did by naming "gaming regulators," which is a "narrow category comprised of only a few persons and entities," and that furthermore, they named IGT. Id. at 12-13.  With regard to whether Aruze and Okada met the heightened pleading standard of Rule 9(b), they argue that they have met the requirement for "each and every false and misleading statement" allegedly made by Universal and Fujimoto. Id. at 13. They argue that they provided the date, title, content, author, and subject of each of the three press releases Universal allegedly made that contained "false and misleading information and that interfered with its prospective contractual relationships." They also assert that they stated these claims were made to the public, including prospective customers, the courts of the Philippines and the Philippines Department of Justice, and Hong Kong's ICAC. Id.

The Court finds that Okada and Aruze adequately pled facts sufficient to state a claim for relief under a claim for intentional interference with prospective economic advantage. The Court disagrees that Okada and Aruze are required to plead harm by alleging that they would have been awarded contracts but for the alleged intentional interference. See Leavitt v. Leisure Sports Incorporation, 734 P.2d 1221, 1225 (Nev. 1987) (stating the elements for a prospective economic

advantage claim and excluding detailed requirements regarding harm); In re Amerco Derivative Litigation, 252 P.3d at 702 (same). Additionally, the Court finds Aruze and Okada have sufficiently identified the "third parties" with whom they had relationships, and that the allegations with regard to the press releases state with particularity the circumstances constituting the interference, in this case, the "misrepresentations." See Fed. R. Civ. P. 9(b). Accordingly, the Court denies the Motion to Dismiss the intentional interference with prospective advantage claim.

### f. Claim Ten: Breach of Patent License Agreement

Claim ten is a breach of patent license agreement claim by Aruze against Universal. Aruze asserts that it had a license to "all game software, gaming systems, and gaming equipment used in or with [Aruze's] Gaming Machines," and that it retained this license after Universal sold all Aruze stock back to Okada on or around March 31, 2009. ECF No. 58 at 64-5. Aruze further alleges that it is licensed rights to the four Asserted Patents in the underlying litigation, and that this license has been "confirmed orally," "in writings by Universal, including emails from Universal's Yoshiyuki Shoji to [Aruze's] executive vice president and general counsel," and "confirmed by the sales contracts . . . and related documents" between Universal and Okada. Id. at 66. Aruze also alleges the license was confirmed by the parties' conduct, including the fact that "Universal knew about, and never objected to," Aruze's gaming business based on Universal's patents before 2017 and validated this license impliedly via press releases, annual reports, its financial information, and a memorandum. Id. at 67-70. Aruze asserts that it has a license "by operation of law under Article 35 of the Japanese Patent Act, Nevada Revised Statute 600.500 and/or or common law or equitable principles." Id. at 71.

Nevada Revised Statutes 600.500 governs ownership of patentable inventions or trade secrets in the context of employment. Specifically, it states that "Except as otherwise provided by express written agreement, an employer is the sole owner of any patentable invention or trade secret developed by his or her employee during the course and scope of the employment that relates directly to work performed during the course and scope of the employment."

Article 35 of the Japanese Patent Act governs inventions by employees, and states, *inter alia*:

> (1) An employer . . . where an employee . . . has obtained a patent for an invention which, by the nature of the said invention, falls within the scope of the business of the said employer, etc. and was achieved by an act(s) categorized as a present or past duty of the said employee, etc. performed for the employer, etc. . . . or where a successor to the right to obtain a patent for the employee invention has obtained a patent therefor, shall have a non-exclusive license on the said patent right.

[Patent Act], Law No. 109 of 2006, art. 35(1) (Japan Patent Office), http://www.japaneselawtranslation.go.jp/law/detail/?id=42&vm=04&re=01.

"An implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel." Winbond Electronics Corp. v. International Trade Corp. v. International Trade Com'n, 262 F.3d 1363, 1374 (Fed. Cir. 2001) (citing Wang Labs., Inc., v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997)). It "signifies a patentee's waiver of the statutory right to exclude others from making, using, selling, offering to sell, or importing, the patented invention." Id. "Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort." Id. (quoting De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (1927)).

Universal argues that Nevada's Statute of Frauds applies to patent licenses and that Aruze has failed to plead a written patent license agreement existed; therefore, there can be no breach of that agreement. ECF No. 59 at 17. Universal further argues that NRS 600.500 is inapposite because it does not apply to licenses but ownership of an employee's invention in the employer, and that regardless, the inventors of the patents at issue were employees of Universal and not Aruze. Id. at 17-19.

Aruze counters that it has sufficiently pled the existence of an oral and implied license, allegations which Universal did not address, as well as the existence of writings confirming the license. ECF No. 64 at 16. It further argues that the Statute of Frauds does not bar Aruze's implied

license claim and that the oral agreement is enforceable based on estoppel. Id. Aruze further asserts that there is a factual dispute over whether inventors of three of the four patents were Aruze or Universal employees in 2007 and that it has alleged Universal transferred employees from its gaming R & D department to Aruze "in or about April 2007," before the patents at issue were filed. See id. at 17.  Accordingly, if those employees were Aruze employees, Aruze argues it has a license under both the Japanese Patent Act and NRS 600.500, as well as the common law shop rights doctrine. Id. Aruze seeks leave to amend its counterclaim to plead in more detail if necessary. Id. at 14.

The Court finds Aruze has adequately pled facts sufficient to state a breach of patent license agreement claim. Universal's Statute of Frauds argument is premature. Aruze has pled facts that suggest the existence of confirmatory writings in the form of email exchanges and press releases, as well as by various contracts between the two entities after ownership of Aruze transferred back to Okada. Construing these facts in the light most favorable to Aruze, the Court finds that they plausibly assert the existence of a written contract, and thus, plausibly state a claim for relief under NRS 600.500 and Article 35 of the Japanese Patent Act. Furthermore, Aruze states in its complaint that "in or about April 2007 Universal did transfer employees in its gaming R&D department to [Aruze], in effect even if formal transfer occurred later, and [Aruze] employed and/or directed them to develop gaming machines for overseas casinos for [Aruze's] benefit." ECF No. 58 at 67-8. This allegation contradicts Universal's assertion that the inventors of the patents at issued were employed by Universal at the time they were filed. Accordingly, the Court finds that Aruze has adequately pled allegations concerning the employment of the inventors of three of the four patents to state a claim for relief. Finally, the Court finds that Aruze has adequately pled the existence of an implied license via allegations of Universal's conduct in conformance with a license agreement, and as such, has plausibly stated a claim for relief pursuant to equitable principles.

Therefore, the Court denies the Motion to Dismiss the breach of patent license agreement claim.

### g.  Claim Eleven: Breach of Trademark License Agreement

Claim eleven is a breach of trademark license agreement claim by Aruze against Universal.

Aruze asserts that Universal's intellectual property license to Aruze includes a trademark license and that Universal retained the obligation to incur all expenses required to establish and maintain the trademarks, agreed to incur all expenses related to registering and maintaining those trademarks used by Aruze after March 31, 2009, and agreed to maintain the registrations for Aruze's benefit and use. ECF No. 58 at 71. Aruze asserts this license is oral, implied, and confirmed by various written documents, and that it was breached when Universal refused to acknowledge and denied its obligation to maintain these trademarks, abandoned registrations and application regarding Aruze trademarks, refused to register related marks used by Aruze, and refused Aruze's request that it assign those trademarks based on Aruze's use and registered for its benefit. Id. at 72.

Universal argues that Aruze has not pled facts evidencing consideration to Universal and as such, the trademark agreements are invalid. ECF No. 59 at 19. Aruze counters that consideration is not always required for a trademark license and that in any event, it has adequately pled a benefit to Universal, by describing a memorandum in which Universal highlighted its "strong relationship with [Aruze] as a reason for investors to purchase notes" during a fundraising effort, and that Universal received consideration when Okada repurchased Universal's shares in Aruze. Id. at 19.

The Court finds that Aruze has adequately pled sufficient facts to state a plausible claim for relief on the breach of trademark agreement claim. Aruze's factual assertions detail press releases and memorandums in which Universal discusses its beneficial relationship with Aruze, which is sufficient to allege consideration for the trademark agreements. The Court denies the Motion to Dismiss the breach of trademark license agreement claim.

### h. Claim Twelve: Sham Patent Litigation

The twelfth claim is a sham patent litigation claim by Aruze against Universal and Fujimoto. Aruze alleges that both Universal and Fujimoto were aware of Aruze's license to the patents at issue and to manufacture and sell gaming machines but filed suit nonetheless, in furtherance of their "broader conspiracy to harm" Okada and Aruze, and force Aruze out of business and monopolize the market for slot machines covered by the patents at issue as well as

1    others. ECF No. 58 at 72-3.

2         Universal and Fujimoto argue Aruze has not alleged any "antitrust injury" beyond Aruze

3    itself. ECF No. 59 at 21. Aruze responds that it has alleged injury, including expenses incurred in

4    defending the instant suit and damage to Aruze and Okada's reputation. ECF No. 64 at 20.

5         The Supreme Court has outlined a two-part definition of "sham" litigation for the purposes

6    of antitrust claims premised on the sham exception. "First, the lawsuit must be objectively baseless

7    in the sense that no reasonable litigant could realistically expect success on the merits . . . . Only

8    if challenged litigation is objectively meritless may a court examine the litigant's subjective

9    motivation." Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 (1993)

10   (citations omitted). In examining subjective motivation, "the court should focus on whether the

11   baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a

12   competitor,' through the 'use [of] the governmental process—as opposed to the outcome of that

13   process—as an anticompetitive weapon.'" Id. at 60-1 (citations omitted). The Court further held

14   that "even a plaintiff who defeats the defendant's claim to [Eastern Railroad Presidents Conference

15   v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) ("Noerr")] immunity by demonstrating both the

16   objective and the subjective components of a sham must still prove a substantive antitrust violation.

17   Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the

18   obligation to establish all other elements of his claim." Id. at 61.

19        "To establish a section 1 violation under the Sherman Act, a plaintiff must demonstrate

20   three elements: (1) an agreement, conspiracy, or combination among two or more persons or

21   distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and

22   (3) which actually causes injury to competition, beyond the impact on the claimant, within a field

23   of commerce in which the claimant is engaged (i.e., 'antitrust injury')." McGlinchy v. Shell Chem.

24   Co., 845 F.2d 802, 811 (9th Cir. 1988) (citations omitted). An "antitrust injury" is an "'injury of

25   the type the antitrust laws were intended to prevent and that flows from that which makes

26   defendants' acts unlawful.'" Somers v. Apple, Inc., 729 F.3d 953, 963 (9th Cir. 2013) (quoting

27   Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 489 (1977)).  To establish an

28   "antitrust injury," a Plaintiff must prove four elements: "(1) unlawful conduct, (2) causing an

injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." Id. (internal quotations omitted) (citations omitted). Further, "the injured party [must] be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." Id. (internal quotations and citation omitted).

The Court finds that Aruze has successfully pled a claim for sham patent litigation. It has alleged that the instant action is objectively baseless because Aruze has a license to the patents and cannot therefore be sued for patent infringement. Regarding the subjective prong, Aruze alleges that Universal and Fujimoto knew Universal had authorized Aruze's manufacture and sale of the instant gaming machines, as well as issued a license to the patents at issue, yet filed the instant anyway in an effort to damage Aruze's reputation, finances, and business as well as interfere with its contracts and prospective contracts and seize its goodwill and customer relations. Further, Aruze has adequately alleged a violation of the Sherman Act, by alleging a conspiracy between Fujimoto and Universal intended to, *inter alia*, facilitate Universal's entrance into the United States slot machine market to compete with Aruze and force it out of business, thereby harming competition. Finally, Aruze has alleged an antitrust injury, as it has alleged injury to itself flowing from the alleged unlawful conduct, and alleged the conduct actually causes injury beyond Aruze itself, by alleging that Universal and Fujimoto plan to monopolize the market for slot machines covered by the patents at issue.

The Court therefore denies the motion as it pertains to counterclaim twelve.

### i.   Claim Thirteen: Breach of Equitable Trust as to Trademarks

Claim thirteen is alleged by Aruze against Universal, and states that Universal holds in equitable trust for Aruze's benefit, registrations of trademarks used by Aruze, where Aruze's use was submitted to trademark offices as the basis for obtaining registrations. ECF No. 58 at 74. Aruze contends Universal breached its obligations as trustee. Id.

Universal argues Aruze has not alleged a "confidential relationship" between the parties as

required under Nevada law, and therefore the claim must be dismissed. ECF No. 59 at 22. Aruze counters it has pled a "confidential relationship" because the trust was formed while Aruze was still a subsidiary of Universal, and it has further alleged that both Universal and Aruze were owned directly or indirectly by Okada and his family and until 2017 operated as closely related companies. ECF No. 64 at 20-1.

"A constructive trust is a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it." Locken v. Locken, 650 P.2d 803, 804–05 (Nev. 1982). "In Nevada, imposition of a constructive trust requires: '(1) [that] a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.'" Waldman v. Maini, 195 P.3d 850, 857 (Nev. 2008) (quoting Locken, 650 P.2d at 804–05).

"Under Nevada law, '[t]he essence of a ... confidential relationship is that the parties do not deal on equal terms.'" In re Commercial Money Ctr., Inc., 392 B.R. 814, 831 (B.A.P. 9th Cir. 2008) (quoting Giles v. GMAC, 494 F.3d 865, 881 (9th Cir.2007) (quoting Hoopes v. Hammargren, 725 P.2d 238, 242 (Nev. 1986)) (internal quotation marks omitted)). "By virtue of the trust and confidence placed in and accepted by one party, that party is in such a superior position as to exert a 'unique influence' over the dependent party." Id. (citing Giles, 494 F.3d at 881). "A confidential relationship exists where 'one party gains the confidence of the other and purports to act or advise with the other's interests in mind.'" Id. (quoting Giles, 494 F.3d at 881) (quoting Perry v. Jordan, 900 P.2d 335, 338 (Nev. 1995) (per curiam)).

The Court finds that Aruze has adequately pled a breach of equitable trust claim. Aruze has alleged that Aruze was a Universal subsidiary until 2008, and that Universal was obliged to incur all expenses needed to establish and maintain the trademark registrations and assist Aruze in registering related trademarks. These allegations plead a "confidential relationship" between Aruze and Universal, as Aruze relied on Universal and Universal purported to act or advise with Aruze's interest in mind.

The Court therefore denies the motion as it pertains to counterclaim thirteen.

44

### j.  Claim Fourteen: Lanham Act

The fourteenth claim is made by Aruze against Universal and alleges that Universal issued false and defamatory statement against Okada and Aruze in violation of the federal Lanham Act, 15 U.S.C. § 1125(a). Universal argues that Aruze has failed to allege any commercial advertisement in which the alleged false statement of facts were made and has therefore failed to state a claim. ECF N. 59 at 22. Universal further asserts that the claim is subject to Federal Rule of Civil Procedure 9b's heightened pleading standard and Aruze has failed to satisfy that standard by pleading its injury "upon information and belief" without a sufficient factual basis, and by failing to allege the required particulars as to the press releases and their content. Id. Aruze counters that it alleges the false statements were made in press releases and that press releases can be commercial advertising for purposes of the Lanham Act. ECF No. 64 at 21-2.

15 U.S.C. § 1125(a)(1)(B) holds civilly liable any person who:

> on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(B).

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 735 (9th Cir. 1999) (citing Gordon & Breach Science Publishers v. American Inst. of Physics, 859 F. Supp. 1521, 1535-36

45

(S.D.N.Y. 1994)).

"Not all commercial speech is promotional." Prager Univ. v. Google LLC, No. 18-15712, 2020 WL 913661, at *5 (9th Cir. Feb. 26, 2020). "The core notion of commercial speech is 'speech which does no more than propose a commercial transaction.'" Rice v. Fox Broad. Co., 330 F.3d 1170, 1181 (9th Cir. 2003), overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Zeppelin, No. 16-56057, 2020 WL 1128808 (9th Cir. Mar. 9, 2020) (quoting City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 422 (1993)). The Supreme Court has elucidated three characteristics that determine whether speech is deemed "commercial" or not. These include (i) whether the speech was in an advertising format, (ii) whether it referred to a specific product, and (iii) the underlying economic motive of the speaker." Ass'n of Nat. Advertisers, Inc. v. Lungren, 44 F.3d 726, 728 (9th Cir. 1994) (citing Bolger v. Youngs Drug Products Corp., 463 U.S. 60 (1983)). No single factor alone is sufficient to characterize speech as commercial; rather it is the combination of these three factors that renders speech "commercial" in character. Bolger, 463 U.S. at 67.

"[I]n a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003). "[I]f particular averments of fraud are insufficiently pled under Rule 9(b), a district court should "disregard" those averments, or "strip" them from the claim. The court should then examine the allegations that remain to determine whether they state a claim." Id.

Allegations of fraud must "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To meet the particularity requirement of Rule 9(b), the complaint must identify the "who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)).

It is evident that a claim under 15 U.S.C. § 1125(a)(1)(B) includes averments of fraud, as it requires a showing that, *inter alia*, a false or misleading representation of fact "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." The Court finds that Aruze has adequately pled the nature of the misrepresentations in the press releases to satisfy Rule 9(b)'s heightened pleading standard, by identifying the allegedly false statements in each press release, when the statements were released, by whom, and why they were false. See ECF No. 58 at 54-55. The Court does not find as Universal argues, that Aruze must also satisfy heightened pleading standards with regard to the injury suffered. Those standards are limited to the "averments of fraud" themselves, i.e., the allegations concerning the statements themselves and their false or misleading representation of fact. Because the Court does not find that fraud is an essential element of a claim under the Lanham Act, but rather includes "averments of fraudulent conduct," allegations of non-fraudulent conduct, such as the injury suffered need satisfy only the ordinary notice pleading standards of Rule 8(a). The Court finds that standard is met here.

Furthermore, the Court finds that Aruze has adequately pled the allegedly defamatory statements were "commercial speech," as it alleges the press releases were disseminated widely, to promote Universal's own gaming machine products, with the underlying economic motive to enter the U.S. slot machine market and compete with Aruze. Universal argues that the press releases are not commercial speech but Aruze need not prove they are at this stage of the proceedings; rather it must plausibly allege a prima facie claim under the Lanham Act, and the Court finds it has done so here.

Accordingly, the Court denies the motion as to the fourteenth claim.

### k.  Claim Fifteen: Declaratory Judgment as to Patent Rights

The fifteenth claim is asserted by Aruze against Universal and seeks declaratory judgment as to Aruze's license to the patents at issue, as well as declaring the terms of the license, including that Aruze's license is exclusive, that Universal has no right to practice the patents outside of Japan, and that Universal is obligated to pay all fees necessary to maintain the patents. Universal

incorporates its argument with respect to claim ten, stating that because the license does not exist, the declaratory relief cannot be granted and the claim must be dismissed. ECF No. 59 at 22-23. Aruze counters that Universal has not shown claim ten should be dismissed and that declaratory judgment does not in any event rely on a determination regarding claim ten. ECF No. 64 at 22.

The Court incorporates its reasoning as to claim ten. Because Aruze has adequately pled a breach of patent license agreement, which necessarily includes an allegation that it had a patent license, it has adequately pled a claim for declaratory judgment as to patent rights. Accordingly, the Court denies the motion as it pertains to claim fifteen.

### l.   Claim Sixteen: Declaratory Judgment as to Trademark Rights

The sixteenth claim for relief is by Aruze against Universal and seeks declaratory judgment as to Aruze's rights in the license trademarks at issue. Universal incorporates its reasoning as to claim eleven to contend that no trademark license exists and therefore declaratory judgment is unavailable. ECF No. 59 at 23. Aruze counters that dismissal of a claim for affirmative relief is not a basis for dismissing a claim for declaratory relief and Universal has not shown claim eleven should be dismissed. ECF No. 64 at 22-3.

The Court incorporates its reasoning as to claim eleven. As Aruze has adequately pled a breach of trademark license agreement, it has necessarily pled that a license agreement existed. As such, it has adequately pled a claim for declaratory judgment. The Court denies the motion as to claim sixteen.

### m.  Claim Seventeen: Breach of Contract

Claim seventeen is a breach of contract claim by Okada against Universal alleging Universal has breached its sales agreement concerning the sale of Aruze stock from Universal to Okada, by asserting patents against Aruze and interfering with its rights to practice the Universal patents and trademarks related to its gaming machine business. Universal argues there is no document establishing Aruze's contracted license and no meeting of the minds between Aruze and Universal was alleged, therefore no breach of agreement occurred. ECF No. 59 at 22-23. Aruze

counters that it pled that Okada purchased one hundred percent of Aruze's stock from Universal in August 2008 and December 2008 which included as an asset the right to use patents, trademarks, and other intellectual property. ECF No. 64 at 23. Further, it has pled the specific parties to the agreements, the nature of the breach, and how Okada was damaged, which is sufficient to state a claim. Id. at 23.

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." May v. Anderson, 119 P.3d 1254, 1257 (Nev. 2005). Breach of contract is "a material failure of performance of a duty arising under or imposed by agreement." Bernard v. Rockhill Dev. Co., 734 P.2d 1238, 1240 (Nev. 1987). A breach of contract claim under Nevada law requires (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. Richardson v. Jones, 1 Nev. 405, 409 (1865); Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013) (citing Richardson).

The Court finds that Okada has adequately stated a claim for breach of contract. Universal's argument that the contracted license rights must be in writing is unavailing. The Court has already found that Aruze has pled facts related to the patent license agreement to suggest the existence of confirmatory writings in the form of email exchanges and press releases, as well as by various contracts between the two entities after ownership of Aruze transferred back to Okada. Accordingly, Okada has pled the existence of a valid contract which granted Aruze the right to use Universal's patents, trademarks, and other intellectual property, a breach by Universal in asserting its patents against Aruze and interfering with its rights to practice the Universal patents and trademarks related to its gaming machine business, and damage to Okada as a result of the breach.

Accordingly, the Court denies the motion as to the seventeenth claim for relief.

### n.  Claim Eighteen: Abuse of Process

The eighteenth claim is asserted by Aruze and Okada against Universal asserting abuse of the legal process by initiating the underlying lawsuit for the purposes of damaging Okada's personal and business reputation, and previously taking willful action not proper in the regular conduct of legal proceedings. These "willful actions" taken by Universal include the issuance of

1    press releases, a Universal affiliate asking the Philippines Department of Justice to initiate a new

2    investigation into a fraud complaint against Okada, Universal's cooperation with the arrest and

3    investigation in Hong Kong into corruption allegations against Okada, and the press release

4    regarding Okada's arrest in Hong Kong.

5          Universal argues that these actions taken by Universal in the Philippines and Hong Kong

6    involved administrative agencies regarding conduct unrelated to the patents at issue, and as such

7    cannot be the basis for an abuse of process claim. ECF No. 59 at 24-25. Further, these actions took

8    place before the instant underlying suit, and therefore cannot support this claim. Aruze and Okada

9    counter that their claim is premised on the filing of the complaint in this action with the intent to

10   harm Okada and Aruze, which relies on the legal process and not just actions involving

11   administrative agencies. ECF No. 64 at 23-24. Further, the Philippines Department of Justice and

12   Hong Kong ICAC are not administrative agencies but government entities that oversee criminal

13   matters potentially leading to prosecution. Id. at 24 n.25. Finally, Aruze and Okada argue that

14   Nevada case law does not require that the abusive actions take place in the action in which the

15   plaintiff brings the abuse of process claim. Id. at 24.

16         "[T]he elements of an abuse of process claim are: '(1) an ulterior purpose by the defendants

17   other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper

18   in the regular conduct of the proceeding.' LaMantia v. Redisi, 38 P.3d 877, 879 (Nev. 2002)

19   (quoting Posadas v. City of Reno, 851 P.2d 438, 444–45 (Nev. 1993)). "Abuse of process can arise

20   from both civil and criminal proceedings." Id. (citing Restatement (Second) of Torts § 682 (1977);

21   Poduska v. Ward, 895 F.2d 854, 856 (1st Cir. 1990) (finding that an underlying breach of contract

22   lawsuit, that caused injury to business and business reputation, supported an abuse of process

23   claim); Vodrey v. Golden, 864 F.2d 28, 31 (4th Cir. 1988) (holding that abuse of process lies where

24   appellants "purposely subverted the criminal justice system in an attempt to frustrate [a] civil

25   suit")). "[T]he claimant must provide facts, rather than conjecture, showing that the party intended

26   to use the legal process to further an ulterior purpose." Land Baron Inv. v. Bonnie Springs Family

27   LP, 356 P.3d 511, 519 (Nev. 2015) (citing LaMantia, 38 P.3d at 880). "The utilized process must

28   be judicial, as the tort protects the integrity of the court." Id. (citation omitted). "[F]iling a

1    complaint does not constitute abuse of process" and "abuse of process claims do not encompass

2    actions involving administrative agencies." Id. at 520 (citation omitted).

3         The Court finds that Okada and Aruze have not adequately pled an abuse of process claim.

4    Though they allege that Universal had an ulterior purpose of "destroying Mr. Okada's personal

5    and business reputation and preventing Mr. Okada from regaining control of Okada Holdings or

6    Universal" in filing the instant suit, they do not adequately plead how the "willful" acts alleged

7    were not proper in the regular conduct of the proceeding. Instead, Okada and Aruze merely list the

8    actions themselves, but without any allegations as to why they were improper.

9         Accordingly, the Court grants the motion as to the eighteenth claim.

10

11   **VI.      CONCLUSION**

12        **IT IS THEREFORE ORDERED** that Fujimoto's Motion to Dismiss Counterclaims (ECF

13   No. 60) is DENIED in part. The Court denies the motion as to joinder, subject matter jurisdiction,

14   and forum non conveniens, but reserves ruling on the personal jurisdiction claim pending the

15   outcome of jurisdictional discovery.

16        **IT IS FURTHER ORDERED**  that Universal and Aruze USA, Inc.'s Motion to Dismiss

17   Counterclaims (ECF No. 59) is GRANTED in part and DENIED in part. The Court grants the

18   motion as to the eighteenth counterclaim. Further, the Court grants the motion as to counterclaims

19   one and two in favor of  Universal only. The Court denies the motion as to all other counterclaims.

20

21        DATED: May 30, 2020.

22

23                                                _____
                                                  **RICHARD F. BOULWARE, II**

24                                                **UNITED STATES DISTRICT JUDGE**

25

26

27

28

51